# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

CHRISTA McAULIFFE INTERMEDIATE
SCHOOL PTO, INC.; CHINESE
AMERICAN CITIZENS ALLIANCE OF
GREATER NEW YORK; ASIAN
AMERICAN COALITION FOR
EDUCATION; PHILLIP YAN HING
WONG; YI FANG CHEN; and CHI WANG,

                           Plaintiffs,

        -against-

BILL DE BLASIO, in his official capacity as
Mayor of New York; and RICHARD A.
CARRANZA, in his official capacity as
Chancellor of the New York City Department
of Education,

                          Defendants.

_____

_____ Civ. _____ (_____)


**MEMORANDUM
IN SUPPORT OF
MOTION FOR
PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

DISCUSSION .................................................................................................................. 9

      A.     Preliminary Injunction Standard ........................................................... 9

      B.     Merits of Plaintiffs' Equal Protection Claim ........................................ 9

            1.     Defendants Were Motivated by a Racial Purpose .................... 10

                  a.     The Discovery Changes Will Disproportionately Affect Asian Americans ............................... 10

                  b.     Defendants' Statements Admit a Racially Discriminatory Purpose ................................................ 13

                  c.     Defendants' "Benign" Motives Are Entitled No Deference......... 15

            2.     Strict Scrutiny ......................................................................... 18

                  a.     Defendants Lack a Compelling Interest in Pursuing Racial Balancing........................................... 19

                  b.     Defendants' Plan is Not Narrowly Tailored to Further Any Conceivable Compelling Interest Defendants Might Have ............................... 24

      C.     Remaining Preliminary Injunction Factors ........................................ 27

CONCLUSION................................................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ................................................. 10, 18-19

*Aguilar v. I.C.E.*, 811 F. Supp. 2d 803 (S.D.N.Y. 2011) ..................................................... 28

*Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71 (1st Cir. 2004) ........................................ 17

*Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738 (2d Cir. 2000) .......................... 23, 25

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...................................................... 21

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) .............................................................................................. 9, 27-28

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ....................................... 16, 19, 23, 27

*Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226 (2d Cir. 2004) ........................................... 28

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006) ........................................................... 25

*Diaz v. New York City Bd. of Elections*, 335 F. Supp. 2d 364 (E.D.N.Y. 2004) ........................ 28

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524 (3d Cir. 2011) .......................... passim

*Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013) ......................................................... passim

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ............................................................................... 15, 27

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ........................................................................... passim

*Hart v. Cmty. Sch. Bd. of Brooklyn*, 536 F. Supp. 2d 274 (E.D.N.Y. 2008) ............................... 21

*Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999) ..................................................... 16-17

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ................................ 9

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) ...... 10, 19

*Legal Aid Soc'y v. Ass'n of Legal Aid Att'ys*, 554 F. Supp. 758 (S.D.N.Y. 1982) ...................... 28

*Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343 (5th Cir. 2011) ........................................ 15-19

*Marks v. United States*, 430 U.S. 188 (1977) ....................................................................... 21-22

*MHANY Mgmt., Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016) .................................... 15

*Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932 (7th Cir. 2016) ........................... 24

*Miller v. Johnson*, 515 U.S. 900 (1995) .............................................................................. 10, 13

*Miller v. Madison*, No. 12-cv-874, 2013 WL 375486 (N.D.N.Y. Jan. 9, 2013) .......................... 28

*Missouri v. Jenkins*, 515 U.S. 70 (1995) .................................................................................... 19

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ............... passim

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ............................................ 10, 14

*Raso v. Lago*, 135 F.3d 11 (1st Cir. 1998) ................................................................................. 16

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)..................................................22, 24, 27

*Shaw v. Hunt*, 517 U.S. 899 (1996) .................................................................................... 23

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995).............................. 27

*United States v. Alcan Aluminum Corp.*, 315 F.3d 179 (2d Cir. 2003) ...................................... 21

*United States v. Leonard*, 844 F.3d 102 (2d Cir. 2016).......................................................... 21

*United States v. Paradise*, 480 U.S. 149 (1987) ..............................................................24-26

*Vill. of Arlington Heights v. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ...................................10, 13

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)........................................ 9

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) ............................................................ 23

### State Statutes

N.Y. Educ. Law § 2590-g(12)(b) (1997) .................................................................................. 2

N.Y. Educ. Law § 2590-g(12)(d) (1997) .............................................................................. 3, 13

N.Y. Educ. Law § 2590-h(1)(b) (1998) ...............................................................................2-3

### Miscellaneous

Brody, Leslie, *Parents to Sue City Over Elite High School Admissions*, Wall St. J.
(Nov. 13, 2018), *available at* https://www.wsj.com/articles/parents-to-sue-
city-over-elite-high-school-admissions-1542161886?ns=prod/accounts-wsj .......................... 8

Brooklyn Technical High School Profile 2016, *available at*
http://www.bths.edu/SCHOOL_FILES/2016_ College_Profile.pdf .......................................... 4

College Board, *SAT Suite of Assessments Annual Report* (2018), *available at*
https://reports.collegeboard.org/pdf/2018-total-
group-sat-suite-assessments-annual-report.pdf........................................................................ 4

de Blasio, Bill, *Our Specialized Schools Have a Diversity Problem. Let's Fix It.*,
Chalkbeat (June 2, 2018), *available at* https://chalkbeat.org/posts/ny/2018/06/02/
mayor-bill-de-blasio-new-york-city-will-push-for-admissions-changes-at-elite-
and-segregated-specialized-high-schools/ ................................................................................ 7

Harris, Elizabeth A. & Hu, Winnie, *Asian Groups See Bias in Plan to Diversify
New York's Elite Schools*, N.Y. Times (June 5, 2018), *available at* https://www.nytimes.
com/2018/06/05/nyregion/carranza-specialized-schools-admission-asians.html...................... 7

Hu, Winnie, *Elite New York High Schools to Offer 1 in 5 Slots to Those Below Cutoff*,
N.Y. Times (Aug. 13, 2018), *available at* https://www.nytimes.com/2018/08/13/
nyregion/discovery-program-specialized-schools-nyc.html ................................................. 3, 26

Ma, Annie, *Getting Black and Hispanic Students into Specialized Schools Remains a Challenge,
Even for Programs Designed to Help*, Chalkbeat (June 9, 2016), *available at*
https://chalkbeat.org/posts/ny/2016/06/09/getting-black-and-hispanic-students-into-
specialized-schools-remains-a-challenge-even-for-programs-designed-to-help/ .................... 13

Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018),
https://twitter.com/nycmayor/status/1003414958464487425?lang=en ..................................... 7

Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018),
https://twitter.com/NYCMayor/status/1003415609915400192.................................................. 7

Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018),
https://twitter.com/NYCMayor/status/1003473019266727936................................................ 14

NYC Dep't of Educ., *Diversity in Admissions*, *available at*
https://www.schools.nyc.gov/enrollment/enrollment-
help/meeting-student-needs/diversity-in-admissions.......................................................... 6, 11

NYC Dep't of Educ., *Specialized High Schools Proposal*, *available at*
https://cdn-blob-prd.azureedge.net/prd-pws/docs/default-source/default-
document-library/specialized-high-schools-proposal.pdf?sfvr sn=c27a1e1c_5......... 5, 8, 12, 22

NYC Dep't of Educ., *Specialized High Schools*, *available at* https://www.schools.
nyc.gov/ enrollment/enroll-grade-by-grade/specialized-high-schools ...................................... 2

NYC Dep't of Educ., *DREAM Program*, *available at*
https://www.schools.nyc.gov/about-us/programs/dream-program........................................... 25

Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan to
Improve Diversity at Specialized High Schools* (Jun. 3, 2018), *available at*
https://www1.nyc.gov/office-of-the-mayor/news/281-18/mayor-
de-blasio-chancellor-carranza-plan-improve-diversity-specialized-high/#/0 ........................... 7

Stuyvesant High School Profile 2018-19, *available at*
https://stuy.enschool.org/ourpages/auto/2013/3/7/37096823/
Class%20of%202019%20profile%20FINAL-ilovepdf-compressed.pdf.................................. 4

Vega, Christina & Park, Sam, *Where Specialized High School Students Come From
(and Where They Don't)*, Chalkbeat (June 14, 2018), *available at*
https://chalkbeat.org/posts/ny/2018/06/14/where-specialized-
high-school-students-come-from-and-where-they-dont/ ..................................................... 8, 11

Zimmerman, Alex, *New Data Show How Few Black and Hispanic Students Benefit from
New York City's Specialized High School Diversity Program*, Chalkbeat (Aug. 14, 2018),
*available at* https://www.chalkbeat.org/ posts/ny/
2018/08/14/discovery-program-data-shsat/ ....................................................................... 5, 13

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs, which include two Asian-American organizations, a Parent Teacher Organization at a New York City middle school, and several individual parents, challenge a new policy regulating admissions to New York City's Specialized High Schools. The policy, announced by Defendants Mayor Bill de Blasio and Department of Education Chancellor Richard Carranza in June, will expand and reorganize a program called Discovery, which was originally designed to help low-income students gain admission to the Specialized High Schools.[1]

Plaintiffs allege in their complaint and demonstrate through this motion that Defendants decided to expand and reorganize Discovery to limit the number of Asian-American students who may attend the Specialized High Schools. The City's own data show that Defendants' policy will have precisely that effect. Under the Equal Protection Clause, this racial motivation and discriminatory effect shifts the burden to Defendants to prove that the policy satisfies strict scrutiny; *i.e.*, that the policy is narrowly tailored to further a compelling government interest. Any policy that intends to distribute benefits and burdens to favored and disfavored races must be subject to the most demanding standard of review.

Defendants cannot satisfy this burden. They have no compelling interest in achieving their preferred racial balance at the Specialized High Schools. And even if Defendants had a compelling interest in some form of racial balancing at the Specialized High Schools, their plan is not narrowly tailored to further any conceivable interest they might have. Therefore, Plaintiffs are likely to succeed on the merits of their equal protection claim. And because the denial of Plaintiffs' equal protection rights is irreparable as a matter of law, Plaintiffs are entitled to a preliminary injunction.

---

[1] Defendants have the authority under New York City law to order the changes without the consent of the City Council or any other actor.

For the reasons set forth below, the Court should grant Plaintiffs' motion for a preliminary injunction, without which, the challenged plan will impact imminent admission decisions.

## FACTUAL BACKGROUND

The Specialized High Schools are the crown jewels of the New York City public school system. Including the "Big Three" of Stuyvesant High School (Stuyvesant), Bronx High School of Science (Bronx Science), and Brooklyn Technical High School (Brooklyn Tech), these eight schools are some of the most rigorous and prestigious secondary schools in the United States.[2] To ensure these schools maintain high academic standards, New York, in 1971, adopted the Hecht-Calandra Act, which requires that:

> Admissions to the Bronx High School of Science, Stuyvesant High School and Brooklyn Technical High School and such similar further special high schools which may be established shall be solely and exclusively by taking a competitive, objective and scholastic achievement examination, which shall be open to each and every child in the city of New York in either the eighth or ninth year of study, without regard to any school district wherein the child may reside.

N.Y. Educ. Law § 2590-g(12)(b) (1997).[3] Under the statute, the Specialized High Schools use the Specialized High School Admissions Test (SHSAT) for admissions.

During the application process, students rank the Specialized High Schools in order of preference.[4] After applicants take the SHSAT, those who score at or above the cutoff to get into any of the Specialized High Schools are matched with a school based on their SHSAT score and school rankings. In 2018, the cutoff to get into any Specialized High School was 482 out of 800.

---

[2] The other five Specialized High Schools are: Brooklyn Latin School; High School for Mathematics, Science and Engineering at City College of New York; High School of American Studies at Lehman College; Staten Island Technical High School; and Queens High School for the Sciences at York College. A ninth school, LaGuardia High School, is an arts school that bases admissions on a competitive audition. It is not implicated by Defendants' plan. Plaintiffs consider only the eight Specialized High Schools affected.

[3] This text no longer appears in the statute books, but it has been replaced by language incorporating its requirements. *See* N.Y. Educ. Law § 2590-h(1)(b) (1998) ("admissions to the special schools shall be conducted in accordance with the law in effect on the date preceding the effective date of this section").

[4] *See* NYC Dep't of Educ., *Specialized High Schools*, *available at* https://www.schools.nyc.gov/ enrollment/enroll-grade-by-grade/specialized-high-schools (last visited Dec. 10, 2018).

Individual school minimum scores ranged from 559 at Stuyvesant to 482 at Brooklyn Latin, but due to the ranked-choice system, students with SHSAT scores higher than 600 attend all eight Specialized High Schools. For example, the minimum score accepted into Brooklyn Tech was 493, but at least one student who scored a 671 chose to attend.[5]

But the admissions cutoffs do not tell the whole story. Hecht-Calandra also authorizes the Specialized High Schools to maintain a "Discovery Program" to afford "disadvantaged students of demonstrated high potential an opportunity to try the special high school program without in any manner interfering with the academic level of those schools." N.Y. Educ. Law § 2590-g(12)(d) (1997). The Discovery Program is open to students who (1) take the SHSAT, but score below the established cut-off for admission; (2) are certified by their local schools as disadvantaged; (3) are recommended by their local schools as having "high potential for the special high school program"; and (4) pass a summer preparatory program administered by the high school. *Id.*[6] State law does not regulate the size of Discovery, but it expressly requires that the program not "interfer[e] with the academic level" of the Specialized High Schools. Last year, less than five percent of the total seats at the Specialized High Schools were awarded through the Discovery Program.[7]

---

[5] For the data in this paragraph, *see* Winnie Hu, *Elite New York High Schools to Offer 1 in 5 Slots to Those Below Cutoff*, N.Y. Times (Aug. 13, 2018), *available at* https://www.nytimes.com/2018/08/13/nyregion/discovery-program-specialized-schools-nyc.html (last visited Dec. 10, 2018).

[6] Like the language regarding the admissions process itself, the original text of Hecht-Calandra about the Discovery Program no longer appears in the books. It, too, has been replaced by backdated language noting that the "special schools shall be permitted to maintain a discovery program in accordance with the law in effect on the date preceding the effective date of this section[.]" N.Y. Educ. Law § 2590-h(1)(b) (1998). Thus, the 1997 requirements remain effective.

[7] City regulations generally have not required the Specialized High Schools to admit any particular percentage of students through Discovery. For example, Stuyvesant High School did not participate in Discovery for many years until the 2018-19 admissions cycle, when it admitted 23 students after completing the summer program. And just 270 students participated in Discovery at all the Specialized High Schools in 2018. *See* Hu, *supra*, note 5.

The small number of "Discovery students," however, are not the only low-income students at the Specialized High Schools. Rather, these schools provide significant numbers of low-income students of all races an opportunity to receive an elite public education. For example, 62 percent of the 5,838 students at Brooklyn Tech (the largest Specialized High School) in 2017-18 were low income, yet the 1,272 Brooklyn Tech students who took the SAT in the class of 2016 achieved a mean score of 1290 (math and critical reading), compared to a national mean of 1006.[8] Just as impressively, the *25th-percentile* SAT score for Stuyvesant's 2018 class was 1470, compared to a national mean of 1061,[9] even though nearly half of the 3,336 students at Stuyvesant, perhaps the most selective magnet high school in the United States, were in poverty.[10] By any measure, these are high-impact and high-achieving high schools.

The "problem"—as Mayor de Blasio and Chancellor Carranza see it—is that the racial demographics of the Specialized High Schools differ markedly from those of the New York City public schools as a whole. According to New York City, the racial makeup of the public school system in 2017-18 was 40.5 percent Hispanic, 26 percent black, 16.1 percent Asian-American, and 15 percent non-Hispanic white.[11] Meanwhile, the same data show that Stuyvesant was 73.5 percent Asian-American in 2017-18, Bronx Science was 65.6 percent Asian-American, and Brooklyn Tech was 59.6 percent Asian-American.[12]

---

[8] *See* Brooklyn Technical High School Profile 2016, *available at* http://www.bths.edu/SCHOOL_FILES/2016_College_Profile.pdf (last visited Dec. 10, 2018).

[9] *See* Stuyvesant High School Profile 2018-19, *available at* https://stuy.enschool.org/ourpages/auto/2013/3/7/37096823/Class%20of%202019%20profile%20FINAL-ilovepdf-compressed.pdf (last visited Dec. 10, 2018) (Stuyvesant numbers) and College Board, *SAT Suite of Assessments Annual Report* (2018), *available at* https://reports.collegeboard.org/pdf/2018-total-group-sat-suite-assessments-annual-report.pdf (last visited Dec. 10, 2018) (national means).

[10] Exhibit 4 (cell 2H). All exhibits referenced in this Memorandum are attached to the Declaration of Christopher M. Kieser, which was filed contemporaneously.

[11] Exhibit 3 (row 7).

[12] The other Specialized High Schools have significantly smaller student bodies but were also disproportionately Asian-American: Brooklyn Latin School (51.5 percent); High School for Mathematics, Science and Engineering at City College of New York (36.2 percent); High School of American Studies at Lehman College (22 percent); Staten

But, perhaps contrary to conventional wisdom, poverty does not explain these enrollment differences: Asian Americans attending the Specialized High Schools are just as poor, if not actually more disadvantaged, than their peers of other races. According to the New York City Department of Education, 61 percent of Asian-American students offered admission to the Specialized High Schools are poor, compared to 61 percent of Black students and 53 percent of Hispanic students extended offers.[13] Further, Asian Americans accounted for 64 percent of Discovery students in 2018 and 67 percent in 2017.[14] That number was 67 percent in 2017. All of these students were economically disadvantaged. Simply put, the large numbers of Asian-American students in New York's Specialized High Schools are simply the result of success on the SHSAT.

Mayor de Blasio and Chancellor Carranza, however, see Hecht-Calandra's examination requirement as the major roadblock to "reform." In June this year, they announced an aggressive two-pronged plan to decrease Asian-American enrollment at the Specialized High Schools. The first prong (which Plaintiffs challenge here)[15] is a significant expansion and reorganization of the Discovery Program—designed to increase the number of Discovery admissions, carefully excluding many heavily Asian-American schools. Beginning with the 2018-19 admissions cycle, Defendants will expand the program to 20 percent of available seats[16] at each Specialized High

---

Island Technical High School (48.4 percent); and Queens High School for the Sciences at York College (81 percent). *Id.* (rows 3, 5, and 7-9).

[13] NYC Dep't of Educ., *Specialized High Schools Proposal*, *available at* https://cdn-blob-prd.azureedge.net/prd-pws/docs/default-source/default-document-library/specialized-high-schools-proposal.pdf?sfvr sn=c27a1e1c_5 (last visited Dec. 10, 2013) (hereinafter "*Specialized High Schools Proposal*").

[14] *See* Alex Zimmerman, *New Data Show How Few Black and Hispanic Students Benefit from New York City's Specialized High School Diversity Program*, Chalkbeat (Aug. 14, 2018), *available at* https://www.chalkbeat.org/posts/ny/2018/08/14/discovery-program-data-shsat/ (last visited Dec. 10, 2018).

[15] The second prong, mentioned more fully below, would require the New York legislature to repeal Hecht-Calandra. Defendants then plan to phase in a "top 7 percent plan" wherein admissions to the Specialized High Schools would be based on academic record (without the SHSAT) and admission offered to the top seven percent of students at each middle school in the City. *See Specialized High School Proposal*, *supra*, note 13, at 6-7.

[16] The expansion will take place over two years, so that Discovery will be 20 percent of the available seats by the summer of 2020.

School *and* restrict the program to applicants from Intermediate Schools with an "Economic Need Index" (ENI) of 60 percent or higher.[17] The ENI is a City-created metric that is supposed to estimate "the percentage of students in a school who face economic hardship."[18]

While innocuous sounding, the ENI restriction is designed to limit the Discovery Program not to all *low-income students* in New York City (as Hecht-Calandra intended), but to students from particular *schools* that score highly on the City-created ENI. This distinction is crucial. Because about two-thirds of recent Discovery participants have been Asian-American, simply expanding Discovery to 20 percent of available seats would do little to change the demographics of the Specialized High Schools. Poor Asian Americans would continue to "disproportionately" fill the Discovery seats. The new ENI restriction makes students at dozens of schools with a high Asian-American population ineligible for Discovery, even if they would have otherwise qualified based on their own disadvantaged status. It particularly targets middle schools that have sent a large number of students to the Specialized High Schools in the recent past, most of which are disproportionately Asian-American. As explained in more detail below, the ENI restriction makes it certain that Defendants' Discovery reorganization will disproportionately affect Asian Americans. Defendants agree; they estimate that their plan will nearly double the enrollment of

---

[17] *See* NYC Dep't of Educ., *Diversity in Admissions*, *available at* https://www.schools.nyc.gov/enrollment/enrollment-help/meeting-student-needs/diversity-in-admissions (last visited Dec. 10, 2018).

[18] The City's ENI calculation is actually based on many other factors. The City assigns an "Economic Need Value" between zero and one. A student's Economic Need Value is one when (a) the student is eligible for public assistance from the New York City Human Resources Administration; (b) the student has lived in temporary housing for the past four years; or (c) the student has a home language other than English and entered the New York City Department of Education for the first time within the last four years. Otherwise, a student's Economic Need Value is based on the percentage of families with school-aged children in the student's census tract whose income is below the poverty level. The student's Economic Need Value is that number divided by 100. A school's ENI is the average of its students' Economic Need Values. *See* Exhibit 5.

This method of calculation prioritizes Census tracts over individuals, which is why it does not always correlate with more commonly-used measures of poverty.

Black and Hispanic students at the Specialized High Schools.[19] As intended, this change will come primarily at the expense of Asian-American applicants to the Specialized High Schools.

Defendants' public statements confirm that they desire to racially balance the Specialized High Schools at the expense of Asian-American enrollment. Most notably, in reference to the percentage of Asian-American students admitted to the Specialized High Schools, Defendant Chancellor Carranza stated in a television interview "I just don't buy into the narrative that any one ethnic group owns admission to these schools."[20] And Mayor de Blasio called the racial demographics at the Specialized High Schools a "monumental injustice," asking "[c]an anyone defend this? Can anyone look the parent of a Latino or black child in the eye and tell them their precious daughter or son has an equal chance to get into one of their city's best high schools?"[21] The Mayor also tweeted, on the same day he announced the challenged plan, his belief that the Specialized High Schools do not admit enough Black or Hispanic students relative to their share of the City population.[22] He promoted the Discovery set-aside two tweets later in the same thread.[23]

Further, the City's press release touting the changes to the Discovery Program notes that the changes are intended to "improve diversity" and "support greater geographic, racial, and socioeconomic diversity" at the Specialized High Schools.[24] Defendants' presentation to local

---

[19] Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools* (Jun. 3, 2018), *available at* https://www1.nyc.gov/office-of-the-mayor/news/281-18/mayor-de-blasio-chancellor-carranza-plan-improve-diversity-specialized-high/#/0 (last visited Dec. 10, 2018) ("Plan Announcement").

[20] Elizabeth A. Harris & Winnie Hu, *Asian Groups See Bias in Plan to Diversify New York's Elite Schools*, N.Y. Times (June 5, 2018), *available at* https://www.nytimes.com/2018/06/05/nyregion/carranza-specialized-schools-admission-asians.html (last visited Dec. 10, 2018).

[21] Bill de Blasio, *Our Specialized Schools Have a Diversity Problem. Let's Fix It.*, Chalkbeat (June 2, 2018), *available at* https://chalkbeat.org/posts/ny/2018/06/02/mayor-bill-de-blasio-new-york-city-will-push-for-admissions-changes-at-elite-and-segregated-specialized-high-schools/ (last visited Dec. 10, 2018).

[22] Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018), https://twitter.com/nycmayor/status/1003414958464487425?lang=en ("Stuyvesant High School just admitted almost a thousand students, but only ten of those students were African American and less than thirty were Latino. In a city that is majority African American and Latino.").

[23] Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018), https://twitter.com/NYCMayor/status/1003415609915400192.

[24] Plan Announcement, *supra* note 19.

schools explain that, should they succeed in convincing the state legislature to repeal Hecht-Calandra, admission offers to Asian Americans would decline by nearly 50 percent.[25] In short, Defendants believe that there are too many Asian Americans at the Specialized High Schools. Defendants intend to replace these students with other minority students whom they believe to be underrepresented.

Plaintiffs are organizations and individuals among those most affected by Defendants' changes to Discovery. For example, plaintiff Christa McAuliffe PTO is the (private) Parent Teacher Organization at one of the highest performing middle schools in New York City. McAuliffe (I.S. 187) sent 205 students to the Specialized High Schools from its 274-student graduating class of 2018.[26] More than one-third of its students went to Stuyvesant (the most selective Specialized High School).[27] I.S. 187 is 67.5 percent Asian-American and 65.8 percent disadvantaged. Yet its ENI is below the 60 percent cutoff necessary for Discovery eligibility.[28] Due to Defendants' plan, students at I.S. 187 will no longer be able to compete for 20 percent of the available seats at the Specialized High Schools. And because of that set-aside, they will also find it more difficult to gain admission to the remaining seats.

The Discovery changes affect everyone, but they particularly burden poor, Asian-American students at schools like I.S. 187 who would have been eligible for Discovery but for Defendants' plan. The more general harm is that the expansion of Discovery to 20 percent of available seats necessarily leaves fewer seats open for those who would otherwise get in without

---

[25] *Specialized High Schools Proposal*, *supra* note 13, at 12.

[26] Christina Vega & Sam Park, *Where Specialized High School Students Come From (and Where They Don't)*, Chalkbeat (June 14, 2018), *available at* https://chalkbeat.org/posts/ny/2018/06/14/where-specialized-high-school-students-come-from-and-where-they-dont/ (last visited Dec. 10, 2018).

[27] Leslie Brody, *Parents to Sue City Over Elite High School Admissions*, Wall St. J. (Nov. 13, 2018), *available at* https://www.wsj.com/articles/parents-to-sue-city-over-elite-high-school-admissions-1542161886?ns=prod/accounts-wsj (last visited Dec. 10, 2018).

[28] I.S. 187's ENI was 43.9 percent in 2016-17 and 57.9 percent in 2017-18. *See* Exhibit 2 (row 305) & Exhibit 1 (row 306).

Discovery. The specific harm to low-income students at ineligible schools is more acute because the expansion and reorganization of Discovery simultaneously limits the number of seats for which they can compete *and* makes them ineligible for a program designed to help them. These individuals might find that although they did not need Discovery before, they would very much like to be eligible once it consumes one in five seats at each Specialized High School.

Plaintiffs filed a complaint today alleging that Defendants' changes to Discovery violate the Equal Protection Clause. Plaintiffs allege that Defendants' actions are race-based and not narrowly tailored to further any compelling government interest. Based on the evidence presented here, Plaintiffs seek a preliminary injunction prohibiting Defendants from enforcing the changes in the 2018-19 admissions cycle.

## DISCUSSION

### A.  Preliminary Injunction Standard

In the Second Circuit, a party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). The *Citigroup* court confirmed that this standard survived the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *Citigroup*, 598 F.3d at 38.

### B.  Merits of Plaintiffs' Equal Protection Claim

The Supreme Court has long recognized that enactments "are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, but

also when, though race neutral on their face, they are motivated by a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). Because the challenged Discovery changes are facially race-neutral, Plaintiffs must first prove that Defendants were motivated by a racial purpose. If Plaintiffs do so, the burden shifts to Defendants to prove that the new policies are narrowly tailored to further a compelling government interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204–05 (2d Cir. 2006).

## 1. Defendants Were Motivated by a Racial Purpose

The Supreme Court developed a framework to ferret out impermissible motivations hidden behind facially neutral policies. Under this framework, discriminatory intent may be established through, among others, (1) disparate impact of the policy on a particular race; (2) the historical background, particularly if it reveals a series of official actions taken for invidious purposes; (3) irregularities in the passage of legislation, and (4) legislative and administrative history. *Vill. of Arlington Heights v. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977). Suspect racial motivation exists when, as here, decision-makers acted "at least in part 'because of,' not merely 'in spite of,' [the policy's] adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

### a. The Discovery Changes Will Disproportionately Affect Asian Americans

It is beyond dispute that Defendants' policy will disproportionately burden Asian-American applicants to the Specialized High Schools. Defendants themselves estimate that Black and Hispanic enrollment in the Specialized Schools will nearly double as a result of their changes to the Discovery Program. As Plaintiffs note above and demonstrate below, that increase will come—as intended—almost entirely at the expense of Asian Americans; white students were

already underrepresented among those admitted through Discovery compared to the Specialized High School population as a whole.

Data from individual schools confirms the extent of this disparate impact. Defendants' plan does more than merely restrict access to Discovery from intermediate schools with the highest Asian-American populations (although, in general, it does that too).[29] Rather, their plan targets the particular schools that feed the most students—predominantly Asian-American—to the Specialized High Schools.

*None* of the 18 schools whose eighth-grade classes received the highest proportion of Specialized High School offers in 2017-18 are eligible for Discovery under the challenged plan.[30] Four of these schools are majority Asian-American (including I.S. 187, home to Plaintiff Christa McAuliffe PTO), and these four schools accounted for 423 students offered admission to the Specialized High Schools last year, nearly ten percent of the total number of offers given.[31] Four more are at least 30 percent Asian-American, and these accounted for 206 students offered admission.[32] As the data in the footnotes show, several of these schools contain a significant

---

[29] Defendants likely had the 2016-17 ENI numbers in mind when devising the challenged plan; until recently, New York City's website directed parents and students to the 2016-17 school dashboard to locate their school's ENI. *See* NYC Dep't of Educ., *Diversity in Admissions*, *supra* note 17 (linking visitors to the school performance dashboard to find historical ENIs). These numbers are stark: just nine of the 50 schools with the highest proportion of Asian-American students would be eligible for Discovery. *See* Exhibit 2.
The Citywide ENI went up from 60.6 percent to 70.7 percent in 2017-18 (despite a much less significant change in the poverty rate). *See* Exhibit 3 (compare row 6 to row 7). Individual school ENIs also increased, making more schools eligible for Discovery. Nevertheless, a significant disparate impact persists: 11 of the 24 majority-Asian-American schools in the City are ineligible, compared to just 20 of the 191 majority-black schools and nine of the 243 majority-Hispanic schools. *See* Exhibit 1.
[30] For the Specialized High School offer data in this section, *see* Vega & Park, *supra*, note 26.
[31] The four schools are I.S. 187 (67.5 percent Asian-American, 57.9 percent ENI, 205 students received offers); New York City Lab Middle School (55.1 percent Asian-American, 38.1 percent ENI, 113 students received offers); Queens Gateway to Health Sciences Secondary School (50.6 percent Asian-American, 53.8% ENI, 23 students received offers); and J.H.S. 067 (60.6 percent Asian-American, 30.5 percent ENI, 82 students received offers). *See* Exhibit 1 (rows 306, 24, 427, and 386).
[32] These four are: New Explorations Into Science, Technology and Math (33.2 percent Asian-American, 27.8 percent ENI, 91 students received offers); The 30th Avenue School (43.8 percent Asian-American, 29.2 percent ENI, 26 students received offers); Baccalaureate School for Global Education (46.1 percent Asian-American, 38.6 percent ENI, 62 students received offers); and Tag Young Scholars (38.8 percent Asian-American, 40.2 percent ENI, 27 students received offers). *See id.* (rows 10, 460, 461, and 56).

proportion of low-income students—particularly I.S. 187. More broadly, all but three of these 18 ineligible schools have Asian-American populations greater than the New York public schools as a whole.

Worse still, of the 15 *additional* schools that had 50 or more students receive offers to attend the Specialized High Schools in 2017-18, just six are eligible for Discovery under the 2017-18 ENI calculation (and *none* would have been eligible under the 2016-17 ENI calculations). Here, too, the ineligible schools include several heavily Asian-American schools with significant low-income populations.[33] These schools include M.S. 158 (62.3 percent Asian-American, 42.3 percent ENI, 84 students received offers of admission to the Specialized High Schools), J.H.S. 216 (65.8 percent Asian-American, 52.8 percent ENI, 95 students received offers), and J.H.S. 074 (66.5 percent Asian-American, 38.4 percent ENI, 95 students received offers), which together account for another 274 offers to attend the Specialized High Schools.[34]

Whether one considers the ENI data from 2016-17 or 2017-18, the numbers leave no doubt that the ENI restriction operates as a racial proxy. No proxy works perfectly, but this one maximizes its effectiveness by targeting heavily Asian-American schools that traditionally send many students to the Specialized High Schools. Unfortunately, this proxy especially targets poor Asian Americans, who make up 61 percent of the Asian-American offers to attend the Specialized High Schools.[35] These students are doubly affected: they disproportionately lose access to

---

[33] Under the 2016-17 calculations, three more majority or near-majority Asian-American schools are ineligible: J.H.S. 201 (48.9 percent Asian-American, 50.3 percent ENI in 2016-17, 101 students received offers); J.H.S. 185 (54.8 percent Asian-American, 40.3 percent ENI in 2016-17, 93 students received offers); and I.S. 237 (73.7 percent Asian-American, 46.9 percent ENI in 2016-17, 53 students received offers). They accounted for another 247 students offered admission to attend the Specialized High Schools. These schools would have been ineligible under ENI calculations in each of the three years before 2017-18. *See* Exhibit 2 (rows 307, 374, and 379).
[34] *See* Exhibit 1 (rows 388, 391, and 387).
[35] *Specialized High Schools Proposal*, *supra*, note 13, at 13.

Discovery *and*, because of the expansion of Discovery, are prohibited from competing for 20 percent of the available seats.[36]

### b. Defendants' Statements Admit a Racially Discriminatory Purpose

Having established disparate impact, Plaintiffs must show discriminatory intent. In the usual case, it might be quite difficult to determine whether a facially-neutral policy was the product of racially discriminatory intent. *See Miller*, 515 U.S. at 914. This, however, is far from the usual case. Defendants have not tried to conceal their racial intentions, but instead have proudly boasted about them, placing "direct evidence of intent" on the public record. *Arlington Heights*, 429 U.S. at 266. As noted above, Defendant Carranza directly attacked the high Asian-American enrollment at the Specialized High Schools, telling New York City's Fox affiliate WNYW that he does not "buy into the narrative that any one ethnic group owns admission to these schools." Of course, nobody buys into that narrative, because it does not exist. Plaintiffs do not think that Asian Americans "own" admission into the Specialized High Schools. They merely believe that the Specialized High Schools should continue to serve the gifted children of New York City, regardless of race. Chancellor Carranza's statement is direct evidence that New York City's decision-makers believe there are too many Asian-American children at the City's best high schools.

---

[36] This is all the more troubling because the purpose of Discovery was to help low-income children of all races get into the Specialized High Schools. *See* N.Y. Educ. Law § 2590-g(12)(d) (1997). Yet Defendants have concluded that, because many low-income Asian Americans get into the Specialized High Schools, the Discovery Program unfairly benefits Asian-American children and fails to achieve what Defendants see as a proper racial balance. As one commentator lamented in 2016, "[o]ne way the city is trying to enroll more black and Hispanic students at its elite specialized high schools is by expanding a program for students who scored just below the cutoff on the entrance exam. But that program actually is helping more white and Asian students get into those schools—illustrating the challenge of boosting black and Hispanic enrollment at those most-competitive schools." Annie Ma, *Getting Black and Hispanic Students into Specialized Schools Remains a Challenge, Even for Programs Designed to Help*, Chalkbeat (June 9, 2016), *available at* https://chalkbeat.org/posts/ny/2016/06/09/getting-black-and-hispanic-students-into-specialized-schools-remains-a-challenge-even-for-programs-designed-to-help/ (last visited Dec. 10, 2018). The same observations held true in 2018; most of the disadvantaged students admitted to Specialized High Schools through Discovery were Asian-American. Zimmerman, *supra* note 14. Defendants believe that the success of poor Asian-American students in the Discovery Program is a problem that needs to be fixed.

Further, Mayor de Blasio has consistently articulated his desire that the Specialized High Schools be more racially balanced.[37] In an op-ed at *Chalkbeat* published concurrently with the announcement of changes to the Discovery Program, Defendant de Blasio called the racial makeup of the Specialized High Schools a "monumental injustice." He continued: "Can anyone defend this? Can anyone look the parent of a Latino or black child in the eye and tell them their precious daughter or son has an equal chance to get into one of their city's best high schools? Can anyone say this is the America we signed up for?" From the tone of the Mayor's remarks, one could be excused for thinking that the New York legislature had authorized a racially discriminatory admissions system for the Specialized High Schools. But of course, Hecht-Calandra did no such thing—and Defendants have not claimed that the SHSAT is racially biased.

Indeed, the only evidence of any racial motivation reveals *Defendants'* plans to discriminate against Asian-American students. "Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011). Statements by the Defendants themselves, along with the official City press releases heralding the (expected) increase in Black and Hispanic students at the Specialized High Schools—at the expense of Asian-American students—demonstrate beyond dispute that Defendants acted with such intent. That is, the public statements show that Defendants acted *because of* the new policy's adverse effect on Asian-American students, rather than *in spite of* that effect. *Feeney*, 442 U.S. at 279. Likewise, Defendants' actions are intended to benefit Black and

---

[37] For example, on the same day he announced the challenged plan, and in the same thread where he promoted his Discovery changes, the Mayor tweeted that Stuyvesant admitted too few Black and Hispanic students relative to their populations in the City. *See supra* note 22. He also tweeted a video wherein he states that the student body of the Specialized High Schools will "look[] like New York City." Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018), https://twitter.com/NYCMayor/status/1003473019266727936.

Hispanic applicants (at the expense of Asian-American applicants). The plan's disparate impact on Asian Americans is a feature, not a bug.

The Second Circuit has affirmed a finding of racial motivation with far less evidence. Just recently in *MHANY Mgmt., Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016), the court held that a Village Board of Trustees acted with an impermissible racial purpose when, in response to public pressure, it reversed course on a decision to zone a new development for multifamily housing. Village residents told the Board that they feared an imposition of "affordable housing" would change the Village's "character," but the record was bereft of any mention of race. *Id.* at 608–09. Nevertheless, it was enough that "in light of the racial makeup of [the Village] and the likely number of members of racial minorities that residents believed would have lived in affordable housing at the [proposed site], these comments were code words for racial animus." *Id.* at 609. Further, having found racial animus on the part of the residents, the court imputed those motivations to the Board, rejecting the Village's argument to the contrary. *Id.* at 610–11. In short, the court found the Village Board had acted with a racial purpose because it had listened to allegedly coded resident protests and decided to change its mind.

Surely, then, the facts before us here show that Defendants were motivated by an impermissible racial purpose. Plaintiffs submit that Defendants' admitted racial purpose in enacting the Discovery changes are sufficient to trigger strict scrutiny, just as if this were a typical case involving racial preferences. *See Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 348 (5th Cir. 2011) (citing *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)).

### c.  Defendants' "Benign" Motives Are Entitled No Deference

The Supreme Court has held time and again that "the mere recitation of a benign or legitimate purpose for a racial classification is entitled to little or no weight." *Fisher v. Univ. of*

*Tex. at Austin*, 570 U.S. 297, 313 (2013) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)). The same is true when the government employs a facially-neutral racial proxy in an attempt to achieve the same results. As the Fifth Circuit explained, a school re-assignment system shown to be racially motivated (although ostensibly based on geography) would be subject to strict scrutiny even if the school district's purpose of maintaining "post-unitary 'racial balance'" was "benign." *Lewis*. 662 F.3d at 349. Put another way, Plaintiffs need not show that Defendants harbor any particular animus towards Asian Americans in order to trigger strict scrutiny. Plaintiffs need only show that Defendants' actions, while facially neutral, were done with a discriminatory intent and resulted in "a governmental standard, preferentially favorable to one race or another, for the distribution of benefits." *Hayden v. County of Nassau*, 180 F.3d 42, 49 (2d Cir. 1999) (quoting *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998)). That is precisely what we have here.

The Second Circuit's *Hayden* decision is not to the contrary. There, the plaintiffs argued that the county's decision to re-design the police entrance exam so as to reduce the exam's previous racially disparate impact amounted to intentional discrimination against non-minority applicants. *Id.* at 50. The court rejected that argument, primarily because of the county's earlier admission in a consent decree that the previous exam results might have supported an inference of discrimination. *See id.* at 51. Of course, rectifying previous discrimination is one of the two permissible uses of racial classifications the Supreme Court has recognized. *See Croson*, 488 U.S. at 509. *Hayden* thus stands for the proposition that a government does not intentionally discriminate against non-minorities by attempting to reduce the disparate impact of an entrance exam in order to remedy potential prior intentional discrimination.

Perhaps more importantly, the *Hayden* court stressed that the new "exam was administered to all of the 25,000 candidates in identical fashion, regardless of race. The test was scored the same

for all candidates, and no differential cutoffs were used." *Hayden*, 180 F.3d at 51. Here, however, Defendants' changes to the Discovery Program will reduce the number of seats available for applicants who score highly on the SHSAT *and* will categorically exclude applicants who otherwise would have been eligible for Discovery. Indeed, that is the whole point of Defendants' plan. And Defendants readily explain that the design is intended to decrease Asian-American enrollment at the Specialized High Schools. Unlike the new exam in *Hayden*, the Discovery changes are a set-aside accomplished with the aid of a racial proxy. The only distinction between this case and the explicit race-preference cases is that, rather than explicitly classifying students based on race, Defendants simply use a particular score from the city-generated ENI as a proxy for race. *See Lewis*, 662 F.3d at 354 (Jones, J., concurring) ("To allow a school district to use geography as a virtually admitted proxy for race, and then claim that strict scrutiny is inapplicable because 'Option 2f designated geographical lines for student assignment with no mention of race' is inconsistent with the Supreme Court's holdings.").

Aside from *Hayden*, the court need not resolve the apparent conflict between *Lewis* and cases like *Doe* and *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 87 (1st Cir. 2004). All three were challenges to school-assignment maps drawn in an attempt to further some interest in diversity, but none involved admissions to particular magnet schools so distinct from other public schools. So even if one takes the position that gerrymandering attendance zones to achieve diversity doesn't trigger strict scrutiny, *see, e.g. Doe*, 665 F.3d at 548 ("consideration or awareness of race while developing or selecting a policy . . . is not in and of itself a racial classification"),[38]

---

[38] The concurrence in *Doe* would have applied strict scrutiny to the challenged assignment plan because "consideration of the racial composition of neighborhoods is . . . a parallel to the consideration of the race of the individual." *Doe*, 665 F.3d at 559 (Roth, J., concurring). Judge Roth would have upheld the plan because, in her view, it was "narrowly tailored to meet race-neutral compelling interests and . . . would have passed without a consideration of the racial make-up of the neighborhoods." *Id.* Illustrating the unsettled state of the law in this area, Judge Roth explicitly asked for Supreme Court clarification regarding whether "concurrent consideration" of race to further an interest in diversity

it does not follow that Defendants' plan evades strict scrutiny. The school districts in those cases drew the lines to promote diversity (or, as in *Lewis*, to maintain unitary status), but not to "benefit or burden an identifiable group." *Id.* Defendants will also likely attempt to justify their plan on diversity grounds, but they *did* adopt the plan *because* it would reduce the number of Asian Americans at the Specialized High Schools. Instead of simply moving students around, Defendants' plan alters distribution of an important benefit: admissions into a prestigious public high school. Thus, strict scrutiny is appropriate even under the *Doe* standard.

\*\*\*

In short, while Defendants' Discovery changes are facially race-neutral, Defendants' admitted purpose is to balance the racial makeup of the Specialized High Schools. Defendants attempt to accomplish that aim through a plan intended to distribute benefits to favored races and burden a particularly disfavored one. The structure of Defendants' policy makes its disproportionate impact on Asian Americans apparent. Because Plaintiffs have established disparate impact and discriminatory intent, this Court must apply strict scrutiny. Although Defendants may harbor no ill will towards Asian-American applicants, any law that distributes benefits and burdens based on race is inherently suspect and must be subject to the "most searching examination" in court. *Fisher*, 570 U.S. at 310. The same standard applies to policies that reach the same goal through racial proxies. This Court should find that Defendants acted with a racially discriminatory purpose and apply strict scrutiny.

## 2. Strict Scrutiny

Because strict scrutiny applies, Defendants must prove that the challenged Discovery changes are narrowly tailored to further a compelling government interest. *Adarand*, 515 U.S.

---

may be constitutional if the plan also furthers race-neutral compelling interests. *Id.* The Supreme Court, however, denied certiorari. 567 U.S. 916 (2012).

at 227; *Jana-Rock*, 438 F.3d at 204–05. "This most exacting standard 'has proven automatically fatal' in almost every case." *Fisher*, 570 U.S. at 317 (Scalia, J., concurring) (quoting *Missouri v. Jenkins*, 515 U.S. 70, 121 (1995) (Thomas, J., concurring)). It should be fatal to Defendants' Discovery changes.

To be sure, as discussed above, Defendants' plan does not classify individuals according to race. Instead, it uses the ENI cutoff as a proxy for race. Since strict scrutiny applies due to Defendants' discriminatory motive, this Court should evaluate Defendants' plan as if it contained explicit racial classifications. *See Lewis*, 662 F.3d at 348; *id.* at 354 (Jones, J., concurring); *Doe*, 665 F.3d at 559 (Roth, J., concurring). After all, Defendants' plan is intended to act as a substitute for a racial set-aside. The Supreme Court's jurisprudence on racial classifications is therefore most relevant to the strict scrutiny analysis.

### a.    Defendants Lack a Compelling Interest in Pursuing Racial Balancing

The Supreme Court has recognized only two interests as potentially compelling enough to justify a racial classification: remedying past discrimination for which the government was responsible, *Croson*, 488 U.S. at 500; and obtaining the benefits that flow from diversity in higher education, *Grutter v. Bollinger*, 539 U.S. 306, 328–33 (2003). *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720–23 (2007). This case involves neither. Therefore, to prevail, Defendants must show either that (1) *Grutter*'s diversity rationale applies at the secondary school level; or (2) another compelling interest justifies Defendants' race-based plan. Supreme Court precedent forecloses both avenues.

In *Parents Involved*, the Supreme Court expressly declined to apply *Grutter*'s reasoning to K-12 schools. There, the plaintiffs challenged school-assignment plans which assigned children to particular public schools based on race. *Id.* at 709–11. Faced with the argument that *Grutter*

required upholding the plans, the Court distinguished *Grutter* on the ground that it "relied upon considerations unique to institutions of higher education." *Id.* at 724. It added that lower courts after *Grutter* had "largely disregarded" that limitation in erroneously upholding race-based assignments in K-12 education. *Id.* at 725.

While a majority of the *Parents Involved* Court agreed that *Grutter* was inapplicable to K-12 education, it failed to reach a majority on whether any form of diversity could ever be a compelling interest below the university level. A four-justice plurality led by Chief Justice Roberts rejected Seattle's and Louisville's purported additional interests, including reducing "racial concentration," ensuring that housing patterns do not result in *de facto* segregation, and ensuring students are educated "in a racially integrated environment." *Id.* at 725 (plurality opinion). As the plurality noted, although the cities "use various verbal formulations to describe the interest they seek to promote—racial diversity, avoidance of racial isolation, racial integration—they offer no definition of the interest that suggests it differs from racial balance." *Id.* at 732. In other words, the cities had no particular "critical mass" of each race in mind, see *Grutter*, 539 U.S. at 333, but simply wanted each school to "look" as much as possible like the district as a whole. According to the plurality, this was "patently unconstitutional" racial balancing. *Id.* The Chief Justice then closed with memorable advice: "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Id.* at 748.

Justice Kennedy did not join that portion of the Chief Justice's opinion (although he later quoted approvingly from parts of it in *Fisher*). He wrote separately to explain his view that "[d]iversity, depending on its meaning and definition, is a compelling educational goal a school district may pursue." *Parents Involved*, 551 U.S. at 783 (Kennedy, J., concurring in part and concurring in the judgment). Justice Kennedy would have preferred to leave open some avenues

for local school districts to pursue diversity but, in the end, he was quite concerned that the Seattle and Louisville plans relied too heavily on race as the deciding factor. For example, he wrote that while "it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body," such policies usually must be implemented without classifying individuals based on race. *Id.* at 788–89. His examples included "strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods;[39] allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." *Parents Involved*, 551 U.S. at 789. Such policies might be considered "race-conscious," but in Justice Kennedy's view, they would not be subject to strict scrutiny.

Neither approach[40] permits Defendants to pursue racial balancing at the Specialized High Schools through the use of racial proxies. A majority of the Supreme Court, including Justice

---

[39] As Plaintiffs explain above, this case involves more than a simple map-drawing exercise. Defendants were not merely *aware* of the demographics of the City when they chose the Economic Need Index cutoff. *Cf. Doe*, 665 F.3d at 548 (majority opinion). Instead, as Plaintiffs demonstrate above, Defendants "adopted the challenged action at least partially because the action would benefit or burden an identifiable group." *Id.* Direct evidence shows that precise intent in this case. Admission to the Specialized High Schools is a significant benefit, and Defendants' policy was enacted with the intent to distribute these benefits to students of some races but not others. Such a policy must be subjected to strict scrutiny in the same manner as overt race preferences.

[40] Applying the rule of *Marks v. United States*, 430 U.S. 188 (1977), some courts consider Justice Kennedy's opinion precedential on the compelling-interest point. *See, e.g.*, *Hart v. Cmty. Sch. Bd. of Brooklyn*, 536 F. Supp. 2d 274, 283 (E.D.N.Y. 2008) ("[I]t is the view of Justice Kennedy in [*Parents Involved*], which represents the applicable approach under *Marks*, and the guiding standard on the use of race as one of a number of appropriate admissions factors."). That view is mistaken. *Marks* applies only when "a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices." *United States v. Leonard*, 844 F.3d 102, 108 (2d Cir. 2016) (quoting *Marks*, 430 U.S. at 193). In such cases, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *Id.* But where an opinion fractures on an issue that was unnecessary to the judgment, "there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003).

*Parents Involved* is not a fractured decision. The Supreme Court issued a majority opinion sufficient to decide the case, holding that (1) strict scrutiny applies to all racial classifications, *Parents Involved*, 551 U.S. at 720 (majority opinion); and (2) the assignment plans were not narrowly tailored to further any conceivable compelling interest, *id.* at 733–35 (part III-C). The competing opinions of Chief Justice Roberts and Justice Kennedy regarding whether achieving diversity may ever be a compelling interest in K-12 education had no effect on the outcome of the case, which was decided on narrow tailoring grounds. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014) (finding it "unnecessary to adjudicate" a question of compelling interest when the case can be resolved on narrow

Kennedy, later adopted Chief Justice Roberts' statement that "[r]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Fisher*, 570 U.S. at 311 (quoting *Parents Involved*, 551 U.S. at 732 (plurality opinion)).

And like the school districts in *Parents Involved*, Defendants struggle to define their goal in terms other than racial balancing. Their benchmark even seems far from the "critical mass" the Supreme Court discussed in *Grutter*. Instead, "the racial balance the districts seek is a defined range set solely by reference to the demographics" of New York City as a whole. *Parents Involved*, 551 U.S. at 729 (plurality opinion). This is not mere speculation; the City Department of Education's presentations to local school districts regarding Defendants' ultimate plan to entirely reorganize Specialized High School admissions after the repeal of Hecht-Calandra assert that "SHS demographics will mirror NYC demographics more closely."[41] Defendants' reworking of Discovery is merely a first step towards that goal; if Hecht-Calandra remains, nothing prevents Defendants from further tinkering with Discovery to obtain their preferred racial balance. As Justice Powell wrote in his controlling opinion in *Regents of Univ. of Cal. v. Bakke*, "[i]f [Defendants'] purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid." 438 U.S. 265, 307 (1978) (opinion of Powell, J.).

Even if Justice Kennedy's concurrence were convincing to the Court, there is still no compelling interest sufficient to uphold Defendants' plan. Although Justice Kennedy was more sympathetic to the pursuit of diversity than was the plurality, he declined to define a school district's interest in diversity that would be sufficiently compelling. *See Parents Involved*, 551 U.S.

---

tailoring grounds). Therefore, neither the plurality opinion nor Justice Kennedy's concurrence is binding on this Court under *Marks*, although both are persuasive authority.

[41] *Specialized High Schools Proposal*, *supra* note 13, at 12.

at 783 (Kennedy, J., concurring in part and concurring in the judgment) ("Diversity, *depending on its meaning and definition*, is a compelling educational goal a school district may pursue." (emphasis added)). Further, he made it clear that racial classifications should be used only as a "last resort" to further any compelling interest that might exist, *id.* at 790, and emphatically rejected the argument that "if race is the problem, race is the instrument with which to solve it," *id.* at 797. On the propriety of race-based admissions procedures in K-12 education, then, Justice Kennedy and the plurality are not far apart.

The concurrence was broadly concerned that, under the plurality's approach, school districts would have to pretend to be oblivious to race when crafting policies. *Id.* at 789. That is not the case. As courts have explained (and as Plaintiffs argue above), a facially-neutral policy triggers strict scrutiny only when it is "developed or selected because it would assign benefits or burdens on the basis of race." *Doe*, 665 F.3d at 553. Mere *awareness* of race does not render a facially-neutral policy unconstitutional. Thus, Plaintiffs agree that school districts may pursue diversity through many of the methods Justice Kennedy suggested; these methods, unlike Defendants' policy, do not distribute benefits and burdens at all. That is why strict scrutiny applies in this case, but not to a program designed to invest resources in certain communities to foster diversity. Nothing in the concurrence suggests that Defendants have a compelling interest in racial balancing or diversity the way Defendants define it.[42]

---

[42] To the extent it applies, the Second Circuit's decision in *Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 747–52 (2d Cir. 2000), and the previous decisions on which it relied, have been abrogated. Much like *Parents Involved*, *Brewer* dealt with a transfer-assignment program meant to address *de facto* segregation and racial isolation. The *Parents Involved* majority clearly stated that only two interests are compelling enough to potentially justify a racial classification: remedying past discrimination and obtaining the benefits of diversity in higher education. *Parents Involved*, 551 U.S. at 720–23 (majority opinion). In striking down the race-based transfer programs in Seattle and Louisville, the majority in *Parents Involved* necessarily declined to recognize any compelling interest in remedying *de facto* segregation. And as the Chief Justice pointed out, a long line of Supreme Court precedent holds that remedying "societal discrimination" is not a compelling government interest. *Id.* at 731–32 (citing *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996), *Croson*, 488 U.S. at 498–99, and *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986)). *Brewer*'s discussion was questionable in 2000, but *Parents Involved* confirmed that it was wrong.

When Defendants chose a policy tailored to pick racial winners and losers, they assumed the burden to prove that a recognized compelling interest supports that policy. Defendants cannot carry this burden. A majority of the Supreme Court has held that the diversity rationale sanctioned in *Grutter* is inapplicable to secondary schools. *Id.* at 724–25 (majority opinion). And neither the plurality opinion nor Justice Kennedy's concurrence in *Parents Involved* sanctions Defendants' use of an admitted racial proxy to balance the demographics at the Specialized High Schools. Defendants lack an interest compelling enough to justify their decision to expand and reorganize Discovery.

      **b.**      **Defendants' Plan is Not Narrowly Tailored to Further Any Conceivable Compelling Interest Defendants Might Have**

Even assuming Defendants can demonstrate a compelling interest to support their policy, they must still prove that the policy is "necessary" to accomplish that purpose. *Fisher*, 570 U.S. at 312 (quoting *Bakke*, 438 U.S. at 305 (opinion of Powell, J.)). Although the narrow tailoring standard generally does not require the government to exhaust "every *conceivable* race-neutral alternative," the "court must ultimately be satisfied that no workable race-neutral alternatives" would suffice. *Id.* In Justice Kennedy's words, the plan must be a "last resort" to satisfy Defendants' interest. *Parents Involved*, 551 U.S. at 790 (Kennedy, J., concurring in part and concurring in the judgment).

Several circuits have adopted the so-called "*Paradise* factors" to help with this inquiry: "(a) 'the necessity for the relief and the efficacy of alternative [race-neutral] remedies,' (b) 'the flexibility and duration of the relief, including the availability of waiver provisions,' (c) 'the relationship of the numerical goals to the relevant labor . . . market,' and (d) 'the impact of the relief on the rights of third parties.'" *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 942 (7th Cir. 2016) (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality

opinion)); *see also Dean v. City of Shreveport*, 438 F.3d 448, 458 (5th Cir. 2006); *Brewer*, 212 F.3d at 756–57 (Miner, J., dissenting). While these factors were developed to assess the constitutionality of remedial programs, they are helpful in this context as well.

Defendants cannot demonstrate that the Discovery reorganization is narrowly tailored to further any potential interest they might have. The first *Paradise* factor weighs in favor of Plaintiffs because Defendants could have explored several race-neutral options before settling on the use of Discovery as a quasi-set aside. For example, Defendants could create more Specialized High Schools, which would allow more students just short of the current SHSAT cutoff to gain admission through the current process. They could also devote even more resources to targeting students at underrepresented schools; Justice Kennedy suggested potential solutions, such as "allocating resources for special programs" and "recruiting students and faculty in a targeted fashion," which "are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race." *Parents Involved*, 551 U.S. at 789. Defendants have allocated resources for the DREAM program,[43] but surely more can be done to attract a more diverse applicant pool and help students of all races succeed on the SHSAT. Instead, when Discovery failed to yield the racial results they wanted, Defendants changed Discovery to discriminate against Asian Americans.

The second *Paradise* factor also weighs against Defendants because the Discovery changes have no expiration date. If anything, the policy is a stopgap designed to "improve" the racial balance at the Specialized High Schools until Defendants can convince the state legislature and the governor to repeal Hecht-Calandra. But if New York does not oblige, it appears Defendants

---

[43] DREAM, an acronym for "Determination, Resiliency, Enthusiasm, Ambition, Motivation," is a program designed to help low-income students prepare for the SHSAT. *See* NYC Dep't of Educ., *DREAM Program*, *available at* https://www.schools.nyc.gov/about-us/programs/dream-program (last visited Dec. 10, 2018).

intend their policy to continue in perpetuity. Given Defendants' goal to make the Specialized High Schools look like the City as a whole, it is more likely that Defendants will further expand Discovery and magnify the discriminatory effect of the current policy until they achieve their desired racial balance. This is not a temporary fix. Defendants will racially balance the Specialized High Schools through whatever means available to them.

The fourth factor[44] favors Plaintiffs for the reasons stated throughout this memorandum: Asian-American students, and especially poor Asian-American students, are the collateral damage in Defendants' plan. While reorganizing Discovery will further Defendants' goal of racially balancing the Specialized High Schools, many Asian-American students will be left out in the cold. Even the other students at the Specialized High Schools will feel some effect, as expanding Discovery will to some extent dilute the academic level of the schools, particularly the Big Three.[45] So in order to take a substantial step towards racial balance at the Specialized High Schools, Defendants must disproportionally burden Asian Americans *and* burden the students who get into the Specialized High Schools through the normal admissions procedure.

The *Paradise* factors aside, Defendants' plan might actually fare worse under narrow-tailoring analysis than the race-as-one-factor admissions plans upheld in *Grutter* and *Fisher*. Although race could play a decisive factor in individual applications under those plans, the plans themselves did not amount to racial set-asides. In contrast, under Defendants' plan, a large portion of eighth graders, disproportionately Asian Americans, are barred from even competing for 20 percent of the available seats at each Specialized High School. Even significantly economically

---

[44] The third *Paradise* factor does not seem to be relevant outside the context of a remedial order. If it were, Defendants' intent to racially balance the Specialized High Schools would actually help them.
[45] That is especially true so long as Defendants continue the policy that students are eligible for Discovery only if they did not get into any of the Specialized High Schools. That would mean that 20 percent of Stuyvesant's class would consist of students who could not get into Brooklyn Latin. *See* Hu, *supra*, note 5. That is a significant collateral burden on the remaining students at the Big Three.

disadvantaged students from these schools cannot take advantage of Discovery, although they were intended to be the program's precise beneficiaries.

Knowing they could not employ an explicit racial set-aside of the type invalidated in *Bakke* and *Croson*, Defendants here employ a type of gerrymander designed to be a racial set-aside in fact, if not in name. It is hard to see how a plan targeted at a particular race that renders members of that race disproportionately ineligible to seek 20 percent of available seats could be narrowly tailored to achieve anything. *See Gratz*, 539 U.S. at 270 (holding that an admissions program distributing 20 percent of the necessary points to achieve admission on the basis of race was not narrowly tailored to further the diversity interest recognized in *Grutter*).

In sum, even if the Court were to find achieving some sort of diversity to be a compelling interest, Plaintiffs submit that Defendants' Discovery plan is not narrowly tailored to achieve that goal. Defendants have not exhausted all reasonable options before employing a targeted, racially-motivated admissions plan. And instead of a race-is-just-one-factor holistic admissions process like those upheld in *Grutter* and *Fisher*, Defendants have resorted to a system that excludes thousands of students from a significant portion of Specialized High School seats through a racial gerrymander. For these reasons, the Court should find that Defendants' plan is not narrowly tailored to achieve any compelling interest Defendants might have.

## C.     Remaining Preliminary Injunction Factors

If the Court agrees that Plaintiffs are likely to succeed on the merits of their equal protection claim, Plaintiffs need only show that failure to issue a preliminary injunction would cause them irreparable harm. *Citigroup*, 598 F.3d at 35. "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).

A violation of constitutional rights is presumed to cause irreparable harm. *Conn. Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *Aguilar v. I.C.E.*, 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011) (collecting cases). In any case, Plaintiffs' injury amounts to "being forced to compete in a race-based system that may prejudice" them. *Parents Involved*, 551 U.S. at 718 (majority opinion).

As described above, absent an injunction, Defendants will operate such a system to determine which students will be admitted to the Specialized High Schools next fall. No amount of monetary damages can compensate such an injury. *See Diaz v. New York City Bd. of Elections*, 335 F. Supp. 2d 364, 367 (E.D.N.Y. 2004) (an allegation of injury under the Equal Protection Clause satisfies the irreparable harm requirement); *Miller v. Madison*, No. 12-cv-874, 2013 WL 375486, at *1 (N.D.N.Y. Jan. 9, 2013) ("[W]hen the alleged irreparable harm is the violation of a constitutional right, no further showing is generally required."). Therefore, if the Court agrees that Plaintiffs have shown a likelihood of success on the merits, Plaintiffs are entitled to a preliminary injunction.

In the event that the Court believes Plaintiffs have not established a likelihood of success, but have raised only "sufficiently serious questions going to the merits to make them a fair ground for litigation," Plaintiffs must then show that the "balance of hardships" tips substantially in their favor. *Citigroup*, 598 F.3d at 35. This Court has suggested that an allegation of an equal protection violation tips the balance towards the plaintiff. *See Legal Aid Soc'y v. Ass'n of Legal Aid Att'ys*, 554 F. Supp. 758, 761 (S.D.N.Y. 1982) ("[P]laintiff has alleged the deprivation of rights that are among the most sacred in our constitutional system: the rights to equal access to the courts, to equal protection of the laws, and to counsel in criminal proceedings…. Such adverse effect has

been alleged, and constitutes in the Court's view, a 'balance of hardships tipping decidedly toward the party requesting relief.'").

That principle makes sense. In this case, Plaintiffs will suffer significant hardship without an injunction. Specialized High School admissions decisions for the fall of 2019 are imminent. Unless this Court issues an injunction, members of Plaintiffs McAuliffe PTO and CACAGNY, as well as individual Plaintiffs and others, will face substantial hardship. Those who would have otherwise been eligible will no longer be permitted to participate in the Discovery Program, while fewer seats will be available for those who would have otherwise been admitted without Discovery. Meanwhile, Defendants have little interest in enforcing a law that raises serious equal protection concerns, and the Specialized High Schools can still operate their current Discovery Programs even with an injunction. Thus, even if the Court finds that Plaintiffs have not shown a likelihood of success on the merits, they are still entitled to a preliminary injunction.

## CONCLUSION

Defendants are unhappy that years of race-neutral selection to New York's elite Specialized High Schools have led to a high concentration of Asian-American students at those schools, especially relative to the Asian-American population of New York City. But they are constrained by state law, which requires the Specialized High Schools to admit students based on the results of an objective examination. So Defendants manipulated the portion of state law which permits the schools to admit certain economically disadvantaged students who score just below the cutoff if those students successfully complete a summer preparatory program. First, they now require the Specialized High Schools to award 20 percent of their seats through this Discovery Program, more than quadrupling the Program's size compared to last year. And second, unsatisfied with the racial balance of past Discovery participants, Defendants restrict the Program to students

attending eighth grade at a school with a high "Economic Need Index." Defendants essentially admit that they are using the ENI as a proxy for race. They seek to make fewer Asian Americans eligible for Discovery, and thus increase the proportion of Black and Hispanic students admitted to the Specialized High Schools.

Defendants' plan is unconstitutional. Their admitted racial motive in promulgating the new Discovery rules means their plan must satisfy strict scrutiny; it must be narrowly tailored to satisfy a compelling government interest. The plan cannot meet this demanding test. Defendants have no interest in racial balancing for its own sake, nor has the Supreme Court recognized any compelling interest in maintaining diversity in secondary schools. Even if it had, Defendants' plan amounts to a set-aside of seats intended to benefit particular racial groups and burden others. It is not narrowly tailored to satisfy any conceivable interest in diversity Defendants might legitimately have.

Because Plaintiffs allege (and demonstrate) a violation of their rights under the Equal Protection Clause, they have necessarily established irreparable harm and that the balance of hardships tips in their favor. Therefore, Plaintiffs are entitled to a preliminary injunction while litigation is pending.

\* \* \*

DATED:  December 13, 2018.

Respectfully Submitted,

<u>          S/ Joshua P. Thompson          </u>
JOSHUA P. THOMPSON, Cal. Bar No. 250955*
WENCONG FA, Cal. Bar No. 301679*
OLIVER J. DUNFORD, Cal Bar No. 320143*
CHRISTOPHER M. KIESER, Cal. Bar. No. 298486*
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747
E-Mail:  JThompson@pacificlegal.org
E-Mail:  WFa@pacificlegal.org
E-Mail:  ODunford@pacificlegal.org
E-Mail:  CKieser@pacificlegal.org

*Counsel for Plaintiffs*

*\*Pro Hac Vice Motions Pending*