# EXHIBIT 4

New York Office
Office for Civil Rights
U.S. Department of Education
32 Old Slip, 26th Floor
New York, NY 10005-2500

September 27, 2012

RE:   **The admissions process for New York City's elite public high schools violates Title VI of the Civil Rights Act of 1964 and its implementing regulations**

Dear New York Office:

Each year, nearly 30,000 eighth and ninth graders compete for the chance to attend Stuyvesant High School (Stuyvesant), The Bronx High School of Science (Bronx Science), Brooklyn Technical High School (Brooklyn Tech), and five other public high schools that are among the best schools in New York City and, indeed, the nation. Known as the "Specialized High Schools," these eight prestigious institutions are operated by the New York City Department of Education (NYCDOE). They provide a pathway to opportunity for their graduates, many of whom go on to attend the country's best colleges and universities, and become leaders in our nation's economic, political, and civic life.

For decades, a single factor has been used to determine access to these Specialized High Schools—a student's rank-order score on a 2.5 hour multiple choice test called the Specialized High School Admissions Test (SHSAT). Under this admissions policy, regardless of whether a student has achieved straight A's from kindergarten through eighth grade or whether he or she demonstrates other signs of high academic potential, the only factor that matters for admission is his or her score on a single test. Because there is a limit to what any single factor can predict about a person's academic promise, let alone his or her potential to succeed and thrive in life, admissions decisions based solely on a high-stakes test have been roundly criticized by educational experts and social scientists. They also defy common sense. By relying upon a test as the sole criterion, the admissions policy for the Specialized High Schools does not fully capture any student's academic merit or his or her potential. This is particularly true of a standardized test given to thirteen- and fourteen-year-olds.

But there is an even more basic problem with the Specialized High Schools admissions policy. For decades, the NYCDOE has continued to use rank-order SHSAT scores as the sole admissions criterion, even though it has never shown that this practice (or the test itself) validly and reliably predicts successful participation in the programs offered by the Specialized High Schools.

As a result of the NYCDOE's exclusive, unjustified, and singular reliance on the SHSAT, many fully qualified, high-potential students are denied access to the life-changing experiences that the Specialized High Schools offer. In a community as diverse as New York City, it is particularly critical that these pathways to leadership be "visibly open to talented and qualified

individuals of every race and ethnicity." *Grutter v. Bollinger*, 539 U.S. 306, 332 (2003). Yet, year after year, thousands of academically talented African-American and Latino students who take the test are denied admission to the Specialized High Schools at rates far higher than those for other racial groups.

The impact is particularly severe at Stuyvesant and Bronx Science—two of the Specialized High Schools that serve the largest numbers of students, have the longest track records of educational excellence, and are among the most popular for test-takers. For example, of the 967 eighth-grade students offered admission to Stuyvesant for the 2012-13 school year, just 19 (2%) of the students were African American and 32 (3.3%) were Latino. While these figures show a *de minimis* increase over the prior two years, they are worse than figures from three years ago. Indeed, the overall trend for the Specialized High Schools is one of increasing racial disparities over time. *See* Appendix A (Specialized High Schools Admissions Offers 2009-2012).

Because determining admissions to the Specialized High Schools based solely on rank-order SHSAT scores causes this unjustified, racially disparate impact, the admissions policy violates Title VI of the Civil Rights Act of 1964 and its implementing regulations. *See* 42 U.S.C. § 2000d; 34 C.F.R. § 100.3. Moreover, there are equally effective, less discriminatory alternatives available to select academically talented students. Following the well-established model for college admissions, other high schools in New York City, New York State, and across the nation use admissions policies that consider multiple measures—not just one factor, such as a standardized test. Other factors may include middle school grades, teacher recommendations, leadership, community service, other aspects of applicants' own backgrounds and experiences, as well as the demographic profile of students' middle schools and neighborhoods. When considered in combination, such factors help assess students' achievements and capabilities in the context of the opportunities they have received. At both the high school and college levels, admissions procedures that rely on multiple measures can yield classes that are both diverse *and* meet high standards of academic excellence. By continuing to rely exclusively on rank-order SHSAT scores to determine admission to the Specialized High Schools, the NYCDOE is failing to follow best practices among education experts nationwide, as well as the well-established test development standards set forth by the American Psychological Association, the American Educational Research Association, and the National Council on Measurement in Education.

Diversity of backgrounds and perspectives has always been New York City's and the United States' strength. It helps drive innovation, new ideas, and our national prosperity. *See Grutter*, 539 U.S. at 330-31 Thus, the key pathways to opportunity in our society, such as those provided by the Specialized High Schools, must be open and accessible to good students with bright educational futures from all communities. Ensuring all young people an opportunity to succeed is in everyone's interest. The Specialized High Schools admissions policy can no longer be allowed to deprive students of a fair chance to demonstrate their merit.

To redress this ongoing persistent pattern and practice of unjustifiable and disproportionate exclusion of African-American and Latino students from the Specialized High Schools, the NAACP Legal Defense and Educational Fund, Inc., LatinoJustice PRLDEF and the Center for Law and Social Justice at Medgar Evers College file this complaint on behalf of the NYC Coalition for Educational Justice, La Fuente, the Alliance for Quality Education, New

York Communities for Change, Black New Yorkers for Educational Excellence, the Community Service Society of New York, the Garifuna Coalition, USA Inc., Make the Road New York, the Brooklyn Movement Center, UPROSE and DRUM-Desis Rising Up and Moving.

To be clear, this complaint does not contend that federal law forbids *any* use of tests in the admissions process for the Specialized High Schools; but it does contend that federal law prohibits admissions policies that inappropriately utilize scores on tests, like the SHSAT, that have not been properly validated as a fair predictor of student performance. In the absence of any attempt by the NYCDOE to validate the SHSAT and because there are equally effective, less discriminatory alternatives available, the NYCDOE should not be permitted to use the SHSAT as the sole criterion to determine which students should be admitted to the Specialized High Schools. Instead, the NYCDOE—in consultation with the New York State Department of Education (NYSDOE), the organizations filing this complaint, educators, parents, and students who are directly affected—should collectively devise a fair and workable admissions policy.

## I.  PARTIES

The organizational complainants bring this complaint on behalf of African-American and Latino students who have been and who will continue to be unjustifiably and disproportionately excluded from some of the best public schools in New York City and the nation as a whole. Among the complainants are organizations with members who are African-American and Latino students (and/or parents of such students) who have taken the SHSAT, either in Fall 2011 or previously, but did not receive an offer of admission to any one of the Specialized High Schools, even though they excelled in middle school and have shown significant promise for academic and civic leadership in high school and beyond. The complainant organizations also have members who are African-American and Latino students (and/or parents of such students) who intend to take the SHSAT this year and in the coming years.

The complainants include the NYC Coalition for Educational Justice (CEJ), La Fuente, the Alliance for Quality Education (AQE), New York Communities for Change (NYCC), Black New Yorkers for Educational Excellence (BNYEE), the Community Service Society of New York (CSS) the Garifuna Coalition USA, Inc. (GCU), Make the Road New York (MRNY), the Brooklyn Movement Center (the MC), UPROSE and Desis Rising Up and Moving (DRUM). CEJ is a collaborative of community-based organizations led by parents committed to ending the inequities in New York City's public school system. La Fuente is an umbrella organization that brings together labor and community partners to engage in neighborhood-based grassroots organizing efforts around immigrant and worker rights issues, developing campaigns to improve their communities. AQE is a statewide non-profit organization that unites parents, children's advocates, schools, teachers, clergy, and others to advocate for high quality public education. NYCC is a coalition of working families in low and moderate income communities working to ensure that every family throughout New York has access to quality schools, affordable housing, and good jobs. BNYEE is a progressive organization dedicated to building a black education movement. CSS draws on a 169-year history of excellence in addressing the root causes of economic disparity, responding to urgent, contemporary challenges through applied research, advocacy, litigation, and innovative program models that strengthen and benefit all New

Yorkers. GCU is a non-profit organization that serves as a resource, forum, advocate, and united voice for the Garifuna immigrant community. MRNY builds the power of Latino and working class communities to achieve dignity and justice through organizing, policy innovation, transformative education, and survival services. The MC is a membership-led, direct-action, community organizing body that focuses on parent and education organizing, street action, leadership development, and communication organizing. UPROSE is an environmental and social justice community-based organization dedicated to the empowerment of Southwest Brooklyn residents through environmental, sustainable development, and youth justice campaigns. DRUM unites South Asian low wage immigrant workers, youth, and families in New York City to advocate for economic and educational justice, and civil and immigrant rights. Appendix B contains additional information on each of the organizational complainants.

Counsel for complainants are the NAACP Legal Defense and Educational Fund, Inc. (LDF), LatinoJustice PRLDEF, and the Center for Law and Social Justice at Medgar Evers College. LDF is a non-profit legal organization established under New York law that has worked for over seven decades to dismantle racial segregation and ensure equal educational opportunities for all. LatinoJustice PRLDEF is a 40-year-old not-for-profit civil rights organization that—through litigation, advocacy and education—works to protect opportunities for all Latinos to succeed in school and work, and to sustain their families and communities. The Center for Law and Social Justice at Medgar Evers College is a community-based legal organization that specializes in addressing racial justice issues.

The respondents are the New York City Department of Education (NYCDOE) and the New York State Department of Education (NYSDOE), to the extent that relief implicates not only the NYCDOE's policies but also the laws and policies of the State of New York. Both respondents are recipients of federal financial assistance from the U.S. Department of Education.

## II. BACKGROUND

### A.     New York City's eight Specialized High Schools

Currently, there are eight Specialized High Schools in New York City that admit students based exclusively on a single standardized test administered annually.

| School | 2010-2011 Enrollment[1] | Location |
|---|---|---|
| Brooklyn Technical High School | 5141 | Brooklyn |
| Stuyvesant High School | 3288 | Manhattan |
| The Bronx High School of Science | 3017 | Bronx |
| Staten Island Technical High School | 1020 | Staten Island |
| Queens High School for the Sciences at York College | 408 | Queens |
| High School for Mathematics, Science, and Engineering at City College | 407 | Manhattan |
| High School for American Studies at Lehman College | 371 | Bronx |
| Brooklyn Latin School | 336 | Brooklyn |

Since the 1970s, New York state law has mandated this admissions process for three of these eight Specialized High Schools: the Bronx High School of Science, Stuyvesant High School, and Brooklyn Technical High School. *See* Appendix C (New York State Law Governing New York City Specialized High Schools). Specifically, state law requires that admissions to these three schools must be based "solely and exclusively" upon student's rank-order scores on "a competitive, objective and scholastic achievement examination." N.Y. Educ. Law § 2590-h(1)(b); Appendix C.[2]

---

[1] The New York State School Report Card: Accountability and Overview Reports (2010-11), *available at* https://www.nystart.gov/publicweb/ (last visited Sept. 19, 2012). School report cards for the 2011-12 school year were not available at the time this complaint was filed.

[2] In addition to these eight test-based schools, Fiorello H. LaGuardia High School of Music & Art and Performing Arts is considered a Specialized High School. *See* N.Y. Educ. Law § 2590-h(1)(b); Appendix C. For the purposes of this complaint, however, the term Specialized High Schools will refer only to the eight test-based schools. Under state law, admission to LaGuardia is based on multiple measures, including music, dance, or drama arts auditions and a

In addition, New York State law *permits* (but has never required) the NYCDOE to designate other high schools as Specialized High Schools. Once designated, those schools are also subject to the same single-test admissions process specified in N.Y. Educ. Law § 2590-h(1)(b); Appendix C. Pursuant to this provision, in recent years, the NYCDOE has identified five additional schools that now base their admissions decisions solely on rank-order SHSAT scores. They are Brooklyn Latin School; the High School for Mathematics, Science, and Engineering at City College; the High School for American Studies at Lehman College; Queens High School for the Sciences at York College; and Staten Island Technical High School. *See* Appendix D at 5-7 (NYCDOE, Specialized High Schools Student Handbook (2011-2012)).

The three original Specialized High Schools—Bronx Science, Stuyvesant, and Brooklyn Tech—are the oldest and best known. Together, they serve over 11,000 students; five times as many students as are collectively served by the other five schools that have been designated by the NYCDOE as Specialized High Schools in recent years.

In the words of New York City Schools Chancellor Dennis M. Walcott, the Specialized High Schools are the "true gems" of New York City's public school system. Elissa Gootman, *In Elite N.Y. Schools, a Dip in Blacks and Hispanics*, N.Y. Times, Aug. 18, 2006.[3] Five of the Specialized High Schools rank on *U.S. News and World Report*'s most recent list of America's top 100 high schools, and they are also among the top fifteen schools in New York State and the top ten schools in New York City. *See America's Best High Schools*, U.S. News and World Report, http://www.usnews.com/education/best-high-schools/national-rankings (last visited Sept. 18, 2012) (listing Stuyvesant High School, Bronx Science, the High School of American Studies at Lehman College, Queens High School for the Sciences at York College, and Staten Island Technical High School). In addition, *Newsweek*'s recent list of the best 1,000 public schools in the nation ranks Stuyvesant High School, Bronx Science, and Queens High School for the Sciences at York College as among the top 100 schools "that have proven to be the most effective in turning out college-ready grads." *America's Best High Schools 2012*, Newsweek, http://www.thedailybeast.com/newsweek/2012/05/20/america-s-best-high-schools.html (last visited Sept. 18, 2012).

Top ranked colleges and universities aggressively recruit graduates of the Specialized High Schools, who have gone on to excel as award-winning scientists, inventors, government officials and corporate leaders. For instance, Bronx Science alone boasts at least seven Nobel Laureates among its alumni (more than most *countries*), and is the nation's all-time leader in the Westinghouse/Intel Science Talent Search competition. Every year, Stuyvesant is among the high schools with the highest number of National Merit Scholars, and Stuyvesant's notable alumni include at least four Nobel Laureates, as well as Academy Award winning actors, Olympic medalists, CEOs of major corporations, Members of Congress (including Rep. Jerrold Nadler of New York), judges (including the Hon. Denny Chin of the United States Court of

---

review of academic records. *Id.* As described below, the student body at Fiorello H. LaGuardia High School of Music & Art and Performing Arts includes a higher percentage of African Americans and Latinos than the eight test-based schools.

[3] Articles published or posted in newspapers and other similar sources are compiled in Appendix E in the order they are first cited herein.

Appeals for the Second Circuit), and Eric Holder, the current Attorney General of the United States. *See* Alec Klein, *A Class Apart: Prodigies, Pressure, and Passion Inside One of America's Best High Schools* 25-27, 279-87 (2007); Javier C. Hernandez, *Holder, High Achiever Poised to Scale New Heights*, N.Y. Times, Nov. 30, 2008.

### B.   Specialized High Schools Admissions Test (SHSAT) and placement process

As discussed above, under New York state law, admission to the three Specialized High Schools enumerated in the statute, as well as those later designated by the NYCDOE on its own, must be based "solely and exclusively" on student's rank-order scores on "a competitive, objective and scholastic achievement examination." N.Y. Educ. Law § 2590-g(12) (1996); Appendix C. Accordingly, each fall the NYCDOE administers a 2.5 hour multiple-choice exam, known as the Specialized High Schools Admissions Test (SHSAT).[4]

In order to take the SHSAT, students must be residents of New York City, but they need not attend a New York City public school; students who attend elite private and parochial schools may also apply. The vast majority of test-takers are eighth graders applying for admission to a Specialized High School for the ninth grade; but ninth graders are also eligible to test into tenth grade. *See* Appendix D at 9.[5]

The SHSAT has two sections: verbal and mathematics. The verbal section covers logical reasoning and reading comprehension. The mathematics section tests arithmetic, algebra, probability, statistics, geometry, and, on the ninth grade test, trigonometry. *See* Appendix G (NYCDOE, Test Information: Specialized High School Admissions). For each section, the total number of correct answers is converted into a "scaled score" using a formula that varies from year to year based on the difficulty level of questions and the relative performance of test-takers; then the scaled scores are added together to obtain a final "composite score." *See* Appendix D at 16-17; *see also* David Herszenhorn, *Admission Test's Scoring Quirk Throws Balance into Question*, N.Y. Times, Nov. 12, 2005.

---

[4] For the last several admissions cycles, the NYCDOE has contracted with a private testing company called NCS Pearson, Inc. for the SHSAT test development, administration, and scoring processes. *See* Appendix F.1 (Redacted Extension Agreement with NCS Pearson, Inc. for the Provision of a Specialized High School Assessment, May 1, 2009). In January 2011, the NYCDOE's Panel for Education Policy renewed Pearson's contract for six years. *See* Contract Agenda, Panel for Education Policy (January 19, 2011), http://schools.nyc.gov/NR/rdonlyres/73E0B54A-DDCF-437F-A42B-F7140A03059D/0/January2011FinalRAso.pdf; Public Meeting Minutes of Action, Panel for Education Policy (Jan. 19, 2010), http://schools.nyc.gov/NR/rdonlyres/0C9D6B81-D341-472C-B098-126180401DAB/98241/moa11911doc1.pdf. Pearson previously acquired the prior SHSAT vendor, American Guidance Service, Inc., which had administered the SHSAT since at least the late 1980s. *See* Appendix F.2 (Requirements Contract between the Board of Education of the City of New York and American Guidance Service, Inc., March 14, 1989).

[5] For example, according to data received from the NYCDOE, 1,726 ninth-graders took the Fall 2010 SHSAT, compared to 28,281 eighth-graders.

As part of the application process, each student is asked to list the Specialized High Schools he or she wants to attend in order of preference before taking the SHSAT. Once the composite scores on the SHSAT are finalized, the scores of all of the thousands of test-takers are ranked in descending order, from highest to lowest. Beginning with the highest scorer, the NYCDOE offers each student admission to his or her first-choice school if that school has seats still available. *See* Appendix D at 13; Appendix C. If all seats in the student's first-choice school have already been offered to higher scorers, the student is offered admission to his or her second-choice school, if seats are available, and so on. The NYCDOE proceeds down the list of students and schools until there are no remaining open seats in any of the eight Specialized High Schools. Appendix D at 13; Appendix C.[6] Students who are not offered admission to any Specialized High School fall back into the general pool of students vying for admission to other New York City high schools.

There is no pre-established "cut-off score" required for admission to any particular school. But, as a practical matter, the cut-off score for any school in a given year is equivalent to the lowest score for a student admitted to that school.[7] In this way, the cut-off scores at different schools may vary from year to year. Stuyvesant and Bronx Science have historically had the highest cut-off scores because these schools tend to be the top choices of the highest-scoring students. *See* Appendix A.4 (Cut-Off Scores for Fall 2010 SHSAT); Appendix H at 7 (Joshua Feinman, *High Stakes but Low Validity? A Case Study of Standardized Tests and Admissions into New York City Specialized High Schools* (2008)).

---

[6] Because not all students offered admission ultimately enroll, the number of offers for each school exceeds its seating capacity—based on a formula determined by the school's expected yield. *See* Appendix G.

[7] *See* N.Y Educ. Law § 2590-g(12)(b) (1996) ("The cut-off score shall be determined by arranging the scores of all candidates who took the examination and who then commit themselves to attend the school in descending order from the highest score and counting down to the score of the first candidate beyond the number of openings available."); Appendix C.

### C.   Severe and continuing racial disparities in offers of admission based on SHSAT results

According to data provided by the NYCDOE and reported by the press in recent years, African-American and Latino students who take the SHSAT are far less likely to receive admissions offers than peers from other racial groups. *See* Appendix A (Specialized High Schools Admissions Offers, 2009-12). For any given admissions year, the disparity can be understood in at least two ways: "demographic comparisons" (comparing the demographics of test-takers to the demographics of those who received admissions offers), and "acceptance rates" by race (the percentage of test-takers in each racial group who received admissions offers). The data analysis below highlights the trend in recent years:

**Acceptance Rates for Eighth Graders By Race for Fall 2008 - 2011 SHSAT exams
(for admission in the 2009-2010 to 2012-2013 School Years)**



### 1.   Fall 2011 SHSAT (for admission to the 2012-13 freshman class)

#### a.   *Demographic comparisons for Fall 2011 SHSAT*

African Americans comprised 23.1% of the 27,612 eighth-graders who took the Fall 2011 SHSAT, but only 6.0% of the 5,360 eighth-graders who received admissions offers to Specialized High Schools for the 2012-13 academic year. Latinos comprised 22.2% of eighth-grade test-takers that year, but only 7.7% of eighth-graders who received admissions offers.[8] By

_____

[8] This complaint focuses on eighth-grade test-takers because they comprise the vast majority of the students who take the SHSAT; ninth-grade is the primary entry point for all the

contrast, Asian-American and white students respectively accounted for 25.8% and 14.9% of the eighth-grader test-takers, yet accounted for 46.5% and 23.4% of the eighth-grade students who received admissions offers. *See* Appendix A.1.[9]

Racial disparities were evident for the Specialized High Schools as a whole; but they were particularly severe at Stuyvesant and Bronx Science—the Specialized High Schools that are the most popular among SHSAT top scorers and are considered by many to be the most prestigious. For instance, when admissions offers were made in February 2012 based on the Fall 2011 SHSAT results, just 19 (2.0%) of the 967 eighth-graders offered admission to Stuyvesant were African Americans, and 32 (3.3%) were Latino; at Bronx Science, only 32 (3.1%) of the 1,020 offers went to African Americans, while 57 (5.6%) went to Latinos. *See id.*

b.   *Acceptance rates for Fall 2011 SHSAT*

Analyzing this data in terms of acceptance rates highlights the racial disparities even more sharply. The overall acceptance rate for Fall 2011 test-takers was 19.4%. But only 5.0% of African-American test-takers and 6.7% of Latino test-takers received offers of admission. By comparison, acceptance rates for Asian-American and white eighth-grade test-takers were 35.0% and 30.6%, respectively. *Id.* Thus, African-American and Latino test-takers were far less likely to be offered admission to the Specialized High Schools than their Asian-American and white peers.[10]

2.   Fall 2010 SHSAT (admissions to the 2011-12 freshman class)

a.   *Demographic comparisons for Fall 2010 SHSAT*

For the Fall 2010 SHSAT, African Americans comprised 23.1% of the 28,281 eighth-grade test-takers, but accounted for only 5.4% of the 5,404 eighth-grade students who received admissions offers to Specialized High Schools for the 2011-12 academic year. Latinos

---

Specialized High Schools. Counsel for the complainants, along with Advocates for Children of New York, sought more detailed demographic data from the NYCDOE through a request under New York Freedom of Information Law (FOIL), Public Officers Law § 84 *et seq.*, initiated in November 2010, but the NYCDOE repeatedly delayed and then refused to release the requested information. *See* Appendix I (Selected Documents pertaining to New York Freedom of Information Law (FOIL) Request filed by LDF and Advocates for Children of New York).

[9] The NYCDOE categorizes as "unknown" the racial background for 13.6% of eighth-grade students who took the Fall 2011 SHSAT and 16.1% of those who received admissions offers, because they were either enrolled in a private or parochial school, did not fill out the NYCDOE's ethnic identification form, or are multi-racial. *See* Appendix A. Even in the highly unlikely event that all of these students are African American or Latino, statistically significant racial disparities in the acceptance rates for these two groups would still be evident.

[10] Compared to the two prior years, the acceptance rate for African Americans and Latinos did increase slightly for the Fall 2011 SHSAT; but this small uptick is only a marginal improvement. Moreover, the racial disparities in admissions offers based on the Fall 2011 SHSAT were still worse than they were for the Fall 2008 SHSAT. *See* Appendix A.

comprised 21.5% of test-takers, but only 6.5% of students who received admissions offers. Asian-American and white test-takers accounted for 25.7% and 15.1% of the test-takers and 46.5% and 23.3% of the students who received admissions offers. *See* Appendix A.2.

        b.     *Acceptance rates based on Fall 2010 SHSAT*

While the overall acceptance rate was 19.1%, African-American and Latino test-takers had acceptance rates of 4.5% and 5.7%, respectively. By comparison, acceptance rates for Asian-American students and white students were 34.6% and 29.5% respectively. *Id.; see also* Sharon Otterman, *New York's Top Public High Schools Admit Fewer Blacks and Hispanics*, N.Y. Times, City Room Blog (Feb. 11, 2011). Again, racial disparities were evident for all eight Specialized High Schools, and were particularly severe for Stuyvesant and Bronx Science. *See* Appendix A.2. Just 12 (1.3%) of the 937 students offered admission to Stuyvesant were African Americans, and 13 (1.4%) were Latino; at Bronx Science, only 26 (2.5%) of the 1,044 offers went to African Americans, while 53 (5.1%) went to Latinos. *Id.*

        3.     <u>Admissions disparities in prior years</u>

Analysis of racial disparities in prior years, in terms of both the percentage of admissions offers and acceptance rates, shows similar trends. *Id.; see also* Jennifer Medina, *A Demographic Breakdown of Who Took, and Passed, the Test*, N.Y. Times, City Room Blog (Feb. 16, 2010) (noting similar disparities for the Fall 2009 SHSAT); Jennifer Medina, *At Top City Schools, Lack of Diversity Persists*, N.Y. Times, City Room Blog (Feb. 5, 2010) (same); Helen Zelon, *What Will It Take to Alter the Makeup of Top Schools?* City Limits, Apr. 6, 2009 (noting similar disparities for the Fall 2008 SHSAT); Javier Hernandez, *Gap Persists in Test for Specialized High Schools*, N.Y. Times, City Room Blog (Feb. 6, 2009) (same); Javier Hernandez, *Racial Imbalance Persists at Elite Public Schools*, N.Y. Times, Nov. 8, 2008 (noting similar disparities for the Fall 2007 SHSAT).

Thus, when the NYCDOE mails out offers of admissions for the 2013-14 school year, based on the results of the SHSAT administered in Fall 2012, it is plainly foreseeable that the disparate rates of admission results will continue to reflect the pattern and practice of racial discrimination that has persisted for decades.[11]

---

[11] This complaint focuses only on the racial disparities in admission to the Specialized High Schools of those students who take the SHSAT. In addition, African-American and Latino students are less likely to take the SHSAT than their fellow students. For example, African Americans and Latinos respectively made up 23.1% and 21.5% of the eighth-graders who took the SHSAT administered in Fall 2011, whereas the October 2011 official audit of student demographics reveals that 28.9% of the New York City public school system's eighth-grade student population were African American and 39.4% were Latino. *See* NYCDOE, Official Audited October 31st Register (JFORM), October 2011, http://schools.nyc.gov/AboutUs/data/stats/Register/JFormbyDistricts/default.htm (overview of student demographics).

### D.    Persistent racial isolation in the Specialized High Schools

In addition to locking many African-American and Latino applicants out of opportunity, the racially disparate impact caused by the continued use of rank-order scores on the SHSAT as the sole criterion for admission to the Specialized High Schools also perpetuates the racial isolation of African-American and Latino students enrolled in those schools, especially Stuyvesant and Bronx Science. *See* The New York State School Report Card: Accountability and Overview Reports (2010-11), *available at* https://www.nystart.gov/publicweb/ (last visited Sept. 19, 2012). For example, in the 2010-11 school year at Stuyvesant and Bronx Science, African Americans comprised only 1% and 3%, respectively, of all enrolled students. *Id.* Latinos represented 3% of Stuyvesant's students and 8% of Bronx Science's students. *Id.*; *see also* Fernanda Santos, *To Be Black at Stuyvesant High*, N.Y. Times, Feb. 25, 2012.

Despite some minor variation from year to year, there has been a decades-long downward trend in African-American and Latino enrollment at Stuyvesant and Bronx Science, as well as the Specialized High Schools overall. *See* Elissa Gootman, *In Elite N.Y. Schools, a Dip in Blacks and Hispanics*, N.Y. Times, Aug. 18, 2006; Helen Zelon, *What Will It Take to Alter the Makeup of Top Schools?*, City Limits, Apr. 6, 2009.

For example, the percentage of African-American students enrolled at Bronx Science dropped from 11.8% in 1994-95 to only 3.0% in the 2010-11 school year; at Stuyvesant, African-American student enrollment fell from 12.9% in 1979 to only 4.8% in 1994-95 and eventually to a meager 1.0% during the 2010-11 school year. *See* The New York State School Report Card: Accountability and Overview Reports (2010-11), *available at* https://www.nystart.gov/publicweb/ (last visited Sept. 19, 2012); Alex Klein, *A Class Apart: Prodigies, Pressure, and Passion Inside One of America's Best High Schools* 66 (2007); Elissa Gootman, *In Elite N.Y. Schools, a Dip in Blacks and Hispanics*, N.Y. Times, Aug. 18, 2006); Tom Allon, *The Blackout at Stuyvesant and Bronx Science: Students of Color Have Disappeared*, N.Y. Daily News, May 25, 2011. Latino enrollment has also declined at these two schools during the same time period. Elissa Gootman, *In Elite N.Y. Schools, a Dip in Blacks and Hispanics*, N.Y. Times, Aug. 18, 2006.

At Brooklyn Tech, African Americans comprised 24% of the student body in the 1999-2000 school year; but by the 2011-12 school year, that figure fell to only 10%. *See* Fernanda Santos, *To Be Black at Stuyvesant High*, N.Y. Times, Feb. 25, 2012. Even the Specialized High Schools with the largest proportions of African-American and Latino students (Queens High School for the Sciences, the High School for Mathematics, Science, and Engineering at City College, and the High School for American Studies at Lehman College) have experienced general declines in enrollment among these groups. *See* Appendix A; Elissa Gootman, *In Elite N.Y. Schools, a Dip in Blacks and Hispanics*, N.Y. Times, Aug. 18, 2006.

As a result of this persistent racial isolation, African-American and Latino students often struggle to obtain the support necessary to thrive in these Specialized High Schools. The small number of African-American and Latino students at these schools can lead to severe racial isolation. *See* Fernanda Santos, *To Be Black at Stuyvesant High*, N.Y. Times, Feb. 25, 2012. In addition, racial tensions have exacerbated the harms of racial isolation at the Specialized High

Schools. *See, e.g., id.* (describing a YouTube video by a group of white Stuyvesant students rapping racist and otherwise offensive lyrics).

The U.S. Supreme Court has recognized the importance of having a critical mass of minority students at the college level so that they are encouraged "to participate in the classroom and not feel isolated." *Grutter*, 539 U.S. at 318 (internal quotation marks and citation omitted). The harms of racial isolation, and the benefits of diversity, are equally apparent at the K-12 level. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 797 (2007) (Kennedy, J., concurring in part and concurring in the judgment) ("This Nation has a moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children."). Notably, both educational research and Supreme Court precedent make clear that the educational benefits of diversity are not limited to African-American and Latino students. Recent research confirms that students of all backgrounds who are exposed to diverse learning environments are more likely than their peers to be prepared to function in an increasingly diverse world.[12] Unfortunately, these benefits are not fully realized at the Specialized High Schools.

---

[12] *See, e.g.,* Linda R. Tropp & Mary A. Prenovost, *The Role of Intergroup Contact in Predicting Children's Interethnic Attitudes, in* Intergroup Attitudes and Relations in Childhood Through Adulthood 236 (Sheri R. Levy & Melanie Killen eds., 2008); National Academy of Education, *Race-Conscious Policies for Assigning Students to Schools: Social Science Research and the Supreme Court Cases* (2007); Elizabeth Stearns, *Long-Term Correlates of High School Racial Composition*, 112 Teachers Coll. Rec. 1654 (2010); Rosyln Mickelson, *Twenty-first Century Social Science on School Racial Diversity and Educational Outcomes*, 69 Ohio St. L.J. 1173 (2008).

III.   THE SPECIALIZED HIGH SCHOOLS' ADMISSIONS POLICY VIOLATES
       FEDERAL CIVIL RIGHTS LAW

   A.   **Applicable legal standard**

   Title VI of the Civil Rights Act of 1964 provides that recipients of federal financial
assistance may not exclude students from participation in their programs or activities on the basis
of race, color, or national origin. 42 U.S.C. § 2000d. The regulations promulgated by the U.S.
Department of Education to implement Title VI prohibit a recipient of federal funds from
"utiliz[ing] criteria or methods of administration which have the *effect* of subjecting individuals
to discrimination because of their race, color, or national origin." 34 C.F.R. § 100.3(b)(2)
(emphasis added); *see also* U.S. Dep't of Justice, *Title VI Legal Manual* 47-49 (2001). Thus, the
U.S. Department of Education's Office for Civil Rights (OCR) may bring enforcement actions
against recipients of federal funds that implement policies with a disparate impact, regardless of
whether the policy in question was motivated by discriminatory intent. On this authority, OCR
has jurisdiction to investigate a complaint that school admissions policies maintained by a
recipient of federal funds violate this disparate-impact regulation. *See* 34 C.F.R. § 100.7.

   Disparate impact claims are analyzed using a three-pronged test:

   *First*, a prima facie case of a Title VI disparate-impact violation is established if a
recipient of federal funds uses selection criteria that have the effect of disproportionately
excluding students of a particular racial or ethnic group. *See Larry P. ex rel. Lucille P. v. Riles*,
793 F.2d 969, 982 (9th Cir. 1984); U.S. Dep't of Justice, *Title VI Legal Manual* 49-50 (2001).
While there is "no rigid mathematical threshold" for demonstrating a prima facie case of
disparate impact, *Groves v. Alabama State Bd. of Educ.*, 776 F. Supp. 1518, 1526 (M.D. Ala.
1991) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-95 (1988) (plurality)),
federal courts use "one of several forms of statistical analysis to reach reliable inferences about
racial disparities in a population based on the performance of a particular sample." *Id*. at 1527.
For instance, borrowing from the employment discrimination context, courts have used the
"four-fifths" test. Adopted from guidelines promulgated by the Equal Employment Opportunity
Commission, this evidentiary test provides that evidence of a selection rate for any minority
group that is less than four-fifths (or 80 percent) of the selection rate for the group with the
highest rate will be considered evidence of adverse impact. *Id*. at 1526-27; 29 C.F.R. §
1607.4(D).

   *Second*, if a prima facie case is established, then the respondent must demonstrate that the
selection criteria are "required by educational necessity." *Larry P.*, 793 F.2d at 982 & nn.9-10
(internal quotation marks omitted). To meet this burden, the recipient of federal funds must
show that the challenged practice bears a manifest relationship to an objective that is "legitimate,
important, and integral to [its] educational mission." *Elston v. Talladega County Bd. of Educ.*,
997 F.2d 1394, 1413 (11th Cir. 1993); U.S. Dep't of Justice, *Title VI Legal Manual* 50-53
(2001). Therefore, justifications that either do not further, or run counter to, the educational
mission of the federal funds recipient (including superficial or nominal justifications) are entirely
insufficient to satisfy this standard. Moreover, where, as here, the challenged practice is an
admissions test, it must be used in a manner that validly and reliably predicts applicants'
performance on metrics that are essential to satisfactory participation in the educational program

at issue.[13] *See Larry P.*, 793 F.2d at 983 (holding that use of IQ tests to place students in special classes for the "educable mentally retarded" violated Title VI's disparate-impact regulation because these tests resulted in the over-identification of African Americans and had not been validated for this purpose); *cf. United States v. Fordice*, 505 U.S. 717, 736-37 (1992) (ruling that Mississippi's use of ACT scores as the sole means to determine college admission was not educationally justified because, among other factors, the ACT's administering organization discouraged this practice). As OCR has explained, "[a]ppropriate validation" of tests used for admissions or other placement decisions "would include documentation of the relationship between what constructs are being measured in the test and what knowledge and skills are actually needed in the future placements. Evidence should also provide documentation that scores are not significantly confounded by other factors irrelevant to the knowledge and skills the test is intending to measure." U.S. Dep't of Ed., Office for Civil Rights, *The Use of Tests as Part of High-Stakes Decision-Making for Students: A Resource Guide for Educators and Policy-Makers* 25 (2000) (hereinafter "OCR, *Use of Tests*").

*Third*, even when a recipient of federal funds can show that its selection criteria are justified by educational necessity, the recipient can still be held liable under Title VI if there are alternative practices available that would be equally effective in serving the recipient's educational mission while having less of a racially disparate impact. *See Young ex rel. Young v. Elston*, 997 F.2d at 1407; *Montgomery County Bd. of Educ.*, 922 F. Supp 544, 550 (M.D. Ala. 1996); U.S. Dep't of Justice, *Title VI Legal Manual* 53 (2001); OCR, *Use of Tests*, at 57.

  **B.**  **The Specialized High Schools' policy of basing admissions solely on rank-order SHSAT scores violates Title VI**

    1.  <u>The Specialized High Schools' admissions policy has a severe disparate impact on African Americans and Latinos</u>

The NYCDOE's offers of admissions to the Specialized High Schools based on the Fall 2011 administration of the SHSAT (and prior years) provide prima facie evidence of a Title VI disparate impact violation. As summarized in section II, *supra*, by using rank-order scores on the SHSAT as the sole criterion for admission to the Specialized High Schools, the NYCDOE disproportionately excludes African-American and Latino students from these life-changing educational programs that provide a critical pathway to local and national leadership.

A statistical comparison of acceptance rates reveals a highly significant disparity between the acceptance rates of either African Americans or Latinos, on the one hand, and those of either

---

  [13] In an analogous context, the U.S. Department of Education has promulgated guidelines requiring that recipients of federal funds may not "judge candidates for admission to vocational education programs on the basis of criteria that have the effect of disproportionately excluding persons of a particular race, color, national origin, sex, or handicap. However, if a recipient can demonstrate that such criteria have been validated as *essential to participation* in a given program *and* that alternative equally valid criteria that do not have such a disproportionate adverse effect are unavailable, the criteria will be judged nondiscriminatory. Examples of admissions criteria that must meet this test are . . . standardized tests. . . ." 34 C.F.R. pt. 100, app. B (emphasis added).

whites or Asian Americans, on the other.  A standard "difference-in-proportions" statistical test (a statistical convention used today by most social scientists) can be used here to determine if there is an actual difference between acceptance rates for students from different racial groups or if, instead, the difference between groups' test scores is simply a function of random fluctuation. For SHSAT admissions offers in Fall 2011 (and prior years), the difference-in-proportions test indicates that the disparity is statistically significant at the 1% level.  In other words, there is a less than 1% chance that the observed differences between the acceptance rates for students of different races occurred randomly.  Thus, the available data suggests that there is a highly significant racial disparity in Specialized High School acceptance rates.

Moreover, there is clear evidence of adverse impact under the "four-fifths test" because the selection rates for African Americans and Latinos are each less than 80 percent of the selection rates for either Asian Americans or whites. *See Groves*, 776 F. Supp. at 1526-27; 29 C.F.R. § 1607.4(D).  For instance, African-American and Latino eighth-grade students who took the Fall 2011 SHSAT (for admission in the 2011-12 academic year) had acceptance rates of 5.0% and 6.7%, respectively.  By comparison, acceptance rates for Asian-American and white eighth-grade test-takers were 35.0% and 30.6%, respectively.  *See* Appendix A.1.

This extreme disparity in acceptance rates translates into a profound lack of access and a long-standing lack of diversity in student enrollment.  The impact is particularly severe at Stuyvesant and Bronx Science.  Moreover, this pattern of racial disparity has persisted for years. *See* section II(C), *supra*.

2.  The discriminatory impact of the Specialized High Schools' admissions policy cannot be justified by educational necessity

a.  *The NYCDOE has not demonstrated that sole reliance on the SHSAT is a valid method for selecting students to attend the Specialized High Schools*

The racially disparate impact caused by the use of rank-order SHSAT scores as the sole admissions criteria for the Specialized High Schools is not justified by educational necessity.  In order to demonstrate educational necessity of this admissions policy and its attendant consequences, the NYCDOE and the NYSDOE must show that basing admissions to the Specialized High Schools exclusively on rank-order SHSAT scores (while ignoring grades and other sources of academic and other merit) validly and reliably identifies those students with the knowledge, skills, and abilities essential to satisfactory participation in the programs offered by the Specialized High Schools. *Cf.* 34 C.F.R. pt. 100, app. B.  In all the years that they have required or implemented various iterations of the SHSAT, the NYCDOE and the NYSDOE have never met—or even attempted to meet—that legal standard.

City officials have repeatedly acknowledged that they have never conducted a study attempting to validate the SHSAT.  For example, in response to a direct inquiry via a public records request, the NYCDOE indicated:

To the extent that you are requesting any studies of predictive validity (i.e., predictive studies of student performance), a diligent inquiry and search of

responsive records has been conducted, and I have been informed that *no predictive ability study of the SHSAT exists* in the custody and control of the New York City Department of Education.

Appendix I.2 (Letter from Joseph A. Baranello, NYCDOE to LDF and Advocates for Children, May 20, 2011) (emphasis added); *see also* David Herszenhorn, *Admission Test's Scoring Quirk Throws Balance into Question*, N.Y. Times, Nov. 12, 2005 (reporting that city officials acknowledged that they had never conducted studies to gauge the validity of the SHSAT).[14]

The NYCDOE has further conceded that it has never attempted to ensure that there is *any* relationship whatsoever between the content and/or the results of the SHSAT, on the one hand, and curricular and/or learning standards in the Specialized High Schools, on the other. *See* Appendix I.2 (Letter from Joseph A. Baranello, NYCDOE to LDF and Advocates for Children, Mach 17, 2011). Nor, we allege on information and belief, has the NYCDOE ever even attempted to identify the appropriate metrics of satisfactory participation in the programs offered by the Specialized High Schools. Notably, Specialized High School teachers and principals are not involved in development of the SHSAT, are not typically shown copies of the test or the score charts, and are not asked their opinion of the results. *See* David Herszenhorn, *Admission Test's Scoring Quirk Throws Balance into Question*, N.Y. Times, Nov. 12, 2005.

Moreover, the NYCDOE also failed to provide any documentation that it had conducted any studies, from 2007 to the present, to examine any relationship between SHSAT scores and the academic performance of SHSAT test takers, including student grades in middle and/or high school, and/or student performance on nationally-administered tests, including the SAT. Appendix I.5 (Letter from Joseph A. Baranello, NYCDOE to LDF and Advocates for Children, May 20, 2011). And notwithstanding a promise in 2006 to study the "demographic lopsidedness" of the SHSAT, the NYCDOE subsequently abandoned that effort. Javier Hernandez, *Racial Imbalance Persists at Elite Public Schools*, N.Y. Times, Nov. 8, 2008.

The failure to complete a validity study on the SHSAT violates the well-recognized educational testing standards prepared by a joint committee of the three leading organizations in

---

[14] In its limited response to counsel's FOIL request for material related to the validity of the SHSAT, the NYCDOE did provide a document entitled "Pearson Review of Tryout Items for Statistical Bias." *See* Appendix I.8 (Letter from Joseph A. Baranello, NYCDOE to LDF and Advocates for Children, July 22, 2011). That document purports to show that Pearson, the test developer, experimented with SHSAT test items to determine whether there was statistical bias based on, *inter alia*, race and ethnicity. Yet, the document provides no explanation of how this assessment was conducted or what steps the test developer took to correct for bias that is manifest in a number of the responses. More significantly, the assessment compares only the performance of whites and "non-whites" on the particular test items. Lumping together different minority groups has been discredited as a flawed approach to assessing equity, *cf. Parents Involved*, 551 U.S. at 723-24, especially considering that the long-standing racial disparities on the SHSAT are primarily between whites and Asian-American students, on the one hand, and African-American and Latino students, on the other. Even if the methodology were appropriate, however, identifying statistical bias is merely one component of a properly conducted validity assessment.

the area of educational testing—the American Psychological Association, the American Educational Research Association, and the National Council on Measurement in Education. *See* American Educational Research Association, American Psychological Association, and the National Council on Measurement in Education, *Standards for Educational and Psychological Testing* (1999) (hereinafter "*Joint Standards*"). The *Joint Standards* are widely accepted as the primary technical authority for developing educational tests. *See* OCR, *Use of Tests*, at 2, 6. According to these standards, "[w]hen test scores are intended to be used as part of the process for making decisions for educational placement . . . , empirical evidence documenting the relationship among particular scores, the instructional programs, and desired student outcomes should be provided." *Joint Standards*, at 147.

In his 2008 study of the SHSAT published jointly by the Arizona State University College of Education and the University of Colorado School of Education, Joshua Feinman, a senior economist at Deutsche Bank, aptly concluded: "[a]bsent predictive validity studies, there's no way to know if any test is providing useful information; and without well-specified objectives, it's not even clear what the test is supposed to do or predict." Appendix H at 2 (Joshua Feinman, *High Stakes but Low Validity? A Case Study of Standardized Tests and Admissions into New York City Specialized High Schools* (2008)).

Moreover, it is well accepted by educational testing experts that the greater the consequences of a test in determining educational opportunity, the more important it is to carefully validate the particular way in which it is used:

> As the stakes of testing increase for individual students, the importance of considering additional evidence to document the validity of score interpretations and the fairness in testing increases accordingly.

*Joint Standards*, at 141; *see* Appendix H at 5-6. Insofar as the NYCDOE and the NYSDOE have never attempted to establish that the SHSAT is a valid test of skills and knowledge that are integral to the educational mission of the Specialized High Schools, they are in clear violation of their Title VI obligations, not to mention well-established standards for educational testing.

b.   *It would be difficult, if not impossible, to validate the educational necessity of using rank-order scores on a single high-stakes test as the sole criteria for high school admissions*

Even if the NYCDOE and the NYSDOE were to attempt to validate the use of rank-order scores on the SHSAT as the sole criterion for admissions to the Specialized High Schools, it would be difficult, if not impossible, to meet this legal requirement.

As a general matter, it is well accepted by educational testing experts that "no single test score can be considered a definitive measure of a student's knowledge." OCR, *Use of Tests*, at 4 (quoting National Research Council, *High Stakes: Testing for Tracking, Promotion, and Graduation* 3 (Jay P. Heubert & Robert M. Hauser eds. 1999)); *see also* Arthur L. Coleman, *Excellence and Equity in Education: High Standards for High Stakes Tests*, 6 Va. J. of Soc. Pol'y & Law 81, 103 (1998). Because all potential admissions criteria have a degree of

uncertainty and imprecision, multiple criteria, used in combination, provide better insight into future student performance than rigid reliance on the rank-order results from a single imperfect criterion. *See Joint Standards*, at 141 ("The validity of individual interpretations can be enhanced by taking into account other relevant information about individual students before making important decisions.").

In his 2008 study of the SHSAT, Joshua Feinman highlighted some rather unusual features of the SHSAT that heighten the difficulties of successfully validating the use of rank-order scores on the SHSAT as a sole admissions criterion. *See* Appendix H.[15]

*First*, it is not possible to demonstrate that the SHSAT score of one student yields information demonstrably different than the score of other students ranked slightly above or below her. Even a well-designed test has a degree of statistical uncertainty because any test is only an estimate of the skills or knowledge that are tested. Thus, under the generally-accepted educational testing standards set forth in the *Joint Standards*, it is critical to justify that fine distinctions resulting from use of cut-off scores significantly and reliably correlate with differences in student performance and cannot simply be explained by statistical uncertainty. *See Joint Standards* 2.14, 4.19, 4.20, 4.21; Appendix H at 18-21. As OCR has previously explained:

> Validity evidence should generally be able to demonstrate that students above the cut score represent or demonstrate a qualitatively greater degree or different type of skills and knowledge than those below the cut score, whenever these types of inferences are made. In high-stakes situations, it is important to examine the validity of the inferences that underlie the specific decisions being made on the basis of the cut scores. In other words, what must be validated is the specific use of the test based on how the scores of students above and below the cut score are being interpreted.

OCR, *Use of Tests*, at 34; *see also Groves*, 776 F. Supp. at 1523-24 (holding that the Alabama State Board of Education violated Title VI's disparate-impact regulation by determining admission to undergraduate teacher training programs based on a cut-off score that had adverse impact on African Americans and bore no logical relationship to teacher competence).[16]

---

[15] Notably, when counsel for the complainants inquired about the existence of any validity or validation studies of the SHSAT, the NYCDOE directed counsel's attention to Feinman's study. Appendix I.5 (Letter from Joseph A. Baranello, NYCDOE to LDF and Advocates for Children, May 20, 2011). The data and other material released by the NYCDOE in limited response to the FOIL request submitted by counsel for the complainants do not satisfy the requirements in the *Joint Standards* for an appropriate validation study—including but not limited to the flaws and omissions identified by Feinman.

[16] Analogously in the employment context, Title VII of the 1964 Civil Rights Act requires employers to validate that rank-order selection of test-takers, or the use of a cut-off score, is justified by business necessity, when such a practice causes disparate impact. *See, e.g., Lewis v. City of Chicago*, 130 S. Ct. 2191, 2196, 2198 (2010); *Isabel v. City of Memphis*, 404 F.3d 404, 413-14 (6th Cir. 2005); *Guardians Ass'n of the N.Y. City Police Dep't v. Civil Serv. Comm'n*, 630 F.2d 79, 100-06 (2d Cir. 1980), *aff'd on other grounds*, 463 U.S. 582 (1983); *Firefighters Institute for Racial Equality v. City of St. Louis*, 616 F.2d 350, 358-60 (6th Cir.

However, as a result of the NYCDOE's process of offering admission to the Specialized High Schools based on strict rank ordering of students' scores, the scores of thousands of students who did not receive admissions offers may be statistically indistinguishable from the scores of those who did receive offers. Based on accepted standards, this renders the admissions decisions arbitrary.

*Second*, the NYCDOE administers several versions of the SHSAT each year, in part to reduce any opportunity for cheating. In order to ensure that students who take certain versions are not more likely to receive admissions offers than those who take other versions, a validity study would need to show that the NYCDOE has a highly accurate process of statistically equating the different versions of the SHSAT. *See* Appendix H at 21-24; *see also* Joint *Standards* 4.10, 4.11.

*Third*, the manner in which the SHSAT is scored is quite unlike other standardized tests. The SHSAT ranks students based on a single, "composite score," which combines the scaled score results of the verbal and math sections. Because the scaling of SHSAT scores awards more points per question as a test-taker approaches a perfect score on either the verbal or the math section, this unorthodox system of using only the composite score to rank students advantages those with a very high score on one section and a lower score on the other; in fact, such unbalanced scorers have a better chance of admission to a top-ranked school than students with relatively strong performance on both sections. Appendix H at 9-18; *see also* David Herszenhorn, *Admission Test's Scoring Quirk Throws Balance into Question*, N.Y. Times, Nov. 12, 2005 (noting that a student scoring in the 90th percentile on both sections would *not* gain admittance to his or her first choice schools, but a student scoring in the 99th percentile on one section and only the 50th percentile on the other, likely *would*).

Moreover, this unorthodox system advantages students whose families can afford costly test-prep tutoring and can learn how to game the system. Test-prep tutors who understand how the SHSAT is scored advise their students to spend as much time as possible not where they are weakest, but on their stronger subject. *See* Appendix H at 9-18; David Herszenhorn, *Admission Test's Scoring Quirk Throws Balance into Question*, N.Y. Times, Nov. 12, 2005; Tutors of Oxford NYC, *Everything You Need to Know About the SHSAT*, http://www.tutorsofoxford.com/SHSAT.htm#overview (last visited Sept. 19, 2012). By contrast, the NYCDOE's Specialized High Schools Student Handbook provides no guidance about the implications of this peculiar scoring system; to the contrary, it actually misleads students by recommending that they spend an equal amount of time studying for each section of the SHSAT. *See* Appendix D at 14.

---

1980); *Pina v. City of East Providence*, 492 F. Supp. 1240, 1246-47 (D. R.I. 1980). The *Uniform Guidelines on Employee Selection Procedures*, which establish a federal standard for employment testing, *see* 29 C.F.R. § 1607.1(A), expressly state that a strict rank-ordering system such as the one imposed by the NYCDOE—*i.e.*, treating a candidate as "better qualified" based on even a slight incremental difference in score—is only appropriate upon a scientific showing "that a higher score on a content valid selection procedure is likely to result in better job performance." *Id;* § 1607.14(C)(9).

   *c.*  *Validating the SHSAT would also be difficult because it is*
     *not aligned to the middle school curriculum in New York*
     *City public schools*

   In addition to the concerns cited in Feinman's study, the difficulty of demonstrating the educational necessity of using rank-order scores on a single high-stakes test as the sole criteria for high school admissions is exacerbated by the fact that the NYCDOE has not shown that material tested by the SHSAT is aligned with its public middle school curriculum.  Indeed, complainants allege on information and belief that in many middle schools with high concentrations of low-income African American and Latino students there is no opportunity to learn the material tested on the SHSAT because the requisite courses are not offered.  Absent such alignment with the public middle school curriculum, students may be deprived of an opportunity to learn the necessary skills and knowledge prior to taking what purports to be a scholastic achievement test.[17]

   At all levels, exams that evaluate mastery of curriculum content are more effective predictors of academic success and are fairer to low-income and minority students than tests that evaluate material that students have not yet had an opportunity to learn in school.  *See, e.g.,* Richard C. Atkinson & Saul Geiser, *Reflections on a Century of College Admissions*, Center for Studies in Higher Education, University of California, Berkeley, Research & Occasional Papers Series: CSHE.4.09 at 2 (Apr. 2009) (hereinafter "Atkinson & Geiser, *Reflections*"); *Joint Standards* 13.5.  When tests are designed to reward mastery of curriculum, the best test preparation is diligence and achievement in the classroom.  By contrast, when tests evaluate applicants based on material that they have not had an opportunity to learn within the regular curriculum, the importance of extracurricular test preparation is magnified.  The SHSAT has been repeatedly criticized for giving a significant advantage to students whose families pay for elite private middle schools or prep courses designed to increase their scores on the SHSAT.  *See* Anemona Hartocollis, *Date of Exam for Elite Schools Is Moved Up, Disturbing Parents*, N.Y. Times, Apr. 27, 2002; Farah Akbar, *Test Fuels Anxiety—and an Industry*, City Limits, Apr. 20, 2010.  In a community as diverse as New York City, it is critical that admissions criteria to top-notch educational experiences do not privilege those who have access to special information and knowledge (through elite private middle schools and extracurricular test preparation services) but rather provide access to any student who diligently achieves mastery of a public school curriculum which he or she has full opportunity to learn.  Curriculum alignment also sends a signal to students that working hard and mastering academic subjects in middle school is the most direct route to a high-quality high school.

   The NYCDOE and other entities provide prep courses.  Although they are free or affordable, they are only available to a relatively small number of low-income families, and they have had minimal impact.  Even with the addition of the recently announced DREAM program (a refinement of the NYCDOE's Specialized High School Institute (SHSI)) and the sponsorship

---

[17] *See* Shirley M. Malcolm, *Equity and Excellence Through Authentic Science Assessment, in* Science Assessment in the Service of Reform 318 (Gerald Kuhn & Shirley M. Malcolm eds., 1991) ("No assessment can be considered equitable for students if there has been differential opportunity to access the material upon which the assessment is based.").

of similar private efforts by Stuyvesant and Bronx Science alumni among others,[18] these programs do not have the capacity to accommodate anywhere near all of the eligible test-takers; therefore, they will have difficulty making even a relatively small dent in the racial disparities resulting from the SHSAT.[19]  Nor do they address the issue of the lack of alignment between middle school curricula and the SHSAT.  Moreover, no amount of test preparation can overcome the fatal flaw of the SHSAT—that it is neither validated nor shown to predict the likelihood of success of applicants.

**3.      Equally effective, less discriminatory alternatives are available**

Even assuming that use of rank-order scores on the SHSAT as the sole admissions criterion for the Specialized High Schools could be validated as consistent with educational necessity, the NYCDOE and the NYSDOE cannot avoid liability under Title VI because there are readily available alternatives that would be equally effective—if not *more* effective—at predicting successful participation in Specialized High School programs while also reducing the racially disparate impact caused by using rank-order scores from the SHSAT as the exclusive admissions criterion.

Below is a menu of options that the NYCDOE and the NYSDOE could pursue to develop an equally effective, less discriminatory alternative to sole reliance on rank-order SHSAT scores. A combination of the following common-sense approaches, tailored specifically to the unique challenges and demographics of New York City, would go a long way towards eliminating the discriminatory effect of the current use of the SHSAT in Specialized High School admissions.

a.      *Adopt a multiple-measures approach*

Best practices in educational testing have established that a high-stakes decision with a "major impact" on students' educational opportunities, such as admission to a Specialized High School, should not turn on "a single test score," much less rank-order scores on that test. *Joint Standards*, at 141, 146; *see also* OCR, *Use of Tests*, at 57 n.202 (noting that less discriminatory alternatives to sole reliance on a test may include procedures that consider additional types of performance information along with test results consistent with the institution's goals).

---

[18] *See* NYCDOE, Press Release, *Chancellor Walcott Launches DREAM—The Specialized High Schools Institute with More Than 2,600 Students and their Families* (Apr. 28, 2012), *available at* http://schools.nyc.gov/Offices/ mediarelations/NewsandSpeeches/2011-2012/DREAM-SHSI.htm; Anna Phillips, *Alumni Tutoring Effort Strives to Raise Diversity at Elite Public Schools*, N.Y. Times, Oct. 11, 2011.

[19] Indeed, in recent years, African-American and Latino enrollment has declined in the SHSI sponsored by the NYCDOE. *See* Meredith Kolodner, *Prep Course Aimed at Diversifying Elite City Schools Fails to Reach Black and Latino Students*, N.Y. Daily News, Mar. 25, 2011. The Office of Bronx Borough President Rueben Diaz recently released a report calling for reforms to the admissions process for the Specialized High Schools and pointing to a number of flaws in the SHSI, as well as inequities in access to private test preparation programs. *See* Appendix J (Office of the Bronx Borough President Ruben Diaz Jr., *An Action Plan for Fixing the Specialized High School Admissions Process* (May 2012)).

Scholarly research establishes that exclusive reliance on standardized tests does not fully capture the wide range of intellectual capacities and abilities that are indicators of students with the potential to thrive in academically rigorous programs, especially for students of color and those from low-income backgrounds. *See* Carolyn M. Callahan, *Identifying Gifted Students from Underrepresented Populations*, 44 Theory into Prac. 98, 102-03 (2005). In other words, using a single test is not the best way, and often not even a valid way, to assess true academic merit. For this reason, the overwhelming consensus among experts is that any process for identifying such students should include multiple criteria—both quantitative and qualitative—in order to ensure that talented students of all backgrounds benefit from these programs. *See, e.g.*, National Association for Gifted Education, *Position Statement: The Role of Assessments in the Identification of Gifted Students* 4 (Oct. 2008), *available at* http://www.nagc.org/index.aspx?id=4022.[20]

Reflecting this consensus, colleges around the country use multiple measures when they make admissions decisions. And increasingly colleges are reducing their reliance on standardized test scores. Important research at the college level attests that high school grades "outperform standardized tests in predicting college outcomes," irrespective of the quality or type of high school attended, and are also less closely associated with students' socioeconomic or racial backgrounds than the results of standardized tests. Atkinson & Geiser, *Reflections*, at 3; *see also Sharif ex rel. Salahuddin v. N.Y. State Educ. Dep't*, 709 F. Supp. 345, 362-63 (S.D.N.Y. 1989) (granting a preliminary injunction in the context of a Title IX challenge by female merit scholarship applicants after concluding that consideration of SAT scores plus grade point averages would be a better measure of high school achievement for purpose of scholarship eligibility than SAT scores alone); William G. Bowen et al., *Crossing the Finish Line: Completing College at America's Public Universities* 8-10 (2009).

Just as high school grades are considered in the university admissions process, middle school grades could be one beneficial component of admissions decisions for selective high school programs, like the Specialized High Schools. Achieving and maintaining a strong GPA requires not only academic prowess but also measures motivation, personal discipline, and perseverance. But grades should not be the only factor used in addition to test scores, as experience at other top-ranked selective high schools and colleges establishes. Other factors could include teacher recommendations, proven leadership skills, a commitment to community service, and other aspects of applicants' own backgrounds and experiences as well as the demographic profile of students' middle schools and neighborhoods—all of which can help

---

[20] For example, some states, including Texas and Maryland, expressly require use of multiple measures (including both quantitative and qualitative criteria) as opposed to exclusive reliance on standardized tests in their identification of students to participate in gifted and talented programs. *See, e.g.*, Div. of Advanced Acad. Servs., Tex. Educ. Agency, *Texas State Plan for the Education of Gifted/Talented Students* 4 (2000), *available at* http://ritter.tea.state.tx.us/gted/GTStaPlaEng.pdf; Md. State Dep't of Educ., *Criteria for Excellence: Gifted and Talented Education Program Guidelines* 1.5 (2007), *available at* http://www.marylandpublicschools.org/NR/rdonlyres/04AFAD1F-8EC8-4EFE-B183-16C2B0C4F84B/13371/MDGTProgramGuidelines.pdf.

assess their achievements and capabilities in the context of the opportunities they have received before entering high school.

Other top-rated schools in New York City already use admissions procedures that rely on a variety of measures to yield classes that meet high standards of academic excellence *and* are generally more diverse than the overall student demographics of the Specialized High Schools (although still not fully reflective of the City's overall student population). For instance, the two Bard Early College High Schools (one in Manhattan, the other in Queens), both require a grade point average of 85 or better in middle school, scores of 3 or 4 on standardized English and math exams, and an exemplary attendance record. Applicants who meet these criteria are invited to take a school-specific entrance exam and then are interviewed by school personnel. Through this multiple-measures approach, during the 2008-2009, 2009-2010, and 2010-2011 school years, the percentage of African American students enrolled in the Bard School in Manhattan ranged from 14 to 18%, and the percentage of Latino students ranged from 16% to 19%; at the Bard School in Queens, the percentage of African Americans ranged from 18% to 20%, and the percentage of Latino students ranged from 24% to 27%.[21] These figures are higher than the average enrollment for the Specialized High Schools overall.

Another model is the Hunter Science High School, which is different from Hunter College High School mentioned below. Hunter Science High School takes into consideration an applicant's grade point average in English, math, science, and social studies; scores on standardized English exams; middle school attendance records; and a school-specific application, which includes a writing sample. Using these criteria, during the 2008-09, 2009-10, and 2010-11 school years, the Hunter Science School enrolled a student body that ranged from 19% to 22% African American and from 39% to 41% Latino. And during the same time period, the Fiorello H. LaGuardia High School of Music & Art and Performing Arts (which is technically considered a Specialized High School under New York state law even though its admissions process is not test-based and thus not challenged here) enrolled a student body that ranged from 14% to 16% African American and from 17% to 18% Latino, based on a competitive audition and review of students' middle school records. Again, these figures are higher than the average enrollment at the Specialized High Schools overall.

To be clear, references to these schools are for illustrative purposes only and in no way suggest that the complainants believe those schools are in full compliance with their federal obligation under Title VI and its implementing regulations to redress unjustified racial disparities. Nor, for that matter, are the Specialized High Schools the only New York City schools where close scrutiny of admissions processes may be warranted. *See, e.g.*, Sharon Otterman, *Diversity Debate Convulses Elite High School*, N.Y. Times, Aug. 4, 2010 (noting that

---

[21] For the information upon which the analysis in this and the following paragraph was based, see The New York State School Report Card: Accountability and Overview Reports (2010-11), *available at* https://www.nystart.gov/publicweb/ (last visited Sept. 19, 2012), and summaries of school admissions criteria, NYDOE, Online High School Directory, http://schools.nyc.gov/ChoicesEnrollment/High/Directory/default.htm (last visited Sept. 19, 2012).

Hunter College High School uses a school-specific test as its exclusive admissions criterion, resulting in a student body that was 3% African American and 6% Latino in 2009-10).

In recently issued joint policy guidance, the U.S. Department of Education and the Department of Justice included multiple-measures approaches among the examples of admissions procedures that selective public schools may lawfully use to further their compelling interests in promoting diversity and avoiding racial isolation. Indeed, this new guidance states that "[a] school district could give special consideration to students from neighborhoods selected specifically because of their racial composition and other factors" or it "could give *greater weight* to the applications of students based on their socioeconomic status, whether they attend underperforming feeder schools, their parents' level of education, or the average income level of the neighborhood from which the student comes, if the use of one or more of these additional factors would help to achieve racial diversity or avoid racial isolation." U.S. Department of Education and U.S. Department of Justice, *Guidance on the Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools* 12 (2011), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/guidance-ese-201111.pdf (emphasis added).[22]

b.    *Abolish the use of "rank-order" admissions based on the SHSAT*

To the extent that the SHSAT or any other properly validated test is used in a multiple-measures approach, a less discriminatory alternative would be to avoid the strict rank-order admissions requirement mandated under New York state law. This requirement exacerbates the racial disparities in admissions overall, and especially at Stuyvesant and Bronx Science, which have the highest cut-off scores because they are the most popular among test-takers. A less discriminatory alternative would be to consider scores on the verbal and math sections separately along with multiple other criteria of the sort described in the preceding section.

At most, test scores should be used to establish a properly validated "baseline score" that denotes mastery of foundational knowledge and skills required for satisfactory participation in the Specialized High Schools. Any such baseline score must be carefully calibrated and validated to ensure a qualified student body for each Specialized High School. Scoring above this baseline would, in theory, certify the test-takers' readiness for the rigorous curricula of the Specialized High Schools. Beyond the baseline, admissions to particular Specialized High Schools should be determined by the multiple-measures approach discussed above.

Such alternatives should not in any way reduce academic standards because, overall, the applicant pool is already of high caliber. According to a recent study, SHSAT test-takers in 2008 had math and reading scores that were 0.73 and 0.61 standard deviations above the citywide

---

[22] As the new federal guidance also recognizes, there is no constitutional bar to considering race as one factor among many in a holistic, individualized review of student's application files as a means to promote diversity and reduce racial isolation at the Specialized High Schools. *See id.* at 10; *Parents Involved*, 551 U.S. at 793 (Kennedy, J., concurring in part and concurring in the judgment); *Hart v. Cmty. Sch. Bd. of Brooklyn*, 536 F. Supp. 2d 274, 283 (E.D.N.Y. 2008); Samar A. Katnani, PICS, Grutter, *and Elite Public Secondary Education: Using Race as a Means in Selective Admissions*, 87 Wash. U. L. Rev. 625, 652-53, 655 (2010).

average. *See* Sean P. Corcoran & Henry M. Levin, *School Choice and Competition in New York City Schools*, *in* Education Reform in New York City: Ambitious Change in the Nation's Most Complex School System (Jennifer A. O'Day et al., eds., 2011).

       c.     *Revive and expand alternative pathways to admission for students from disadvantaged backgrounds*

Even if the NYCDOE were able to validate an admissions test and to use it as one of multiple measures in an admissions process, alternative pathways to admission for students from disadvantaged backgrounds should be revived and expanded. Even now, under New York state law, the NYCDOE is permitted to operate a Discovery Program as a limited supplement to exclusively test-based admissions for the Specialized High Schools. *See* Appendix C. Through the Discovery Program, students who successfully complete a summer preparatory institute gain admission to a Specialized High School. Students are eligible if they take the SHSAT, are recommended by their guidance counselor, and are certified as disadvantaged by their middle school according to any of the following criteria:

      (a)    The student attends a Title I school and comes from a family whose total income meets federal income eligibility guidelines established for school food services by the New York State Department of Agriculture;

      (b)    The student receives assistance from the Human Resources Administration;

      (c)    The student comes from a family whose income is documented as being equivalent to or below Department of Social Services standards;

      (d)    The student is a foster child or ward of the state; or

      (e)    The student initially entered the United States within the last four years and lives in a home in which the language customarily spoken is not English.

*See* Appendix D at 17.

If adopted on a broader scale, a program like the Discovery Program, which provides alternate pathways to admission for students from disadvantaged backgrounds, could be an important component of an equally effective, less discriminatory alternative to the current policy. The group of students enrolled through the Discovery Program is more diverse than those admitted based solely on their rank order scores. For instance, according to data provided by the NYCDOE, 22.8% of the students selected to participate in the Discovery Program based on their Fall 2010 SHSAT scores were African American and 21.7% were Latino. Moreover, on information and belief, students admitted through the Discovery Program have thrived at the Specialized High Schools. *See* Megan Finnegan & Stephon Johnson, *Benign Neglect?: Who Killed the Discovery Program*, Our Town, May 12, 2011.

Unfortunately, the Discovery Program is currently discretionary under New York state law, and despite the growing racial disparities in their schools, a number of the Specialized High Schools, including Stuyvesant and Bronx Science, have stopped participating in it. *Id.* Accordingly, the NYCDOE now offers very few students the opportunity to enroll in the Discovery Program. For instance, according to data provided by the NYCDOE, there were only 92 students selected to participate from among the nearly 30,000 eighth-graders who took the

Fall 2010 SHSAT. Indeed, the number of students admitted through the Discovery Program has decreased over time. *Id.* In order for the Discovery Program to be effective, all of the Specialized High School must participate in and expand their use of the program.

  d.    *Reserve seats for top students at middle schools across the City*

Another potential component of a less discriminatory alternative approach, also endorsed in the new federal policy guidance, would be to allocate a small portion of admissions slots at the Specialized High Schools to the top-performing students at each of the public middle schools across the City. *See* U.S. Department of Education and U.S. Department of Justice, *Guidance on the Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools* 12 (2011).

This approach could help foster geographic diversity, which currently is lacking at the Specialized High Schools. *See* Richard Buery, *The Case of the Disappearing Black and Latino Student: Race and the Achievement Gap at Smith College and Stuyvesant High School*, Huffington Post, Mar. 2, 2012. For instance, Mark Twain Gifted and Talented in Brooklyn and certain other middle schools annually send dozens of students to Stuyvesant, while years can go by without a single student from District 7, in a poor section of the South Bronx, earning an offer of admission. *See* Fernanda Santos, *To Be Black at Stuyvesant High*, N.Y. Times, Feb. 25, 2012; *see also* N.R. Kleinfeld, *"Why Don't We Have Any White Kids?"* N.Y. Times, May 11, 2011) (reporting first student admitted to Stuyvesant from Explore Charter School in Brooklyn founded in 2002). Moreover, as a recent report issued by the Office of Bronx Borough President Rueben Diaz reveals, Bronx students are significantly underrepresented among students admitted to the Specialized High Schools. *See* Appendix J at 4 (Office of the Bronx Borough President Ruben Diaz Jr., *An Action Plan for Fixing the Specialized High School Admissions Process* (May 2012)).

A survey of enrollment at Stuyvesant in 1997 revealed that more than half of the admitted students had previously attended a private school or a middle school in only three out of thirty-two Community School Districts. Equally as significant for purposes of this complaint, the five community school districts that sent the highest number of students to Stuyvesant were 45% African American and Latino; the five districts that sent the lowest number of students were 97% African American and Latino. Samar A. Katnani, PICS, Grutter, *and Elite Public Secondary Education: Using Race as a Means in Selective Admissions*, 87 Wash. U. L. Rev. 625, 639 n.94 (2010). More recently, 115 of the 843 students in the 2010-11 freshman class at Stuyvesant did not come from New York City public middle schools, and this class included no students at all from ten of the City's community school districts. *See* Schott Foundation for Public Education, *A Rotting Apple: Education Redlining in New York City* (2012) *available at* http://schottfoundation.org/drupal/docs/redlining-full-report.pdf (last visited Sept. 25, 2012).

Specialized High Schools should serve students from a wide cross section of the City's neighborhoods—even the most economically disadvantaged. Allocation of a certain number of slots to promote geographic diversity has been used successfully in admissions policies for certain selective middle and high school programs in Chicago and Virginia. *See* Noreen S. Ahmed-Ullah, *High School Cutoff Scores Reveal Impact of Diversity Policy*, Chicago Tribune, Feb. 28, 2011; Jeremy Slayton & Holly Prestidge, *Henrico School Officials Plan Meeting on*

*Maggie Walker Selection Process*, Richmond Times Dispatch, Jan. 23, 2010. Complainants do not advocate that such an approach should be used to fill more than a relatively small number of slots in the Specialized High Schools; rather, it could supplement a multiple-measures approach, which complainants believe should be the primary means of admission to promote diversity and reduce racial isolation.

\*     \*     \*

Accordingly, not only do the practices of the NYSDOE and the NYCDOE with respect to admissions to the Specialized High Schools produce an unjustified disparate impact for African-American and Latino applicants, but there are also less discriminatory alternatives available. The NYSDOE and the NYCDOE are therefore in violation of Title VI and its implementing regulations.[23]

---

[23] A finding of intentional discrimination is not necessary for OCR to conclude that the NYSDOE and the NYCDOE have violated Title VI, but there is sound basis for a finding of disparate-treatment liability due to the stark empirical evidence of disparate impact over an extensive period of time, the long-standing official and public recognition of these racially disparate outcomes, the NYCDOE's persistent failure to conduct any validity study of the SHSAT, and its failure to adopt other readily available and equally effective, less discriminatory admissions policies. "The foreseeability of a segregative effect, or '[a]dherence to a particular policy or practice, "with full knowledge of the predictable effects of such adherence upon racial imbalance,"' is a factor that may be taken into account in determining whether acts were undertaken with segregative intent." *United States v. Yonkers Bd. of Educ.* 837 F.2d 1181, 1227 (2d Cir. 1987) (quoting *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 465 (1979) (quoting district court opinion therein, 429 F. Supp. 229, 255 (S.D. Ohio 1977)); *accord United States v. City of New York*, 683 F. Supp. 2d 225, 249, 262-64 (E.D.N.Y. 2010). Rather than respond to calls to broaden admissions criteria for the Specialized High Schools, the NYCDOE has taken steps to increase racial isolation—insofar as it has made little use of the Discovery Program generally and discontinued it at Stuyvesant and Bronx Science in the 1990s. *See* Megan Finnegan & Stephon Johnson, *Stuyvesant's Minority Admissions Under Attack*, Our Town, May 18, 2011.

## IV.    REMEDY AND PRAYER FOR RELIEF

Neither the NYCDOE nor the NYSDOE should accept the status quo. There is a moral and legal imperative to change this long-flawed policy. As Supreme Court Justice Anthony Kennedy recognized in his controlling concurrence five years ago in *Parents Involved*, "[i]n the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition." 551 U.S. at 788 (Kennedy, J., concurring in part and concurring in the judgment).

As discussed above, it is well accepted by educational testing experts that a single test is neither fair nor accurate as a metric to determine high-stakes decisions such as admission to a selective high school. *See Joint Standards*, at 141. Moreover, as also discussed above, it would be extremely difficult for the NYCDOE and the NYSDOE to justify that the fine distinctions required by using rank-order SHSAT scores as a sole admissions criterion significantly and reliably correlate with differences in student performance and cannot simply be explained by statistical uncertainty. *See Joint Standards* 2.14, 4.19, 4.20, 4.21; Appendix H at 18-21; OCR, *Use of Tests*, at 34. Especially in light of the numerous equally effective, less discriminatory alternatives that are available, Title VI should prohibit the continued use of rank-order SHSAT scores as the only factor in admission to the eight Specialized High Schools.

For the foregoing reasons, there is a pressing need for OCR to conduct a comprehensive investigation of the admissions process for the Specialized High Schools and remedy the NYCDOE's and the NYSDOE's violation of Title VI and its implementing regulations. Both requiring admission and actually admitting students to the Specialized High Schools based solely on their rank-order scores on the SHSAT conflict with Title VI and its implementing regulations, where, as here, this practice produces a disparate and discriminatory impact, neither the test nor rank-order admissions has ever been validated as necessary for satisfactory participation in Specialized High School programs, and equally effective, less discriminatory alternatives are available. *See* 42 U.S.C. § 2000d; 34 C.F.R. § 100.3.[24]

---

[24] Although OCR has twice investigated complaints regarding the Specialized High Schools, these prior reviews do not preclude the significant present need for federal scrutiny. The Specialized High Schools' admissions process was one issue addressed by an OCR investigation in 1977-78, but the circumstances were very different. At that time the Specialized High Schools included substantially higher percentages of African Americans and Latinos—44% combined for the 1975-76 school year, and era when the City's public school population was less diverse than it is now. *See* Ari L. Goldman, *Grouping by Ability of Students Upheld for New York City*, N.Y. Times, June 16, 1978. In the 1990s, OCR investigated a complaint that the NYCDOE was not providing information to minority parents about programs offered by the school district, including the Specialized High Schools. When OCR and the NYCDOE entered an agreement requiring that parents receive information necessary to access quality education, the validity of the SHSAT as a sole criterion for admission was not addressed. *See* Norma V. Cantu, Assistant Secretary for Civil Rights, U.S. Dep't of Educ., *Statement before the House Appropriations Subcommittee on Labor, Health & Human Services and Education on the Fiscal*

To redress this Title VI violation, the complainants urge OCR to take the following actions:

*First*, OCR should make findings that: (a) New York state law requiring the use of rank-order scores on the SHSAT as the sole criterion for admission to the Specialized High Schools is in violation of Title VI and its implementing regulations; and (b) so long as the NYCDOE and the NYSDOE do not implement less discriminatory alternatives for admissions to the Specialized High Schools, they will remain in violation of Title VI and its implementing regulations.

*Second*, OCR should require the NYCDOE and the NYSDOE to revise the admissions procedures for the Specialized High Schools to comply with federal law.

*Third*, OCR should require that the NYCDOE and the NYSDOE refrain from *any* use of the SHSAT or any other test, unless it can demonstrate, through a professionally acceptable, high-quality predictive validity study that its admissions process is justified by educational necessity and there are no equally effective, less discriminatory alternatives available. OCR should require that any validity study be conducted by an independent educational researcher or consortium of researchers, with expertise in analysis of educational testing and equity issues.

*Fourth*, the NYCDOE and the NYSDOE should be required to demonstrate that any such test must be aligned with the curriculum that students across New York City's public school system have an opportunity to learn.

*Fifth*, at most, OCR should permit the NYCDOE and the NYSDOE to use a properly validated, curriculum-aligned, standardized test *only* to establish a baseline mastery of foundational knowledge and skills required for the Specialized High Schools. To distinguish among applicants who meet or exceed this baseline, the NYCDOE and the NYSDOE should consider multiple measures including middle school grades, attendance, teacher recommendations, leadership, community service, and other aspects of applicants' own backgrounds and experiences, as well as the demographic profile of students' middle schools and neighborhoods—all of which can help assess their achievements and capabilities in the context of the opportunities they have received.

*Sixth*, any revised admissions procedure should make full use of the Discovery Program, already sanctioned under New York state law, and other tools to ensure that even students from the most disadvantaged backgrounds get a fair opportunity to take advantage of the pipelines to leadership offered by the Specialized High Schools.

*Finally*, the NYCDOE and the NYSDOE should involve parents, teachers, students, and community members in the design of any reforms to the Specialized High Schools admissions process.

*       *       *

---

*Year 1999 Budget Request for the Office for Civil Rights*, Apr. 1, 1998, *available at* http://www.ed.gov/Speeches/99ocr.html. Thus, the issue is still ripe for OCR review.

We will be happy to provide additional information about the matters raised in this complaint and look forward to further communication with OCR as its investigation proceeds.

Respectfully submitted,


    /s/ *Damon T. Hewitt*

Debo P. Adegbile
Elise Boddie
Damon T. Hewitt
Rachel M. Kleinman
Leticia Smith-Evans
NAACP LEGAL DEFENSE AND
   EDUCATIONAL FUND, INC.
99 Hudson Street, 16th Floor
New York, NY 10013
(212) 965-2200

Joshua Civin
NAACP LEGAL DEFENSE AND
   EDUCATIONAL FUND, INC.
1444 I Street, NW, 10th Floor
Washington, DC 20005

Juan Cartagena
Jose Perez
Jackson Chin
LATINOJUSTICE PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

Esmeralda Simmons
Joan Gibbs
CENTER FOR LAW AND SOCIAL JUSTICE
   AT MEDGAR EVERS COLLEGE
1150 Carroll Street
Brooklyn, New York 11225
(718) 804-8893


Dated:       September 27, 2012

Enclosures