EXHIBIT 9

 

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

## GUIDANCE ON THE VOLUNTARY USE OF RACE TO ACHIEVE DIVERSITY AND AVOID RACIAL ISOLATION IN ELEMENTARY AND SECONDARY SCHOOLS

### Introduction

The United States Department of Education (ED) and the United States Department of Justice (DOJ) (collectively, the Departments) are issuing this guidance to explain how, consistent with existing law, elementary and secondary schools can voluntarily consider race to further compelling interests in achieving diversity and avoiding racial isolation. This guidance replaces the August 28, 2008 letter issued by ED's Office for Civil Rights (OCR) entitled "The Use of Race in Assigning Students to Elementary and Secondary Schools."

More than 50 years ago, *Brown v. Board of Education* recognized that "education is perhaps the most important function of state and local governments. . . .It is the very foundation of good citizenship."[1] Providing students with diverse, inclusive educational opportunities from an early age is crucial to achieving the nation's educational and civic goals.

As the Supreme Court has explained, elementary and secondary schools (also referred to in this guidance as K-12 schools) are "pivotal to sustaining our political and cultural heritage;"[2] they teach "that our strength comes from people of different races, creeds, and cultures uniting in commitment to the freedom of all."[3] Racially diverse schools provide incalculable educational and civic benefits by promoting cross-racial understanding, breaking down racial and other stereotypes, and eliminating bias and prejudice. Our "'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples."[4]

Conversely, where schools lack a diverse student body or are racially isolated (*i.e.*, are composed overwhelmingly of students of one race), they may fail to provide the full panoply of benefits that K-12 schools can offer. The academic achievement of students at racially isolated schools often lags behind that of their peers at more diverse schools. Racially isolated schools often have fewer effective teachers, higher teacher turnover rates, less rigorous curricular resources (*e.g.*, college preparatory courses), and inferior facilities and other educational resources. Reducing racial isolation in schools is also important because students who are not exposed to racial diversity in school often lack other opportunities to interact with students from different racial backgrounds.[5]

---

[1]  347 U.S. 483, 493 (1954).

[2]  *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (quoting *Plyler v. Doe*, 457 U.S. 202, 221 (1982)).

[3]  *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 782 (2007) (Kennedy, J., concurring in part and concurring in the judgment).

[4]  *Grutter*, 539 U.S. at 324 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 313 (1978) (opinion of Powell, J.)).

[5]  *See Parents Involved*, 551 U.S. at 798 ("[N]eighborhoods in our communities do not reflect the diversity of our Nation as a whole." (Kennedy, J., concurring in part and concurring in the judgment)).

For all these reasons, the Departments recognize, as has a majority of Justices on the Supreme Court, the compelling interests that K-12 schools have in obtaining the benefits that flow from achieving a diverse student body and avoiding racial isolation.[6]  This guidance addresses the degree of flexibility that school districts have to take proactive steps, in a manner consistent with principles articulated in Supreme Court opinions, to meet these compelling interests.

Section I of this guidance describes the relevant legal framework for considering race to further the compelling interests in achieving diversity and avoiding racial isolation in K-12 schools.  Section II sets forth considerations for school districts in their voluntary use of race to achieve their compelling interests.  Section III provides a summary of key steps for school districts seeking to achieve diversity or avoid racial isolation.  Section IV provides examples of ways that, in light of this guidance, school districts may choose to advance these compelling interests.

## I.    LEGAL FRAMEWORK

Under the Civil Rights Act of 1964, the Departments are responsible for enforcing federal laws that bar public schools, as well as private institutions that receive federal financial assistance, from discriminating on the basis of race, color, or national origin.  *See* 42 U.S.C. § 2000(c)-(d) (Title IV and Title VI).[7]  Racial discrimination by school districts that violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution also violates Titles IV and VI.[8]  Accordingly, the Departments here consider not only federal statutory law, but also case law interpreting the Equal Protection Clause, particularly the Supreme Court's decision in *Parents Involved in Community Schools v. Seattle School District No. 1 (Parents Involved)*.[9]

In *Parents Involved*, the Supreme Court considered challenges to voluntary efforts by the Seattle, Washington, and Jefferson County (Louisville), Kentucky, school districts to use individualized racial classifications to achieve diversity or avoid racial isolation through their student assignment plans.  A majority of the Justices recognized that seeking diversity and avoiding racial isolation are compelling interests for school districts.  *Id.* at 783, 797 (Kennedy, J., concurring in part and

---

[6]   The Departments also recognize the compelling interest in remedying the vestiges of past racial discrimination, which is not the focus of this guidance.  Numerous school districts are required to consider race pursuant to desegregation orders, compliance plans, or other legal mandates to remedy discrimination.  This guidance does not address the remedial use of racial classifications in these or other circumstances; nothing in it should be read to imply any limitations on remedial orders by courts or administrative agencies.  In addition, nothing in this guidance addresses other claims of compelling interests justifying the consideration of race, which the Departments will consider on a case-by-case basis.  *See Parents Involved,* 551 U.S. at 720  (stating that the Court's opinion was issued "[w]ithout attempting in these cases to set forth all the interests a school district might assert").

[7]   Throughout this guidance, references to "race" includes race, color, and  national origin.  When evaluating efforts to promote diversity or avoid racial isolation that fall within the scope of Title VI (and Title IV in the case of DOJ), the Departments will apply this guidance.

[8]   *See Alexander v. Sandoval,* 532 U.S. 275, 280-81 (2001) (citing *Bakke,* 438 U.S. at 287 (opinion of Powell, J.)).

[9]   The Court's decisions in *Grutter,* and *Gratz v. Bollinger,* 539 U.S. 244 (2003), are also relevant to the Department's analysis.  In *Grutter,* the Court held that student body diversity, including racial diversity, is a compelling interest for higher education institutions, and affirmed the consideration of individual students' race as a factor in the holistic review of applicants to the University of Michigan Law School.  *Grutter,* 539 U.S. at 328, 333-37.  In *Gratz,* while accepting student body diversity as a compelling interest, the Court held that the University's race-conscious plan was not narrowly tailored to achieve that interest because, among other things, the University used a point system that awarded 20 percent of the total number of points needed for admission based solely on an applicant's race, rather than conducting a more individualized assessment.  *Gratz,* 539 U.S. at 268-71, 275.

concurring in the judgment); *id.* at 838-42 (Breyer, J., dissenting).  However, the Court struck down both school districts' uses of individualized racial classifications in assigning students to schools. *Id.* at 733-35; *id.* at 782 (Kennedy, J., concurring in part and concurring in the judgment).

Chief Justice Roberts issued the lead opinion, which was joined by three other Justices in its entirety (the plurality opinion), and by Justice Kennedy in part and in the judgment.  Justice Kennedy issued a separate concurrence addressing those areas where he disagreed with the Chief Justice's plurality opinion and discussing how schools can pursue the compelling interests in achieving a diverse student population or avoiding racial isolation.  Justice Breyer's dissenting opinion was joined by the remaining three Justices.

### A.      The Opinion of the Court in *Parents Involved*

The portions of the plurality opinion that Justice Kennedy joined constitute the opinion of the Court. The Court affirmed its prior holdings that "when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Id.* at 720.  To survive strict scrutiny, a school district that considers race in making individual student assignment decisions must show that the use of race is narrowly tailored to achieve a compelling governmental interest.  *Id.*

Although the Court declined to rule on whether the interests that were asserted by Seattle and Louisville were compelling, it held that the two school districts in that case had failed to demonstrate that their use of individual students' race was narrowly tailored to meet their goals.  *Id.* at 722-25.  In making this determination, the Court generally applied the four-prong narrow tailoring test from its 2003 decision in *Grutter v. Bollinger*.  That test assesses whether an educational institution has considered workable race-neutral alternatives; whether its plan provides for flexible and individualized review of students; whether it has minimized undue burdens on other students; and whether its plan is limited in time and subject to periodic review.  *See Grutter*, 539 U.S. at 334-43.[10]

In applying these factors in *Parents Involved*, the Court noted that:  Seattle and Louisville had not demonstrated that they seriously considered race-neutral alternatives; the individual racial classifications used had a minimal impact that cast doubt on their necessity; the districts defined diversity in overly limited terms that did not adequately reflect the diversity within the districts; and the districts' plans did not provide for a meaningful, individualized review of student assignments. Consequently, the Court held that Seattle's and Louisville's consideration of the race of individual students in their student assignment plans was impermissible.  *Parents Involved*, 551 U.S. at 723-24; 734-35.

### B.      Justice Kennedy's Concurrence

While Justice Kennedy joined the opinion of the Court that Seattle's and Louisville's uses of individual racial classifications were not narrowly tailored, he wrote separately to emphasize that the Court's decision should not be read as prohibiting state and local authorities from considering

---

[10] For a more detailed discussion of the narrow tailoring factors that apply to individual racial classifications used to promote diversity in postsecondary educational institutions, see the Departments' "Guidance on the Voluntary Use of Race to Achieve Diversity in Postsecondary Education."

the racial makeup of schools and adopting "general policies to encourage a diverse student body." *Id.* at 788 (Kennedy, J., concurring in part and concurring in the judgment).

Together with the four dissenting Justices, Justice Kennedy recognized that K-12 school districts have compelling interests both in achieving diversity and in avoiding racial isolation, and he concluded that school districts could voluntarily adopt measures to pursue these goals. *Id.* at 797-98; *see also id.* at 838-45 (Breyer, J., dissenting).

Importantly, Justice Kennedy drew a distinction between school district plans that rely on the race of individual students and plans that seek to achieve diversity or avoid racial isolation through more generalized race-conscious measures:

> If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.

*Id.* at 788-89 (Kennedy, J., concurring in part and concurring in the judgment).

Justice Kennedy went on to state that race-conscious approaches that do not rely on individual racial classifications are "unlikely" to "demand strict scrutiny" and are likely to pass constitutional muster. In so doing, he also provided some examples of the sorts of approaches that he had in mind:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races.

*Id.* at 789 (citation omitted).

Furthermore, while the Seattle and Louisville school districts failed to show the necessity of classifying individual students by race in their plans, Justice Kennedy refused to rule out approaches that in appropriate circumstances take account of the race of individual students in school assignment. *Id.* at 790. He explained that a school district can employ a "more nuanced individual evaluation of school needs and student characteristics that might include race as a component." *Id.* Such an individualized approach would be informed by the narrow tailoring analysis set forth in *Grutter*, "though of course the criteria relevant to student placement would differ based on the age of the students, the needs of the parents, and the role of the schools." *Id.*

Thus, a majority of Justices has concluded that school districts have flexibility in determining how voluntarily to achieve diversity or avoid racial isolation in their schools. Although *Parents Involved* ultimately was decided on other grounds, a majority of the Justices expressed the view that schools must have flexibility in designing policies that endeavor to achieve diversity or avoid racial isolation, and, at least where those policies do not classify individual students by race, can do so without triggering strict scrutiny. *Id.* at 789 (Kennedy, J., concurring in part and concurring in the judgment); *id.* at 837 (Breyer, J., dissenting). Thus, although there was no single majority opinion on this point, *Parents Involved* demonstrates that a majority of the Supreme Court would be "unlikely" to apply strict scrutiny to generalized considerations of race that do not take account of the race of individual students.

*Parents Involved* also reaffirmed that when a district chooses to take into account the race of individual students in providing benefits or imposing burdens, it must meet the strict scrutiny standard, demonstrating that its plan is narrowly tailored to meet the compelling interest in achieving diversity or avoiding racial isolation in schools. *Id.* at 787. The Court has repeatedly emphasized, however, that the application of strict scrutiny, in and of itself, is "'not fatal in fact.'" *Grutter*, 539 U.S. at 327 (quoting *Adarand v. Pena*, 515 U.S. 200, 237 (1995)).

The Departments will examine efforts to achieve diversity and avoid racial isolation in K-12 education in light of each of these principles. This guidance seeks to outline, in practical terms, the legal requirements applicable to such efforts, recognizing that whether a particular approach comports with the law depends on the relevant facts and context.

## II.    APPLICATION TO ELEMENTARY AND SECONDARY EDUCATION

This Section sets out considerations for school districts in their voluntary use of race to achieve diversity or avoid racial isolation. The discussion in this and the following sections assumes that districts are acting to achieve diversity or avoid racial isolation; districts should be prepared to explain how these objectives fit within their overall mission. Nothing in this guidance should be understood to suggest that race, or racial impact, may be considered in furtherance of an invidious purpose.[11]

Approaches to achieve diversity or avoid racial isolation fall into two broad categories: those that do not rely on the race of individual students, and those that do. School districts should consider approaches that do not rely on the race of individual students before adopting approaches that do.

Approaches that do not rely on the race of individual students include both race-neutral and generalized race-based approaches. Race-neutral approaches can take racial impact into account but do not rely on race as an express criterion. Generalized race-based approaches use race as an express criterion, but do not rely on the race of individual students or treat individual students differently because of their race.

---

[11] *See, e.g., Parents Involved*, 551 U.S. at 788-89 (Kennedy, J., concurring in part and concurring in the judgment) (clarifying that the leeway to "devise race-conscious measures" to achieve diversity or avoid racial isolation extends only to circumstances where school districts "pursue the goal of bringing together students of diverse backgrounds and races"); *cf., e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-68 (1977); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976).

### A.   Approaches That Do Not Rely on the Race of Individual Students

School districts should first determine if they can meet their compelling interests by using race-neutral approaches.  Race-neutral approaches can be used for decisions about individual students, such as admissions decisions for competitive schools or programs, as well as for decisions made on an aggregate basis, such as the drawing of zone lines that affect a large number of students.  A district using race-neutral criteria for the purpose of achieving diversity or avoiding racial isolation may, "with candor . . . consider[] the impact a given approach might have on students of different races." *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring in part and concurring in the judgment).  Examples of race-neutral approaches include — but are not limited to — the use of criteria such as:  students' socioeconomic status; parental education (*e.g.*, highest degree attained or years of education); students' household status (*e.g.*, dual or single-parent household); neighborhood socioeconomic status; geography (*e.g.*, existing neighborhood lines); and composition of area housing (*e.g.*, subsidized housing, single-family home, high-density public housing, or rental housing).

School districts are required to use race-neutral approaches only if they are workable.  *See Grutter*, 539 U.S. at 339 (requiring the law school to give "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity [it] seeks").[12]  School districts are not required to implement such approaches if, in their judgment, the approaches would not be workable.  In some cases, race-neutral approaches will be unworkable because they will be ineffective to achieve the diversity that the school district seeks or to address racial isolation in the district's schools.  School districts may also reject race-neutral approaches that would require them to sacrifice a component of their educational mission or priorities (*e.g.*, academic selectivity).[13]

When race-neutral approaches would be unworkable to achieve their compelling interests, school districts may employ generalized race-based approaches.  Generalized race-based approaches employ expressly racial criteria, such as the overall racial composition of neighborhoods, but do not involve decision-making on the basis of any individual student's race.  For example, a school district could draw attendance zones based on the racial composition of particular neighborhoods, as well as on race-neutral factors such as the average household income and average parental education level of particular neighborhoods within the school district.  All students within those zones would be treated the same regardless of their race.[14]

### B.   Approaches That Rely On Individual Racial Classifications

As authorized by *Grutter* and referenced in Justice Kennedy's concurrence in *Parents Involved*, a school district may only consider the race of individual students if it does so in a manner that is narrowly tailored to meet a compelling interest.  Thus, when schools adopt approaches that consider

---

[12] In deciding whether a given approach is workable, a school district can consider both its current and projected racial demographics.  For example, a district can consider how the rapidly changing population of a neighborhood will affect racial diversity in that neighborhood's schools.

[13] *See Grutter*, 539 U.S. at 340.

[14] The fact that the school district did not follow the steps set forth above will not, by itself, cause the Departments to conclude in the course of their enforcement activities that there has been a violation of Title IV or Title VI. However, the district must consider whether non-individualized uses of race are workable before relying on the race of individual students.

the race of individual students, they should do so in a manner that closely fits their goals of achieving diversity or avoiding racial isolation and includes race no more than necessary to meet those ends. *See Grutter*, 539 U.S. at 333-34.

As an initial matter, a district should first determine that race-neutral approaches would be unworkable to achieve its compelling interests before relying on individual racial classifications.

In implementing programs that consider a student's race as a factor, schools should provide each student with an individualized review appropriate to the K-12 context.[15]  A district may consider a student's race as a "plus factor" (among other, non-racial considerations) to achieve its compelling interests.  But no student applicant to a school or program should be insulated – based on his or her race – from an assessment or comparison to all other student applicants, to ensure that the district minimizes the impact of its program on those other students.

In addition, a school district should not evaluate student applicants in a way that makes a student's race his or her defining feature.  School districts should consider how the range of student attributes, including both non-racial characteristics (*e.g.*, a student's socioeconomic status or parental educational background) and racial characteristics, contribute to meeting the district's compelling interest in achieving diversity or avoiding racial isolation.

Based on its particular educational objectives and unique needs, a district should determine how it will achieve the benefits that it is pursuing through its program to promote diversity[16] or avoid racial isolation.  Finally, a school district that uses individual racial classifications should periodically review the program to determine whether such racial classifications remain necessary and modify its practices as needed.

It will be helpful for districts to have documents that describe their educational objectives and the process they followed in structuring their programs, including alternatives that they considered and rejected.  These documents will assist in answering any questions that arise.

## III.   KEY STEPS FOR IMPLEMENTING PROGRAMS TO ACHIEVE DIVERSITY OR AVOID RACIAL ISOLATION

Based on the foregoing, here is a checklist of key steps for school districts seeking to achieve diversity or avoiding racial isolation:

---

[15] A school district's use of individual racial classifications may differ based on the type of school or program at issue (*e.g.*, a high school with competitive, merit-based admission as compared to a non-competitive elementary school). Where a program is noncompetitive, the types of individualized criteria described by the Supreme Court in the postsecondary cases (*Bakke, Grutter* and *Gratz*) are generally inapplicable.

[16] A school district may permissibly aim to achieve a "critical mass" of underrepresented students.  A critical mass is the level of enrollment of underrepresented students that is necessary to realize the educational benefits that a school district is seeking, including "encourag[ing] underrepresented minority students to participate in the classroom and not feel isolated," *Grutter*, 539 U.S. at 318, or dispelling stereotypes about characteristically minority viewpoints on issues.  A school district that attempts to obtain a critical mass of underrepresented students to achieve its compelling interests is not engaging in impermissible racial balancing.  *Id.* at 329-30.  Moreover, while a district should focus on the qualitative benefits of diversity or avoiding racial isolation, it is permissible to pay some attention to numbers.  As the Court recognized in *Grutter*, "'[s]ome attention to numbers,' without more, does not transform a flexible admissions system into a rigid quota." *Id.* at 336 (quoting *Bakke*, 438 U.S. at 323 (opinion of Powell, J.)).

*Identifying the Reason for Your Plan*

- Determine how these compelling interests relate to your school district's mission and unique circumstances.

- Evaluate how you will know when your compelling interest has been achieved.

*Implementing Your Plan*

- Consider whether there are race-neutral approaches that you can use, such as looking at socioeconomic status or the educational level attained by parents. In selecting among race-neutral approaches, you may take into account the racial impact of various choices. If you determine that race-neutral measures would be unworkable, consider whether using an approach that relies on the generalized use of racial criteria, such as the racial demographics of feeder schools or neighborhoods, would help to achieve your goals.

- If race-neutral and generalized race-based approaches would be unworkable to achieve your compelling interest(s), you may then consider approaches that take into account the race of individual students. When doing so, evaluate each student as an individual and do not make the student's race his or her defining characteristic. Periodically review your program to determine if you continue to need to consider the race of individual students to achieve your compelling interest. It is important to ensure that race is used to the least extent needed to workably serve your compelling interest.

*General Considerations*

- Continue to consider factors that you ordinarily weigh in student assignment and other decisions, such as current and projected student enrollment, travel times, and sibling attendance issues. As you review these factors in light of changes, such as increased or decreased demand at school sites, you should also examine your practices to achieve diversity or avoid racial isolation and modify them if needed.

- Your district's process for students or parents to raise concerns about school assignments or other school decisions should be open to students or parents who wish to raise concerns about decisions made pursuant to efforts to achieve diversity or avoid racial isolation.

- It would be helpful to maintain documents that describe your compelling interest, and the process your institution has followed in arriving at your decisions, including alternatives you considered and rejected and the ways in which your chosen approach helps to achieve diversity or avoid racial isolation. These documents will help you answer questions that may arise about the basis for your decisions.

8

IV.     APPROACHES TO ACHIEVING DIVERSITY OR AVOIDING RACIAL
        ISOLATION

This Section provides practical examples of actions that schools may consider, consistent with prior
Supreme Court opinions and the principles set forth in the previous Sections, as necessary to
achieve diversity or avoid racial isolation. The examples include race-neutral approaches as well as
generalized uses of race, and identify when a school district may consider the race of individual
students.

In choosing among options, school districts should keep in mind the framework discussed above.
We encourage school districts to contact us for technical assistance in applying this guidance to
their particular situations.

These examples are intended to be illustrative, not exhaustive. Districts may choose to pursue more
than one of these options (*e.g.,* a combination of school zoning and school choice for some or all of
their schools) or may design other options that are consistent with this guidance.[17]

In addition to the approaches discussed below, school districts may wish to consider using
recruitment to achieve diversity or avoid racial isolation. For instance, if a school district is seeking
to increase the diversity in the applicant pool of a competitive magnet school with a predominantly
white student body, the district could, as part of its general outreach and recruitment of potential
applicants, place flyers or make announcements at schools with a predominantly non-white student
population or encourage individual non-white students to apply. Such actions simply enlarge the
applicant pool and help to ensure that it is inclusive; they do not determine which students will
ultimately be admitted to the program.

    A.     **School and Program Siting Decisions**

School districts routinely make decisions about the siting of schools and special programs, such as
non-competitive magnet schools or specialized academic, athletic, or extracurricular programs.
School districts seeking to achieve diversity or avoid racial isolation may make siting decisions to
further those interests. School siting decisions, by their nature, will of course also involve
numerous other considerations, such as construction costs, transportation needs, geographic
obstacles, and enrollment projections.

A school district's decision to close a school or to discontinue a special program in an effort to
achieve diversity or avoid racial isolation is analyzed in the same manner as the decision to site a
school or program.

    **Examples**

**Example 1**: A school district that has two potential locations for the siting of a new school – one
that would draw students from varying socioeconomic groups and the other that would draw

---

[17] In addition to enrolling a diverse student body or reducing racial isolation, school districts will want to preserve those
gains. Therefore, districts may employ mentoring, tutoring, retention, and support programs to maintain diversity or
reduce racial isolation. The legal considerations regarding such programs are addressed in the Departments'
"Guidance on the Voluntary Use of Race to Achieve Diversity in Postsecondary Education." These same
considerations apply to the use of such programs by school districts.

primarily from one socioeconomic group – might choose the location that would enroll a socioeconomically diverse student population if it also furthers the district's interest in racial diversity or avoiding racial isolation.

**Example 2**:  When a school district is deciding where to site a specialized academic program (*e.g.*, a nursing or computer science program) designed to improve educational attainment and to draw students from across the school district, it might choose to do so at a low-performing school if the program would also help to achieve racial diversity or avoid racial isolation.

**Example 3**:  A school district might determine where to site a new school based on criteria that expressly include the racial characteristics of a particular geographic area.  If this school is open to all students within that area, the siting decision would use race only in a general way and would not be based on any individual student's race.

### B.   Decisions about Grade Realignment and Feeder Patterns

School districts use grade alignments and feeder patterns to assign students to schools and to make decisions about which schools will serve each grade.  School districts seeking to achieve diversity or avoid racial isolation may design or redesign such programs to further those interests.

#### Examples

**Example 1**:  A school district has two K-5 elementary schools, one of which has a large enrollment of students whose households have higher than average annual incomes and the other of which has a student population whose households have lower than average annual incomes.  The district could mix students from lower and higher income households in one grade K-2 school and one grade 3-5 school, if doing so also helps to achieve racial diversity or avoid racial isolation.

**Example 2**:  A school district might choose to feed underperforming elementary schools into higher performing middle schools if this also helps to achieve racial diversity or avoid racial isolation.

**Example 3**:  A school district could create feeder patterns for elementary schools that expressly include the racial makeup of the population of the elementary school as a whole as a criterion in determining which elementary schools would feed into which middle schools.  All students at a particular elementary school would then be assigned to the same middle school, without regard to the race of any individual student.

### C.   School Zoning Decisions

School districts often use attendance zones to assign students to schools.  An attendance zone is a geographically defined area in which all students who reside in the area are assigned to particular schools.  School districts seeking to achieve diversity or avoid racial isolation may draw or re-draw attendance zones to further those interests.

#### Examples

**Example 1**:  A school district that must zone for two schools in proximity to one another might categorize the geographic area around the schools by socioeconomic status (or some other race-

neutral characteristic). It could then draw attendance zones to achieve socioeconomic diversity, recognizing that it would also help to achieve racial diversity or avoid racial isolation.

**Example 2**: A school district could develop a variety of race-neutral requirements for possible new attendance zones, including equalizing enrollment, minimizing travel times (including facilitating students' walking to school), and ensuring peer continuity (*e.g.*, assigning elementary school classmates to the same middle school). In choosing among possible assignment plans based on these criteria, the school district could choose the one that best advances its interest in achieving racial diversity or avoiding racial isolation.

**Example 3**: A school district could create attendance zones that consider the relative racial composition of areas in combination with the average household income and educational levels of parents in those areas (*e.g.*, highest degree attained or years of education). All students in a given area would then, regardless of their individual race, receive the same consideration when applying to a particular school based on how much their zoned area would contribute to the diversity of or reduce the racial isolation in that school.

## D. Open and Choice Enrollment Decisions

Some school districts use open enrollment or school choice programs to assign students to schools. These programs allow parents to choose among (or rank by preference) district schools. The district then assigns students based in part on their parents' choices. School districts seeking to achieve diversity or avoid racial isolation may design or redesign such programs to further those interests.

### Examples

**Example 1**: A school district in which students of different races are concentrated in different attendance zones could implement a district-wide lottery system that allows parents to identify and rank a certain number of schools and then randomly assigns students based on the parents' choices.

**Example 2**: A school district could design a program that clusters existing schools (*i.e.*, create large attendance zone areas that encompass several neighborhoods and multiple schools that serve the same grade levels) based on a race-neutral factor such as the socioeconomic composition of different geographic areas. The district could then provide parents with choices from among the schools within their assigned cluster in a manner that furthers socioeconomic diversity. In some circumstances, clustering schools based on the socioeconomic composition of particular geographic areas may also help to achieve racial diversity or avoid racial isolation.

**Example 3**: A school district could design a program to cluster existing schools based on their racial composition. The district could then provide parents with choices from among the schools within their assigned cluster that would help to foster diversity or avoid racial isolation.

**Example 4**: A school district could use a program that assigns a diversity priority to each "planning area" (*i.e.*, a geographic area of a small number of residential blocks) based on the area's racial demographics, economic data, and educational demographics. Students could then be assigned to a school based on a combination of parents' choices and a lottery that gives priority based on the planning area in which they reside.

If a school district determines that these types of approaches would be unworkable, it may consider using an individual student's race as one factor among others in considering how an individual student's school assignment would contribute to achieving diversity or avoiding racial isolation. In so doing, a school district should follow the legal guidelines specifically described in Section II(B) above regarding the consideration of individual students' race.

### E.    Admission to Competitive Schools and Programs

Some school districts have schools or programs to which students apply and are selected through a competitive admissions process. School districts seeking to achieve diversity or avoid racial isolation may develop admissions procedures for competitive schools or programs to further those interests.

### Examples

**Example 1:**  A school district could identify race-neutral criteria for admission to a school (*e.g.,* minimum academic qualifications and talent in art) and then conduct a lottery for all qualified applicants rather than selecting only those students with the highest scores under the admission criteria, if doing so would help to achieve racial diversity or avoid racial isolation.

**Example 2:**  For students who meet the basic admissions criteria, a school district could give greater weight to the applications of students based on their socioeconomic status, whether they attend underperforming feeder schools, their parents' level of education, or the average income level of the neighborhood from which the student comes, if the use of one or more of these additional factors would help to achieve racial diversity or avoid racial isolation.

**Example 3**:  If it would help achieve racial diversity or avoid racial isolation, a school district could decide to admit all applicants with grades that put them within the top quartile of their class at the schools from which the competitive program draws.

**Example 4**:  A school district could give special consideration to students from neighborhoods selected specifically because of their racial composition and other factors. In the selection process, a district would treat all the students who live in the selected neighborhood the same regardless of their race.

If a school district concludes that these types of programs would be unworkable to achieve diversity or avoid racial isolation, the district may then consider using race as one factor among others in the selection of individual students for admission to competitive schools or programs. In so doing, a school district should follow the legal guidelines specifically described in Section II(B) above regarding the consideration of individual students' race.

### F.    Inter- and Intra-District Transfers

Numerous school districts use transfer programs to allow students to move between schools within and outside the district. School districts seeking to achieve diversity or avoid racial isolation may use transfer programs to further those interests.

## Examples

**Example 1:**  A school district might categorize neighborhoods based on average household income and allow a student from a geographic area with a lower than average household income to transfer out of his or her assigned school and into a school that draws from a geographic area with a higher than average household income if it would help to achieve racial diversity or avoid racial isolation.

**Example 2:**  A school district could design a transfer program that expressly relies upon the overall racial composition of geographic areas within the district.  For example, in evaluating requests to transfer into a predominantly Asian-American school, a school district could give priority to students who live in a neighborhood comprised predominantly of non-Asian-American households, regardless of the race of the particular student requesting the transfer.  All students from this neighborhood would be treated the same in the decision-making process.

**Example 3:**  Two or more adjacent districts (for example, a predominantly African-American urban district and a predominantly white suburban district) could collaborate to facilitate district-to-district student transfers, by which students in each district (regardless of their particular race) could apply to transfer voluntarily to a school in the other district.  All students from a district would be treated the same in the decision-making process, without regard to the race of any individual student.

If a school district determines that these types of approaches would be unworkable, it may consider using an individual student's race as one factor among others in considering whether to approve or deny the student's transfer request.  In so doing, a school district should follow the legal guidelines specifically described in Section II(B) above regarding the consideration of individual students' race.

## Conclusion

This document provides guidance and examples of approaches that school districts can voluntarily use to further their compelling interests in achieving diversity and avoiding racial isolation, consistent with case law under Title IV, Title VI, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

The issues discussed herein relate to a complex area of the law, and the Departments encourage school districts to contact us with questions or for further assistance in applying this guidance in a specific district.  To contact the OCR regional office for your state or territory, please visit http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm, or contact OCR's Customer Service Team at:

> U.S. Department of Education
> Office for Civil Rights, Customer Service Team
> 400 Maryland Avenue, SW
> Washington, DC  20202-1100
> Telephone: 800-421-3481
> Fax: 202-453-6012; TDD: 877-521-2172
> Email: OCR@ed.gov

13

To reach the Department of Justice, please contact:

> U.S. Department of Justice
> Civil Rights Division
> Educational Opportunities Section
> 950 Pennsylvania Ave., NW
> Washington, DC  20530
> Telephone: 877-292-3804 or 202-514-4092
> Fax: 202-514-8337; TDD: 202-353-3926
> Email: education@usdoj.gov