UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTA McAULIFFE INTERMEDIATE SCHOOL
PTO, Inc., et al,

Plaintiffs,

-against-

BILL De BLASIO, in his official capacity as Mayor of
New York, et ano.,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

***ZACHARY W. CARTER***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Marilyn Richter*
*Thomas B. Roberts*
*Andrea Fastenberg*
*Benjamin Miller*
*Sabrina Hassan*
*Josh Wertheimer*
*Amy Cassidy*
*Tel: (212) 356-0872*
*Matter No.: 2018-094646*

# TABLE OF CONTENTS

**Pags**

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF FACTS....................................................................... 4

ARGUMENT

      POINT I

          PLAINTIFFS LACK STANDING TO BRING
          THIS ACTION ...................................................4

          A.   The Organizational Plaintiffs Have not
                Alleged an Injury.......................................5

          B.   The Individual Plaintiffs Have not Alleged an
                Imminent Injury ......................................7

      POINT II

          PLAINTIFFS HAVE FAILED TO SATISFY
          THE REQUIREMENTS FOR THE
          EXTRAORDINARY AND DRASTIC REMEDY
          OF A PRELIMINARY INJUNCTION ................8

      POINT III

          PLAINTIFFS CANNOT DEMONSTRATE
          LIKELIHOOD OF SUCCESS ON THE MERITS
          BECAUSE THE REVISED CRITERIA FOR
          THE DISCOVERY PROGRAM DO NOT
          VIOLATE THE EQUAL PROTECTION
          CLAUSE...........................................13

          A.   The Discovery Program Eligibility Criteria
                Revisions Are Rationally Related to the
                Compelling Government Interest of Fostering
                Diversity in Secondary Schools and Neither
                Result in a Disproportionate Impact Upon a
                Protected Class Nor Are Motivated by a
                Discriminatory Purpose................................14

1.  *Rational Basis Review: DOE's Modifications to the Discovery Program Eligibility Criteria Are Rationally Related to the Compelling Government Interest in Fostering Diversity, and thus, Are Permissible under the Equal Protection Clause* ............................................................................... 15

2.  *Encouraging Geographic, Socioeconomic, Racial, and Ethnic Diversity in Secondary Schools Is a Compelling Government Interest* ........................... 18

3.  *Promoting Diversity Is Not a Discriminatory Purpose* ............................................................................. 21

    i.  *DOE's Challenged Discovery Program Criteria Will Not Have a Disparate Impact on Asian-Americans* ...................................... 22

    ii. *The Legislative History of the Hecht-Calandra Act Demonstrates that the Intended Use of the Discovery Program Was to Provide an Alternate Means of Admission to the Specialized High Schools for Disadvantaged Students* ................................. 26

    iii. *Prior Race-Neutral Initiatives Designed to Foster Diversity at the Specialized High Schools Have Been Unsuccessful* ...................... 27

4.  *The Challenged Discovery Program Eligibility Criteria Do Not Rely Upon Individual Racial Classifications and Are Not Subject to Strict Scrutiny* ........................................................................... 31

B.  Assuming Arguendo that Strict Scrutiny Applies, DOE's Modification to the Discovery Program Eligibility Criteria Was Narrowly Tailored to Achieve a Compelling Government Interest Because Other Race-Neutral Alternatives Did not Suffice, the Modification Did Not Result in an Undue Burden on Other Students, and DOE Will Monitor and Adjust the Modifications as Appropriate and Necessary ................................................ 32

    1.  *Fostering Diversity Is a Compelling Government Interest* ........................................................... 32

    2.  *The Modifications Were Narrowly Tailored* .................. 33

CONCLUSION ....................................................................................... 35

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Abdul Wali v. Coughlin,*
   754 F.2d 1015 (2d Cir. 1985) ..................................................................... 7

*Able v. United States,*
   44 F.3d 128 (2d Cir. 1995) ......................................................................... 7

*ACLU v. Clapper,*
   804 F.3d 617 (2d Cir. 2015) ....................................................................... 7

*Bray v. City of New York,*
   346 F. Supp. 2d 480 (S.D.N.Y. 2004) ...................................................... 10

*Brown v. Board of Education,*
   347 U.S. 484 (1954) ................................................................................. 17

*Burbank v. Office of the AG,*
   240 F. Supp. 2d 167 (D. Conn. 2003) ...................................................... 15

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay,*
   868 F.3d 104 (2d Cir. 2017) ....................................................................... 4

*Citigroup Global Mkts., Inc. v VCG Special Opportunities Master Fund, Ltd.,*
   598 F3d 30 (2d Cir 2010) ........................................................................... 7

*City of New Orleans v. Dukes,*
   427 US 297 (1976) ................................................................................... 14

*Crawford v. Bd. of Educ.,*
   458 US 527 (1982) ................................................................................... 12

*Ctr. For Food Safety v. Price,*
   2018 U.S. Dist. LEXIS 155794, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ................. 4, 5

*D.S. v. N.Y.C. Dep't of Educ.,*
   255 F.R.D. 59 (E.D.N.Y. 2008) ............................................................... 18

*Doe v. Lower Merion Sch. Dist.,*
   665 F.3d 524 (3d Cir. 2011) ........................................................... 12, 14, 21

*Fisher v. Univ. of Tex.,*
   136 S. Ct. 2198 (2016) ............................................................................. 32

*G.M.M. v. Kimpson,*
   116 F. Supp. 3d 126 (E.D.N.Y. 2015) ...................................................... 18

**Cases**                                                                                                                          **Pages**

*Grutter v. Bollinger,*
    539 U.S. 306 (2003)..............................................................................17, 18, 31, 32, 33

*Hart v. Cmty. Sch. Bd.,*
    536 F. Supp. 2d 274 (E.D.N.Y. 2008) ................................................................18

*Hayden v. County of Nassau,*
    180 F.3d 42 (2d Cir. 1999) ................................................................................14

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc,*
    219 F.3d 104 (2d Cir. 2002) ..............................................................................10

*Irish Lesbian & Gay Org. v. Giuliani,*
    918 F. Supp. 732 (S.D.N.Y. 1996) ....................................................................11

*League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors,*
    737 F.2d 155 (2d Cir. 1984) ................................................................................4

*Lowell v. Lyft, Inc.,*
    2018 U.S. Dist. LEXIS 202495, 2018 WL 6250661 (S.D.N.Y. Nov. 29, 2018)..................4, 5

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).............................................................................................3

*Marks v. United States,*
    430 U.S. 188 (1977)...........................................................................................18

*Mastrovincenzo v. City of New York,*
    435 F.3d 78 (2d Cir. 2006) ..................................................................................7

*Miller v. Johnson,*
    515 U.S. 900 (1995)...........................................................................................20

*Moore v. Consol. Edison Co. of N.Y., Inc.,*
    409 F.3d 506 (2d Cir. 2005) ................................................................................6

*New York State Citizen's Coalition for Children v. Velez,*
    629 Fed. Appx. 92 (2d Cir. 2015).........................................................................4

*Nnebe v. Daus,*
    644 F.3d 147 (2d Cir. 2011) ................................................................................4

*Palmer v. Thompson,*
    403 U.S. 217 (1971)...........................................................................................21

**Cases**                                                                  **Pages**

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
551 U.S. 701 (2007)..................................................................17, 18, 30, 31

*Pers. Adm'r of Mass. v. Feeney,*
442 U.S. 256 (1979).........................................................................14

*Plaza Health Labs., Inc. v. Perales,*
878 F.2d 577 (2d Cir. 1989) ............................................................7

*Plyler v. Doe,*
457 U.S. 202 (1982).........................................................................17

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,*
324 U.S. 806 (1945).........................................................................10

*Shaw v. Reno,*
509 U.S. 630 (1993).........................................................................12

*Simon, v. E. Ky. Welfare Rights Org.,*
426 U.S. 26 (1976)...........................................................................4

*Spokeo, Inc. v. Robins,*
136 S. Ct. 1540 (2016)......................................................................3

*Spurlock v. Fox,*
716 F.3d 383 (6th Cir. 2013) ..........................................................14

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
60 F.3d 27 (2d Cir. 1995) ................................................................7

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.,*
17 F.3d 38 (2d Cir. 1994) ................................................................10

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018)......................................................................3

*United States v. Alamance-Burlington Bd. of Educ.,*
640 F. Supp. 2d 670 (M.D.N.C. 2009) ...........................................18

*Upstate Jobs Party v Kosinski,*
2018 U.S. App. LEXIS 20197 (2d Cir. Jul 20, 2018)..............7, 10, 11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977).........................................................................25

**Cases**     **Pages**

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)...........................................................................7

**Statutes**

42 U.S.C. § 1983...............................................................................4

N.Y. Educ. L. § 2590-g subd. 12.....................................................26

N.Y. Educ. L. §§ 2590-h(1)(b), incorporating N.Y. Educ. Law § 2590-g(12), as in
effect on March 29, 1997.................................................................8

**Other Authorities**

A.S. Wells, *Seeing Past the 'Colorblind' Myth of Education Policy: Why
Policymakers Should Address Racial/Ethnic Inequality and Support
Culturally Diverse Schools* .............................................................19

DOE Specialized High Schools Proposal, *Making Admissions to the Specialized
High Schools More Equitable for All Students* ..................................12

Elizabeth Stearns, *Long-Term Correlates of High School Racial Composition:
Perpetuation Theory Reexamined*....................................................19

Marcia Chambers, *U.S. Inquiry Into Bias Is Opposed At Prestigious New York
Schools*, N.Y. TIMES, November 7, 1977 .......................................27

Mark Berends & Roberto V. Penaloza, *Increasing Racial Isolation and Test Score
Gaps in Mathematics: A Thirty Year Perspective* ............................19

Michal Kurlaender & John T. Yun, *Fifty Years After Brown: New Evidence of the
Impact of School Racial Composition on Student Outcomes* ..............20

Mo Yin S. Tam & Gilbert W. Bassett Jr., *Does Diversity Matter? Measuring the
Impact of High School Diversity on Freshman GPA*...........................19

Roslyn Arlin Mickelson & Martha Bottia, *Integrated Education and Mathematics
Outcomes: A Synthesis of Social Science Research*, 88 North Carolina Law
Review 993 (2010) ........................................................................19

Shelly Brown-Jeffy, *The Race Gap in High School Reading Achievement: Why
School Racial Composition Still Matters*............................................19

Susan E. Eaton, *The Other Boston Busing Story: What is Won and Lost Across the
Boundary Line* .............................................................................19

# PRELIMINARY STATEMENT

Plaintiffs are a parent teacher organization of a New York City public middle school, two Asian-American organizations, one parent of a child who took the high school entrance examination which is the backdrop of this litigation in October 2018, and two individual parents whose young children will not be ready to take a high school entrance examination for years. Plaintiffs have sued pursuant to 42 U.S.C. § 1983, claiming that their rights under the Equal Protection Clause of the Fourteenth Amendment are being violated. Defendants are Bill de Blasio, in his official capacity as Mayor of the City of New York[1] and Richard A. Carranza, in his official capacity as Chancellor of the New York City Department of Education ("DOE.").

DOE operates eight "Specialized High Schools," which provide rigorous instruction to academically gifted students. Admission to these schools is controlled by a State law, enacted in 1971, which mandates that a competitive achievement exam be the main criterion for admission, but also provides that disadvantaged students who score just below the cut-off score may enter these schools through a Discovery Program. The original bill contained a cap of 14% of the seats at these schools reserved for the Discovery Program, but the final bill contains no cap on the size of the Discovery Program.

These schools have become far less diverse than in previous decades, in terms of geography, race and ethnicity. The majority of middle schools in New York City send no students to the Specialized High Schools while 50% of the offers go to just 30 middle schools. Very few students come from middle schools in the Bronx. The percentage of African-American and Latino students at the Specialized High Schools has declined to the extent that in two of

---

[1] The Mayor is not a proper party to this lawsuit. The City and the New York City Department of Education are separate and distinct legal entities. *Perez v. City of New York,* 41 A.D.3d 378, 379 (1st Dep't 2007); *Williams v. City of New York,* 2014 U.S. Dist. LEXIS 49837, * 22-24, aff'd, 602 F. App'x 28 (2d Cir. 2015). Defendants have asserted this defense in their answer. It is unnecessary to brief this issue fully at this juncture because the Chancellor in his official capacity is a proper party.

these schools, including Stuyvesant High School, less than one percent of the enrolled students are African-American. Over the years, DOE has implemented many programs, and even opened additional Specialized High Schools, in part to address the lack of diversity. These efforts have not been effective in increasing diversity. In the spring of 2018, DOE considered other ways to foster diversity, and decided to expand the Discovery Program to 20% of the seats in the Specialized High Schools over two years. In 2019-2020 the Program will expand to approximately 13% of the seats. DOE also decided to revise the eligibility criteria for the Discovery Program, which by State law must serve disadvantaged students, to include a requirement that a student attend a school with a high Economic Need Index ("ENI"), which measures the economic disadvantage of its students. The threshold selected, an ENI of 60% or greater, represents schools who have greater than average Economic Needs. Thus the expanded Discovery Program would identify the most disadvantaged students, and provide a pathway to their admission to the Specialized High Schools.

Plaintiffs claim the revised criteria and the expansion of the Discovery Program violate the Equal Protection Clause. They speculate that these efforts to promote diversity were actually motivated by animus toward Asian-Americans, and are an attempt to reduce the number of Asian-American students in the Specialized High Schools. Plaintiffs challenge the expansion of the Discovery Program because it will reduce the number of seats for students admitted on the basis of exam scores. This argument ignores the express authorization in the law for DOE to establish and maintain a robust Discovery Program to afford disadvantaged students the opportunity to enroll in these schools. Plaintiffs challenge the revised eligibility criteria limiting the Discovery Program to students from schools of greater need, because students from other

schools that they cite, such as Christa McAuliffe Intermediate School, are not captured by the revised criteria.

However, the students at Christa McAuliffe have the advantage of attending a school with a culture that fosters achievement to such a degree that 268 of its eight graders received offers in 2017. By contrast, there are hundreds of public middle schools whose students received no offers. Because Christa McAuliffe and some other high-performing middle schools have large numbers of Asian-American students, Plaintiffs speculate that the plan was motivated by anti-Asian animus. Plaintiffs also point to statements by the Mayor and the Chancellor as indicia of animus, whereas the cited statements in context demonstrate full support for equal opportunity and diversity. Finally, the statistical model that was prepared for the decision makers predicts that the plan will increase the percentage of Black and Latino students in the Specialized High Schools to a small degree, and will decrease the percentage of Asian-American and "Unknown" students (usually students of multi-racial backgrounds), to a much smaller degree, and decrease the percentage of White students to a slightly larger but still small degree. It is widely recognized that diversity benefits all students. Indeed, four Asian-American organizations publicly supported a complaint filed in 2012 with the Office of Civil Rights of the United States Department of Education, which asserted that the lack of racial and other forms of diversity at the Specialized High Schools was a violation of federal Title VI. The statements of these groups recognize the importance for all students of learning and growing in a diverse environment.

Plaintiffs have moved for a preliminary injunction seeking to enjoin Defendants' current plan, which was announced last June and is now being implemented. Defendants oppose the motion on the grounds that Plaintiffs lack standing, Plaintiffs have not shown they are entitled to

the extraordinary remedy of a preliminary injunction, and Plaintiffs have no likelihood of success on the merits.

## STATEMENT OF FACTS

For a complete and accurate statement of the relevant facts, the Court is respectfully referred to the Declaration of Joshua Wallack, dated January 17, 2019, the Declaration of Nadiya Chadha, dated January 17, 2019, and the Declaration of Thomas B. Roberts, dated January 17, 2019, all submitted in support of Defendants' Opposition to the motion for a preliminary injunction.

## ARGUMENT

## POINT I

## PLAINTIFFS LACK STANDING TO BRING THIS ACTION

To prosecute an action, the Plaintiffs must have standing. As the Supreme Court recently held:

> Federal courts have authority under the Constitution to decide legal questions only in the course of resolving "Cases" or "Controversies." One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue. Standing requires more than just a keen interest in the issue." It requires allegations—and, eventually, proof—that the plaintiff "personal[ly]" suffered a concrete and particularized injury in connection with the conduct about which he complains.

*Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (citations omitted). The Supreme Court previously held that:

> the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized,... and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly ... trace[able] to the challenged action of the

> defendant, and not ... the result [of] the independent action of some
> third party not before the court." Third, it must be "likely," as
> opposed to merely "speculative," that the injury will be "redressed
> by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). Plaintiffs bear

the burden of establishing standing, and at the pleading stage they must do so by "clearly

alleg[ing] facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).

Here, none of the plaintiffs satisfy these requirements.

## A.    The Organizational Plaintiffs Have not Alleged an Injury

It is well settled in the Second Circuit that an organization lacks standing to sue under 42

U.S.C. § 1983 for the alleged injuries to its members. *New York State Citizen's Coalition for

Children v. Velez*, 629 Fed. Appx. 92, 93-95 (2d Cir. 2015); *League of Women Voters of Nassau

Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984). Such

"associational" standing is not recognized in the context of § 1983 actions.

An organization, however, may have standing if there is an injury in fact to the

organization itself. *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,

868 F.3d 104, 109-111 (2d Cir. 2017); *Nnebe v. Daus*, 644 F.3d 147, 156-57 (2d Cir. 2011);

*Lowell v. Lyft, Inc.*, 2018 U.S. Dist. LEXIS 202495 at *15-20, 2018 WL 6250661 (S.D.N.Y.

Nov. 29, 2018); *Ctr. For Food Safety v. Price*, 2018 U.S. Dist. LEXIS 155794 at * 10-14, 2018

WL 4356730 (S.D.N.Y. Sept. 12, 2018). An injury to an organization, however, must be real.

"An organization's abstract concern with a subject that could be affected by an adjudication does

not substitute for the concrete injury required by Art. III." *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 40 (1976).

Here, none of the organizational plaintiffs allege facts sufficient to establish standing. At

paragraph 7 of the complaint, the McAuliffe PTO asserts only that its members will be injured if

some of their children are not admitted to a Specialized High School. The McAuliffe PTO alleges no injury to itself. As it may not assert the alleged injuries of its members, it lacks standing. *Velez*, 629 Fed. Appx. at 93-95 (2d Cir. 2015).

At paragraph 8 of the complaint, the Chinese American Citizens Alliance of Greater New York ("CACAGNY") alleges that the children of several of its members may be injured and makes the bald assertion – without alleging any facts – that it has had to devote significant resources to counteract the challenged policy. Under *Velez*, CACAGNY cannot assert the alleged injuries to its members, and its allegation of diversion of resources is insufficient to establish standing. The only claimed injury to CACAGNY is that CACAGNY has advocated against the challenged policy. *See* Declaration of Wai Wah Chin, para. 5 (Dkt. no. 13). This is not a legally recognizable injury. This Court recently held that an organization for the disabled that alleged it had diverted resources to advocate for its constituents lacked standing to challenge the adequacy of the accommodations Lyft made for passengers with disabilities. The judge explained:

> Plaintiff WDOMI states that it is injured because it must divert resources to advocate "for its constituents who are harmed by Lyft's discriminatory policies and practices." … This injury is not distinct from the matter before the Court. Rather, Plaintiff WDOMI's stated injury results from WDOMI's efforts to pursue this very lawsuit.

*Lowell*, 2018 U.S. Dist. LEXIS 202495 at *15-16. The court dismissed WDOMI's claim holding that its "conclusory" allegations of diversion of resources was insufficient to establish standing. *Id.* at *19. CACAGNY's alleged basis for standing is equally defective. *See also*, *Ctr. For Food Safety v. Price*, 2018 U.S. Dist. LEXIS 155794 at *14. 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ("to allow standing based on these allegations alone would mean that any entity that

spends money on an issue of particular interest to it would have standing, which would in turn contravene the principle that an entity's 'mere interest in a problem' cannot support standing.").

In paragraph 9 of the complaint, the Asian American Coalition for Education ("AACE") also makes the bare allegation that it "has had to devote significant resources to opposing the challenged policy." The declaration of Raymond H. Wong filed in support of AACE does not even reference or allude to a diversion of resources (Dkt. no. 14). The complaint's conclusory allegation is insufficient for the same reasons that CACAGNY's allegation is defective.

**B.     The Individual Plaintiffs Have not Alleged an Imminent Injury**

None of the individual plaintiffs have alleged an imminent or actual injury. Paragraph 11 of the complaint alleges that Plaintiff Yi Fang Chen's son is currently a first grader, who cannot expect to apply for admission to high school for seven years. Plaintiff Chi Wang states in her declaration (dkt. no. 17) that she has two children, ages five and nine. The nine year old is in fourth grade and cannot expect to apply for admission to high school for four years. Any injury they might suffer is not imminent or actual.

Phillip Yan Hing Wong's daughter is an eighth grader who took the SHSAT test in October 2018. Mr. Wong lacks standing, however, because his daughter's score on the SHSAT demonstrates that she will not be affected by the Discovery Program. Indeed, even if her SHSAT score had been just below the cut-off, her eligibility for the Discovery Program would turn on her individual hardship factors because she attends I.S. 5 in Queens, a school with an ENI greater than 0.60. Indeed, if Mr. Wong's daughter were otherwise qualified for the Discovery Program and her test score was just below the cut-off, she would have <u>benefited</u> from the challenged program. As Mr. Wong's daughter was not injured by the Discovery Program, he lacks standing. Therefore, all the individual plaintiffs lack standing.

## POINT II

## PLAINTIFFS HAVE FAILED TO SATISFY THE REQUIREMENTS FOR THE EXTRAORDINARY AND DRASTIC REMEDY OF A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.,* 409 F.3d 506, 510 (2d Cir. 2005) (quotation marks and citation omitted). A party seeking a preliminary injunction must ordinarily establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008); *accord ACLU v. Clapper,* 804 F.3d 617, 622 (2d Cir. 2015).

While Plaintiffs claim that a lesser general standard than that articulated by the Supreme Court in *Winter* is applicable (Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Pl. MOL") 9, 27-29), it is unnecessary to decide this issue, because the law is clear that heightened standards are applicable in the circumstances present here.

> Where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous ["serious questions"] standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995) (first alteration in original) (quoting *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir. 1989)).
>
> Second, "[a] heightened 'substantial likelihood' standard may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Mastrovincenzo v. City of New York,* 435 F.3d 78, 90 (2d

Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995)).

Third, a "mandatory" preliminary injunction that "alter[s] the status quo by commanding some positive act," as opposed to a "prohibitory" injunction seeking only to maintain the status quo, "should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Tom Doherty Assocs.*, 60 F.3d at 34 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

*Citigroup Global Mkts., Inc. v VCG Special Opportunities Master Fund, Ltd.*, 598 F3d 30, 35, n 4 (2d Cir 2010).

*See also, Upstate Jobs Party v Kosinski*, 2018 U.S. App. LEXIS 20197, at **2-3 (2d Cir. Jul 20, 2018). Plaintiffs seek to stay government action taken in the public interest pursuant to a statutory or regulatory scheme. The challenged expansion of the DOE's Discovery Program and revised eligibility criteria for that Program is clearly government action, and it is taken in the public interest pursuant to a statutory scheme. The Hecht-Calandra Act, N.Y. Education Law § 2590-h(1)(b), incorporating N.Y. Educ. Law § 2590-g(12), as in effect on March 29, 1997, establishes the parameters for admission to the Specialized High Schools. Accordingly, Plaintiffs must establish both a likelihood of success on the merits and irreparable injury.

Second, the requested injunction would provide Plaintiffs with all the relief that they seek concerning the admission of students in September 2019, and that relief could not be undone by a judgment for Defendants on the merits. The requested injunction would compel DOE to reduce the size of the Discovery Program and use eligibility criteria that have been superseded, with an anticipated loss of increased diversity in the Specialized High Schools for the 2019-2020 school year. Further, the hundreds of students who would be admitted under the current plan but who will be denied admission under the requested injunction, will never have another chance to

enter ninth grade at a Specialized High School. Accordingly, Plaintiffs must meet a heightened substantial likelihood of success standard.

Finally, Plaintiffs seek a mandatory preliminary injunction that alters the status quo by commanding a positive act. The plan that is applicable to the admission process that is occurring right now was publicly announced on June 3, 2018. Staff, students and parents have been informed that the plan is in effect this year. The Discovery Program is being more than doubled in size; there were 252 students in the Program last summer and there will be room for 528 students this summer.

DOE and the principals of the eight Specialized High Schools have engaged in extensive discussions concerning accommodation of the expanded Discovery Program in the summer of 2019. The SHSAT cut-off scores are being calculated now based on this plan, and arrangements are being made to provide the additional resources necessary for the expansion. Plaintiffs' requested relief would reduce the size of the Discovery Program by more than half and compel DOE to reinstate eligibility criteria that were changed. This would result in the admission of hundreds of different students than will be admitted under the current plan, diminish the likelihood of increased diversity in the Specialized High Schools, require DOE to develop and implement a new Discovery Program admissions process in a matter of weeks. The relief sought would not maintain the status quo. Plaintiffs are seeking a mandatory injunction and therefore are not entitled to an injunction unless they make "a clear showing" of entitlement to the requested relief, or show extreme or very serious damage.

To obtain a preliminary injunction, Plaintiffs must satisfy each prerequisite; here they have not satisfied any. First, as fully discussed in Point III below, Plaintiffs have not shown a clear likelihood, or even a heightened substantial likelihood, of success on the merits. Second,

Plaintiffs have not demonstrated that they are likely to suffer irreparable injury in the absence of injunctive relief. As fully discussed in Point I above, Plaintiffs lack standing because they have not asserted an actual or imminent injury. Plaintiffs' alleged injury – that they are "being forced to compete in a race-based system" – is non-existent, as the Discovery Program criteria are race-neutral. *See* Pl. MOL 28. However, even if there were a possible injury, only one plaintiff, Mr. Wong, has a child who is now competing for admission to the Specialized High Schools. However, as discussed in Point I above, she is not affected by the challenged changes in the Discovery Program and accordingly cannot be prejudiced by them. Plaintiff Wong will suffer no irreparable injury.

Third, the balance of the equities tips decidedly in favor of Defendants, as Plaintiffs are guilty of laches for failing to bring the lawsuit sooner. The challenged plan was publicly announced on June 3, 2018. Plaintiffs waited over seven months to commence this action. They then served this motion simultaneously with the summons and complaint, claiming urgency because "the challenged plan will impact admissions decisions which are imminent." (Pl. MOL 2.) Plaintiffs then compounded the prejudicial effect of their delay by serving their summons and complaint, together with the instant motion, on December 20, 2018, one business day before the DOE began its winter recess, which lasts for nine days. The main office of DOE was only open for three days during this period, and most staff were on preplanned vacations for the entire period. The conclusion that this timing was a deliberate tactic to prejudice Defendants in opposing this motion is unavoidable.

The equitable defense of laches is appropriately considered in the preliminary injunction context. *Bray v. City of New York*, 346 F. Supp. 2d 480, 491-492 (S.D.N.Y. 2004). Laches "bars injunctive relief where a plaintiff unreasonably delays in commencing an action." *Tri-Star*

*Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994). The guiding principle is that "he who comes into equity must come with clean hands." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc*, 219 F.3d 104, 107 (2d Cir. 2002) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806 (1945)).

In *Upstate Jobs Party, supra, 2018 U.S. App. LEXIS 20197, at **5,* the denial of a preliminary injunction was upheld, even though the Circuit found there were serious questions as to possible constitutional violations, in part because plaintiff had unduly delayed bringing its challenge until four months before an election. In *Irish Lesbian & Gay Org. v. Giuliani*, 918 F. Supp. 732, 748-749 (S.D.N.Y. 1996), the plaintiff was found guilty of laches and a preliminary injunction was denied because the plaintiff waited one month before bringing a lawsuit and simultaneously seeking preliminary relief concerning an imminent event.

Clearly Defendants have been prejudiced here, by having to prepare their opposition to a constitutional challenge involving complex facts, in a period of time that was short to begin with, and was effectively almost halved by Plaintiffs' service of their papers just before the winter recess. Even more compelling is the prejudice to the 80,000 students and their families who are eagerly awaiting DOE's high school admissions offers for fall 2019. The transmittal of these offers has been voluntarily delayed by DOE for two weeks, to permit the Court to have adequate time to decide this motion, which concerns admission to eight schools for which over 29,000 students are competing. Although Plaintiffs claim that the mere fact that they are alleging an equal protection violation tips the "balance of the hardships" in their favor (Pl. MOL 28-29), courts in the Second Circuit have not agreed. *See Upstate Jobs Party, supra*, 2018 U.S. App. LEXIS 20197, at *3 (equal protection and first amendment claims alleged.); *Irish Lesbian & Gay Org., supra*, 918 F.Supp. at 735, 740, 742-747 (equal protection and first amendment claims

alleged.)  In summary, Plaintiffs have failed to satisfy any of the prerequisites for a preliminary injunction and their motion should be denied.

**POINT III**

**PLAINTIFFS CANNOT DEMONSTRATE LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE REVISED CRITERIA FOR THE DISCOVERY PROGRAM DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE**

The central purpose of the Equal Protection Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). However, "[a] government action does not necessarily purposely discriminate merely because it is race-related." *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543 (3d Cir. 2011) (citing *Crawford v. Bd. of Educ.*, 458 US 527, 538 (1982)). Proof of racially discriminatory intent or purpose is required. *Lower Merion*, 665 F.3d at 543.

For at least the past decade, admission to the Specialized High Schools has been unattainable for a range of otherwise qualified students who fall short of the cut-off score on the SHSAT, the examination constituting the primary basis of admission, as required by the Hecht-Calandra Act. *See* Laws of 1971, chap. 1212.[2] As a result, there has been a decrease in diversity – at least with respect to race, ethnicity, socioeconomic status and geographic distribution – in the Specialized High Schools' student bodies. For the ninth grade class entering in the fall of 2017, for example, 50% of offers for seats at Specialized High Schools were made to students at only 30 – or 4.6% - of DOE intermediate schools.[3] DOE intermediate schools with a high

---

[2] Declaration of Thomas B. Roberts, sworn to January 17, 2019 (hereafter, "Roberts Declaration"), Ex. 1.

[3] DOE Specialized High Schools Proposal, *Making Admissions to the Specialized High Schools More Equitable for All Students*, https://www.schools.nyc.gov/docs/default-source/default-document-library/specialized-high-schools-proposal, last accessed January 17, 2019.

proportion of disadvantaged students were even underrepresented in the Discovery Program a program that was authorized for the specific purpose of giving opportunities to "disadvantaged students of demonstrated high potential." *See* Laws of 1971, chap. 1212. And for the ninth grade class entering in the fall of 2018, although African-American and Latino students accounted for approximately 41% of SHSAT test-takers, they received approximately 9% of offers to Specialized High Schools.

Although DOE recognizes that, with respect to some measures – national origin and religion, for example – the student bodies of the Specialized High Schools are diverse, the lack of diversity in other important areas, including race, ethnicity and geography, is troubling. As such, DOE reasonably exercised its discretion under the Hecht-Calandra Act to refine the criteria for participation in the Discovery Program, such that only students attending an intermediate school with an Economic Need Index ("ENI," *see* Wallack Declaration, at ¶ 22) of 60% or greater ("High ENI School") would be eligible. The purpose of such refinement is to extend enrollment opportunities to the most disadvantaged students in the City, thereby offering admission to the Specialized High Schools to a broader and more diverse swath of students, and ultimately, creating a more dynamic overall learning environment from which all students can benefit. Because DOE's actions rationally relate to the legitimate – indeed compelling – governmental interest in encouraging diversity in secondary schools, Plaintiffs' claim under the Equal Protection Clause will fail, and they cannot demonstrate a likelihood of success on the merits.

A. **The Discovery Program Eligibility Criteria Revisions Are Rationally Related to the Compelling Government Interest of Fostering Diversity in Secondary Schools and Neither Result in a Disproportionate Impact Upon a Protected Class Nor Are Motivated by a Discriminatory Purpose**

Plaintiffs allege that Defendants' purpose in modifying the race-neutral criteria for eligibility in the Discovery Program was "to limit the number of Asian-American students who may attend" and to "achiev[e] their preferred racial balance" at the Specialized High Schools. *See* Pl. MOL 1. This allegation is wholly unsupported by the evidence, which instead demonstrates that DOE's motivation was to increase geographic, racial and socioeconomic diversity at these high schools. If the goal was to achieve racial balance, DOE has certainly failed.

In essence, Plaintiffs ask the Court to find that DOE's efforts to foster diversity across several dimensions using race-neutral factors constitute racial discrimination. Plaintiffs cite no case that has made an analogous ruling. Indeed, if a race-neutral measure taken to diversify a particular population has the effect of slightly decreasing the proportion of dominant groups, the measure does not constitute unlawful discrimination. DOE's revision to the criteria for eligibility in the Discovery Program offers opportunities to disadvantaged students from currently underrepresented intermediate schools without regard to race and serves the compelling governmental interest of promoting multi-dimensional diversity. Accordingly, DOE acted in accord with the Equal Protection Clause.

1. *Rational Basis Review: DOE's Modifications to the Discovery Program Eligibility Criteria Are Rationally Related to the Compelling Government Interest in Fostering Diversity, and thus, Are Permissible under the Equal Protection Clause*

Absent a racially discriminatory purpose, explicit or inferable, on the part of DOE, the revised criteria for the Discovery Program are subject to rational basis review. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979). Under rational basis review, the challenged government action "must be upheld if it is 'rationally related to a legitimate government interest.'" *Lower Merion*, 665 F.3d at 556 (citing *City of New Orleans v. Dukes*, 427 US 297 (1976)). Rational basis review is "highly deferential" and will result in a holding of

unconstitutionality "only in rare or exceptional circumstances." *Spurlock v. Fox*, 716 F.3d 383, 403 (6th Cir. 2013).

The rational basis test in this case is appropriate, as demonstrated by *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999). Plaintiffs seek to minimize *Hayden*, claiming that it represents the narrow proposition that "a government does not intentionally discriminate against non-minorities by attempting to reduce the disparate impact of an entrance exam in order to remedy potential prior intentional discrimination." Pl. MOL 16. But *Hayden* has been properly construed more broadly. *See Burbank v. Office of the AG*, 240 F. Supp. 2d 167 (D. Conn. 2003) (citing *Hayden* for the Second Circuit's "clear" position that "the intent to remedy past discrimination does not amount to a forbidden racial classification or an intent to discriminate against non-minority candidates unless it involves quotas, set-asides, preferential grading, or similar means that prevent non-minorities from competing for positions"). In fact, because the defendant in *Hayden* established a facially race-neutral policy that was motivated in part by a desire to diminish impact on African-American applicants, the Second Circuit rejected the plaintiffs' argument that strict scrutiny applied. *Id.* at 48. The Second Circuit plainly stated that the defendant's desire "to design an entrance exam which would diminish the adverse impact on black applicants" did not constitute a racial classification. *Id.* at 48. Similarly, here, the challenged Discovery Program criteria announced in June 2018 apply equally to all students regardless of race or ethnicity and do not constitute a racial classification.

Additionally, no court has found that race-neutral efforts to foster diversity constitute racial discrimination, and the present facts and circumstances demonstrate that DOE did not act for the purpose of hindering any racial group. Rather, DOE exercised its discretion to alter the

eligibility criteria for the Discovery Program to ensure that the Specialized High Schools are accessible to qualified, disadvantaged students, thereby further diversifying their student bodies.

Plaintiffs note that, under the criteria historically utilized by DOE to determine which students are "disadvantaged" – including eligibility for free lunch, eligibility for reduced price lunch and attendance at a Title I school, receipt of public assistance, residence in temporary housing, or residence in United States for less four years and home language that is not English – numerous students throughout the City qualified for the Discovery Program, including many that attend intermediate schools with an ENI lower than 60%. Plaintiffs assert that, by adding the requirement that students attend a High ENI School, DOE has impermissibly excluded some disadvantaged students from the Discovery Program. But the Hecht-Calandra Act affords DOE discretion to determine who is "disadvantaged" and thus eligible for the Discovery Program.

Here, DOE has concluded that the use of the revised criteria to determine disadvantaged status ensures that more of the most disadvantaged students gain admission to the Specialized High Schools. For example, in 2017, approximately 70% of DOE students were eligible to receive free lunch, which contributed to a large percentage of students potentially eligible for Discovery. At the same time, DOE has determined that the historical criteria, which focused exclusively on individual students' characteristics, do not encompass all factors relating to economic need, and that the poverty level of a child's intermediate school classmates is a highly relevant consideration. *See* Wallack Declaration at ¶ 24. Accordingly, DOE incorporated intermediate school ENI into the criteria for determining disadvantaged status.

DOE has concluded that limiting eligibility to students who both attend a High ENI School and meet the other criteria more accurately captures economic need, and will result in the inclusion in the Discovery Program of a greater proportion of the most disadvantaged students in

the City. Additionally, this refinement will lead to Specialized High Schools with student bodies of greater geographic and socioeconomic diversity, which may in turn increase racial diversity. In short, DOE's refinement of the Discovery Program criteria advances the compelling governmental interest in fostering diversity. Thus, Plaintiffs cannot demonstrate a likelihood of success on the merits.

2. *Encouraging Geographic, Socioeconomic, Racial, and Ethnic Diversity in Secondary Schools Is a Compelling Government Interest*

In its landmark decision *Brown v. Board of Education*, the Supreme Court stated that the provision of public "education is perhaps the most important function of state and local government..." and "the very foundation of good citizenship." 347 U.S. 484, 493 (1954). Fifty years later, the Supreme Court explained that elementary and secondary schools are "pivotal to sustaining our political and cultural heritage." *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (quoting *Plyler v. Doe*, 457 U.S. 202, 221 (1982)). At these institutions, young people learn that "our strength comes from people of different races, creeds and cultures uniting in commitment to the freedom of all." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 782 (2007) (Kennedy, J., concurring in part and concurring in the judgment).

The Supreme Court most recently addressed the issue of racial diversity in secondary schools in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007). In contrast to the instant matter, *Parents Involved* related to school district plans in which an individual child's race was one of the factors that determined his or her school assignment. The Court found that these race-based assignment plans warranted strict scrutiny. However, more relevant to the instant case, Justice Kennedy wrote separately to emphasize that the Court's 5-4 decision should not be read as prohibiting efforts by local and state governments to encourage diversity in public schools. As Justice Kennedy explained:

> In the administration of public schools by the state
> and local authorities **it is permissible to consider
> the racial makeup of schools and to adopt
> general policies to encourage a diverse student
> body, one aspect of which is racial composition.**
> *Cf. Grutter v. Bollinger*, 539 U.S. 306 (Kennedy, J.
> dissenting). If school authorities are **concerned that
> the student-body compositions of certain schools
> interfere with the objective of offering an equal
> educational opportunity to all of their students,**
> they are free to devise race-conscious measures to
> address the problem in a general way and without
> treating each student in a different fashion solely on
> the basis of systematic, individual typing by race.

*Parents Involved in Cmty. Sch.*, 551 U.S. at 788-89 (Kennedy, J., concurring in part and

concurring in the judgment) (emphasis added).

As the narrowest holding in the majority on a divided Court, Kennedy's opinion

controls.[4] Plaintiffs acknowledge the numerous decisions recognizing Kennedy's concurrence as

binding per the *Marks* doctrine. *See* Pl. Mem. 20. Plaintiffs erroneously assert, however, that

Justice Kennedy's determination is not binding despite *Marks* because it was not material to the

result of the plurality opinion. *Id.* at 21 n.39. This contention is lacks all support, as other courts

in the Second Circuit have repeatedly held that Justice Kennedy's opinion is controlling and

follow his reasoning. *Hart v. Cmty. Sch. Bd.*, 536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008); *G.M.M.*

*v. Kimpson*, 116 F. Supp. 3d 126, 154 (E.D.N.Y. 2015); *see also D.S. v. N.Y.C. Dep't of Educ.*,

255 F.R.D. 59, 64 (E.D.N.Y. 2008) (citing *Grutter* and *Hart* in approving a plan for diversity as

a compelling state interest); *United States v. Alamance-Burlington Bd. of Educ.*, 640 F. Supp. 2d

---

[4] The "narrowest grounds" principle was set forth in *Marks v. United States*, 430 U.S. 188 (1977), and
reaffirmed in *Grutter v. Bollinger*, 539 U.S. 306 (2003): "In [*Marks*], we explained that 'when a
fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five
Justices, the holding of the Court may be viewed as that position taken by those Members who concurred
in the judgments on the narrowest grounds.'" *Grutter*, 539 U.S. at 325 (quoting *Marks*, 430 U.S. at 193).

670, 683 n.5 (M.D.N.C. 2009) ("[R]acial diversity remains a compelling government interest that the School System may pursue.").

Robust empirical evidence supports the cases holding that diversity in primary and secondary schools is a compelling state interest. Social science research has demonstrated that attending a racially diverse high school is associated with higher levels of both mathematics and reading ability.[5] Additionally, diversity fosters livelier and better informed class discussions that challenge all students to examine their own assumptions.[6]

The positive effects of diversity extend beyond secondary school; studies have found that attending a diverse high school is correlated with greater academic achievement in college. For example, students who attend very diverse high schools have been found to have higher grade point averages in their freshman year of college than students who attend high schools with low levels of diversity.[7]

Attending a diverse high school also promotes important non-academic outcomes. For example, students who attend racially diverse high schools are more likely to work in diverse settings later in life.[8] Adults of all racial and ethnic backgrounds who attended racially diverse

---

[5] *See* Mark Berends & Roberto V. Penaloza, *Increasing Racial Isolation and Test Score Gaps in Mathematics: A Thirty Year Perspective*, 112 Teachers College Record 978 (2010); Roslyn Arlin Mickelson & Martha Bottia, *Integrated Education and Mathematics Outcomes: A Synthesis of Social Science Research*, 88 North Carolina Law Review 993 (2010); Shelly Brown-Jeffy, *The Race Gap in High School Reading Achievement: Why School Racial Composition Still Matters*, 13 Race, Gender & Class 268 (2006).

[6] *See* A.S. Wells, *Seeing Past the 'Colorblind' Myth of Education Policy: Why Policymakers Should Address Racial/Ethnic Inequality and Support Culturally Diverse Schools*, National Education Policy Center (2014).

[7] *See* Mo Yin S. Tam & Gilbert W. Bassett Jr., *Does Diversity Matter? Measuring the Impact of High School Diversity on Freshman GPA*, 32 Policy Studies Journal 129 (2004).

[8] *See* Elizabeth Stearns, *Long-Term Correlates of High School Racial Composition: Perpetuation Theory Reexamined*, 112 Teachers College Record 1654 (2010).

schools are more accepting of racially diverse neighbors and classmates for their children,[9] and individuals who attend diverse high schools are more likely to feel comfortable debating social and political issues with their peers.[10]

In short, school districts have a compelling interest in encouraging diversity. Here, incorporating intermediate school ENI into the Discovery Program eligibility criteria was intended to foster greater geographic and socioeconomic diversity – and in turn, expand racial and ethnic diversity. Such diversity leads to more dynamic learning environments for all students. Because striving for such environments in secondary schools is a legitimate government interest, DOE's action should be upheld.

3.  *Promoting Diversity Is Not a Discriminatory Purpose*

Plaintiffs acknowledge that the challenged plan they contest is facially race-neutral, *see* Pl. MOL 10, but contend that it is nonetheless subject to strict scrutiny because DOE was "motivated by a racial purpose or object." *Id.*, citing *Miller v. Johnson*, 515 U.S. 900, 913 (1995). Such assertion is baseless, as Plaintiffs provide no evidence demonstrating that the challenged revisions were made for the purpose of excluding Asian-Americans from the Discovery Program. Plaintiffs misconstrue selective excerpts of public statements by Mayor de Blasio and Chancellor Carranza as demonstrating a racial motivation by DOE. *See* Pl. MOL 7. Most egregiously, Plaintiffs assert that Chancellor Carranza's correct statement that no "one ethnic group owns admission" to the Specialized High Schools demonstrates a desire to "racially balance" the schools. This statement was made in an 8-minute television interview in which the Chancellor advocated for DOE's plan to

---

[9] *See* Susan E. Eaton, *The Other Boston Busing Story: What is Won and Lost Across the Boundary Line*, New Haven, CT: Yale University Press (2001).

[10] *See* Michal Kurlaender & John T. Yun, *Fifty Years After Brown: New Evidence of the Impact of School Racial Composition on Student Outcomes*, 6 International Journal of Educational Policy, Research & Practice 51 (2005).

increase the geographic, racial and socioeconomic diversity at the Specialized High Schools. The statement was made in response to a question regarding whether DOE was seeking to pit minority groups against one another. The full interview can be accessed at https://www.fox5ny.com/good-day/338399825-video, and no fair-minded listener could detect any anti-Asian-American bias. If this is all Plaintiffs have – and it is – they have nothing to support their suit. In fact, as discussed at length in the Wallack Declaration, DOE acted to foster diversity without any discriminatory intent.

    *i.*  *DOE's Challenged Discovery Program Criteria Will Not Have a Disparate Impact on Asian-Americans*

   Moreover, Plaintiffs cannot demonstrate that the Discovery Program modifications will result in unconstitutional "disparate impact," which is a required element of any claim of discriminatory purpose. Even when a plaintiff demonstrates a discriminatory intent on the part of the government – which Plaintiffs have not done and cannot do here - the plaintiff is also required "to show discriminatory impact in order to prove an equal protection violation." *Lower Merion*, 665 F.3d at 549 (quoting *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in the [Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it."). In the context of cases claiming racial discrimination, plaintiffs "must show that similarly situated individuals of a different race were treated differently." *Lower Merion*, 665 F.3d at 550.

   Here, the Plaintiffs have failed to show that Asian-Americans will be adversely affected by the modifications to the eligibility criteria for the Discovery Program. For the vast majority of seats allocated at the Specialized High Schools for the 2019-2020 school year, approximately 87%,[11] admission will continue to be based solely on the SHSAT. Any student who scores above the cut-off score for the school she has ranked as her preference, regardless of race, ethnicity,

---

[11] This percentage is planned to decrease to 80% in 2020-2021 under Defendants' proposed expansion of the Discovery Program, which has a two-year phase-in.

economic background, geographic location within the City, and primary language, will gain admission through this process. Meanwhile, for the remaining 13% of seats – those allocated to students through the Discovery Program under the contested plan – student eligibility is determined according to five factors: (i) SHSAT score, (ii) attendance at a High ENI school, (iii) satisfaction of at least one other specified criteria related to the determination that the student is disadvantaged, (iv) recommendation by the student's intermediate school for the Specialized High School program, and (v) willingness to participate in and successfully complete an intensive summer school program. See, Declaration of Nadiya Chadha (hereinafter "Chadha Decl.") at ¶ 11.) Any student, regardless of race, who meets these criteria could be eligible to attend a Specialized High School via the Discovery Program. These criteria are applied to all students who apply to enroll at one of the Specialized High Schools. An Asian- American student who attends a High ENI school and meets the Discovery Program's race-neutral criteria will be in the same position as an African-American or Latino student who satisfies such criteria. As such, Plaintiffs cannot show that similarly situated students will be treated differently.

Recognizing that Asian-American students are treated the same as similarly situated students belonging to other racial or ethnic groups, Plaintiffs instead argue that the revised criteria is intended to have, and will have, an adverse impact on the number of Asian-American students admitted through Discovery. See Pl. MOL, at p. 6. But there is no factual support for this contention. Plaintiffs contend that limiting eligibility for Discovery to students attending High ENI schools will have the effect of reducing the numbers of Asian-American students admitted to the specialized schools through Discovery. See Pl. MOL 11 ("[T]heir plan targets the particular schools that feed the most students—predominantly Asian-Americans—to the Specialized High Schools").

In actuality, however, as explained at length in the Wallack Declaration at paragraphs 29, 31-33, neither plaintiffs nor DOE know how the revised criteria will impact the number of Asian-American students who are eligible to participate in the Discovery Program for summer 2019 because eligibility depends on factors that are specific to particular students. There are several factors beyond DOE's control that will affect the racial and ethnic composition of the students admitted through the challenged Discovery Program. Based on past experience, many students who may qualify for the Discovery Program indicate that they are not interested in receiving an offer, because the Discovery Program requires them to attend and successfully complete an intensive summer school program. At this time, no one knows which students are qualified for the Discovery Program or how many of them will be interested in participating in the Discovery Program.

Moreover, there are many Asian-American students in the intermediate schools with ENIs of 0.60 or greater. For the class admitted in the fall of 2018, of the students offered admission to a Specialized High School from an intermediate school with an ENI of 0.60 or greater, 70% were Asian-American, which constituted 1,060 Asian-American students. Chadha Decl. ¶ 31. Accordingly, there is no basis for the Plaintiffs' assertion that the expansion of the Discovery Program and the use of the current criteria will limit or reduce the enrollment of Asian-American students in the Specialized High Schools. We simply do not know.

Analysis of the test-takers in High ENI Schools for the class admitted in the fall of 2018 also refutes Plaintiffs' argument that the DOE developed the revised criteria to fashion a pool of Discovery eligible students that over-represents African-American and Latino students and under-represents Asian-American students. In fact, of the roughly 16,000 students attending High ENI Schools who took the SHSAT, Asian-American students made up roughly one third of

those students. If the revised criteria had been in effect, the percentage of Asian-American, African-American and Latino students eligible for the Discovery Program would have been similar – 30% for Asian-American students, 27% for African-American students, and 31% for Latino students. Chadha Decl. ¶ 33.

The modeling that DOE's Office of Student Enrollment performed in the spring of 2018 was a rough prediction, unlikely to definitively predict the future ethnic and racial composition of the students enrolling in the Specialized High Schools through the Discovery Program. Indeed, there was - and is - significant uncertainty about the predictive accuracy of the modeling because it necessarily employed assumptions that may not reflect reality. Specifically, the modeling made the assumption that the students who are potentially eligible to participate in the Discovery Program would respond to offers of admission to the Discovery Program the same way as students offered admission to a Specialized High School based solely upon their SHSAT score. The model did not account for the higher percentage of students eligible for the Discovery Program who would likely turn down offers because of the summer school requirement. Nor did the model attempt to predict whether certain groups of students would be more or less inclined to participate in the Discovery Program and attend summer school.

Although the modeling's predictive value was uncertain, it did suggest the possibility of increasing racial and ethnic diversity at the Specialized High Schools. Moreover, the modeling undermines the Plaintiffs' contention that DOE sought to limit Asian-American enrollment. DOE's April 2018 modeling suggested that for the class entering in the fall of 2020, when 20% of the enrollment in the eight Specialized High Schools would be reserved for students participating in the Discovery Program, the racial and ethnic diversity of students enrolled in the Specialized High Schools might be somewhat increased, in that the combined percentage of

African-American and Latino students in the eight schools might increase from approximately 9% to 16%. Chadha Decl. ¶ 19 – 22.

The model further suggested that if this occurred it would have limited impact upon students of other ethnicities. Indeed, it was projected that the total enrollment of Asian-American students in the eight Specialized High Schools would decline by approximately 2.1%, from 53% to 51%. The total enrollment of students whose race or ethnicity was unknown to DOE would decline by approximately 1.2%, from 9% to 7.8%. And the total enrollment of White students would decline by approximately 2.5%, from 27.2% to 24.7%. Chadha Decl. ¶ 21.

Far from seeking to limit the enrollment of Asian-American students, the modeling predicted that the current criteria would result in limited impact upon the enrollment of other groups, including Asian-Americans, while increasing diversity and providing all the students in the Specialized High Schools the advantages of learning and socializing in a more diverse student body.

  ii. *The Legislative History of the Hecht-Calandra Act Demonstrates that the Intended Use of the Discovery Program Was to Provide an Alternate Means of Admission to the Specialized High Schools for Disadvantaged Students*

In addition to impact, courts may examine other factors in evaluating whether a facially race-neutral policy has a discriminatory purpose, including historical background and legislative history relating to the policy. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Here, such factors weigh heavily in Defendants' favor.

As explained in the Wallack Declaration, the Specialized High Schools have existed in New York City for more than 100 years, providing rigorous instruction to academically gifted students. In 1971, New York enacted legislation to codify the requirement that a scholastic achievement examination be the main criterion for admission to the Specialized High Schools.

- 26 -

The Hecht-Calandra Act expressly provided for a Discovery Program to assist disadvantaged students with great academic potential. *See* Laws of 1971, chap. 1212.[12] The legislation codified a program that had been operating in each of the Specialized High Schools, which provided admission to students who were disadvantaged, scored only slightly below the cut-off score for admission, were recommended by their intermediate schools as "having high potential" for the Specialized High Schools, and attended and passed a summer preparatory program. *See* Mem. in Supp. of S. Reprint 30,052 Amending Assemb. B., A. 7005-A, at 2 (June 4, 1971), *reprinted in* Chapter 1212 Bill Jacket, at 8.[13]

The bill that initially advanced in the State legislature provided that the number of students accepted through the Discovery Program would be limited to 14% of all admitted students. *See* S.5668-A/A.7005-A, 1971-1972 Regular Sessions, March 2, 1971 at proposed subdivision (d) of new subdivision 12 of section 2590-g of the Education Law.[14] Such limitation was eliminated from the bill that ultimately passed, with the effect of leaving the size of the Discovery Program and the definition of "disadvantaged" to DOE's discretion.

 *iii.*   *Prior Race-Neutral Initiatives Designed to Foster Diversity at the Specialized High Schools Have Been Unsuccessful*

As explained in more detail in the Wallack Declaration, enactment of the Hecht-Calandra Act did not end the debate about the fairness of the heavy reliance on a single test for admission to the Specialized High Schools. In 1977, the Office for Civil Rights of the United States Department of Education ("OCR") began investigating whether the use a single test score as an

---

[12] Roberts Declaration, Ex. 1.

[13] Roberts Declaration, Ex. 2.

[14] Roberts Declaration, Ex. 3.

admission standard constituted a form of discrimination against members of minority groups and females.[15]

Decreasing admissions of African-American students, as well as stagnated growth in admissions of Latino students, led former Chancellor Joel Klein to create additional Specialized High Schools in 2002, in an effort to expand opportunities for enrollment to minorities and increase overall student body diversity. Between the 2002-2003 and 2007-2008 school years, DOE added a new testing high school in each borough.[16]

DOE has engaged in other efforts to increase the number of offers extended to underrepresented students. DOE has instituted City-wide extracurricular programs to help prepare disadvantaged students for the SHSAT. These programs include the Specialized High School Institute ("SHSI") and its replacement program, Dream-SHSI ("DREAM").[17] In 2016, Defendants added the DREAM Intensive program, which runs during the summer and fall immediately preceding administration of the SHSAT in the fall of eighth grade.

As detailed in the Wallack Declaration, DOE has also instituted programs to build awareness of the Specialized High Schools, ease the burden of weekend testing, and increase

---

[15] *See* Marcia Chambers, *U.S. Inquiry Into Bias Is Opposed At Prestigious New York Schools*, N.Y. TIMES, November 7, 1977, available at https://www.nytimes.com/1977/11/07/archives/us-inquiry-into-bias-is-opposed-at-prestigious-new-york-schools-us.html (last visited January 12, 2019).

[16] The High School for Mathematics, Science and Engineering at City College ("Math, Science and Engineering"), the High School of American Studies at Lehman College ("American Studies"), and the Queens High School for the Sciences at York College ("Sciences at York") opened for the 2002-03 school year. Staten Island Technical High School ("Staten Island Tech") became a testing school in 2006-2007, and Brooklyn Latin joined the group in 2007-2008.

[17] SHSI was an intensive 15-month program that provided students with coursework in literature, writing, mathematics, and science, as well as group guidance activities. SHSI began in June of the sixth-grade year and continued until October of eighth grade, when students took the SHSAT. The structure of DREAM is similar, except that students begin participating in DREAM in the spring semester of sixth grade. The eligibility criteria for participation in SHSI and DREAM were race-neutral and related to a student's socioeconomic status, academic achievement, and school attendance.

intermediate school teachers' capacity to prepare students for the SHSAT. In 2017, DOE initiated school-day SHSAT testing at 15 schools serving students from underrepresented groups, aimed at easing the burden posed by weekend testing. This program was extended to an additional 50 schools in 2018, and expanded to include test preparation and family engagement activities. DOE also launched a Capacity Building Initiative in spring 2018 to train intermediate school teachers on the best practices to prepare their students for the SHSAT. Alongside these initiatives, DOE took steps to invigorate the Discovery Program, which, by the early years of this decade, was operating in four of the Specialized High Schools. As of summer 2018, all testing schools participated in Discovery.

Notwithstanding all these efforts to promote diversity in the Specialized High Schools, over the past fifteen years, the percentages of African-American and Latino students enrolled at the Specialized High Schools have declined. *See* Specialized High Schools Demographics from NYC Department of Education, 1995-2015. During the same period, admission offers for the Specialized High Schools have been concentrated among students attending a relatively small group of intermediate schools, while there are hundreds of intermediate schools where no student receives an offer. *See* DOE excel showing offers for fall 2017 by school.

The concentration of offers to certain intermediate schools parallels a similar concentration in the geographic distribution of offers, with large sections of the City consisting almost entirely of intermediate schools from which no student receives an offer to attend the Specialized High Schools. For example, of the 161 intermediate schools in the Bronx, only 45 – less than 30% - had students that received an admission offer for fall 2017 to the Specialized High Schools based upon individual SHSAT scores. Of the remaining 116 Bronx intermediate

schools that had no students receiving offers based on SHSAT scores, only 4 - approximately 3% - had students that received offers through the Discovery Program. Chadha Decl. ¶ 29.

In the face of the declining representation of African-American and Latino students in the Specialized High Schools, and the uneven distribution of admissions offers across the City, the NAACP Legal Defense and Education Fund, Inc., Latino Justice PRLDEF and the Center for Law and Social Justice at Medgar Evers College filed a complaint in 2012 with OCR against DOE, alleging that DOE's admission process for the Specialized High Schools violated Title VI of the Civil Rights Act of 1964 because of the very low number of African-American and Latino students who gained admission to these schools.[18] OCR opened an investigation, has requested and received from DOE numerous documents and has interviewed a number of witnesses. This investigation is ongoing.

The complaint primarily focuses on the adverse impact the SHSAT has on African-American and Latino students.[19] However, the complaint also asserts that DOE's failure to operate a robust Discovery Program, which is authorized by state law, and which may ameliorate some of the adverse impact, may constitute disparate treatment – i.e., intentional discrimination against African-American and Latino students. Four not-for-profit organizations representing

---

[18] *See Complaint re The admissions process for New York City's elite public high schools violates Title VI of the Civil Rights Act of 1964 and its implementing regulations*, September 27, 2012, available at thttp://www.naacpldf.org/files/case_issue/Specialized%20High%20Schools%20Complaint.pdf (last visited, January 12, 2019); *see also* Roberts Declaration, Ex. 4.

[19] The complaint asserts that DOE had failed to have an analysis performed to determine if the SHSAT has predictive validity. While that was true in 2012, a predictive validity study was performed in 2013, covering the most recent five-year period for which data was available. The analysis showed that the SHSAT did have predictive validity when measured against student performance in the first two years of high school.

Asian-American communities submitted statements supporting the complaint's contentions and advocating for measures to foster greater diversity at the Specialized High Schools.[20]

Against this historical backdrop, and with the goal of taking steps that would enhance racial, ethnic, geographic, and socioeconomic diversity in the Specialized High Schools, DOE exercised its discretion to adjust the current Discovery Program eligibility criteria for the exact purpose that such discretion was intended – i.e., to ensure that disadvantaged students could enroll in the Specialized High Schools. DOE has determined that including attendance at a High ENI School as a criterion for determining disadvantaged status serves to more precisely identify disadvantaged students in the City for participation in the Discovery Program. Such determination is lawful and within DOE's discretion.

    4.   *The Challenged Discovery Program Eligibility Criteria Do Not Rely Upon Individual Racial Classifications and Are Not Subject to Strict Scrutiny*

The challenged criteria are race-neutral, but DOE does not contend that it was unaware that the modifications to the criteria could increase the racial or ethnic diversity of the Specialized High Schools. To the contrary, DOE's purpose was to foster diversity, including racial and ethnic diversity.

DOE's challenged criteria quite clearly fall within the types of policies that Justice Kennedy declared permissible in *Parents Involved*. DOE was aware that restricting eligibility to students attending a High ENI School might have a limited effect on the demographic diversity

---

[20] *Statement on U.S. Department of Education Office of Civil Rights Complaint of the NYC Coalition for Educational Justice, et al. Regarding New York City Specialized High Schools*, CAAAV Organizing Asian Communities, September 27, 2012; *Asian American Amicus in Support of Administrative Complaint by the NAACP Legal Defense and Educational Fund*, National Asian American Coalition, October 10, 2012; *Statement on U.S. Department of Education Office of Civil Rights Complaint of the NYC Coalition for Educational Justice, et al. Regarding New York City Specialized High Schools*, The Coalition for Asian American Children and Families; *Statement on U.S. Department of Education Office of Civil Rights Complaint of the NYC Coalition for Educational Justice, et al. Regarding New York City Specialized High Schools*, Asian American Legal Defense and Education Fund (AALDEF), *see* Roberts Declaration, Exs. 5-8.

of the Specialized High Schools.  But this criterion is school-based, not based on the race of any individual student, and comparable to "drawing attendance zones with general recognition of the demographics of neighborhoods," which Justice Kennedy noted would be constitutionally permissible.  *Parents Involved*, 551 U.S. at 789.

**B.**     **Assuming Arguendo that Strict Scrutiny Applies, DOE's Modification to the Discovery Program Eligibility Criteria Was Narrowly Tailored to Achieve a Compelling Government Interest Because Other Race-Neutral Alternatives Did not Suffice, the Modification Did Not Result in an Undue Burden on Other Students, and DOE Will Monitor and Adjust the Modifications as Appropriate and Necessary**

Governmental actions or policies subject to strict scrutiny will be found constitutional if they are narrowly tailored to further compelling governmental interests.  *Grutter*, 539 U.S. at 327. Because the modifications to the Discovery Program satisfy this standard, even if the Court determines that strict scrutiny applies, Plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment will not prevail.

*1.     Fostering Diversity Is a Compelling Government Interest*

As explained above, diversity in primary and secondary education is a vital goal which state and local governments should strive to cultivate. Recognizing the value of diversity in elementary and secondary schools, federal courts have deemed fostering diversity in such schools to be a compelling governmental interest.  *See, e.g., Parents Involved*, 551 U.S. at 783, 797 (Kennedy, J., concurring in part and concurring in the judgment); *id.* at 838-42 (Breyer, J., dissenting).  And at the time the challenged criteria were adopted, the guidance from the Justice Department expressly authorized steps parallel to those challenged herein.[21]

---

[21] *Guidance on the Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools*, USDOJ Civil Rights Division, USDOE Office for Civil Rights, 2011. *See* Roberts Declaration. Ex. 9.  While the Justice Department withdrew this Guidance on July 3, 2018, it offered no legal explanation for its action. *Withdrawn Affirmative Action Guidance*. USDOJ Civil Rights Division, USDOE Office for Civil Rights, July 3, 2018, *see* Roberts Declaration. Ex. 10.

Here, DOE confronted a disturbing trend in the Specialized High Schools of the isolation and exclusion of African-American and Latino students. Increasing diversity in these areas benefits all the students at these schools, as such students enjoy the advantages provided by a greater range of voices and views. Given these circumstances, DOE had a compelling interest in using all available tools to encourage diversity in the Specialized High Schools.

2. *The Modifications Were Narrowly Tailored*

To possibly address this challenge, DOE modified the Discovery Program eligibility criteria. Such modification is narrowly tailored. In evaluating whether a government policy is narrowly tailored, courts assess a variety of factors,[22] one of which is whether the decision-making body considered workable race-neutral alternatives prior to adoption of the challenged policy. *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2208 (2016). The government is not required to "exhaust every conceivable race-neutral alternative"; it need only demonstrate that race-neutral alternatives do not suffice to achieve the compelling interest. *Id.*; *Grutter*, 539 U.S. at 339.

Here, the modification to the Discovery Program eligibility criteria is race-neutral. However, in its efforts to diversify the Specialized High Schools, DOE has attempted other race-neutral alternatives, outlined above and in the Wallack Declaration, ¶¶ 11-15. Though the ultimate goal of these programs was to increase diversity of the student bodies at the Specialized High Schools, they have not achieved that goal. The challenged program is merely the latest race-neutral effort to diversify. No one can predict the precise effect it will have on the composition of the Specialized High Schools.

---

[22] The Supreme Court has never adopted a formulaic test for determining whether an allegedly racially discriminatory policy is narrowly tailored. Moreover, neither the Supreme Court nor the Second Circuit have endorsed the so-called "*Paradise* factors," which some other Circuits have adopted and which Plaintiffs rely upon in their memorandum of law. However, some of the "*Paradise* factors" largely overlap with considerations relevant to the narrowly tailored inquiry.

In addition to race-neutral alternatives, a government plan purportedly favoring one group of students is narrowly tailored if it does not place an undue burden upon students that are non-members of the favored group. *Grutter,* 539 U.S. at 341. There is no evidence that the Discovery Program will unduly burden any groups, and as demonstrated in the Wallack Declaration, the modeling suggested that any impact upon Asian-American enrollment would be slight.

Finally, policies narrowly tailored to achieve a compelling interest should be limited in time and subject to periodic review. *Grutter*, 539 U.S. at 342. Though no formal expiration date for the modifications to the Discovery Program eligibility criteria has been set, DOE continually re-evaluates its procedures. Such practice will apply here, as DOE monitors the effectiveness of the modifications on Specialized High School enrollment and adjusts the criteria as appropriate, depending on their success or failure at fostering diversity.

In short, even if strict scrutiny applies – which it does not - DOE's revisions to the Discovery Program eligibility requirements are narrowly tailored and are constitutional.

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and grant such other and further relief as to the Court may seem just and proper.

Dated:     New York, New York
              January 17, 2019

                                     ZACHARY W. CARTER
                                     Corporation Counsel of the
                                      City of New York
                                     Attorney for Defendants
                                     100 Church Street, Room 2-110
                                     New York, New York 10007
                                     (212) 356-0872

                          By:                            
                                     MARILYN RICHTER
                                   THOMAS B. ROBERTS
                                   Assistants Corporation Counsel

Of Counsel:
Andrea Fastenberg
Benjamin Miller
Sabrina Hassan
Josh Wertheimer
Amy Cassidy
Assistants Corporation Counsel