# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTA McAULIFFE INTERMEDIATE SCHOOL PTO, et al., <br><br> Plaintiffs, <br><br> -against- <br><br> BILL de BLASIO, in his official capacity as Mayor of New York City, et al., <br><br> Defendants. | Case No. 1:18-cv-11657(ER)(OTW) <br><br> **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

JOSHUA P. THOMPSON, Cal. Bar No. 250955*
WENCONG FA, Cal. Bar No. 301679*
OLIVER J. DUNFORD, Cal Bar No. 320143*
CHRISTOPHER M. KIESER, Cal. Bar. No. 298486*
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
E-Mail: JThompson@pacificlegal.org
E-Mail: WFa@pacificlegal.org
E-Mail: ODunford@pacificlegal.org
E-Mail: CKieser@pacificlegal.org
*Counsel for Plaintiffs*

**Pro Hac Vice* application pending

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

    I.    PLAINTIFFS HAVE STANDING .................................................................... 1

        A.    Christa McAuliffe PTO has associational standing ...................................... 1

        B.    The PTO, CACAGNY, and AACE have institutional standing ................... 4

    II.    PLAINTIFFS ARE ENTITLED TO PRELIMINARY RELIEF ...................... 5

        A.    Plaintiffs have raised sufficiently serious questions,
            and the balance of hardships tip substantially in their favor ........................ 5

        B.    Plaintiffs have satisfied the traditional preliminary injunction requirements ............... 8

    III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................ 10

        A.    The disparate impact on Asian-American applicants is legally significant ............... 10

        B.    Defendants acted with a racially discriminatory purpose ........................... 11

        C.    Defendants' plan cannot survive strict scrutiny ......................................... 14

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

## **Cases**

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed. Cir. 1992) ............... 9

*Able v. United States*, 44 F.3d 128 (2d Cir. 1995) .................................................................. 6

*Bank of America Corp. v. City of Miami, Florida*, 137 S. Ct. 1296 (2017) ................................... 5

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*,
   799 F.2d 6 (1st Cir. 1986) ........................................................................................... 4

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017) ......................................................................................... 5

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ....................................................................................... 5-8

*Deferio v. City of Syracuse*, 193 F. Supp. 3d 119 (N.D.N.Y. 2016) ............................................ 8

*Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*,
   675 F.3d 149 (2d Cir. 2012) ......................................................................................... 1

*Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524 (3d Cir. 2011) .................... 12-13

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814 (2d Cir. 1979) ......................... 6

*Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013) ............................................. 1, 15

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ....................................................................... 14-15

*Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir. 1992), *vacated as moot*,
   *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993) ........................................... 6

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .................................................... 4-5

*Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999) ................................................ 12-13

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ..................... 1, 3

*In re Nortel Networks Corp. Security Litigation*, 539 F.3d 129 (2d Cir. 2008) .............................. 8

*Irish Lesbian & Gay Organization v. Giuliani*, 143 F.3d 638 (2d Cir. 1998) ................................ 3

*Irish Lesbian & Gay Organization v. Giuliani*, 918 F. Supp. 732 (S.D.N.Y. 1996) ...................... 8

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ......................................................................... 8

*LaRouche v. Kezer*, 20 F.3d 68 (2d Cir. 1994) ....................................................................... 7

*League of Women Voters of North Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ...................................................................................... 10

*Legal Aid Society v. Association of Legal Aid Attorneys*,
   554 F. Supp. 758 (S.D.N.Y. 1982) ............................................................................... 9

*Lewis v. Ascension Parish School Board*, 662 F.3d 343 (5th Cir. 2011) ............................. 11-12

*Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547 (1990) ....................................................... 12

*Miller v. Johnson*, 515 U.S. 900 (1995) .................................................................. 11-12

*North Carolina State Conference of NAACP v. McCrory*,
 831 F.3d 204 (4th Cir. 2016) ............................................................................. 10-12

*Northeastern Florida Chapter of the Associated General Contractors of America v.
 City of Jacksonville, Florida*, 508 U.S. 656 (1993) ............................................... 2-3

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .................................................................... 3

*Parents Involved in Community Schools v. Seattle School District No. 1*,
 551 U.S. 701 (2007) .......................................................................................... 2, 12, 14-15

*Pecorino v. Vutec Corp.*, 6 F. Supp. 3d 217 (E.D.N.Y. 2013) ........................................... 9

*Pennell v. City of San Jose*, 485 U.S. 1 (1988) ................................................................. 3

*Perez v. Danbury Hospital*, 347 F.3d 419 (2d Cir. 2003) .................................................. 9

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ............. 11-12

*Raso v. Lago*, 135 F.3d 11 (1st Cir. 1998) ....................................................................... 12

*Rent Stabilization Association of the City of New York v. Dinkins*,
 5 F.3d 591 (2d Cir. 1993) ....................................................................................... 2-3

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
 60 F.3d 27 (2d Cir. 1995) ....................................................................................... 7-8

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
 517 U.S. 544 (1996) ............................................................................................... 3-4

*Upstate Jobs Party v. Kosinski*, 741 F' Appx. 838 (2d Cir. 2018) ..................................... 8

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ............................................................... 10

*Webster Electric Co. v. Splitdorf Electrical Co.*, 264 U.S. 463 (1924) ............................... 9

## Rule of Court

L.R. 6.1(b) ......................................................................................................................... 10

## Miscellaneous

Clegg, Roger, *Attacking "Diversity": A Review of Peter Wood's Diversity:
 The Invention of a Concept*, 31 J.C. & U.L. 417 (2005) ........................................... 14

NYC Dep't of Educ., *Diversity in Admissions*,
 https://www. schools.nyc.gov/enrollment/enrollment-help/meeting-
 student-needs/diversity-in-admissions (last visited Jan. 23, 2019) ........................... 12

Pager, Tyler, *SHSAT Predicts Whether Students Will Succeed in School, Study Finds*,
 N.Y. Times, Aug. 3, 2018, *available at* https://www.nytimes.com/2018/08/03/
 nyregion/admissions-test-shsat-high-school-study.html .......................................... 13

Veiga, Christina (@cveiga), Twitter (Jan. 23, 2019, 4:30 PM),
 https://twitter.com/cveiga/status/1088232565167833088 ........................................ 14

## INTRODUCTION

Plaintiffs seek to maintain the status quo and preserve Discovery program eligibility for all of New York's economically disadvantaged students. Defendants, in contrast, seek to upend the status quo by making many economically disadvantaged students from predominantly Asian-American schools ineligible for the program. Defendants concede that they changed the eligibility criteria at certain middle schools to alter the racial balance at the Specialized High Schools. Yet Defendants defend the Discovery changes on the ground that their purported interest in racial diversity is distinct from the racial balancing that the Supreme Court has repeatedly declared "patently unconstitutional." *Fisher v. University of Texas at Austin*, 570 U.S. 297, 311 (2013). No matter how they label it, the Discovery changes are intended to decrease the Asian-American population at the Specialized High Schools. It follows that Defendants' actions are subject to strict scrutiny. Because Defendants' changes to Discovery are not narrowly tailored to further a compelling interest, Plaintiffs are likely to succeed on the merits of their Equal Protection Claim. And because Plaintiffs established the other prerequisites for preliminary relief, this Court should grant the motion and issue a preliminary injunction.

## I. PLAINTIFFS HAVE STANDING

### A. Christa McAuliffe PTO has associational standing

An association has standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012) (quoting *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977)). The PTO satisfies

all three requirements: the parent members are injured because their children are no longer eligible to compete for a significant proportion of the seats at each Specialized High School (13 percent this year, 20 percent next year); the PTO was formed in part to protect the interests of Christa McAuliffe students in the Specialized High School admissions process, and no individual participation is required to evaluate its claim, which "depend[s] on a purely legal analysis of the ordinance and of the law of Equal Protection" because it is "factually indisputable that [McAuliffe students] could no longer compete equally with [students at eligible schools] for [admission]." *Rent Stabilization Association of the City of New York v. Dinkins*, 5 F.3d 591, 597 (2d Cir. 1993) (citing *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656 (1993)).

Defendants incorrectly argue that this rule does not apply to Section 1983 claims. The Supreme Court has repeatedly held that an association has standing to pursue an equal protection claim on behalf of its members. Recently in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 718-19 (2007), the Court held that an association of parents had standing to challenge a race-based school-assignment system because its members "have children in the district's elementary, middle, and high schools," and those children "may be 'denied admission to the high schools of their choice when they apply for those schools in the future.'" *Id.* at 718 (internal record citations omitted). It was enough that the association's members *might* be assigned to a particular school based on race, because "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff, an injury that the members of Parents Involved can validly claim on behalf of their children." *Id.* at 719 (internal quotation marks omitted).[1]

---

[1] *Parents Involved*'s standing conclusion followed directly from *Ne. Fla.*, where the Court permitted an association of contractors to challenge, under the Equal Protection Clause, a city set-aside requiring 10 percent of city contract money

2

*Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011), does not—and cannot—say otherwise. Whatever rule *Nnebe* followed cannot be categorical. And it certainly isn't jurisdictional. First, the Second Circuit has often explained that an association had standing to sue on behalf of its members in an *equal protection action* so long as individual participation is not required to evaluate the merits of the claim. In *Rent Stabilization Ass'n*, for example, the plaintiff association alleged that some of its members had been subject to unconstitutional regulatory takings. 5 F.3d at 596. The association lacked standing only because those takings inquiries were so fact-dependent that the court could not have resolved them without the benefit of an "actual factual setting." *Id.* (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 10 (1988)). That was unlike *Ne. Fla.*, where the ordinance prevented "some of [the Association's] members" from "compet[ing] for the contracts on an equal footing[,]" and "the Court easily could determine the identities of the aggrieved parties, that is, the [non-minority businesses] who were members of the association." *Id.* at 596-97. *Ne. Fla.* case boiled down to a legal question, and the particular identities of members who might eventually fail to get government contracts were irrelevant. *Id.* at 597.[2]

Further, the third *Hunt* prong (upon which the *Nnebe* court presumably based its rule) is merely prudential. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-56 (1996). As the Court explained, "once an association has satisfied *Hunt*'s first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more." *Id.* at 556. The third prong certainly has its merits—for instance, it "may guard against the hazard of litigating a

---

be spent on minority businesses. 508 U.S. at 656, 667-69. There, it was enough that members regularly bid for city contracts and could no longer compete on an equal footing due to the set-aside. *Id.* at 668-69.

[2] The Second Circuit took the same view in *Irish Lesbian & Gay Organization v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998), holding that an association lacked standing to bring an Equal Protection claim only because "to establish the injuries alleged in the complaint . . . would require the participation of individual members in the lawsuit." That is not an issue here.

case to the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity." *Id.* But that is not an issue in a case where the harm to all members is the same *and* the organization seeks only injunctive relief. After all, "[a]ctions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation." *Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 11 (1st Cir. 1986).

Children of Christa McAuliffe PTO members are ineligible to compete for 13 percent of the seats at the Specialized High Schools this year (and 20 percent next year, assuming its ENI remains below 60 percent). That is true even though the PTO represents parents of students at a school that is nearly two-thirds economically disadvantaged. Further, in the absence of an injunction, these predominantly Asian-American students will also face the higher SHSAT cutoffs necessary to implement Defendants' plan. Dkt, 43 at 3. Participation of individual members is not necessary to adjudicate the PTO's claim since it does not depend on "evidence that differs from member to member." *Id.*[3]

B.    The PTO, CACAGNY, and AACE have institutional standing

Finally, Defendants are incorrect that the organizational Plaintiffs lack institutional standing. These organizations have had to spend resources, outside of this lawsuit, to counteract Defendants' policy. Chin Dec. ¶¶ 4-6; Wong Dec. ¶¶ 4-6; LaBella Dec. ¶¶ 5-7.[4] The PTO was formed in part to counteract policies such as this one that threaten to harm Christa McAuliffe's students. Under the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982), these declarations and allegations are enough to establish institutional standing.

---

[3] CACAGNY has associational standing for the same reason as the PTO. Complaint ¶ 8.
[4] Should the Court require further evidence of these activities, Wai Wah Chin, Raymond Wong, and Vito LaBella are available to provide testimony or further declarations.

*See also Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017) ("[T]he Supreme Court has recently reaffirmed *Havens Realty*'s holding that a nonprofit organization establishes an injury-in–fact if, as here, it establishes that it 'spent money to combat' activity that harms its organization's core activities." (quoting *Bank of America Corp. v. City of Miami, Florida*, 137 S. Ct. 1296, 1303 (2017)).[5]

## II. PLAINTIFFS ARE ENTITLED TO PRELIMINARY RELIEF

### A. Plaintiffs have raised sufficiently serious questions, and the balance of hardships tip substantially in their favor

Plaintiffs have established that there are serious questions going to the merits and that the balance of equities tips substantially in their favor. *See* Plaintiffs' Memo. at 28-29. Defendants' changes to the Discovery program raise serious equal protection concerns, since they threaten to funnel high school applicants into a discriminatory system in two ways: "Those who would have been otherwise eligible will no longer be permitted to participate in the Discovery Program, while fewer seats will be available for those who would have otherwise been admitted without Discovery." *Id.* at 29. Defendants do not attempt to defend their actions under the serious-questions standard. Instead, citing *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010), Defendants argue that this Court must subject Plaintiffs to a heightened standard for obtaining a preliminary injunction. *See* Opp. 8-9. But the limited *Citigroup* exceptions do not apply here.

In *Citigroup*, the Second Circuit reiterated the longstanding rule that the "'serious questions' standard permits a district court to grant a preliminary injunction" even where "it cannot

---

[5] Plaintiffs acknowledge that two of the individual plaintiffs will not suffer immediate harm this cycle. As to Mr. Wong, the admissions cutoffs have yet to be released, so Plaintiffs maintain he still may be injured and that his claim is not moot.

5

determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup*, 598 F.3d at 35 (citing *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 815-19 (2d Cir. 1979)). Defendants misconstrue a footnote in *Citigroup* and contend that three conditions necessitate a heightened standard here. *See* Opp. at 8-9 (citing *Citigroup*, 598 F.3d at 35 n.4). The same footnote expressly describes those conditions as "limited exceptions" to the general preliminary injunction standard. *Citigroup*, 598 F.3d at 35 n.4. As in *Citigroup*, none of those limited exceptions apply in this case.

First, Defendants argue that the heightened standard is appropriate because they believe that their reconfiguration of the Discovery program is a government action taken in the public interest pursuant to a statutory or regulatory scheme. *See* Opp. 9. That is not the law. "[N]o party has an exclusive claim on the public interest" and, therefore, the heightened standard doesn't apply "merely because a movant seeks to enjoin government action." *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326, 1339 (2d Cir. 1992), *vacated as moot*, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993). Rather, the heightened standard applies only where "both the legislative and executive branches [have] produced a policy in the name of the public interest embodied in a statute and implementing regulations." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). The heightened standard therefore only applies where both legislative and executive branches have engaged in lengthy public debate before enacting legislation. *Id.* Such cases are distinguished from those, like here, where the policy is "formulated solely by the executive branch." *Id.*; *see* Opp. at 14 (admitting the executive was solely responsible for "exercis[ing] its discretion under the Hecht-Calandra Act to refine the criteria for participation in the Discovery program . . . ."). Thus, the first *Citigroup* exception is inapplicable.

Second, Defendants contend that a heightened standard is appropriate because the "requested injunction would provide Plaintiffs with all the relief they seek." *See* Opp. at 9-10. In other words, as the Second Circuit has noted, the heightened standard may apply when the requested "order, once complied with, cannot be undone." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995). Therefore, this exception can apply only when the preliminary injunction makes it "difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial." *Id.* (using, as an example, a case involving disclosure of confidential information). Here, however, a preliminary injunction only maintains the status quo by recognizing that Defendants bear a heavy burden to prove their racially discriminatory actions satisfy strict scrutiny. But if Defendants can meet that high bar at trial, then the preliminary injunction would be lifted and their changes to the Discovery program can be implemented. Accordingly, the second *Citigroup* exception is also inapplicable.

Third, Defendants claim that Plaintiffs "seek a mandatory preliminary injunction that alters the status quo by commanding a positive act." Opp. at 10. Not so. Plaintiffs seek a prohibitory, rather than mandatory, injunction because they ask this Court to maintain the status quo in New York Specialized High School admissions. *See Tom Doherty Assocs., Inc.*, 60 F.3d at 34. Defendants contend that since the changes were "publicly announced" last June, the status quo has shifted. Opp. at 10. But the "'status quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994). As Defendants have noted in other filings to the Court, decisions regarding admission to Specialized High Schools are imminent, but they have not been made. Dkt. 43 at 2-3. Maintaining the status quo means that Defendants are not permitted from implementing their presumptively unconstitutional changes pending this lawsuit. Plaintiffs'

challenge—as all parties recognize—*changes* to how the Discovery program operates. Those changes have not yet happened and Defendants have explained that they could easily comply with a preliminary injunction with minimal administrative cost. The third exception does not help Defendants.[6]

### B. Plaintiffs have satisfied the traditional preliminary injunction requirements

Plaintiffs are entitled to a preliminary injunction under the traditional standard. That standard requires the party seeking a preliminary injunction to show irreparable harm and likelihood of success on the merits. *Citigroup*, 598 F.3d at 35. As Plaintiffs have discussed at length, they are likely to succeed on the merits.

Absent a preliminary injunction, Plaintiffs would suffer irreparable harm. First, "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).[7] Plaintiffs also suffer irreparable harm because Defendants' changes to Specialized High School admissions will soon funnel students into a racially discriminatory admissions system. The injury is "actual and imminent," and no monetary award can adequately compensate Plaintiffs for the harm that they will suffer absent an injunction. *See Tom Doherty Assocs.*, 60 F.3d at 37. Because Plaintiffs have shown that they are likely to succeed on the merits and will suffer irreparable harm, they are entitled to a preliminary injunction. *See Citigroup*, 598 F.3d at 35.[8]

---

[6] Defendants' opposition omits any argument that a preliminary injunction should not be granted under the traditional test. Defendants have accordingly waived this argument. *See In re Nortel Networks Corporate Security Litigation*, 539 F.3d 129, 132 (2d Cir. 2008). And in any event, Plaintiffs are entitled to a preliminary injunction even under the "heightened" standard.

[7] Defendants' authorities do not rebut this point. They cite *Upstate Jobs Party v. Kosinski*, 741 F' Appx. 838, 840 (2d Cir. 2018), an unpublished decision that discusses irreparable harm only in dicta and does not even mention *Jolly*; as well as *Irish Lesbian & Gay Organization v. Giuliani*, 918 F. Supp. 732, 739 (S.D.N.Y. 1996), where the parties agreed that potential deprivation of constitutional rights constituted irreparable harm.

[8] Even assuming Plaintiffs must show that the balance of the equities tips in their favor and that an injunction would be in the public interest, they have done so. "[I]t is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law." *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y.

Against this, Defendants contend that the doctrine of laches should prevent Plaintiffs from obtaining a preliminary injunction. That argument is wrong on the facts and on the law. To prove laches, Defendant must establish: (1) an unreasonable delay by the plaintiff in bringing suit; and (2) prejudice to the defendant. *See Perez v. Danbury Hospital*, 347 F.3d 419 (2d Cir. 2003). "The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." *Pecorino v. Vutec Corp.*, 6 F. Supp. 3d 217, 224 (E.D.N.Y. 2013) (quoting *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992)). In *Pecorino*, for example, a delay of two years was held insufficient to trigger laches. *See id.* Here, Plaintiffs filed their lawsuit six months after Defendants announced their plan to change the admissions policy to specialized high schools. Given the diverse interests of Plaintiffs in this case and the pre-filing investigation needed for a case that, in Defendants' own words, concerns a "complicated Specialized High School offer process," Dkt. 43 at 3, there is no merit to any assertion that Plaintiffs "stood by and awaited developments." *Webster Electric Co. v. Splitdorf Electrical Co.*, 264 U.S. 463, 465 (1924) (invoking laches where patentee delayed for eight years).

Defendants' unsupported assertion that Plaintiffs chose the filing date as "a deliberate tactic to prejudice Defendants in opposing this motion," Opp. at 11, is patently false. Defendants cannot show any prejudice. Although Defendants complain that they were served with the complaint "one business day before the DOE began its winter recess," Opp. at 11, they do not mention that they failed to respond to that motion within the deadline set by the Local Rules and failed to seek an extension from Plaintiffs or from the Court until after their opposition was due on January 3. Despite Defendants' unexcused delay, Plaintiffs endorsed a two-week extension to allow the

---

2016). And an allegation that a policy violates Plaintiffs' equal protection rights is sufficiently serious to tip the balance of hardships in their favor. *Legal Aid Society v. Association of Legal Aid Attorneys*, 554 F. Supp. 758, 761 (S.D.N.Y. 1982).

Defendants until January 17 to file a response, and the Court agreed. The mid-December filing date could not have prejudiced Defendants when they simply ignored Local Rule 6.1(b) and were given the usual two weeks *after* the initial deadline to file their response.

## III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Defendants do not dispute the main allegations in Plaintiffs' complaint or their motion for a preliminary injunction: (1) that Defendants' changes to the Discovery eligibility criteria were intended to foster racial diversity at the Specialized High Schools; and (2) that the challenged policy will have that effect, causing a decrease in Asian-American enrollment. Instead, they argue that (1) the expected disparate impact will be small; (2) their intent to racially diversify the Specialized High Schools is somehow distinct from impermissible discriminatory intent; and (3) their plan is narrowly tailored to further a compelling interest in obtaining racial diversity at the Specialized High Schools. The first of these arguments is irrelevant. The latter two are incorrect.

### A. The disparate impact on Asian-American applicants is legally significant

Even under Defendants' questionable model of measuring disparate impact, Asian-American enrollment at the Specialized High Schools is expected to fall by at least two percent. Opp. at 26. Defendants contend that this is insignificant, but courts have disagreed. *See Veasey v. Abbott*, 830 F.3d 216, 251-56 (5th Cir. 2016) (voter ID law has disparate impact even though only 4.5 percent of registered voters lack IDs); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 233, 244 (4th Cir. 2014) (chastising the district court for noting that the racially disparate impact of failure to count out-of-precinct votes was "minimal," even though 99.658 percent of black voters voted in the correct precinct). Defendants "require[] too much in the context of an intentional discrimination claim." *North Carolina State Conference of NAACP*

*v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016). "Showing disproportionate impact, even if not overwhelming impact,[9] suffices to establish one of the circumstances evidencing discriminatory intent." *Id.* Plaintiffs have met this burden.

### B. Defendants acted with a racially discriminatory purpose

Although Defendants admit that the Discovery changes are intended to increase the racial diversity of the Specialized High Schools, Opp. at 31, they do not concede the application of strict scrutiny. None of their arguments are persuasive. The relevant question is whether Defendants enacted the challenged policy "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). The undisputed facts show that they did.

First, Defendants say Plaintiffs take the statements of Mayor de Blasio, Chancellor Carranza, and the Department of Education out of context. Yet Defendants admit the crux of Plaintiffs' argument that they were "motivated by a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). They simply disagree as to whether such a racial purpose is sufficient to trigger strict scrutiny. In any event, public statements make it plain that Defendants seek an increase in Black and Hispanic enrollment. Given the current racial makeup of the schools, that *must* come at the expense of Asian-American students. That the DOE modeled the racial effect of the changes confirms the obvious. *See Lewis v. Ascension Parish School Board*, 662 F.3d 343, 350 (5th Cir. 2011) (that a school district had a demographer estimate the "statistical effects" of a

---

[9] Plaintiffs still contend that, looking at the school-level data from the City's Demographic Snapshot, the disparate impact is obvious. Out of the 66 schools with eighth-grade enrollment whose entire school population was at least 30 percent Asian-American in 2017-18, 30 are ineligible. Yet out of 299 schools with at least a 30 percent Black student population, just 28 are ineligible. Of schools with at least a 30 percent Hispanic population, just 32 of 396 are ineligible.

school assignment plan is evidence of impermissible racial intent). The disparate impact is the whole purpose of Defendants' plan.[10]

Second, Defendants say there is a legal distinction between their purpose of increasing racial diversity and the illicit racially discriminatory purpose discussed in cases like *Arlington Heights*, *Feeney*, and *Miller*. But Defendants need not be racist to adopt a plan intended to burden Asian-American applicants.[11] *See N.C. State Conference of NAACP*, 831 F.3d at 233. A racially discriminatory purpose is simply "a governmental standard, preferentially favorable to one race or another, for the distribution of benefits." *Hayden v. County of Nassau*, 180 F.3d 42, 49 (2d Cir. 1999) (quoting *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998)). That is, an illicit racial purpose exists where "the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group." *Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 548 (3d Cir. 2011). The intent to burden a protected group need not be the whole reason—or even the predominant reason—it need only be *a* reason.[12]

Third, Defendants rely heavily on Justice Kennedy's *Parents Involved* concurrence, which they argue is controlling. Even if they are correct, the concurrence is not at all helpful to them. Justice Kennedy never sanctioned the use of disparate admissions criteria to obtain race-based diversity. Rather, the concurrence "approves the possibility of a school board's adopting generic measures to increase racial diversity in primary and secondary schools." *Lewis*, 662 F.3d at 355

---

[10] Defendants are not hiding this. The Discovery changes are listed on the City's website under "Diversity in Admissions." *See* NYC Dep't of Educ., *Diversity in Admissions*, https://www.schools.nyc.gov/enrollment/enrollment-help/meeting-student-needs/diversity-in-admissions (last visited Jan. 23, 2019).

[11] Defendants reference the positions of other Asian-American advocacy groups to buttress their position that the racial makeup of the Specialized High Schools is problematic. Aside from being irrelevant, this argument seems to adopt "the demeaning notion that members of the defined racial groups ascribe to certain 'minority views' that must be different from those of other citizens." *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 636 (1990) (Kennedy, J., dissenting).

[12] It does not matter that Defendants represent their intent is "benign," as they only want diversity. "Benign" intent cannot save a racially discriminatory admissions program, whether done through explicit racial classification or facially race-neutral means. *See Lewis*, 662 F.3d at 349.

(Jones, J., concurring). Such generally applicable measures do not include subjecting select eighth-graders to differential treatment in admissions in an attempt to alter the racial demographics of certain schools. Nor is Defendants' action analogous to a generally applicable redrawing of school boundaries. Rather than shifting a few kids between zoned schools based on *generally applicable criteria*, Defendants' *disparate criteria* for the Discovery program intentionally distributes benefits and burdens to children of some races more than others. *See Hayden*, 180 F.3d at 49; *Doe*, 665 F.3d at 548. They cannot do this unless they satisfy strict scrutiny.

The Second Circuit's decision in *Hayden* does not help Defendants. *Hayden* concerned an allegation that Nassau County discriminated against certain police applicants by changing its entrance exam to lessen an apparent disparate impact against Black applicants. The county had changed the exam after multiple federal investigations resulted in two consent decrees wherein the county agreed to work with the Department of Justice to develop a test with less disparate impact. 180 F.3d at 46. The Second Circuit upheld the use of the new exam because (1) it was designed to remedy past discrimination, *id.* at 51; and (2) "[t]he test was scored the same for all candidates, and no differential cutoffs were used[,]" *id.* Here, there have been no consent decrees,[13] and Defendants are using *differential* cutoffs to ensure the changes will have a racial effect.[14]

---

[13] Defendants reference an ongoing Department of Justice Office of Civil Rights investigation into the admissions practices at the Specialized High Schools. Opp. at 30-31. The OCR complaint, alleged that the SHSAT produced racially discriminatory outcomes. That investigation has yet to produce any findings. Moreover, in response to the OCR complaint, the Department of Education commissioned (but did not publicly release) a study that validated the SHSAT as a predictor of academic success. *See* Tyler Pager, *SHSAT Predicts Whether Students Will Succeed in School, Study Finds*, N.Y. Times, Aug. 3, 2018, *available at* https://www.nytimes.com/2018/08/03/nyregion/admissions-test-shsat-high-school-study.html.

[14] Finally, Defendants' argument that Hecht-Calandra's text or legislative history supports them is unavailing. Plaintiffs recognize that Hecht-Calandra affords Defendants discretion with respect to the Discovery program. However, that discretion may not violate the Constitution.

### C. Defendants' plan cannot survive strict scrutiny

For the reasons stated in Plaintiffs' initial memorandum, the Discovery changes are not narrowly tailored to further any compelling government interest. Here it is important to note that the Supreme Court has never recognized a compelling interest—even at the collegiate level—in obtaining racial diversity for its own sake. *See Grutter v. Bollinger*, 539 U.S. 306, 329-30 (2003). *Grutter* recognized a compelling interest (for higher education) in obtaining "the educational benefits that flow from student body diversity."[15] *Id.* at 330. The Court has expressly refused to extend this rationale to secondary education. *Parents Involved*, 551 U.S. at 725. In other words, Defendants have no compelling interest in simply enrolling more students of their preferred races, and the Supreme Court has not held that K-12 schools may pursue the *Grutter* interest.

It is hard to describe Defendants' efforts as anything other than attempts at racial balancing. To be sure, Defendants are unlikely to achieve their preferred racial balance through Discovery reorganization alone. But Defendants make it plain that their ultimate goal to make sure the demographics of the Specialized High Schools "mirror NYC demographics more closely." Specialized High Schools Proposal, exhibit B to Plaintiffs' RJN, at 12. That Defendants will not entirely succeed in their aims through this policy alone does not change the fact that their aim is racial balancing.[16] Defendants have no compelling interest in doing that, especially at the secondary school level.

Defendants say they have tried for years to diversify the Specialized High Schools. But they bear a significant burden to show that the challenged plan was essentially the "last resort" to

---

[15] Defendants cite several articles extolling the virtues of diversity. But social science has not spoken with one voice on this issue. *See* Roger Clegg, *Attacking "Diversity": A Review of Peter Wood's Diversity: The Invention of a Concept*, 31 J.C. & U.L. 417, 426-30 (2005) (citing studies questioning the educational value of diversity).

[16] Mayor de Blasio apparently reiterated this aim last night at Boys and Girls High School, saying the Specialized High Schools "have to look like all NYC." Christina Veiga (@cveiga), Twitter (Jan. 23, 2019, 4:30 PM), https://twitter.com/cveiga/status/1088232565167833088.

satisfy their supposedly compelling interest. *See Parents Involved,* 551 U.S. at 790 (Kennedy, J., concurring in the judgment). This they cannot do. More resources can and should still be devoted to helping children prepare for and succeed on the SHSAT, rather than manipulating admissions standards.

Unfortunately Defendants' plan will hurt the Black and Hispanic students who got into the Specialized High Schools under a plan with uniform admissions requirements. Their qualifications may now be unfairly subject to questioning. And "[t]he question itself is the stigma—because either racial discrimination did play a role, in which case the person may be deemed 'otherwise unqualified,' or it did not, in which case asking the question itself unfairly marks those . . . who would succeed without discrimination." *Fisher*, 570 U.S. 334 (Thomas, J., concurring) (quoting *Grutter*, 539 U.S. at 373 (Thomas, J., dissenting)). Unfortunately, any plan designed to tinker with racial outcomes comes with significant collateral damage.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

DATED: January 24, 2019.

                                                        Respectfully Submitted,

                                                        S/ Joshua P. Thompson
JOSHUA P. THOMPSON, Cal. Bar No. 250955*
WENCONG FA, Cal. Bar No. 301679*
OLIVER J. DUNFORD, Cal Bar No. 320143*
CHRISTOPHER M. KIESER, Cal. Bar. No. 298486*
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
E-Mail: JThompson@pacificlegal.org
E-Mail: WFa@pacificlegal.org
E-Mail: ODunford@pacificlegal.org
E-Mail: CKieser@pacificlegal.org

*Counsel for Plaintiffs*

\**Pro Hac Vice* application pending