UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTA McAULIFFE INTERMEDIATE
SCHOOL PTO, INC.; CHINESE AMERICAN
CITIZENS ALLIANCE OF GREATER NEW
YORK; ASIAN AMERICAN COALITION FOR
EDUCATION; PHILLIP YAN HING WONG; YI
FANG CHEN; and CHI WANG,

                        Plaintiffs,

          – against –

BILL DE BLASIO, in his official capacity as Mayor
of New York; and RICHARD A. CARRANZA, in
his official capacity as Chancellor of the New York
City Department of Education,

                        Defendants.

**OPINION & ORDER**

18 Civ. 11657 (ER)

Ramos, D.J.:

        Plaintiffs bring this action against Bill de Blasio, Mayor of New York, and Richard A.

Carranza, Chancellor of the New York City Department of Education ("DOE"), claiming that the

Mayor and Chancellor's changes to the admissions process for the eight specialized New York

City public high schools violate the Equal Protection Clause of the Fourteenth Amendment

because they discriminate against Asian-American students.  Plaintiffs are three organizations—

Christa McAuliffe Intermediate School PTO, Inc. ("PTO"), Chinese American Citizens Alliance

of Greater New York ("CACAGNY"), and Asian American Coalition for Education

("AACE")—and three individuals—Phillip Yan Hing Wong, Yi Fang Chen, and Chi Wang, who

are the parents of students in New York City public schools.  Before the Court are two motions:

Plaintiffs' motion for the Court to take judicial notice of certain facts and Plaintiffs' motion for a

preliminary injunction prohibiting Defendants from implementing the challenged changes while this action is pending.

For the reasons set forth below, Plaintiffs' motion for judicial notice is GRANTED in part and DENIED in part, and Plaintiffs' motion for a preliminary injunction is DENIED.

**MOTION FOR JUDICIAL NOTICE**

Under Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The court may take judicial notice of a fact on its own and must take judicial notice of a fact if a party requests it and the court is supplied with the necessary information.  Fed. R. Evid. 201(c).

Plaintiffs ask this Court to judicially notice a variety of facts for the purposes of adjudicating this action, including the instant preliminary injunction motion.  The Court addresses Plaintiffs' requests in turn.

1. The Court takes judicial notice of the statistics contained in New York City's Demographic Snapshot, a database containing demographic information for every public school in New York City.  Plaintiffs have rendered certain relevant information from the database into tables and attached them as exhibits to their motion for a preliminary injunction, *see* Kieser Decl. Ex. 1–5, but ask the Court to take judicial notice of the entire database.  As the Demographic Snapshot is information published by the DOE and available on a government website, the Court takes judicial notice of it.  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

2.  The Court takes judicial notice of the fact that in connection with the changes to the Discovery program,[1] (1) by the summer of 2020, 20% of the seats at each specialized school will be reserved for Discovery program participants, and (2) to participate in the Discovery program, students must attend a school with an Economic Need Index ("ENI") of at least 60%.  These facts come from the DOE's official website, dated June 3, 2018, on a page titled Diversity in Admissions.  *See* Doc. 19 Ex. A.  Since the facts are from a government website, and the government is the entity making the changes to the program, judicial notice is appropriate.  *See Wells Fargo Bank*, 127 F. Supp. 3d at 166.

3.  The Court does not take judicial notice of the statistics and projections in the DOE slide deck to school districts, Doc. 19 Ex. B.  Many of the statistics in the slide deck are uncited, including the statistic Plaintiffs specify for judicial notice, that 61% of Asian-Americans who received offers to attend a specialized school are low-income, *see* Doc. 19 Ex. B at 13.  The Court will, however, take judicial notice of the facts that the DOE made the slide deck and made the statements in the slide deck, facts which are undisputed by Defendants, *see* Roberts Decl. ¶ 9.

4.  The Court takes judicial notice of the fact that Mayor de Blasio's office, Mayor de Blasio, and Chancellor Carranza made the statements attributed to them in the June 3, 2018 DOE press release, Doc. 19 Ex. J.  A press release is a source whose accuracy "cannot reasonably be questioned" as to the fact that the statements contained therein were made.

5.  The Court does not take judicial notice of the offer rate data for 100 New York intermediate schools contained in the June 14, 2018 Chalk Beat article, Doc. 19 Ex. C.  Chalk Beat is a non-government website that publishes news related to public education; it is not a

---

[1] As discussed in greater detail below, participation in the Discovery program is one of two ways of gaining admission to the eight specialized high schools; the other way involves only one criterion—scoring high enough on a standardized test.

source "whose accuracy cannot reasonably be questioned" as to the proffered data.  Plaintiffs

argue that the statistics contained therein should still be judicially noticed because a New York

Times article contained the same statistics and stated that they came from the DOE.  But this

does not lend the quoted statistics any more credence.  Presumably, if they are DOE statistics,

then Plaintiffs can request them directly from the source.

6.   The Court does not take judicial notice of any of the facts or data in the August 13,

2018 New York Times article, Doc. 19 Ex. F.  The New York Times is a well-respected news

publication, but it is not a source "whose accuracy cannot reasonably be questioned" when it

comes to the facts and data Plaintiffs ask the Court to notice, namely, (1) the Specialized High

School Admissions Test ("SHSAT") cut-off for admission at each specialized school in 2018, (2)

the SHSAT cut-off score for the Discovery program in 2018, and (3) an explanation of how the

Discovery program worked before 2018, Doc. 19 ¶ 5.

7.   The Court does not take judicial notice of the statistics on the percentage of Discovery

program participants who were Asian-American in 2018 proffered in the August 14, 2018 Chalk

Beat article, Doc. 19 Ex. E, for the same reason as item (5), above.

8.   The Court takes judicial notice of the fact that Mayor de Blasio made the statements

published under his name in a June 2, 2018 Chalk Beat article, Doc. 19 Ex. D.  He authored the

article.  The fact that he made the statements thus "can be accurately and readily determined"

from a source "whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

9.   The Court takes judicial notice of the fact that Mayor de Blasio made the following

statements published on Twitter in his official account, @NYCMayor, under his name, on June

3, 2018:

Zipcode is limiting destiny in New York City and in our Specialized High Schools. Only 14% of students at Bronx Science come from the Bronx. Only 3.4% of Brooklyn Tech students come from Central Brooklyn.

Stuyvesant High School just admitted almost a thousand students, but only ten of those students were African American and less than thirty were Latino. In a city that is majority African American and Latino.

These schools are the proving grounds for future leaders, and unless we believe our leaders should only come from certain communities, we cannot have our most prestigious schools available to only some.

Our first reforms will commit 20% of the seats to kids from disadvantaged communities. And we will work with Albany to eliminate a system where one broken test dictates a child's future.

So much talent is being locked out right now. Justice has been delayed, but it does not have to be denied. We can fix this. These schools will get better when they reflect all of New York City.

A single standardized test can never capture the talent of young people. We need a fairer way to admit students to our Specialized High Schools.

*See* Doc. 19 Ex. H, I. The statements were "tweeted" by the Mayor on his official account, under his name. The fact that he made the statements thus "can be accurately and readily determined" from a source "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

10. The Court takes judicial notice of the statements made by Chancellor Carranza in a television interview conducted on June 5, 2018 on local news station Fox 5 New York. Plaintiffs ask the Court to specifically take notice of one of the Chancellor's statements, "I just don't buy into the narrative that any one ethnic group owns admissions to these schools," Doc. 19 ¶ 10, citing a New York Times article that reprints the statement in isolation, Doc. 19 Ex. G. Defendants claim that the New York Times article "mischaracterizes the Chancellor's statements, takes quotes out of context, and creates an inaccurate impression," and cite to the video footage of the full interview, *see Plan to Diversify Elite NYC Schools*, Fox 5 (June 5,

2018).[2]  Roberts Decl. ¶ 14.  Consequently, the Court *sua sponte* takes judicial notice of the contents of the full interview.  What statements the Chancellor made therein "can be accurately and readily determined from" the video footage of the interview, Fed. R. Evid. 201(b)(2).

Having determined what facts the Court can and shall take judicial notice of in deciding Plaintiffs' motion for a preliminary injunction, the Court turns to that motion.

## MOTION FOR A PRELIMINARY INJUNCTION

### I.     FINDINGS OF FACT

A.     *The Specialized School System*

The New York City DOE operates eight high schools that, under state law, must admit students solely on the basis of an academic exam.  These schools, called "specialized schools," are the Bronx High School of Science ("Bronx Science"); Stuyvesant High School; Brooklyn Technical High School ("Brooklyn Tech"); Brooklyn Latin School; High School for Mathematics, Science and Engineering at City College of New York; High School of American Studies at Lehman College; Staten Island Technical High School; and Queens High School for the Sciences at York College.[3]  Wallack Decl. ¶¶ 6, 10.  As the parties acknowledge, these high schools offer superior educational opportunities to academically gifted students and admission is highly prized by parents and students alike.  Indeed, the three oldest of these schools—Bronx Science, Stuyvesant, and Brooklyn Tech—are widely and historically regarded as amongst the finest public high schools in the country.  The schools' alumni are a testament to this perception;

---

[2] *Available at* http://www.fox5ny.com/good-day/338399825-video.

[3] LaGuardia High School is also a specialized school under state law, but admits students using a competitive audition instead of an exam.  It is thus not at issue in this case.  When the Court refers to the specialized schools, it is referring to the eight schools that use the SHSAT as a basis for admissions.

Bronx Science, for instance, has produced eight Nobel Prize winners, and Stuyvesant four.  *See About Page*, Bronx High School of Science;[4] *History of the School*, Stuyvesant High School.[5]

The state law that requires the specialized schools to use testing as the basis for admissions is the Hecht-Calandra Act (the "Act"), and it states the following:

> Admission to the Bronx High School of Science, Stuyvesant High School and Brooklyn Technical High School and such similar further special high schools which may be established shall be solely and exclusively by taking a competitive, objective and scholastic achievement examination, which shall be open to each and every child in the city of New York in either the eighth or ninth year of study, without regard to any school district wherein the child may reside.

N.Y. Educ. Law § 2590-g(12)(b) (1997).[6]  The test the specialized schools use is the Specialized High School Admissions Test ("SHSAT").

To apply to a specialized school, students first decide their order of preference for the schools.  Chadha Decl. ¶ 4.  Students then take the SHSAT, during which they declare and submit their order of preference.  *Id.*  The tests are then scored, and the students who took the test are ordered by score from highest to lowest.  *Id.* ¶ 5.  The student with the highest score is offered a seat at her first choice school.  *Id.* ¶ 6.  The student with the next highest score is then offered a seat in his first choice school, and so on, until all the seats in a student's first choice school have been filled.  *Id.*  In that case, the student is offered a seat in her second choice school.  *Id.*  If all the seats in the second choice school have been filled, the student is placed in

---

[4] *Available at*
https://www.bxscience.edu/apps/pages/index.jsp?uREC_ID=219378&type=d&termREC_ID=&pREC_ID=433038&hideMenu=0.

[5] *Available at*
https://stuy.enschool.org/apps/pages/index.jsp?uREC_ID=126631&type=d&pREC_ID=251657&hideMenu=1.

[6] This text has been replaced by language incorporating it by reference.  *See* N.Y. Educ. Law § 2590-h(1)(b) ("admissions to the special schools shall be conducted in accordance with the law in effect on the date preceding the effective date of this section").

her third choice school, and so on.  *Id.*  This process continues until all the seats at the eight specialized high schools have been filled.[7]  *Id.*  By virtue of this system, after each admissions cycle, each specialized school has a cut-off score for admission:  the SHSAT score of the last student offered admission to the school.

The Hecht-Calandra Act provides only one other means of admission—the Discovery program.  The Act expressly provides for the implementation of the Discovery program "to give disadvantaged students of demonstrated high potential an opportunity to try the special high school program."  Roberts Decl. in Opp. to Pls.' Mot. Prelim. Inj. Ex. 3 at 3.  Under the Act, to be eligible for the program, a student must:  (1) be disadvantaged; (2) be certified by her current school as being "high potential"; (3) score just below the lowest overall score of all admitted students; and (4) successfully complete a summer preparatory program demonstrating her ability to "cope with the special high school program."  *Id.*; Chadha Decl. ¶¶ 8, 10.  Importantly, however, the Act neither defines "disadvantaged" nor prescribes the number of students that may be admitted through the Discovery program, leaving such determination to the discretion of the Chancellor.  Roberts Decl. in Opp. to Pls.' Mot. Prelim. Inj. ¶¶ 14, 15.  Once a student successfully completes the summer school program, the student is admitted to a specialized school.  Chadha Decl. ¶ 10.  Of the class entering in September 2017, approximately 4% of offers were made through the Discovery program.  *See* Chadha Decl. Ex. 1 (recording that 203 out of 5,281 offers were made through Discovery).

By all accounts, this admissions process is grueling.  Yet over 29,000 students took the SHSAT last year in hopes of attending a specialized high school in the fall of 2019.  This demand reflects the common view of New Yorkers that the schools are "elite," "exclusive," and

---

[7] Not all students accept the offers they receive.  Accordingly, the DOE makes more offers than there are seats available.  Chadha Decl. ¶ 7.

"among the best high schools in the country."  *See The Exclusive Eight*, N.Y. TIMES (Oct. 16,

2012);[8] Laura Meckler, *NYC plan to diversify elite high schools challenged in court*, WASH.

POST (Dec. 13, 2018).[9]

B.      *Racial Demographics at the Specialized Schools*

        New York's specialized schools stand out in another way:  their racial demographics are

highly unrepresentative of the City's public school system overall.  The racial makeup of New

York City's public high schools is 40% Hispanic, 26% Black, 16.1% Asian-American, and 15%

white.  Kieser Decl. Ex. 3.  In sharp contrast, the racial makeup of Stuyvesant, the second largest

of the specialized schools, is 73.5% Asian-American, 0.7% Black, 2.8% Hispanic, and 17.8%

white.  Kieser Decl. Ex. 4.  The other specialized schools are more representative, but none come

close to proportionate representation.  While Black and Hispanic students make up 66% of New

York City public high schools, they only make up 13.5% of Brooklyn Tech, 8.7% of Bronx

Science, 3.5% of Staten Island Tech, 23.9% of Brooklyn Latin, 25.2% of the High School for

Math, Science & Engineering, 8.4% of Queens High School for the Sciences, and 15% of the

High School of American Studies.  *See id.*  Asian-American students make up 61.3% of

Brooklyn Tech, 65.6% of Bronx Science, 48.4% of Staten Island Tech, 51.5% of Brooklyn Latin,

36.2% of the High School for Math, Science & Engineering, 81% of the Queens High School for

the Sciences, and 22% of the High School of American Studies.  *See id.*

        The demographically skewed student populations and test-only admissions basis of the

specialized schools have attracted scrutiny from civil rights groups and government agencies for

---

[8] *Available at* https://www.nytimes.com/2012/10/17/opinion/the-exclusive-eight-high-schools.html?rref=collection%2Ftimestopic%2FStuyvesant%20High%20School&action=click&contentCollection=timestopics&region=stream&module=stream_unit&version=latest&contentPlacement=27&pgtype=collection.

[9] *Available at* https://www.washingtonpost.com/local/education/nyc-plan-to-diversify-elite-high-schools-challenged-in-court/2018/12/13/37810eb6-ff20-11e8-862a-b6a6f3ce8199_story.html?utm_term=.b68752394a36.

decades.  In 1977, the federal Office of Civil Rights ("OCR") opened an investigation into whether the use of a single test as an admission standard constituted a form of discrimination against racial minorities and women.  *See* Wallack Decl. ¶ 8.  The OCR and the City eventually reached an agreement not to change the admissions standard.  *See id.*  In 2012, the NAACP Legal Defense and Education Fund, Inc., Latino Justice PRLDEF, and the Center for Law and Social Justice at Medgar Evers College filed a complaint with the OCR against the DOE, alleging that the use of the SHSAT violated Title VI of the Civil Rights Act of 1964.  *See id.* ¶ 13.  OCR opened an investigation in response to the complaint.  *Id.*  That investigation is still pending.  *Id.*[10]

Over the years, the DOE has undertaken multiple initiatives in hopes of increasing the enrollment of Black and Latino students at specialized schools.  Beginning in 2002, when the only specialized schools were Stuyvesant, Bronx Science, and Brooklyn Tech, the DOE added a new specialized school in each borough in a conscious effort to increase the number of available seats.  *Id.* ¶ 10.  In addition, the DOE instituted citywide extra-curricular programs that provided for additional coursework and taught test preparation skills for pre-high-school-aged students. *See id.* ¶ 11.  These programs include the Specialized High School Institute ("SHSI"), which began in the 1990's and ended in 2012, and its replacement, Dream-SHSI ("DREAM"), which began during the 2011-12 school year.  *Id.*  In 2016, the DOE added the DREAM intensive program, which runs during the summer before students take the SHSAT in the fall.  *Id.*  The DOE also engaged in targeted outreach to students from underrepresented groups to increase awareness of the specialized schools and allowed students at intermediate schools with large Black and Latino populations to take the SHSAT on a weekday, to encourage participation by

---

[10] Neither Plaintiffs nor Defendants provide further information concerning the OCR investigation.

students for whom testing on the weekend may be a burden. *Id.* ¶ 14. And the DOE expanded

the Discovery program, such that by the 2018-19 school year 252 students were enrolled in the

program, *see* Chadha Decl. ¶ 9 n.1, and all the specialized schools were required to admit

students through Discovery, Wallack Decl. ¶ 15. Previously, not all schools admitted students

via the Discovery program. *Id.* These various measures failed to substantially increase the

number of Black and Latino students at the schools. Black and Latino students still respectively

made up 5% and 7% of the specialized schools' enrollment in the 2015-16 school year. Wallack

Decl. Ex. 1. Despite the implementation of these multi-faceted efforts over the years, the

problem of Black and Latino underrepresentation in the specialized high schools, if anything,

seemed to worsen. *See id.*

C.       *Changes to the Discovery Program*

In the spring of 2018, a DOE working group recommended to Chancellor Carranza that

he modify the Discovery program in order to increase the racial, ethnic, geographic, and socio-

economic diversity of the specialized schools. Wallack Decl. ¶ 19. There were two parts to the

proposed changes, both of which relate to the two areas that the Act left to the discretion of the

Chancellor:  the size of the Discovery program and the definition of "disadvantaged." First, the

DOE sought to expand the program. The Discovery program would increase from 252 seats to

528 seats, comprising 13% of the available specialized school seats, in the 2019-20 school year.

Chadha Decl. ¶ 9 n.1. It would further increase to 800 seats, comprising 20% of the available

seats, for the 2020-21 school year and thereafter. *Id.*

Second, the DOE sought to change the eligibility criteria for the Discovery program.

Previously, in order to be deemed "disadvantaged" and thus eligible for the program, a student

had to have one of the following characteristics:  (1) qualify for free lunch; (2) attend a school

receiving federal funds under Title I of the Elementary and Secondary Education Act and qualify for reduced price lunch; (3) receive assistance from the New York City Human Resources Administration; (4) be a foster child, a ward of the state, or in temporary housing; or (5) have entered the United States within the last four years and live in a home where the primary language spoken is not English.  Wallack Decl. ¶ 16.  Under the new plan, to qualify as "disadvantaged," a student would have to attend a school with a 2017-18 Economic Need Index ("ENI") of 60% or higher, *and* have one of the following characteristics:  (1) qualify for free or reduced-price lunch; (2) receive assistance from the New York City Human Resources Administration; (3) be a foster child, a ward of the state, or in temporary housing; or (4) have been an English Language Learner within the last two years and have enrolled in a DOE school for the first time within the last four years.[11]  *Id.* ¶ 20.

The old and proposed criteria differ little except in the new ENI requirement.  The DOE created the ENI indicator, which is itself based on another indicator, a student's "Economic Need Value" ("ENV").  *Id.* ¶ 22.  The ENV measures the relative poverty of a student.  *See id.* ¶¶ 22, 23.  A student's ENV is 1.0 if he (1) lives in a household that is eligible for assistance from the New York City Human Resources Administration; (2) lived in temporary housing sometime in the past four years, or (3) speaks a language at home other than English and enrolled in a DOE school for the first time within the last four years.  *Id.* ¶ 23.  Otherwise, a student's ENV is the decimal value of the percentage of families with school-age children in the student's census tract whose income is below the federal poverty level.  *Id.*  For example, if 62% of families in a student's census tract are below the poverty level, that student's ENV is 0.62—unless one of the

---

[11] The other three statutory factors—that the student (1) be certified by her school as high-potential; (2) score just below the lowest overall score; and (3) successfully complete a summer program—remain the same.

above three circumstances apply, in which case his ENV is 1.0.  A school's ENI is simply the average ENV of its students.  *Id.* ¶ 22.  A higher ENI thus indicates a poorer student body.

The ENI requirement is not insignificant because only students who attend a school with a relatively low-income student body are eligible for the Discovery program.  Thus, if a student is herself very low-income but attends an intermediate school with an ENI below 60%, the student is ineligible for Discovery, despite the fact that the student would have been eligible for the program under the prior criteria.  About half of all New York City intermediate schools have an ENI below 60%.  *Id.* ¶ 25.

Modeling conducted by a DOE working group projected that the ENI requirement would change the racial makeup of the Discovery program and therefore the specialized schools, albeit only slightly.  To model these demographic consequences, the DOE first took the SHSAT and demographic data of the specialized schools' entering class of 2017, then analyzed how the demographic data would change if the Discovery program's eligibility criteria that year were the new criteria and the program took up 20% of the available seats.  Chadha Decl. ¶¶ 19, 20.  The projections show a decline of Asian-American enrollment from 53.0% to 50.9% (-2.9%), an increase in Black enrollment from 4.0% to 6.4% (+2.4%), an increase in Hispanic enrollment from 6.8% to 10.2% (+3.4%), and a decline in white enrollment from 27.2% to 24.7% (-2.5%).[12] Chadha Decl. Ex. 1.  DOE policy makers had access to these projections while considering and designing the changes to the Discovery program.  Chadha Decl. ¶ 22.  They remain the DOE's projections of the Discovery changes; however, the DOE emphasizes that it is highly uncertain of the accuracy of these projections.  *Id.* ¶ 21.

---

[12] The data also includes an "other" category, which includes students who do not report their race, Native American students, and multi-racial students.  Chadha Decl. ¶ 20 n.2.  The program changes were projected to decrease enrollment of students in the "other" category from 9.0% to 7.8% (-1.2%).  Chadha Decl. Ex. 1.

The Plaintiffs acknowledge that the proposed changes to the Discovery program are facially race-neutral. They claim, however, that the changes will have a disparate impact on Asian-American students, and that Defendants intended this effect. They note that the projected increase in Black and Latino enrollment will come largely at the expense of Asian-American students.

DOE policymakers forwarded the proposed changes to the Discovery program to Chancellor Carranza in the spring of 2018, and he adopted them on June 3, 2018. Wallack Decl. ¶ 19.

D.    *Mayor de Blasio and Chancellor Carranza's Statements*

On June 3, 2018, Mayor de Blasio and Chancellor Carranza announced the changes to the Discovery program. *Id.* The two also announced that they would lobby the New York legislature to amend or repeal the Hecht-Calandra Act so that the DOE could scrap the SHSAT as a requirement for admissions to the specialized schools.[13]  This proposed change to the Act is not at issue in this case.

Mayor de Blasio and Chancellor Carranza have touted the changes to the Discovery program on the grounds that the new plan would increase racial diversity at the specialized schools. The Mayor's press release stated that the changes "will support greater geographic, racial, and socioeconomic diversity" at the specialized schools. Press Release, Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools, Office of the Mayor of New York City (June 3, 2018). The press release also stated that with the new changes, "[b]ased on modeling of current offer patterns, an estimated 16 percent of offers

---

[13] Because state legislation, the Hecht-Calandra Act, provides that admission to the specialized schools must be made exclusively on the basis of an exam, the City of New York and the DOE cannot unilaterally get rid of the SHSAT.

would go to Black and Latino students, compared to 9 percent currently." *Id.* On the same day

the changes were announced, Mayor de Blasio posted a string of messages on his official Twitter

account, stating:

> Stuyvesant High School just admitted almost a thousand students, but only ten of those
> students were African American and less than thirty were Latino. In a city that is
> majority African American and Latino. These schools are the proving grounds for future
> leaders, and unless we believe our leaders should only come from certain communities,
> we cannot have our most prestigious schools available to only some. Our first reforms
> will commit 20% of the seats to kids from disadvantaged communities. And we will
> work with Albany to eliminate a system where one broken test dictates a child's future.

Doc. 19 Ex. H.[14] Contemporaneously, in an op-ed published online on the website

Chalkbeat.org, Mayor de Blasio characterized the racial demographics of the specialized schools

as a "monumental injustice" given that "two out of every three eighth-graders in [New York

City's] public schools are Latino or Black." Doc. 19 Ex. D.[15] Regarding the lack of

representation in the specialized schools with regard to race and geography, he added:

> Can anyone defend this? Can anyone look the parent of a Latino or Black child in the
> eye and tell them their precious daughter or son has an equal chance to get into one of
> their city's best high schools? Can anyone say this is the America we signed up for?

*Id.* Mayor de Blasio went on to defend the changes to the Discovery program and his proposal to

eliminate the SHSAT. *Id.*

Right after the June 3rd public announcement, Chancellor Carranza appeared in an

interview on local news channel Fox 5 to defend and discuss the changes to the Discovery

---

[14] For the reasons given *supra*, the Court takes judicial notice of the fact that Mayor de Blasio made these statements.

[15] For the reasons given *supra*, the Court takes judicial notice of the fact that Mayor de Blasio made the statements in this document.

program and the plan to eventually eliminate the SHSAT.  *See Plan to Diversify Elite NYC Schools*, Fox 5 (June 5, 2018).[16]  During the interview, the following exchange took place:

> INTERVIWER:  So today some Asian-Americans are going to rally at City Hall.  They're concerned because they feel you're pitting minority against minority; they also come from, you know, poor sections of the city, and they're immigrants, and struggling for, you know, the American dream.  Are you pitting minority against minority?

> CARRANZA:  Oh, absolutely not.  And I just don't buy into the narrative that any one ethnic group owns admission to these schools.

*Id.*  It is unclear from this segment of the interview whether the two were referring just to a public reaction against the SHSAT elimination or also to a reaction against the Discovery program changes.  Almost all of Chancellor Carranza's statements in the interview concerned the possible elimination of the SHSAT, which would arguably be a more significant change than the amendments to the Discovery program.

E.    *The Lawsuit*

On December 13, 2018, Plaintiffs sued Mayor de Blasio and Chancellor Carranza pursuant to 42 U.S.C. § 1983, alleging that the changes to the Discovery program violate the Equal Protection Clause of the Fourteenth Amendment by discriminating against Asian-Americans.  Compl.  Along with their complaint, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin the Discovery program changes from being implemented for the class entering in the fall of 2019.  Doc. 10.

The three organizational plaintiffs are the PTO, CACAGNY, and AACE.  The PTO is a private organization of parents and teachers at Christa McAuliffe Intermediate School (I.S. 187), a public school located at 1171 65th St., Brooklyn, New York.  Compl. ¶ 7.  Many I.S. 187 students go on to attend specialized schools; out of the 274 students who graduated from I.S. 187

---

[16] *Available at* http://www.fox5ny.com/good-day/338399825-video.  For the reasons given *supra*, the Court takes judicial notice of the fact that Chancellor Carranza made the statements in this video.

in 2018, 205 currently attend a specialized school.  *Id.*  Sixty-seven and a half percent of students at the school are Asian-American and 65.8% are classified by the City of New York as living below the poverty line.  Kieser Decl. Ex. 1.  I.S. 187's ENI is 57.9%.  *Id.*  Members of the PTO have organized and participated in multiple public demonstrations protesting Defendants' changes to the admissions system, Doc. 62 ¶ 8, and have met with public officials to discuss their opposition to the changes, *see id.* ¶¶ 7, 11, 14, 20, 24, 25.

CACAGNY is a 501(c)(8) nonprofit organization formed in 2016 dedicated to furthering Chinese-American interests.  Compl. ¶ 8.  CACAGNY has advocated against the consideration of racial diversity in setting admissions standards.  Doc. 63 ¶ 4.  Since Defendants announced their plan to change the Discovery program and eventually eliminate the SHSAT, CACAGNY members have organized events, spoken at public forums, and lobbied legislators in opposition to the changes.  *Id.* ¶ 6.  AACE is a 501(c)(3) nonprofit organization formed to further education rights for Asian-Americans, Doc. 64 ¶ 3, and it too has dedicated efforts to protest the changes, *see id.* ¶ 6.

The individual plaintiffs are Yi Fan Chen, Chi Wang, and Phillip Yan Hing Wong.  All are parents with children in the New York City public school system.  Chen's son is six years old and attends P.S. 105.  Chen Decl. ¶ 3.  Wang's two children are five and nine years old respectively; the nine-year-old is a fourth grader at P.S. 203Q.  Wang Decl. ¶ 3.  Wong's daughter is an eighth grader at I.S. 5, P. Wong Decl. ¶ 5, which has an ENI of 76.3%, Kieser Decl. Ex. 1.  As she would like to attend a specialized school in the coming school year, she took the SHSAT in October of 2018.  P. Wong Decl. ¶ 6.

## II.   CONCLUSIONS OF LAW

A.   *Standing*

Defendants challenge the standing of all six plaintiffs, arguing that none has sufficiently alleged the type of concrete and particularized injury necessary to maintain constitutional standing. Three elements form the constitutional minimum of standing. First, the plaintiff must have suffered an invasion of a legally protected interest that is concrete and particularized, and actual or imminent. Second, the challenged conduct must have caused the plaintiff's injury. Third, it must be likely, not speculative, that a favorable decision by the court will redress the plaintiff's injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). The party invoking federal jurisdiction bears the burden of establishing standing. *Id.* at 561. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

There are six plaintiffs in this action, three organizations and three individuals. The Court finds that of these plaintiffs, only the three organizations and Phillip Wong have standing.

### 1.   Associational Standing

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). In the Second Circuit, however, an organization only has standing to sue under § 1983 on its own behalf, not that of its members. *New York State Citizen's Coalition for Children v. Velez*, 629 Fed. App'x 92, 93–95 (2d Cir. 2015) (summary order). This is because the Second Circuit has interpreted the rights

18

that § 1983 secures to be personal to those purportedly injured.[17]  *League of Women Voters of Nassau Cty. v. Nassau Cty. Bd. of Sup'rs*, 737 F.2d 155, 160 (2d Cir. 1984).

Therefore, for an organization to have standing, it must independently satisfy the requirements of Article III standing as enumerated in *Lujan*.  *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).  Defendants argue that the three organizational plaintiffs all lack standing because none have sufficiently alleged an injury in fact.

The Court disagrees.  All three organizational plaintiffs independently satisfy the Article III requirements because all three have dedicated resources to counteracting Defendants' allegedly discriminatory actions.  Only a "perceptible impairment" of an organization's ability to provide services to further its mission is necessary to constitute an actionable injury in fact. *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  The PTO, CACAGNY, and AACE have all expended resources outside of this litigation organizing public events, speaking to press, and lobbying officials to combat the proposed changes to the Discovery program.  *See* Doc. 62 ¶¶ 7–

---

[17] This limitation on associational standing appears to be unique to the Second Circuit.  *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 123 (2d Cir. 2017) (Jacobs, dissenting) (collecting cases).  It originated in *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973).  In *Aguayo*, Chief Judge Friendly held that neither the language nor the legislative history of 42 U.S.C. § 1983 suggest that an organization may sue under § 1983 for the violation of the rights of members.  *See id.* at 1099.

Two Supreme Court opinions issued shortly after *Aguayo*, however, cast doubt on that holding.  First, in *Warth v. Seldin*, 422 U.S. 490 (1975), a § 1983 action, the Supreme Court stated in dicta that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *id.* at 511.  Then, in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), the Supreme Court cited to that dicta in *Warth* and held that an organization could sue on behalf of its members, *id.* at 343.  *Hunt* was not a § 1983 action, however.

Nonetheless, the Second Circuit reaffirmed *Aguayo* in *League of Women Voters of Nassau County v. Nassau Board of County Supervisors* without addressing *Warth* or *Hunt*.  *See* 737 F.2d 155, 161 (2d Cir. 1984).  Only many years later in *Nnebe v. Daus*, 644 F.3d 156 (2d Cir. 2011), did the Second Circuit address the apparent tension between *Aguayo* and the two Supreme Court cases.  The Second Circuit in *Nnebe* held that, since they "reaffirmed the *Aguayo* rule in *League of Women Voters* nine years after *Warth* and have not since reconsidered" the rule, it is "bound by the implicit determination of prior panels that the rule survives *Warth* 'until such time as [our prior decisions] are overruled either by an *en banc* panel of our Court or by the Supreme Court.'" 644 F.3d at 156 n.5 (alteration in original) (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)).  Therefore, in the Second Circuit, organizations still cannot have standing solely by virtue of the standing of their members.

28; Doc. 63 ¶¶ 8–25; Doc. 64 ¶¶ 5–7.  Resources expended for these activities could have gone

towards other activities furthering the organizations' goals.  Doc. 62 ¶ 29; Doc. 63 ¶ 26; Doc. 64

¶ 8.  Such a "drain on the organization's resources," *Havens Realty Corp.*, 455 U.S. at 379, is

"far more than simply a setback to the organization's abstract social interests," *id.*  The

organizational plaintiffs have thus sufficiently pled injury in fact, and they have standing to

pursue this action.

> 2.   Individual Standing

Chen and Wang do not have standing.  To have standing, a plaintiff's injury must be

actual or imminent.  *Lujan*, 504 U.S. at 564.  Chen and Wang's children are both years away

from high school.  Chen's son is in first grade and thus is likely seven years away from applying

to high school.  Wang's oldest child is in fourth grade and four years from applying.  During that

time, they may decide that they do not wish to attend a specialized school.  Their current "some

day" intentions to attend a specialized school are, like those professed by the plaintiffs in *Lujan*,

*see id.*, insufficient to show the existence of an imminent injury.

Wong does have standing.  His daughter is an Asian-American student currently enrolled

in eighth grade at a public intermediate school in Queens, New York.  P. Wong Decl. ¶ 5.  She

took the SHSAT in October 2018 and would like to attend a specialized school.  *Id.* ¶ 6.

Plaintiffs allege that Defendants' policy denies her the right to compete on an equal basis with

other students on account of her race.  As Wong's daughter is currently going through the

specialized school admissions process, her injury is no longer speculative, but actualized.

Defendants argue that Wong does not have standing because his daughter's SHSAT

score[18] is such that the determination of whether she will be admitted into the Discovery program or her choice of specialized school will be unaffected by the changes to the program, presumably because it is either too high or too low.[19]  But whether Defendants' policy change actually lowered her chances of obtaining admission is irrelevant to whether Wong has standing. The Supreme Court has made clear that "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."  *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003).  Wong alleges that Defendants are not treating his daughter equally to students of other races; that is sufficient to confer standing.

      For these reasons, the PTO, CACAGNY, AACE, and Wong have standing.  Because at least one plaintiff has standing, the Court may consider the case's merits.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007).

B.    *Preliminary Injunction Standard*

      "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)) (alteration in original).  Ordinarily,

---

[18] Defendants explain that as part of this litigation, they specifically inquired of the organization that administers the SHSAT what Wong's daughter's score is. Chadha Decl. ¶ 37.

[19] If Wong's daughter's SHSAT score is higher than the cut-off score for a particular school *with* the Discovery changes in place, then the changes will not affect her because she will be admitted to that school.  Conversely, if her score is *lower* than what the cut-off score for a particular school would be if the Discovery changes were not in place, then the changes would also not affect her because she would not be admitted regardless.

On February 8, 2019, Defendants asked for leave to submit evidence showing that Wong's daughter's score is too high or too low to be affected by the challenged program changes.  Doc. 61.  The Court denied Defendants' request. Doc. 65.

"[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the Second Circuit, as an alternative to showing a likelihood of succeeding on the merits, the movant can rely on the "serious questions" standard.  Under this standard, the movant may secure relief if it establishes that, even in the absence of a likelihood of success, there exist "sufficiently serious questions going to the merits to make them a fair ground for litigation," so long as the movant also establishes that "the balance of hardships tips decidedly" in its favor.  See *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  Because the movant must show that "the balance of hardships tips *decidedly*" in its favor, its overall burden under the "serious questions" standard "is no lighter than the one it bears under the 'likelihood of success' standard."  *Id.* (alteration in original).

Three exceptions exist to a party's ability to resort to this alternative standard.  First, where "the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the district court should not apply the "serious questions" standard.  *Id.* at 35 n.4 (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).  Second, the serious questions standard also should not be applied where the requested injunction would provide the plaintiff with "all the relief that is sought" and "could not be undone by a judgment favorable to defendants on the merits at trial."  *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006).  Third, where the moving party seeks a "mandatory" preliminary injunction that "alters the status quo by commanding some positive act" as opposed to a "prohibitory"

injunction seeking "to maintain the status quo," *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995), the district court should grant the injunction "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from the denial of preliminary relief," *id.* (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

None of these exceptions apply here. The government action exception does not apply because it only applies to government action "embodied in a statute and implementing regulations," *Able*, 44 F.3d at 131. Only the DOE, part of the executive branch, was responsible for the changes to the Discovery program.[20] This makes the government action here more like that in *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir. 1992), *vacated as moot*, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993). In that case, legal services organizations sought to enjoin the I.N.S. from refusing them access to Haitian refugees detained at Guantanamo Bay and from repatriating said refugees. *See id.* at 1329–32. The I.N.S.'s policy of doing so was "formulated solely by the executive branch." *Able*, 44 F.3d at 131–32. The Second Circuit thus refused to apply the government action exception. *See Haitian Centers*, 969 F.2d at 1338–39. Like the I.N.S.'s policy in *Haitian Centers*, the changes to the Discovery program are the product of a unilateral decision by the executive branch of the City. As such, the government action exception does not apply.

The all-relief-sought exception does not apply either. Granting the preliminary injunction would only affect this year's admissions, while if Plaintiffs win at trial, Defendants would be enjoined from using the changed Discovery procedures in future admissions cycles.

---

[20] State law grants the Chancellor the "power and duty" to "control and operate" the specialized schools, which includes the Discovery program. N.Y. Educ. Law § 2590-h(1)(b). The changes to the Discovery program that Plaintiffs are challenging are not prescribed by state law, but are part of the DOE's control over the Discovery program, which is authorized by state law.

Lastly, the exception for mandatory injunctions does not apply because Plaintiffs seek to maintain the status quo, not disrupt it.  The "'[s]tatus quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994) (alteration in original) (citing BLACK'S LAW DICTIONARY 1410 (6th ed. 1990)).  This status can differ from "the situation existing at the moment the law suit is filed." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).  When an injunction seeks "to require a party who has recently disturbed the status quo to reverse its actions," it seeks to "restore[], rather than disturb[], the status quo ante, and is thus not an exception to the rule" that is typically applied in evaluating motions for a preliminary injunction. *Id.*; *see also* 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948 (3d ed. 2018) ("Courts also have awarded preliminary injunctions when it is necessary to compel defendant to correct injury already inflicted by defining the status quo as 'the last peaceable uncontested status' existing between the parties before the dispute developed.  This standard allows the court to restore the status quo ante when the continuation of the changed situation would inflict irreparable harm on plaintiff.").  Defendants publicly announced the changes to the Discovery program on June 3, 2018, and it is the implementation of these changes that Plaintiffs seek to enjoin.  The last uncontested status is therefore how the Discovery program was organized prior to the changes announced on June 3, 2018.

The fact that the DOE may have undertaken numerous steps to implement its proposed changes to the Discovery program and is currently planning to utilize the new admissions plan does not make the sought injunction a mandatory injunction.  In *Mastrovincenzo v. City of New*

24

*York*, street vendors selling shirts featuring graffiti art moved for a preliminary injunction against the City from applying a licensing requirement against them after being repeatedly arrested and told to secure a license, 435 F.3d at 86.  The City characterized the sought injunction as a mandatory injunction "affirmatively forc[ing] the City to change its conduct" because unless "restrained" by the district court, the City would "continue" to enforce the licensing requirement. *Id.* at 89.  But the Second Circuit rejected this reasoning, finding that "[o]n its face," the injunction "clearly prohibits, rather than compels," government action.  *Id.* at 90.

Thus, the ordinary standard for a preliminary injunction applies in this case:  Plaintiffs must demonstrate that (1) they will suffer an "irreparable harm," and (2) either (a) they are "likely to succeed on the merits," or (b) "that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005).

As a preliminary matter, the Court finds that Plaintiffs have failed to show that the balance of hardships tips decidedly in their favor.  The PTO, which represents parents at a school no longer eligible for participation in the Discovery program because it has an ENI of less than 60%, arguably suffers the most hardship from the new changes.  But I.S. 187 students may still compete for 87% of the specialized school seats this year—those seats reserved for the students who score highest on the SHSAT.  The expansion of the Discovery program will lead to there being a slightly higher cut-off score for admission based purely on test scores, but this slight change is not a significant hardship.  Wong's daughter attends a school with an ENI above 60%, *see* Kieser Decl. Ex. 1, so the program changes do not change whether she is eligible for Discovery.  Further, if Wong's daughter is Discovery eligible—it is unclear from the record

whether she is—then any hardship from the increased cut-off must be considered in tandem with the fact that she has a higher chance of admission through Discovery this year.

Meanwhile, Defendants have shown that granting the injunction would place an undue burden on the DOE.  School administrators, teachers, students, and parents have all been proceeding for the last eight months under the assumption that the new changes will be in effect for the upcoming admissions cycle.  Defs.' Mem. at 10.  The DOE has made extensive preparations necessary to implement the new plan.  *See* Chadha Decl. ¶¶ 34–44.  It has also made arrangements for the additional resources that the expansion of the program will require.  *See id.* The burden on the DOE has been exacerbated here by the fact that Plaintiffs filed the complaint and moved for a preliminary injunction in late December, nearly seven months after the changes were publicly announced.  Of course, the Court is sensitive to the time and resources needed to initiate a lawsuit and the imperative of ensuring compliance with Rule 11 of the Federal Rules of Civil Procedure.  But Plaintiffs' filing date has left the DOE with only two months to accommodate the possibility that Plaintiffs' motion will be granted.  *Cf. Irish Lesbian & Gay Org. v. Giuliani*, 918 F. Supp. 732, 740 (S.D.N.Y. 1996) (refusing to apply lower standard of proof for a preliminary injunction because plaintiff could have moved for injunctive relief within one or two months of receiving notice of the challenged event).  The Court thus concludes that the balance of hardships does not tip decidedly in Plaintiffs' favor.

Consequently, Plaintiffs cannot rely on the "serious questions" standard.  To secure a preliminary injunction, they must instead show that they are likely to succeed on the merits.

C.      *Irreparable Harm*

When a plaintiff alleges a deprivation of a constitutional right, the Court presumes the existence of irreparable harm.  *See Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317,

322 (2d Cir. 1999); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992).  As Plaintiffs allege a violation of their right to equal protection, this condition is satisfied.

D.    *Merits*

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  Government action can discriminate on the basis of race in various ways.  First, a law or policy discriminates on its face if it expressly classifies persons on the basis of race.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995).  Second, a law or policy that is facially neutral discriminates on the basis of race if it is enforced in a discriminatory way.  *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886).  Lastly, a law or policy that is facially neutral discriminates on the basis of race if it is motivated by a discriminatory purpose and its application results in a discriminatory effect.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).

If a court concludes that the government used a racial classification or was motivated by racial discrimination, then the court must review the government action under strict scrutiny.  *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).  Absent either conditions, the government action is subject to rational basis review.  *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 271–72 (1979).

The Court first discusses whether Defendants' changes to the Discovery program were intended to discriminate on the basis of race.  Then, assuming that they were, the Court discusses whether they survive strict scrutiny.

1.    Whether the Discovery Program Changes Amount to Racial Discrimination

Plaintiffs argue that the Discovery program changes, though facially neutral, discriminate against Asian-Americans because the changes disproportionately hurt Asian-Americans and, critical here, Defendants intended the changes to do so. The Court finds that Plaintiffs are not likely to succeed in showing discriminatory intent and the program changes are thus likely subject to rational basis review. As a consequence, Plaintiffs are not likely to succeed on their equal protection claim.

        a.    <u>*Discriminatory Purpose*</u>

A plaintiff must show "[p]roof of racially discriminatory intent or purpose" to establish that a facially neutral government action violates equal protection. *Arlington Heights*, 429 U.S. at 265. Having a discriminatory purpose implies more than simply having volition or being aware of the consequences of a government action. *See Feeney*, 442 U.S. at 279 (citing *United Jewish Orgs. v. Carey*, 430 U.S. 144, 179 (1977) (Brennan, J., concurring)). Instead, "[i]t implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* While a plaintiff must prove that a discriminatory purpose exists, he or she need not prove that the "challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265.

Determining whether discriminatory intent exists is often difficult. In the absence of direct proof, litigants must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Whether the government action challenged has a disparate impact on certain races is one piece of evidence. *Id.* But unless a "clear pattern, unexplainable on grounds other than race, emerges . . . impact alone is not determinative, and the Court must look to other evidence." *Id.* (footnotes omitted). The Supreme Court has identified

possible factors showing racially discriminatory intent, including "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; "[d]epartures from the normal procedural sequence"; "[s]ubstantive departures";  and "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id*. at 267–68.

Mayor de Blasio and Chancellor Carranza's statements concerning the Discovery program do not constitute evidence of their intent to discriminate against Asian-Americans.  The only statement that either made that could be construed to concern Asian-Americans specifically was Chancellor Carranza's statement that he does not "buy into the narrative that any one ethnic group owns admission to these schools."  *Plan to Diversify Elite NYC Schools*, Fox 5 (June 5, 2018).[21]  Plaintiffs claim that this statement wrongly and offensively proposes that Asian-Americans believe that they own admission to the specialized schools.  Context suggests otherwise.  Chancellor Carranza was responding to the question, "Are you pitting minority against minority?"  *Id.*  In context, Chancellor Carranza's response is best understood as a rebuke of what he saw as the idea suggested by *the interviewer*—that minority ethnic groups must compete with each other for their right to specialized school seats.

With the exception of that statement, Plaintiffs rely upon statements by the DOE and Defendants lauding how the program changes will increase Black and Latino enrollment at the specialized schools.  These include the Mayor's press release announcing that with the changes, offers to Black and Latino students would go up to 16%, *see* Press Release, Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools, Office of the Mayor of New York City (June 3, 2018); his description of the low enrollment of Black and

---

[21] *Available at* http://www.fox5ny.com/good-day/338399825-video.

Latino students as a "monumental injustice," Doc. 19 Ex. D; his criticism that so few Black and

Latino students attended Stuyvesant "[i]n a city that is majority African American and Latino,"

Doc. 19 Ex. H; and his suggestion, via rhetorical question, that no one could "look the parent of a

Latino or black child in the eye and tell them that their precious daughter or son has an equal

chance" at attending a specialized school, Doc. 19 Ex. D.  Plaintiffs argue that these statements

reveal that in implementing the program changes Defendants sought to decrease the number of

Asian-Americans at the specialized schools.[22]  They therefore allege that this amounts to

discriminatory intent that, coupled with disparate impact, constitutes racial discrimination

warranting strict scrutiny.

          This conclusion, however, requires one to accept the proposition that a facially neutral

policy seeking to improve racial diversity necessarily carries with it a discriminatory intent.  That

is not the law.  In *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999), the Second Circuit

affirmed the use of racial preferences to remedy past racial discrimination, *id.* at 50, and added

that "[e]ven in the absence of specific and identified discrimination, nothing in our jurisprudence

precludes the use of race-neutral means to improve racial and gender representation," *id.* at 51

(citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509–10 (1989)).  As the Second

Circuit explained in a later case, "to equate a 'desire to eliminate the discriminatory impact' on

---

[22] Plaintiffs specify the object of Defendants' animus as Asian-Americans, but it is unclear whether Asian-Americans will be the demographic most affected by the changes.  The DOE projects, with admittedly low confidence, that the enrollment of Asian-Americans will decline by about 2.9 percentage points, from 53.0% to 50.9%—a decline of about 4%.  Chadha Decl. Ex. 1.  The same model projects that the enrollment of white students will decline by about 2.5 percentage points, or 9%, from 27.2% to 24.7%; and that the enrollment of students who do not report their race, Native American students, and multi-racial students will decline by about 1.2 percentage points, or 13%, from 9.0% to 7.8%.  *See* Chadha Decl. Ex. 1; Chadha Decl. ¶ 20 n.2.  The model thus predicts that while Asian-American enrollment will decline the most *numerically* as a result of the changes, enrollment in the white and "other" category will decline more *proportionately*.

These impacts cast doubt on Plaintiffs' theory that Defendants specifically targeted Asian-Americans in changing the Discovery program.  Ultimately, however, they do not change the equal protection analysis.  Plaintiffs' equal protection claim could simply be recast as one on behalf of groups other than Black and Latino students.

some disadvantaged groups with 'an intent to discriminate against' other groups 'could seriously

stifle attempts to remedy discrimination.'"  *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ.

Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) (quoting *Hayden*, 180 F.3d at 51).  Following *Hayden*, in

*Ricci v. DeStefano*, 554 F. Supp. 2d 142 (D.Conn. 2006), *aff'd*, 264 F. App'x 106 (2d Cir. 2008),

*opinion withdrawn and superseded*, 530 F.3d 87 (2d Cir. 2008), *rev'd and remanded*, 557 U.S.

557 (2009),[23] the district court held that government officials did not act with a discriminatory

purpose under the equal protection clause when they abandoned a test used for promoting

firefighters because the test "would undermine their goal of diversity in the Fire Department," *id.*

at 162.

Justice Kennedy's concurrence in *Parents Involved in Community Schools v. Seattle

School District No. 1*, 551 U.S. 701 (2007), also suggests that seeking to improve racial diversity

among secondary school students does not amount to discriminatory intent.  In his concurrence,

Justice Kennedy stated that mechanisms that seek to improve racial diversity at secondary

schools "but do not lead to different treatment based on a classification that tells each student he

or she is to be defined by race" are "unlikely" to demand strict scrutiny.  *Id.* at 789 (Kennedy, J.,

---

[23] At issue in *Ricci* was the New Haven Civil Service Board's refusal to certify the test results of two promotion
exams for officer positions at the New Haven Fire Department.  *See* 554 F. Supp. 2d 142, 144 (D.Conn. 2006).
Since white candidates were dramatically overrepresented among the officers who did the best on the exam, the
Civil Service Board refused to certify the results, fearing that doing otherwise would expose it to a lawsuit under
Title VII for disparate impact and hoping to attain a more racially diverse set of officers. *See id.* at 145, 151–52.
White firefighters who had taken the exam then sued the city for abandoning the exam results, arguing that the
decision amounted to intentional discrimination under Title VII and an equal protection violation.  The district court
held that the city's decision was neither.  *See id.* at 163.

The Second Circuit affirmed the district court in a summary order "substantially for the reasons stated" in the district
court opinion.  *Ricci v. DeStefano*, 264 F. App'x 106, 107 (2d Cir.), *opinion withdrawn and superseded*, 530 F.3d 87
(2d Cir. 2008), *rev'd and remanded*, 557 U.S. 557 (2009).  The active judges of the Second Circuit voted on whether
to rehear the case en banc, and the majority decided to deny rehearing.  *Ricci v. DeStefano*, 530 F.3d 88, 88 (2d Cir.
2008).  After the poll was concluded, the original three-judge panel withdrew their summary order and filed a per
curiam opinion again affirming the district court.  *See Ricci v. DeStefano*, 530 F.3d 87, 87 (2d Cir. 2008).

The Supreme Court then granted certiorari, *Ricci v. DeStefano*, 555 U.S. 1091 (2009), and ultimately reversed the
Second Circuit, holding that the city intentionally discriminated against plaintiffs under Title VII, *Ricci v.
DeStefano*, 557 U.S. 557, 592 (2009).  The Supreme Court did not reach the equal protection issue.  *See id.* at 563.

concurring in part and concurring in the judgment) (citing *Bush v. Vera*, 517 U.S. 952, 958 (1996)).  In order for such facially neutral mechanisms to demand strict scrutiny, they must embody a discriminatory intent.  Justice Kennedy's concurrence thus necessarily suggests that seeking to improve racial diversity in a facially neutral manner, as Defendants are attempting to do here, does not *ipso facto* implicate a discriminatory purpose.

 For these reasons, the Court concludes that Plaintiffs are not likely to show that Defendants had discriminatory intentions in amending the Discovery program.  Hence, the changes are subject to rational basis review.

       b.     *Rational Basis Review*

Under rational basis review, the challenged government policy must be upheld if it is rationally related to a legitimate government interest.  *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  Rational basis review affords the government's policy "a strong presumption of validity."  *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993).  The government need not "actually articulate at any time the purpose or rationale" behind the distinctions set out in its policy.  *Id.* at 320.  Instead, the policy "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis" for the distinctions.  *Id.* (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  "[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it[.]"  *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  "Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."  *Id.* at 321.

The Discovery program changes would likely be upheld under rational basis review. Indeed, Plaintiffs do not dispute this.  The expansion of the program is rationally related to a

legitimate government interest in helping more economically disadvantaged students receive a high-quality education. And the only substantial change to the definition of "disadvantaged," the new minimum-ENI requirement, is rationally related to the government's interest in prioritizing Discovery eligibility for students it deems to be the most in need. The government is within its right under rational basis review to determine that limiting the Discovery program to students at schools with a student body that is relatively lower income furthers the purpose of the Act, to provide "disadvantaged students of demonstrated high potential" an opportunity to attend the specialized schools. Roberts Decl. in Opp. to Pls.' Mot. Prelim. Inj. Ex. 3 at 3.

Since it is not likely that the Discovery program changes were motivated by racial discrimination, the changes would be subject to rational basis review, and they would be upheld. Plaintiffs are thus not likely to succeed on their equal protection claim.

2.    Whether the Discovery Program Changes Survive Strict Scrutiny

While the foregoing analysis is sufficient to deny Plaintiffs' motion for a preliminary injunction, the Court further notes that even if it were to subject the Discovery program changes to strict scrutiny, it would still not issue the injunction.

All racial classifications trigger strict scrutiny, while facially neutral laws only trigger strict scrutiny if motivated by a racially discriminatory purpose. *Cromartie*, 526 U.S. at 546. The strict scrutiny "standard of review . . . is not dependent on the race of those burdened or benefited by a particular classification." *Adarand*, 515 U.S. at 222 (quoting *Croson*, 488 U.S. at 494). To withstand the Court's strict scrutiny analysis, the government must show that its actions are narrowly tailored to further a compelling government interest. *Gratz*, 539 U.S. at 270. The Discovery program changes at issue here are narrowly tailored to further the

government's compelling interest in the benefits that flow from having racially diverse schools. Thus, Plaintiffs are unlikely to succeed on the merits of their claim.

        a.     *<u>Compelling Government Interest</u>*

*Parents Involved in Community Schools v. Seattle School District No. 1* is "the only recent Supreme Court case respecting the use of race in placing high school students." *Student Doe 1 v. Lower Merion Sch. Dist.*, 2010 WL 2595278, at *3 (E.D. Pa. June 24, 2010). Because of its importance to the issues in this case, the Court will describe the case in detail.

In *Parents Involved*, the Supreme Court found that two school districts, one in Seattle, Washington, and one in Louisville, Kentucky, violated the equal protection clause by explicitly using race to assign students to schools. The Seattle school district allowed incoming ninth graders to rank and choose from the district's high schools, and normally students would be allocated to schools based on their preference. *Parents Involved*, 551 U.S. at 711–12. When more students wanted to attend a school than there were spots available, however, the school district would use a "tiebreaker" factor that depended on the students' race and the racial composition of the school. *Id.* The district classified all students as either "white" or "nonwhite" and would use the racial tiebreaker to ensure each school had an acceptable "balance" between white and nonwhite students. *Id.* at 712. The Louisville school district assigned elementary school students only to the schools within each student's "cluster," but allowed students to transfer to other schools within or outside of the cluster if their parents so chose. *Id.* at 716–17. Each school, however, needed "to maintain a minimum black enrollment of 15 percent, and a maximum black enrollment of 50 percent." *Id.* at 716. Assignments and transfers to schools would be denied if they would exacerbate the racial imbalance at a school whose racial composition was at "the extremes of the racial guideline." *Id.* Both the Seattle and Louisville

plans, therefore, involved the use of an explicit racial classification to allocate students to schools.

Five Justices concluded that the school districts violated the equal protection clause. Writing for himself and Justices Thomas, Alito, Scalia, and Kennedy, the Chief Justice delivered the Court's opinion holding that the racial classifications at issue were not narrowly tailored to the school districts' stated ends of "reduc[ing] racial concentration" in schools, *id.* at 725, encouraging the educational benefits the flow from racial diversity, *id.* at 725–26, and "racial integration," *id.* at 732.  *Id.* at 733.  In a section not joined by Justice Kennedy, the Chief Justice stated that the Court would withhold judgment of whether enhancing racial diversity in secondary schools was a compelling government interest.  *Id.* at 726 (plurality opinion).  The issue need not be resolved, the plurality explained, because regardless of what the school districts claimed, the two city's plans were "directed only to racial balance, pure and simple, an objective this Court has repeatedly condemned as illegitimate."  *Id.* (plurality opinion).

Four Justices would have held that the school districts had a compelling interest in achieving racial diversity in elementary and secondary schools.  Writing for the dissent, Justice Breyer defined the government's interest in racial diversity in this context as its interest in avoiding "racial isolation" and increasing the degree to which "racial mixture" characterizes a school and an "individual student's public school experience."  *Id.* at 838 (Breyer, J., dissenting).

Justice Kennedy authored a sole concurrence in which he explained that he did not join in the Chief Justice's opinion in full because it "does not acknowledge that the school districts have identified a compelling interest here."  *Id.* at 783 (Kennedy, J., concurring in part and concurring in the judgment).  "To the extent the plurality opinion suggests the Constitution mandates that state and local school authorities must accept the status quo of racial isolation in schools," in

Justice Kennedy's view, "it is . . . profoundly mistaken."  *Id.* at 788.  He proceeded to explain that he would find avoiding racial isolation and achieving a diverse student population, of which race is one factor, to be compelling government interests.  *Id.* at 797–98.

Therefore, in *Parents Involved*, five Justices agreed that achieving racially diverse classrooms in elementary and secondary schools is a compelling government interest,[24] and the remainder agreed that whether it is so is an open question.[25]  While the record is insufficiently developed at this early stage in the litigation to hold one way or the other, the Court believes that it is more likely than not that achieving racially diverse classrooms will be shown to be a compelling government interest.

The Supreme Court has repeatedly affirmed the benefits that flow from racial diversity in *higher* education as a compelling government interest.  *See Fisher v. Univ. of Tex. at Austin*, 136 S.Ct. 2198, 2208 (2016) ("*Fisher II*"); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013) ("*Fisher I*"); *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003); *Gratz v. Bollinger*, 539 U.S. at 268; *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 314 (1978).  It has described such benefits to include the promotion of "cross-racial understanding," "break[ing] down racial

---

[24] Additionally, the majority opinion in *Texas Department of Housing v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507 (2015), cited Justice Kennedy's concurrence positively in a passage approving of housing authorities' race-neutral efforts to improve diversity in housing, *id.* at 2525.

[25] Defendants argue that under the *Marks* rule, Justice Kennedy's opinion is the controlling opinion from *Parents Involved*.  A few district courts agree, and therefore conclude that under Supreme Court precedent, racial diversity in public schools is a compelling government interest.  *See United States v. Alamance-Burlington Bd. of Educ.*, 640 F. Supp. 2d 670, 684 (M.D.N.C. 2009); *D.S. ex rel. S.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 63 (E.D.N.Y. 2008); *Hart v. Cmty. Sch. Bd. of Brooklyn, New York Sch. Dist. #21*, 536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008), *as amended* (Feb. 28, 2008).  The Court disagrees.  The *Marks* rule is that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (alteration in original) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).  *Marks* is inapplicable because while five Justices agreed that enhancing racial diversity at the elementary and high school level is a compelling government interest, that finding did not explain the *result* of the case, which was that the classifications had to be struck down under strict scrutiny because they were not narrowly tailored to a compelling government interest.

stereotypes," "enab[ling] [students] to better understand persons of different races," "promo[tion] [of] learning outcomes," "better prepar[ing] students for an increasingly diverse workforce and society," and "better prepar[ing] them as professionals." *Grutter*, 539 U.S. at 330.

If these benefits flow from increasing racial diversity in universities, the Court sees no logical reason why increasing racial diversity in high schools would not benefit students to the same extent.  Indeed, an argument could be made that increased racial diversity is more beneficial at the high school level, when students are younger.  This is especially true for the social effects of racial diversity.  High school students generally spend more time in class and have smaller class sizes than university students, amplifying the extent to which they interact with each other.  Their freedom to move and attend the classes of their choice is also significantly curtailed compared to university students, limiting their ability to self-segregate. Defendants submit multiple studies that purport to show the positive social and educational effects of racial diversity in secondary education.  *See* Defs.' Mem. at 20–21.

Assuming that increasing racial diversity in the specialized high schools is a compelling government interest, Defendants must still show that this interest was in fact a reason for changing the Discovery program.  Defendants claim that it was.  Plaintiffs argue that the DOE's reason for changing the Discovery program was instead to racially balance the specialized schools, a constitutionally impermissible motive.

Keeping in mind the sparse record the Court has for this fact-intensive question, at this stage the Court finds that Defendants likely intended to achieve the benefits flowing from increased diversity in the specialized schools, not to racially balance them.  This finding is explained simply by the modest projected increase in Black and Latino enrollment:  the DOE expects that the changes will increase Black and Latino enrollment at the schools by 5.8

percentage points, from 10.8% to 16.6%.  Chadha Decl. Ex. 1.  These modest effects are more

consonant with an intention to achieve the educational benefits that obtain from having a "critical

mass of underrepresented minority students," a permissible motive, *Grutter*, 539 U.S. at 335,

than with an intention to racially balance the schools to reflect "racial proportionality," an

impermissible motive, *Parents Involved*, 551 U.S. at 730 (plurality opinion).  Moreover, as

Defendants plainly acknowledge, "[n]o one can predict the precise effect [the changes] will have

on the composition of the Specialized High Schools."  Defs.' Mem. at 33.

      Therefore, Plaintiffs are not likely to succeed in showing that the program changes were

not intended to further a compelling government interest.

      b.      *Narrow Tailoring*

      Once a compelling government interest is established, the government must show that its

actions are narrowly tailored to further that interest.  *Gratz*, 539 U.S. at 270.  "Narrow tailoring

does not require exhaustion of every conceivable race-neutral alternative."  *Grutter*, 539 U.S. at

339.  The Court can take account of the government's "experience and expertise" on its policy

choices in considering whether the actions are narrowly tailored.  *Fisher I*, 570 U.S. at 311.

      A racial classification is narrowly tailored only if the government "sufficiently

considered workable race-neutral alternatives," *Grutter*, 539 U.S. at 340, and shows that "'race-

neutral alternatives' that are both 'available' and 'workable' 'do not suffice'" at furthering the

compelling interest, i.e., the benefits from increased racial diversity, *Fisher II*, 136 S.Ct. at 2208.

*Parents Involved* struck down the racial classifications at issue in that case partly because the

school districts rejected without consideration the use of assignment plans that would increase

racial diversity without using an express racial classification.  551 U.S. at 735.  The three-

member dissent in *Fisher II*, which would have struck down the University of Texas's use of

racial classifications as part of its holistic review process for admissions, identified the university system's Top Ten Percent plan as a "facially race-neutral law" that nonetheless increased racial diversity by "tend[ing] to benefit African-American and Hispanic students."  136 S.Ct. at 2218 (Alito, J., dissenting).

The changes to the Discovery program are exactly the sort of alternative, race-neutral means to increase racial diversity that the Court has repeatedly suggested governments may use in lieu of express racial classifications.  *See, e.g.*, *Parents Involved*, 551 U.S. at 788–90 (Kennedy, J., concurring in part and concurring in the judgment) ("If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.").  Additionally, Defendants have shown that they have exhaustively attempted numerous other racially neutral efforts over many years to achieve greater diversity.  All have failed.  *Cf. Fisher II*, 136 S.Ct. at 2208 (holding that in evaluating whether a racial classification passes strict scrutiny, courts assess, among other factors, whether the entity considered race-neutral alternatives).  The Court therefore concludes that, were the changes to the Discovery program subject to strict scrutiny, they would likely be upheld as narrowly tailored to a compelling government interest.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for judicial notice is GRANTED in part and DENIED in part, and Plaintiffs' motion for a preliminary injunction is DENIED.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 10, 19.  The parties are directed

to appear for an initial conference at 10:00AM, March 7, 2019, at Courtroom 619, Thurgood

Marshall Courthouse, 40 Foley Square, New York, NY.

It is SO ORDERED.

Dated:  February 25, 2019
         New York, New York

_____
Edgardo Ramos, U.S.D.J.