## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTA MCAULIFFE INTERMEDIATE SCHOOL PTO, INC., et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> BILL DE BLASIO, in his official capacity as mayor of New York, et al., <br><br> *Defendants,* <br><br> and <br><br> TEENS TAKE CHARGE; HISPANIC FEDERATION; DESIS RISING UP AND MOVING; COALITION FOR ASIAN AMERICAN CHILDREN AND FAMILIES; O.R., a minor by and through his mother and next friend, ELIZABETH PIERRET; A.S., a minor by and through his father and next friend, ODUNLAMI SHOWA; C.M., a minor by and through his mother and next friend, ROSA VELASQUEZ; K.B., a minor by and through her mother and next friend, TIFFANY M. BOND; N.D.F. and N.E.F., minor children by and through their mother and next friend, LAUREN R. MAHONEY, <br><br> *Proposed Defendant-Intervenors.* | Case No. 1:18-cv-11657 |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO INTERVENE AS DEFENDANTS

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT .........................................................................1

FACTUAL BACKGROUND ............................................................................3

PROPOSED INTERVENORS .........................................................................8

RELEVANT LAW & ANALYSIS ...................................................................14

I.      Proposed Intervenors Should be Granted Intervention as of Right Pursuant to
        Federal Rule of Civil Procedure 24(a). ...........................................................14

        A.      Proposed Intervenors' Motion is Timely. ............................................15

        B.      Intervenors Have Substantial Interests that May be Impaired by the
                Disposition of the Litigation. ................................................17

        C.      Proposed Intervenor's Interests Are Not Adequately Represented by
                Defendants. ..............................................................................21

II.     In the Alternative, Permissive Intervention Is Appropriate. ...............................26

CONCLUSION..............................................................................................30

## **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES**

*ASPIRA of New York, Inc. v. Bd. of Educ. of N.Y.*,
    58 F.R.D. 62 (S.D.N.Y. 1973) ...........................................................................29

*Ass'n of Conn. Lobbyists LLC v. Garfield*,
    241 F.R.D. 100 (D. Conn. 2007)........................................................................29

*Brennan v. N.Y.C. Bd. of Educ.*,
    260 F.3d 123 (2d Cir. 2001)........................................................................ *passim*

*Brown v. Bd. of Ed. of Topeka*,
    347 U.S. 483 (1954)....................................................................................20, 29

*Brumfield v. Dodd*,
    749 F.3d 339 (5th Cir. 2014) ............................................................................18

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
    250 F.3d 171 (2d Cir. 2001)..............................................................................21

*Caulfield v. Bd. of Educ. of N.Y.*,
    632 F.2d 999 (2d Cir. 1980)..............................................................................29

*Comer v. Cisneros*,
    37 F.3d 775 (2d Cir. 1994)................................................................................27

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*,
    170 F.R.D. 93 (E.D.N.Y. 1996) ...................................................................17, 28

*Donaldson v. United States*,
    400 U.S. 517 (1971)..........................................................................................17

*Dorsett v. County of Nassau*,
    283 F.R.D. 85 (E.D.N.Y. 2012) ........................................................................25

*Dow Jones & Co. v. U.S. Dep't of Justice*,
    161 F.R.D. 247 (S.D.N.Y. 1995) .................................................................15, 16

*Eddystone Rail Co. v. Jamex Transfer Servs.*,
    289 F. Supp. 3d 582 (S.D.N.Y. 2018)..........................................................15, 27

*Fisher v. Univ. of Tex. at Austin* (*Fisher II*),
    136 S. Ct. 2198 (2016)......................................................................................29

**PAGE(S)**

**CASES**

*Floyd v. City of New York*,
    770 F.3d 1051 (2d Cir. 2014)........................................................................15

*Friends of E. Hampton Airport, Inc. v. Fed. Aviation Admin.*,
    No. 15-CV-0441(JS)(ARL), 2016 WL 792411 (E.D.N.Y. Feb. 29, 2016) ...........24

*Great Atl. & Pac. Tea Co. v. Town of E. Hampton*,
    178 F.R.D. 39 (E.D.N.Y. 1998) ...................................................................17

*Grutter v. Bollinger*,
    188 F.3d 394 (6th Cir. 1999) ......................................................................18

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)...................................................................................29

*Herdman v. Town of Angelica*,
    163 F.R.D. 180 (W.D.N.Y. 1995)................................................................17

*Kleissler v U.S. Forest Serv.*,
    157 F.3d 964 (3d Cir. 1998).......................................................................22

*League of Women Voters of Michigan v. Johnson*,
    902 F.3d 572 (6th Cir. 2018) ......................................................................25

*McConnell v. Fed. Election Comm'n*,
    540 U.S. 93 (2003) (*overruled on other grounds by*
    *Citizens United v. Fed. Election Comm'n*, 588 U.S. 310 (2010)).......................15

*McNeill v. N.Y.C. Hous. Auth.*,
    719 F. Supp. 233 (S.D.N.Y. 1989)...............................................................26

*Miller v. Silberman*,
    832 F. Supp. 663 (S.D.N.Y. 1993)...............................................................28

*Mortg. Lenders Network, Inc. v. Rosenblum*,
    218 F.R.D. 381 (E.D.N.Y. 2003) ................................................................16

*N.M. Off-Highway Vehicle Alliance v. U.S. Forest Serv.*,
    540 F. App'x 877 (10th Cir. 2013) ..............................................................22

*N.Y. Pub. Interest Research Grp. v. Regents of Univ. of N.Y.*,
    516 F.2d 350 (2d Cir. 1975)...........................................................17, 25, 26

*New York v. Pruitt*,
    Nos. 18-CV-1030, 18-CV-1048, 2018 WL 1684341 (S.D.N.Y. Apr. 5, 2018)......27

iii

**PAGE(S)**

<u>**CASES**</u>

*Olin Corp. v. Lamorak Ins. Co.*,
   325 F.R.D. 85 (S.D.N.Y. 2018) ........................................................................16, 26

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 .............................................................................................................20, 23

*Podberesky v. Kirwan*,
   38 F.3d 147 (4th Cir. 1994) ....................................................................................19

*Regents of the Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)..................................................................................................29

*Republic of the Philippines v. Abaya*,
   312 F.R.D. 119 (S.D.N.Y. 2015) ...........................................................................16

*Schuette v. Coal. to Defend Affirmative Action*,
   572 U.S. 291 (2014)..................................................................................................29

*Sheff v. O'Neill*,
   No. LND-HHD-CV-175045066-S, 2017 WL 4812624
   (Conn. Super. Ct. Aug. 7, 2017) ...........................................................................29

*Sherman v. Town of Chester*,
   339 F. Supp. 3d 346 (S.D.N.Y. 2018)......................................................15, 16, 21

*Stout v. Jefferson Cty. Bd. of Educ.*,
   882 F.3d 988 (11th Cir. 2018) ................................................................................29

*Thomas v. Sch. Bd. St. Martin Par.*,
   756 F.3d 380 (5th Cir. 2014), *on remand,* No. 6:65-cv-11314,
   2016 U.S. Dist. LEXIS 8580 (W.D. La. Jan. 21, 2016)........................................29

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017)..............................................................................................15

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972)..................................................................................................21

*U.S. Postal Serv. v. Brennan*,
   579 F.2d 188 (2d Cir. 1978)..............................................................................27, 28

*United States v. Columbia Pictures Indus., Inc.*,
   88 F.R.D. 186 (S.D.N.Y. 1980) .............................................................................27

**PAGE(S)**

## CASES

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
    247 F.3d 1262 (11th Cir. 2001) .................................................................................19

## STATUTES & RULES

Fed. R. Civ. P. Rule 24 .......................................................................................14, 17

Fed. R. Civ. P. Rule 24(a)(2) .......................................................................................14

Fed. R. Civ. P. Rule 24(b)...........................................................................................27

Fed. R. Civ. P. Rule 24(b)(1) ........................................................................................8

N.Y. Educ. Law § 2590-g(12)(b) (1997) ....................................................................1

N.Y. Educ. Law § 2590-g(12)(d)..................................................................................3

## OTHER AUTHORITIES

7C Charles Alan Wright, et al*., Federal Practice and Procedure* (3d ed. 2019) ...................18, 21

*Closing Achievement Gaps in Diverse and Low-Poverty Schools: An Action Guide
    for District Leaders* 8 (Public Impact, 2018), https://publicimpact.com/wp-
    content/uploads/2018/08/Closing_Achievement_Gaps_in_Diverse_and_Low-
    Poverty_Schools.pdf ..............................................................................................5

Eliza Shapiro, *How the Few Black and Hispanic Students at Stuyvesant High
    School Feel*, N.Y. Times (Mar. 22, 2019) .............................................................20

Eliza Shapiro, *Only 7 Black Students Got Into N.Y.'s Most Selective High School,
    Out of 895 Spots*, N.Y. Times (Mar. 18, 2019),
    https://www.nytimes.com/2019/03/18/nyregion/black-students-nyc-high-
    schools.html ............................................................................................................2

Fernanda Santos, *To Be Black at Stuyvesant High*, N.Y. Times (Feb. 25, 2012)........................20

Jon Taylor, *I've Spent Years Studying The Link Between SHSAT Scores and
    Student Success. The Test Doesn't Tell You As Much As You Might Think.*,
    Chalkbeat (June 22, 2018) .......................................................................................3

Kimberly Reyes, *Worry About the Black Students Who Get In*, The Atlantic (Apr.
    22, 2019), https://www.theatlantic.com/ideas/archive/2019/04/ black-students-
    nycs-elite-schools-are-exhausted/587506 ............................................................20

**PAGE(S)**

**OTHER AUTHORITIES**

Leslie Brody & Katie Honan, *Top Lawmakers Open to Diversity Fix at New York City's Elite Schools*, Wall Street J. (Mar. 20, 2019), https://www.wsj.com/articles/top-lawmakers-open-to-diversity-fix-at-new-york-citys-elite-schools-11553112360 ...................................................................................24

Leslie Brody, *NYC's Elite Public High Schools Admit a New Class—With Little Change in Diversity*, Wall Street J. (Mar. 19, 2019), https://www.wsj.com/articles/nycs-elite-public-high-schools-admit-a-new-classwith-little-change-in-diversity-11552941000 ..................................................................2

Letter from NAACP Legal Def. & Educ. Fund, Inc. to OCR (Sept. 27, 2012), https://www.naacpldf.org/wp-content/uploads/Specialized-High-Schools-Complaint.pdf ............................................................................................................4

Megan Finnegan & Stephon Johnson, *Benign Neglect?: Who Killed the Discovery Program*, Our Town (May 12, 2011)........................................................................3

Motoko Rich, Amanda Cox, & Matthew Block, *Money, Race and Success: How Your School District Compares*, N.Y. Times (Apr. 29, 2016), https://www.nytimes.com/interactive/2016/04/29/upshot/money-race-and-success-how-your-school-district-compares.html ..................................................5

NYCDOE, *2017—18 School Performance Dashboard*, https://tools.nycenet.edu/dashboard/#dbn=84M388 &report_type=EMS&view=City ............................................................................8

## PRELIMINARY STATEMENT

Proposed Defendant-Intervenors file this Memorandum of Law in support of their Motion to Intervene to ensure that modest steps taken by the New York City Department of Education ("NYCDOE") to increase opportunity and access to New York City's most competitive and highly-regarded public high schools are fully and vigorously defended.

The NYCDOE operates eight prestigious public high schools, known as the Specialized High Schools, for which the sole determinant of admission is a standardized test: the Specialized High School Admissions Test ("SHSAT").[1] *See* N.Y. Educ. Law § 2590-g(12)(b) (1997). Because standardized tests are at best poor predictors of academic promise and potential to succeed, and because New York City's public-school system is beset with persistent barriers to educational opportunities, many fully capable, high-potential students are denied access to the life-changing opportunities that the Specialized High Schools offer.

Most glaringly, the admissions results for the Specialized High Schools have been plagued by severe and longstanding racial disparities. Black and Latinx students who take the SHSAT are far less likely to receive admissions offers than peers from other racial groups. Black and Latinx students comprised 41% of about 28,000 eighth-grade students who took the Fall 2017 SHSAT, but were only 9% of the 5,067 eighth-grade students who received admissions offers to Specialized

---

[1] These eight schools are Stuyvesant High School ("Stuyvesant"); The Bronx High School of Science ("Bronx Science"); Brooklyn Technical High School ("Brooklyn Tech"); Staten Island Technical High School; Queens High School for the Sciences at York College; High School for Mathematics, Science, and Engineering at City College; High School for American Studies at Lehman College; and Brooklyn Latin School. A ninth high school, Fiorello H. LaGuardia High School of Music & Art and Performing Arts, is also a Specialized High School; however, it does not rely on the SHSAT for admission unlike the other eight schools and is therefore not a subject of this dispute. *See* Op. and Order Den. Prelim. Inj. 6 n.3, ECF No. 66.

High Schools for the 2018-19 academic year. Def.'s Mot. in Opp'n 13–14, ECF No. 51; Chadha Decl. ¶ 33, ECF No. 49. For the 2019-20 academic year, only 7 Black students and 33 Latinx students were automatically admitted to Stuyvesant and overall, Black students received only 190 and Latinx students only 316 of the 4,798 offers of admission to Specialized High Schools.[2] Additionally, the schools lack geographic diversity. While most public middle schools send *no* students to the Specialized High Schools, 50% of all offers go to students from only 30 of approximately 600 middle schools. Def.'s Mot. in Opp'n 1, ECF No. 51. These disparities arise from a history of racial discrimination, extreme segregation, and historical inequities in the New York City public school system as well as the flawed educational policy of using a single test to determine admissions.

In apparent recognition of the unjustifiable exclusion of qualified candidates who are capable of succeeding at the Specialized High Schools and the deeply troubling racial and geographical disparities within these schools, the NYCDOE began considering measures to address these issues. Most recently, on June 3, 2018, Mayor de Blasio and Chancellor Carranza announced a modest, but welcome, set of measures: the mandatory use and expansion of the Discovery Program by all Specialized High Schools and a change in the methodology to determine whether an applicant is disadvantaged for purposes of program eligibility (collectively, "the Discovery Expansion").

---

[2] *See* Eliza Shapiro, *Only 7 Black Students Got Into N.Y.'s Most Selective High School, Out of 895 Spots*, N.Y. Times (Mar. 18, 2019), https://www.nytimes.com/2019/03/18/nyregion/black-students-nyc-high-schools.html; Leslie Brody, *NYC's Elite Public High Schools Admit a New Class—With Little Change in Diversity*, Wall Street J. (Mar. 19, 2019), https://www.wsj.com/articles/nycs-elite-public-high-schools-admit-a-new-classwith-little-change-in-diversity-11552941000.

This lawsuit challenges this small step to address ongoing inequities in the Specialized High Schools admissions process. Proposed Intervenors—a Specialized High School student, seventh- and eighth-grade students with increased chances of admission to the Specialized High Schools under the Discovery Expansion, and organizations dedicated to increasing diversity and integration in New York City public schools—seek to intervene in this lawsuit to protect their interests in increased access to and diversity within the Specialized High Schools.

## FACTUAL BACKGROUND

Since 1971, pursuant to the Hecht-Calandra Act, a single factor has been used to determine access to the Specialized High Schools—a student's rank-order score on the SHSAT. But this statute has also always permitted the use of a "[D]iscovery [P]rogram to give disadvantaged students of demonstrated high potential an opportunity" to gain admission into one of the Specialized High Schools. N.Y. Educ. Law § 2590-g(12)(d). The Discovery Program is open to students who (1) take the SHSAT but narrowly miss the SHSAT score cut-off; (2) are certified by their local schools as "disadvantaged"; (3) are recommended by their middle school "as having high potential for the special high school program"; and (4) attend, and subsequently pass, a summer preparatory program administered by the high school. N.Y. Educ. Law § 2590-g(12)(d). Historically, students admitted through the Discovery Program have thrived academically at the Specialized High Schools.[3]

---

[3] *See* Megan Finnegan & Stephon Johnson, *Benign Neglect?: Who Killed the Discovery Program*, Our Town (May 12, 2011); *see also* Jon Taylor, *I've Spent Years Studying The Link Between SHSAT Scores and Student Success. The Test Doesn't Tell You As Much As You Might Think.*, Chalkbeat (June 22, 2018) (performance of 35 Discovery Program students at Brooklyn Technical High School "was equal to that of other students" and that "Freshman year grade point averages for the two groups were essentially identical: 86.6 versus 86.7.").

In 2012, a multiracial, multiethnic coalition of ten community organizations[4] filed a complaint with the U.S. Department of Education, Office for Civil Rights ("OCR"), challenging the single-test admissions process for the Specialized High Schools as racially discriminatory.[5] In addition to challenging the method of admissions mandated by state law, the complainants raised the NYCDOE's failure to take measures that are permissible under the same state law that would help break down unjust barriers to admission and ensure equality of access for students of all races. Indeed, until recently, the Discovery Program had not been being utilized at the two most competitive schools—Stuyvesant and Bronx Science—and was underutilized at the remaining six schools despite its proven success in expanding access for disadvantaged students. Advocates called for full utilization of the Discovery Program to increase both fairness in admissions and diversity at the Specialized High Schools. *See supra* note 5.

On June 3, 2018, Mayor de Blasio and Chancellor Carranza (collectively, "Defendants" or "the City") took a small step towards addressing inequitable access to the Specialized High Schools by expanding the Discovery Program as permitted by state law. First, the City announced that each Specialized High School would be required to use the Discovery Program to fill at least 13% of its seats for the 2019-20 school year and 20% of its seats in the following years. Wallack

---

[4] Those organizations are the NYC Coalition for Educational Justice, La Fuente, the Alliance for Quality Education, New York Communities for Change, Black New Yorkers for Educational Excellence, the Community Service Society of New York, the Garifuna Coalition USA, Inc., Make the Road New York, the Brooklyn Movement Center, UPROSE, and Desis Rising Up and Moving.

[5] The racial disparities at the Specialized High Schools at the time the OCR complaint was filed were similar to the current ones. For example, of the 967 eighth-grade students admitted to Stuyvesant for the 2012-13 school year, only 19 (2%) of the students were Black and 32 (3.3%) were Latinx. *See* Letter from NAACP Legal Def. & Educ. Fund, Inc. to OCR (Sept. 27, 2012), https://www.naacpldf.org/wp-content/uploads/Specialized-High-Schools-Complaint.pdf.

Decl. ¶ 19, ECF No. 50. Second, Defendants adjusted the definition of the term "disadvantaged" to more equitably determine student eligibility for the Discovery Program.

Prior to this year, the DOE considered a student disadvantaged if one of the following five factors was satisfied: (1) eligibility for free lunch; (2) eligibility for reduced-price lunch and attendance at a Title I school; (3) receipt of New York City public assistance; (4) status as a foster child, ward of the state, or residency in temporary housing; or (5) residency in the United States for under four years in a home with a primary language other than English. Op. and Order Den. Prelim. Inj. 11–12, ECF No. 66. Now, under the Discovery Expansion, in addition to meeting substantially the same requirements, a student must also attend a high-poverty middle school according to the City's Economic Need Index (ENI)—a school with an ENI of 60% or above—to be eligible for the program.[6] Wallack Decl. ¶ 20, ECF No. 50. This measurement is particularly apt because educational research has shown that educational achievement gaps can be explained, at least in part, by the degree to which students attend schools with other low-income students. High-poverty schools educate greater percentages of students who need greater supports and services, and yet are persistently underfunded. In addition, high-poverty schools tend to be racially segregated.[7]

---

[6] To qualify as disadvantaged under the revised criteria, a student must attend a school with an ENI of 60% or above and "(1) qualify for free or reduced-price lunch; (2) receive assistance from the New York City Human Resources Administration; (3) be a foster child, a ward of the state, or in temporary housing; or (4) have been an English Language Learner within the last two years and have enrolled in a DOE school for the first time within the last four years." Op. and Order Den. Prelim. Inj. 12, ECF No. 66 (citing Wallack Decl. ¶ 20).

[7] *See, e.g., Closing Achievement Gaps in Diverse and Low-Poverty Schools: An Action Guide for District Leaders* 8 (Public Impact, 2018), https://publicimpact.com/wp-content/uploads/2018/08/Closing_Achievement_Gaps_in_Diverse_and_Low-Poverty_Schools.pdf; Motoko Rich, Amanda Cox, & Matthew Block, *Money, Race and Success: How Your School District Compares*, N.Y. Times (Apr. 29, 2016), https://www.nytimes.com/interactive/2016/04/29/upshot/money-race-and-success-how-your-school-district-compares.html.

In December 2018, Plaintiffs filed the instant action. Plaintiffs argue that the NYCDOE's race-neutral changes to the Discovery Program eligibility criteria were adopted with the discriminatory purpose of disadvantaging Asian-American students. Proposed Intervenors disagree and seek to show, instead, that the race-neutral Discovery Expansion is designed to mitigate the gross deficiencies of an admissions program that rests on a single test, to expand equal access to publicly-funded educational opportunities, and to increase diversity along geographical, socioeconomic, and racial lines in the Specialized High Schools. While Defendants have acknowledged that they could not predict with precision what groups of students would benefit most from the Discovery Expansion, they predicted that both the increased number of seats and the changes to the eligibility requirements would likely increase, even if only marginally, the diversity—in terms of race, class, ethnicity, and geography—of the admitted class of Specialized High School students. *See, e.g.,* Chadha Decl. ¶¶ 19–21, ECF No. 49; Op. and Order Den. Prelim. Inj. 37, ECF No. 66. Indeed, the recently released numbers for admission through the Discovery Program for the 2019–20 academic year show an increase in offers for Black, Latinx, *and* Asian-American applicants and, depending on actual enrollment numbers, are likely to result in an increase in the overall percentage of Black and Latinx students in the Specialized High Schools.

Proposed Intervenors' interests are twofold. First, A.S., C.M., K.B., N.D.F., and N.E.F., who are a subset of Proposed Intervenors (collectively, "Applicant Intervenors"), are Black and Latinx seventh- and eighth-grade students who have applied or plan to apply to the Specialized High Schools and meet the Discovery Program's revised eligibility criteria.[8] Applicant Intervenors

---

[8] While High School placements for the 2019–20 school year, along with SHSAT scores, were released on March 18, 2019, the eighth-grade Proposed Intervenors do not yet know whether they have qualified for admission under the Discovery Program. Applicant Intervenors did not

have a concrete interest in the opportunity to attend the schools under the Discovery Expansion. Invalidation of the Discovery Expansion through this case would seriously impair this interest.

Second, all Proposed Intervenors have an interest in increasing diversity in the Specialized High Schools. O.R. is an Afro-Latino student currently attending one of the Specialized High Schools who has experienced tokenism at school; he is particularly well-equipped to discuss what is at stake in the lawsuit. The Applicant Intervenors, all of whom hope to attend a Specialized High School, likewise have an interest in attending schools that benefit from increased student body diversity. Teens Take Charge ("TTC"), Hispanic Federation, Inc. ("HF"),  Desis Rising Up and Moving ("DRUM"), and the Coalition for Asian American Children and Families ("CACF") are all membership and/or community-based organizations that support education equity and whose constituents include students and families of racial and ethnic groups who are underrepresented in the Specialized High Schools. These organizations thus have a particular interest in advocating for increased diversity in these schools.

While Proposed Intervenors do not believe that the Discovery Expansion is sufficient to reverse the longstanding and entrenched racial exclusion of disadvantaged students from the Specialized High Schools—particularly of Black and Latinx students and students from underrepresented Asian-American ethnicities—they seek to intervene in this lawsuit to vigorously defend the modest gains that the Discovery Expansion has engendered. Proposed Intervenors respectfully move this Court to grant intervention as of right pursuant to Rule 24(a)(2) of the

---

score high enough on the SHSAT to be automatically admitted to any of the Specialized High Schools, but the City has not yet announced the final cut-off scores for the Discovery Program. Proposed Intervenors recognize that the determination of the final cut-off score for the Discovery Program will implicate the nature of the interests of some Applicant Intervenors; however, the Applicant Intervenors would continue to share the other interests of Proposed Intervenors, and their experiences regarding the Specialized High Schools admissions process will remain relevant.

Federal Rules of Civil Procedure or, in the alternative, for permissive intervention pursuant to Rule 24(b)(1).

## PROPOSED INTERVENORS

Proposed Intervenors are: (1) Elizabeth Pierret, on behalf of her minor child O.R, an Afro-Latino student in the eleventh grade at Brooklyn Tech, *see* O.R. Decl. (attached hereto as Exhibit 1); (2) Odunlami Showa, on behalf of his minor child A.S., a Black student in the eighth grade at St. HOPE Leadership Academy ("St. HOPE")—a middle school in Harlem with an 86.4% ENI[9]—who took the SHSAT in the fall, *see* Showa Decl. (attached hereto as Exhibit 2); (3) Rosa Velasquez, on behalf of her minor child C.M., a Latino student in the eighth grade at St. HOPE who took the SHSAT in the fall, *see* Velasquez Decl. (attached hereto as Exhibit 3); (4) Tiffany Bond, on behalf of her minor child K.B., a Black student in the seventh grade at St. HOPE, *see* Bond Decl. (attached hereto as Exhibit 4); (5) Lauren Mahoney, on behalf of her minor children N.D.F. and N.E.F., Black, twin siblings in the eighth grade at St. HOPE who took the SHSAT in the fall, *see* Mahoney Decl. (attached hereto as Exhibit 5); (6) TTC,[10] a student-led coalition of high school students from across New York City's five boroughs that advocates for educational equity through oral and written testimony, discussions with policy makers, and interactive events, *see* B.M. Decl. (attached hereto as Exhibit 6); (7) DRUM, a membership-led organization of South Asian and Indo-Caribbean low-wage immigrant workers and youth, *see* Islam Decl. (attached

---

[9] According to the Demographic Snapshot available on the NYCDOE website, the applicable ENI for St. HOPE is 86.4%. However, according to the School Performance Dashboard also available on the NYCDOE website, the applicable ENI is 89%. *See* NYCDOE, *2017—18 School Performance Dashboard*, https://tools.nycenet.edu/dashboard/#dbn=84M388 &report_type=EMS&view=City.

[10] TTC is a subsidiary of The Bell Voices, Inc., a nonprofit incorporated under the laws of the State of New York. *See* Rule 7.1 Disclosure Statement.

hereto as Exhibit 7); (8) HF, a nonprofit member organization that works to empower and advance the Hispanic community through public policy advocacy, leadership development, and community revitalization projects, *see* Calderon Decl. (attached hereto as Exhibit 8); and (9) CACF, the nation's only pan-Asian policy advocacy member organization for children and families, *see* Gundanna Decl. (attached hereto as Exhibit 9).

O.R.—an Afro-Latino junior at Brooklyn Tech—was devastated when his SHSAT score was not high enough to gain immediate admission to a Specialized High School. He initially expressed reticence towards participating in the Discovery Program, in part due to the pressure of having to prove himself as a Discovery Program participant; but he does not regret his decision to complete the program and ultimately attend Brooklyn Tech. O.R. Decl. ¶¶ 25, 30. While he has thrived as a student leader in a predominantly Latinx affinity group at Brooklyn Tech, one of the most racially diverse of the Specialized High Schools, O.R. has nonetheless experienced being the only Latinx or Black student in a classroom. As a result, he has experienced being pigeonholed as the student who can provide "the Black perspective" when classroom conversations touch upon race because he "ha[s] the darkest skin in the room." *Id.* ¶ 27. O.R. recalls instances of everyone in his ninth-grade class looking at him during classroom discussions about slavery, and of a teacher in another classroom giving students permission, including white students, to use the "N-word" because the word appeared in a book discussed by the class. O.R. considers these instances among the "negative impacts of the lack of diversity at Brooklyn Tech." *Id.* ¶ 25.

A.S. is a Black student in eighth grade at St. HOPE. A.S. has been studying to take the SHSAT since sixth grade. After years of studying during the school week and on the weekends, A.S. took the exam in October 2018. A.S.'s older sister, R.S., took the SHSAT last year after studying for years, and was devastated when she was not admitted to a Specialized High School.

A.S.'s family believes "an excellent education can prepare our children for a positive life." Showa Decl. ¶ 8. For A.S. and his family, "education is the most important thing, because it is about the future." *Id*. Mr. Showa wants A.S. to go to an academically excellent school, but also one that is racially diverse. He knows that people "expand their scope of understanding" from exposure to people with different backgrounds and believes that his son will be more relaxed and more able to focus on his studies if he is not in a racially isolated environment. *Id.* ¶ 11. A.S. was informed on March 18, 2019, that his SHSAT score was not high enough for automatic admission to one of the Specialized High Schools, so the Discovery Program is now his only possible chance of admission to one of the schools for ninth grade.

C.M. is a Latino student in eighth grade at St. HOPE. C.M. is an honor roll student, loves baseball and math (which comes naturally to him), and hopes to study computer science someday. C.M. was inspired by his cousin, who went to Stuyvesant, to apply to the Specialized High Schools, so C.M. asked his mom to buy him a book to begin studying during the summer between seventh and eighth grade when he had free time from his baseball league. At the start of eighth grade, C.M. began studying two nights a week with his middle school's SHSAT preparatory program. Velasquez Decl. ¶ 10. C.M. was informed on March 18, 2019, that his SHSAT score was not high enough to qualify him for automatic admission to one of the Specialized High Schools, so the Discovery Program is now his only possible chance of admission to one of the schools for ninth grade.

K.B. is a Black student in seventh grade at St. HOPE. She is an honor roll student who participates in an "extended days" program at St. HOPE for extra credit. Bond Decl. ¶ 1. She is involved in student government and is particularly interested in and excels at STEM subjects. K.B. is also involved in the Harlem Children's Zone afterschool program. In January 2019, K.B. was

selected to participate in St. HOPE's SHSAT preparation program, which began the third quarter of her seventh-grade year and takes place every day, replacing her art class. K.B. is willing to make this sacrifice in order to increase her chances of admission to a Specialized High School. K.B.'s mother believes that the Discovery Program gives children from disadvantaged backgrounds a fairer chance to attend a Specialized High School. *Id.* ¶ 15.

N.D.F. is a Black student in eighth grade at St. HOPE. She has made the honor roll every quarter since sixth grade and currently has a grade of 4 in math, which is the highest grade. N.D.F enjoys drawing, music, and choreography. In the seventh grade, N.D.F was invited to join the SHSAT preparation program at St. HOPE, which, at the time, was an extended, thirty-minute period at the end of the school day. N.D.F participated in the preparation program from the end of seventh grade until eighth grade, when she took the exam. N.D.F wants to attend a Specialized High School because she believes it would help her succeed in high school, college, and beyond. Mahoney Decl. ¶ 18. N.D.F. was informed on March 18, 2019, that her SHSAT score was not high enough to qualify for automatic admission to one of the Specialized High Schools, so the Discovery Program is now her only possible chance of admission to one of the schools for ninth grade.

N.E.F. is also a Black student in eighth grade at St. HOPE, and N.D.F.'s twin brother. N.E.F. has been academically successful at St. HOPE and particularly enjoys Math and U.S. History. He plays on St. HOPE's football team, takes fencing lessons after school, and participated in the school's SHSAT preparation program. N.E.F was so determined to get into a Specialized High School that he took the SHSAT despite having a fever on exam day. N.E.F. wants to attend a Specialized High School because he believes that he will be motivated to thrive in the challenging academic environment but would also like to take advantage of the available extracurricular

activities. *Id.*  ¶ 16. N.E.F. was informed on March 18, 2019 that his SHSAT score was not high enough to qualify for automatic admission to a Specialized High School, so the Discovery Program is his only chance of admission for ninth grade. N.E.F and N.D.F.'s mother believes that being admitted to a Specialized High School would offer her children a chance at a better life and that the Specialized High Schools "should be more diverse, like the NYC public school system as a whole," as they are "public schools just like the other public schools." *Id.* ¶ 21.

TTC is a student-led group that advocates for educational equity. One of TTC's two core goals is to advocate for fair admission policies that lead to diversity and equity for all New York City high schools. B.M. Decl. ¶ 4. TTC advocates for diversity in the Specialized High Schools because it believes that all students benefit from racially diverse classrooms, because the current environment at Specialized High Schools is isolating and unwelcoming to the Black and Latinx students who are admitted, and because the system breeds a culture of division and elitism that harms all New York City students. *Id.* ¶ 9. TTC advocates for changes to the admissions to New York City's Specialized High Schools, including replacing the single-measure, multiple-choice entrance exam with a more holistic admissions method. *Id.* ¶ 11.

TTC's members come from more than thirty different high schools across all five New York City boroughs. Its membership includes students of many different racial and ethnic identities, including Black, Latinx, White, Middle Eastern, South Asian, East Asian, West African, and Caribbean, who have an interest in school integration and equity. *Id.* ¶ 6. Many of its members have applied for admission to Specialized High Schools, but few received offers. In some cases, students who were valedictorians or salutatorians of their eighth-grade classes did not score high enough on the admissions test to receive an offer. *Id*. And TTC's members who do attend Specialized High Schools experience the negative effects of a segregated school environment.

12

DRUM is a nonprofit member organization focused on empowering low income, South Asian and Indo-Caribbean immigrant workers, youth, and families in New York City through civil rights and immigrants' rights advocacy. Islam Decl. ¶ 2. DRUM's programs include YouthPower!, a youth-led program that lifts up, *inter alia*, low-income youth in New York City's public schools. As part of its education work, DRUM and YouthPower! have advocated for equitable access to New York City's Specialized High Schools for many years, particularly for students of working class, immigrant, and South Asian and Indo-Caribbean backgrounds, who are underrepresented in the Specialized High Schools and face significant barriers to access because of their ethnic backgrounds, and their economic and immigration status. *Id.* ¶¶ 2-3. DRUM has members who have benefited from the Discovery Program, and others who go to high ENI middle schools in the Bronx and Queens and will benefit from the Program's expansion. DRUM's members therefore not only have an interest in ethnic and economic diversity at the Specialized High Schools, but also in the increased opportunity for admission under the new program.

HF is a nonprofit membership organization that supports Hispanic families and strengthens Latinx institutions through work in areas, such as education, immigration, civic engagement and economic empowerment. Calderon Decl. ¶ 3. HF's membership includes a network of over 100 Latinx grassroot and nonprofit organizations, many of which have students who attend middle schools that would benefit from an expanded Discovery Program. *Id.* ¶ 4. For nearly two decades, HF has been advancing educational equity, promoting racial diversity, and diminishing racial isolation for students of color, particularly Latinx students, through several initiatives, including Pathways to Academic Excellence workshops with its Pathways to College Prep and Pathways for Early Childhood Literacy components, and numerous community forums and town halls. *Id.* ¶ 5. HF also has promoted the benefits of the Discovery Program and partnered with the New York

13

City Department of Education to co-host the first ever Spanish Language Specialized High Schools Information Session and Fair. In 2018 alone, through these initiatives, HF served more than 5,000 students, parents or caregivers, and community members. *Id*.

CACF is a nonprofit membership organization that advocates for equity and opportunity for marginalized Asian Pacific American ("APA") children and families. Gundanna Decl. ¶ 2. The APA community is very diverse, consisting of groups from East Asia, South Asia, Southeast Asia, the Indo-Caribbean, and Pacific Islands. *Id*. ¶ 2. CACF's membership includes over 45 organizations serving the needs of the APA community. *Id*. Through its policy work, CACF has a history of advocating for education equity and increased accessibility of high-quality schools for underrepresented APA students, including those from low-income families. *Id*. ¶ 3. CACF staff testify at public hearings, hold community forums to educate the community on education issues, and release policy documents. *Id*. ¶¶ 10—12. Some of the members of CACF's youth engagement program, the Asian American Student Advocacy Project, currently attend Specialized High Schools or participated in the Specialized High School admissions process. *Id*. ¶ 13. CACF believes integration and equity in education benefits all students and that racially segregated learning environments pose serious potential harms to students' development. *Id*. ¶ 8. CACF and its member organizations have an interest in increased opportunity for admission for their members under the expanded Discovery Program and an interest in increased diversity within the schools, particularly from underrepresented and marginalized Asian-American communities.

## RELEVANT LAW & ANALYSIS

I.   **Proposed Intervenors Should be Granted Intervention as of Right Pursuant to Federal Rule of Civil Procedure 24(a).**

Rule 24 permits a party to intervene in ongoing litigation as of right or by permission of the court. Fed. R. Civ. P. 24. Pursuant to Rule 24(a)(2), a Court "must permit" a party to intervene

as of right if the movant has "(1) timely file[d] an application, (2) show[ed] an interest in the action, (3) demonstrate[d] that the interest may be impaired by the disposition of the action, and (4) showed that the interest is not protected adequately by the parties to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128–29 (2d Cir. 2001) (quotation marks and internal citation omitted); *see also Sherman v. Town of Chester,* 339 F. Supp. 3d 346, 358 (S.D.N.Y. 2018).[11]

### A.   Proposed Intervenors' Motion is Timely.

Courts "have not imposed a hard and fast rule defining timeliness under Rule 24(a), preferring instead . . . that the ruling be based on all the circumstances of the case." *Dow Jones & Co. v. U.S. Dep't of Justice*, 161 F.R.D. 247, 251 (S.D.N.Y. 1995). In the Second Circuit such circumstances include: "(a) the length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness." *Floyd v. City of New York*, 770 F.3d 1051, 1058 (2d Cir. 2014) (citing *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n,* 471 F.3d 377, 390 (2d Cir. 2006)).

---

[11]  In *Town of Chester v. Laroe Estates, Inc.*, the Supreme Court held that a litigant must possess Article III standing in order to intervene as of right "if the intervenor wishes to pursue relief not requested by a plaintiff" or "to pursue relief that is *different from that which is sought by a party with standing*." 137 S. Ct. 1645, 1648, 1651 (2017) (internal citations and quotation marks omitted) (emphasis added). Specifically, the Court held that "[f]or all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Id.* at 1648. However, a district court "need not address the standing of the intervenor-defendants" whose position is identical to the named defendant. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 233 (2003) (*overruled on other grounds by Citizens United v. Fed. Election Comm'n,* 588 U.S. 310 (2010)); *see also Eddystone Rail Co. v. Jamex Transfer Servs.,* 289 F. Supp. 3d 582, 590 (S.D.N.Y. 2018). Here, Defendants and Proposed Intervenors seek the same relief—the retention of the Discovery Expansion. Accordingly, Proposed Intervenors need not independently establish Article III standing for intervention as of right. *See Town of Chester*, 137 S. Ct. at 1651.

All of these factors counsel in favor of intervention as of right in the instant matter and the parties do not dispute that this motion is timely. This case was filed on December 13, 2018, and this year's SHSAT scores were released on March 18, 2019, at which time Proposed Eighth-Grade Intervenors learned for the first time that they would not be granted automatic admission to the Specialized High Schools but may still be eligible for admission through the Discovery Program. Proposed Intervenors' application is therefore timely. *See, e.g.*, *Republic of the Philippines v. Abaya*, 312 F.R.D. 119, 123 (S.D.N.Y. 2015) (application in which plaintiffs waited "nearly a year to intervene in the action" was timely); *Dow Jones & Co.*, 161 F.R.D. at 251–53 (finding intervention motion timely despite its filing after issuance of order granting summary judgment); *Mortg. Lenders Network, Inc. v. Rosenblum*, 218 F.R.D. 381, 383–84 (E.D.N.Y. 2003) (granting motion to intervene when filed more than six months after the proposed intervenors knew or should have known of their interest in the litigation).

Moreover, intervention at this stage will not cause any prejudice because discovery has just begun and Proposed Intervenors do not seek a delay of the proceedings. *See, e.g.*, *Sherman*, 339 F. Supp. 3d at 359 (noting that the Second Circuit recognized that intervention was timely where "the parties ha[d] not even begun discovery") (citing *Laroe Estates, Inc. v. Town of Chester*, 828 F.3d 60, 67 (2d Cir. 2016)); *Olin Corp. v. Lamorak Ins. Co.*, 325 F.R.D. 85, 88 (S.D.N.Y. 2018) (granting motion to intervene of right where "summary judgment briefing has not yet begun" even though "discovery deadlines have come and gone"). Finally, as described below, Proposed Intervenors have interests that may be impaired by the disposition of this litigation and may suffer prejudice if they are not permitted to intervene.

**B.**     **Intervenors Have Substantial Interests that May be Impaired by the Disposition of the Litigation.**

The Second Circuit defines the nature of the interest in the subject matter of the action under Rule 24 as one that is "direct, substantial, and legally protectable[,]" as opposed to "remote from the subject matter of the proceeding, or . . . contingent upon the occurrence of a sequence of events[.]" *Brennan*, 260 F.3d at 129 (quoting *Washington Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.,* 922 F.2d 92, 97 (2d Cir. 1990)); *accord Donaldson v. United States,* 400 U.S. 517, 531 (1971) (requiring "significantly protectable interest"); *see also N.Y. Pub. Interest Research Grp. v. Regents of Univ. of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975) (per curiam) (finding interest and granting intervention of pharmacists in action challenging advertising of prescription drug prices); *Great Atl. & Pac. Tea Co. v. Town of E. Hampton*, 178 F.R.D. 39, 42 (E.D.N.Y. 1998) (finding the interest of environmental organization dedicated to preserving the rural character of a town "would likely be impaired" if controversy decided absent the organization); *see generally* Fed. R. Civ. P. 24 (advisory committee's note) ("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene[.]").

Interests protected by a constitutional provision or statute of general application are construed broadly and are particularly likely to warrant intervention, especially when the lawsuit raises a question of public interest. "The Supreme Court has recognized that 'certain public concerns' may constitute an adequate 'interest' within the meaning of [Rule 24(a)(2)].'" *Herdman v. Town of Angelica*, 163 F.R.D. 180, 187 (W.D.N.Y. 1995) (quoting *Diamond v. Charles*, 476 U.S. 54, 68 (1986)) (alteration in original). This Court, therefore, must "take into account both the public nature" of the instant litigation "and the basis for, and strength of, [Proposed Intervenors'] particular interest in the outcome of the litigation." *Id.*; *accord Commack Self-Serv. Kosher Meats,*

17

*Inc. v. Rubin*, 170 F.R.D. 93, 100 (E.D.N.Y. 1996); *see also, e.g.*, *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) ("The interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group. The zone of interests protected by a constitutional provision or statute of general application is arguably broader than are the protectable interests recognized in other contexts." (internal citations omitted)); *cf.* 7C Charles Alan Wright, et al., *Federal Practice and Procedure* § 1908.1 (3d ed. 2019) ("[I]n cases challenging various statutory schemes as unconstitutional or as improperly interpreted and applied, the courts have recognized that the interests of those who are governed by those schemes are sufficient to support intervention.").

Proposed Intervenors have at least two categories of significant interests.

*First*, Applicant Intervenors have an interest in increased access to educational opportunity, which is directly impacted by this challenge to the Discovery Expansion. As a seventh grader, K.B. has an interest in having her potential admission to the Specialized High Schools determined under the Discovery Expansion, which increases the likelihood of admission for disadvantaged students, like herself, who meet the criteria articulated by the NYCDOE. And, A.S., C.M., N.D.F., and N.E.F. ("Eighth Grade Applicant Intervenors"), who were not admitted automatically based on their SHSAT scores, have an interest in the Discovery Expansion because it is now their only chance of admission to the Specialized High Schools for the 2019–20 school year. These individuals have a protectable interest for purposes of intervention to defend an existing educational policy that tangibly and directly affects them. *See Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999) (proposed intervenors had "a substantial legal interest in educational opportunity, which requires preserving access to the University for African-American and Latino/a students and preventing a decline in the enrollment of African-American and Latino/a students[]");

18

*cf. Podberesky v. Kirwan*, 38 F.3d 147, 162 n.* (4th Cir. 1994) (discussing allowance of students to intervene to defend scholarship program for African Americans at University of Maryland); *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1268 (11th Cir. 2001) (noting that organizations representing applicants and African-American individuals had successfully intervened to defend consideration of race in remedying Georgia's formerly-segregated system of higher education).

The Applicant Intervenors have each either applied to the Specialized High Schools for the 2019–20 school year or taken steps towards taking the SHSAT next year. Each qualifies for the Discovery Expansion because each attends a school with a higher than 60% ENI and meets the individual criteria. *See* Showa Decl. ¶ 5; Velasquez Decl. ¶ 13; Bond Decl. ¶ 3; Mahoney Decl. ¶ 3. Given the very limited access that Black and Latinx students have to these top schools, any increase in their opportunity for admissions is significant, rendering their interest direct, not remote or contingent. *See Brennan*, 260 F.3d at 129.

This interest could be seriously impaired by the disposition of this litigation. If the Discovery Expansion were to end as the result of this case, Applicant Intervenors would be directly harmed, as their chances of admission would be diminished.

*Second*, all Proposed Intervenors have an interest in preserving any amount of increased racial diversity and decreased racial isolation that the Discovery Expansion promises to bring to the Specialized High Schools. As Justice Kennedy expressed:

> This Nation has a moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children. A compelling interest exists in avoiding racial isolation, an interest that a school district, in its discretion and expertise, may choose to pursue. Likewise, a district may consider it a compelling interest to achieve a diverse student population.

19

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 797–98 (Kennedy, J., concurring in part and concurring in the judgment); *see also Brown v. Bd. of Ed. of Topeka,* 347 U.S. 483, 493–94 (1954) (describing education as "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment[,]" and recognizing the "intangible" harm of racial segregation, which "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.").

The current single-test method of admissions to the Specialized High Schools makes it unlikely for even highly capable students from Black, Latinx, and underrepresented Asian communities, who are more likely to attend high-poverty, low-opportunity, and segregated middle schools, to access these elite schools. And the Specialized High Schools are unwelcoming educational environments for the few underrepresented students that defy the odds and gain admission.[12] Based on the modeling by the NYCDOE, the Discovery Expansion will increase the diversity of the student bodies at the Specialized High Schools along multiple measures, including race, socioeconomic status, and geography. Wallack Decl. ¶ 19; Chadha Decl. ¶¶ 19–20; Chadha Decl. Ex. 1. Proposed Intervenors' substantial interest in educational opportunity and school diversity are thus directly impacted by this challenge to the Discovery Expansion and NYCDOE's efforts to increase opportunity and improve diversity at the Specialized High Schools.

Accordingly, the Intervenors have a significant interest in the instant litigation.

---

[12] *See, e.g.,* Eliza Shapiro, *How the Few Black and Hispanic Students at Stuyvesant High School Feel*, N.Y. Times (Mar. 22, 2019), https://www.nytimes.com/2019/03/22/nyregion/stuyvesant-high-school-black-students.html; Kimberly Reyes, *Worry About the Black Students Who Get In*, The Atlantic (Apr. 22, 2019), https://www.theatlantic.com/ideas/archive/2019/04/black-students-nycs-elite-schools-are-exhausted/587506/; Fernanda Santos, *To Be Black at Stuyvesant High*, N.Y. Times (Feb. 25, 2012), https://www.nytimes.com/2012/02/26/education/black-at-stuyvesant-high-one-girls-experience.html.

**C.      Proposed Intervenor's Interests Are Not Adequately Represented by Defendants.**

Finally, intervention as of right is warranted because Proposed Intervenors' interests are not "adequately represent[ed]" by "the existing parties." Fed. R. Civ. P. 24(a)(2); *see also Sherman*, 339 F. Supp. 3d at 360 (*citing Laroe*, 828 F.3d at 70). Courts must permit intervention under this factor unless the interests of existing parties are "so similar to those of [Intervenors] that adequacy of representation [is] assured." *Brennan*, 260 F.3d at 132–33. This analysis does not require certainty about how existing parties will litigate the case; it is sufficient that representation of proposed intervenors' interests "'may be' inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see also id.* at 538 (observing "sufficient doubt about the adequacy of representation to warrant intervention"); 7C Charles Alan Wright, et al., *Federal Practice and Procedure* § 1909 (3d ed. 2019) (an applicant ordinarily should be permitted to intervene as of right "unless it is clear that the party will provide adequate representation for the absentee.").

Where, as here, Proposed Intervenors have the same ultimate objective as Defendants, it is Proposed Intervenors' burden to overcome the presumption of adequacy. *See Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179–80 (2d Cir. 2001). The Second Circuit has not precisely defined what is necessary to meet this heightened burden. *See id.* at 180 (holding that, while "not an exhaustive list, . . . evidence of collusion, adversity of interest, nonfeasance, or incompetence may suffice to overcome the presumption of adequacy."). Nonetheless, Proposed Intervenors overcome the presumption of adequacy because their interests diverge from defendants in two key ways: (1) Defendants have institutional interests that may outweigh the interests in school diversity they share with Proposed Intervenors, creating a real possibility that Defendants may retreat from their current efforts or choose to resolve this case on terms which do not represent Proposed

21

Intervenors' interests in increased diversity or chance of admissions to the schools; and (2) Proposed Intervenors may raise legal arguments in defense of the Discovery Program that Defendants are disincentivized from raising themselves. Moreover, Proposed Intervenors are uniquely qualified to assist the Court regarding questions about the discriminatory impact of the current admissions system and the need for the City's efforts to remedy these inequities.

*First,* Defendants have competing priorities that may outweigh the interests they share with Proposed Intervenors. It is plausible that the City's position on the importance of diversity in the Specialized High Schools may change either during the pendency of the litigation or following the resolution of this litigation. Despite years of advocacy from community members on this issue, previous administrations have not done enough to address the continuing diversity crisis in these schools and, this administration has enacted the modest changes at issue in this case only after years of advocacy by parents and civil rights groups. Defendants thus should not be presumed to be adequate representatives for Proposed Intervenors for the duration of this litigation. *See, e.g.*, *N.M. Off-Highway Vehicle Alliance v. U.S. Forest Serv.*, 540 F. App'x 877, 881 (10th Cir. 2013) (finding that government agency could not adequately represent the intervenors' interests in part because "there is no guarantee that the Forest Service's policy will not shift during litigation"). Nor should Defendants be presumed to adequately represent Proposed Intervenors with respect to ensuring a lasting resolution to this case designed to withstand the policy changes of future administrations. *See, e.g.*, *Kleissler v U.S. Forest Serv*., 157 F.3d 964, 973–74 (3d Cir. 1998) (finding inadequate representation and granting intervention in part because the court did not believe that it was "realistic to assume that the [government] agency's programs [would] remain static or unaffected by unanticipated policy shifts.").

Moreover, unlike Proposed Intervenors, Defendants have an interest in resolving this case that is not necessarily coextensive with defending the Discovery Program and the ability to pursue diversity, including racial diversity, in city schools. In *Brennan v. NYC Department of Education,* the Second Circuit upheld the grant of intervention as of right to school district employees where the Defendant NYC Board of Education had an interest in defending its hiring practices but also possibly had "an equally strong or stronger interest in bringing such litigation to an end by settlements involving the displacement of employees who are not parties to the action." *Brennan*, 260 F.3d at 133.

Similarly, while Defendants have thus far defended the Discovery Expansion, as in *Brennan*, they may have "an equally strong or stronger interest" in resolving the litigation by ending or otherwise diminishing the Discovery Expansion as part of a settlement. *Id.* Moreover, Defendants have already demonstrated that their interest in defending the Discovery Expansion is tempered by their interest in a fast and efficient process for assigning students to the Specialized High Schools. *See* First Letter Mot. to Expedite Decision at 4, ECF No. 43. Although speedy resolution of this case and the timely release of admissions decisions are laudable interests, Proposed Intervenors' interest in the Discovery Expansion could never be counterbalanced by an interest in the smooth administration of high school assignments. Any resolution of the case that narrows the Discovery Program would harm the interests of Proposed Intervenors. Further, a retreat from efforts to increase school diversity would communicate the diminished import of this "historic commitment" with real harm to students. *Parents Involved*, 551 U.S. at 797 (Kennedy,

J., concurring in part and concurring in the judgment).[13]

The concern that the City would retreat from its current efforts, which represent a small step towards increasing equity and opportunity, is real and significant. Up until this point and even through the Discovery Expansion, the City has prioritized other interests over diversifying the Specialized High Schools. For example, Defendants could, but have chosen not to, immediately change the admissions policy for the other five Specialized High Schools not named in the Hecht-Calandra Act.[14] This would allow for increased fairness in admissions to those five schools and likely achieve much greater diversity than can be achieved by the Discovery Expansion. While the small step represented by the Discovery Expansion is laudable, its modest impact—compared to other available reforms—reflects how the City's interests in addressing the underrepresentation of Black, Latinx, and certain Asian students in the Specialized High Schools continue to be weighed against competing pressures. Defendants' failure to take additional steps, therefore, raises concerns about their commitment to follow through on the Discovery Expansion as a necessary measure to increase diversity regardless of pressures from critics of the City's efforts to expand opportunities for admissions and increase diversity at the Specialized High Schools.

─────────────────────

[13] To be clear, the City's inability to adequately represent Proposed Intervenors' interests extends beyond settlement decisions and affects other stages of the litigation. For example, interests have already diverged where the City elected to answer the complaint rather than file a vigorous motion to dismiss under Rule 12. *See, e.g.*, *Friends of E. Hampton Airport, Inc. v. Fed. Aviation Admin.*, No. 15-CV-0441(JS)(ARL), 2016 WL 792411, at *6 (E.D.N.Y. Feb. 29, 2016) (finding interests inadequately represented and noting that government defendant elected to answer rather than move to dismiss the complaint). Further, as is discussed *infra*, the Proposed Intervenors may present substantive arguments that the City, as an institution, is unable or disinclined to advance.

[14] *See* Leslie Brody & Katie Honan, *Top Lawmakers Open to Diversity Fix at New York City's Elite Schools*, Wall Street J. (Mar. 20, 2019), https://www.wsj.com/articles/top-lawmakers-open-to-diversity-fix-at-new-york-citys-elite-schools-11553112360 (Gov. Andrew Cuomo "said the New York City Council should come up with a new admissions policy for the five newer specialized high schools" but "[t]he mayor has resisted doing so. 'Legally, the way they're structured, it is better to have a single legislative solution for all of them,' [de Blasio] said").

*Second,* Defendants are disincentivized from raising factual and legal arguments that would portray the City or State in an unfavorable light. This includes potential evidence of past intentional discrimination, including the origins of the single-test admissions policy, and legal arguments regarding the City's duty to eradicate discrimination. *Cf. Brennan*, 260 F.3d at 130 ("[I]t is precisely the existence or non-existence of prior discrimination and its relationship to appellants' present status that they want to contest by intervening as parties. The merits can, therefore, be resolved only after appellants have an opportunity for discovery and the presentation of evidence as a party to the action."); *N.Y. Pub. Interest Research Grp.*, 516 F.2d at 352 (noting that potential intervenors "should have an opportunity to make their own arguments to protect their own interests" and finding it likely that movants would "make a more vigorous presentation" of certain arguments than government defendants); *League of Women Voters of Michigan v. Johnson*, 902 F.3d 572, 580 (6th Cir. 2018) (finding inadequate representation where proposed intervenors had sought to make additional defenses than those presented in government defendant's motion to dismiss).

Moreover, Proposed Intervenors bring to this litigation the real-life experience of communities and families who will directly benefit from the educational opportunities presented by the Specialized High Schools, that have been largely beyond their reach, and the enhanced diversity within these schools. By contrast, the current Defendants bring an institutional and political perspective to this controversy and will likely defend the Discovery Expansion primarily from that standpoint. *See Dorsett v. County of Nassau*, 283 F.R.D. 85, 93 (E.D.N.Y. 2012) (finding a police union's interests inadequately represented, even though interests aligned with the police department's, because the department represented the institution as a whole while the union protected the individual officers and specifically safeguarded the officers' interests). Without

25

Proposed Intervenors, there would be an imbalanced presentation of the interests and concerns raised in this case, with the case including individuals and organizations who oppose the Discovery Expansion, but not the students and families who stand to benefit. Proposed Intervenors, unlike Defendants, are uniquely qualified to give testimony on the impact of inequities in the system. They have firsthand experience applying to Specialized High Schools, experiencing the barriers of being unequipped and uninformed in that process, feeling isolated and tokenized while attending a Specialized High School, attending schools, whether the Specialized High Schools or others, that do not reflect the rich and vibrant diversity of the city where they live, and participating in a school system in which pathways to success are unfairly closed to many. Proposed Intervenors can further testify about the impact of these inequities on their education and their futures.

However vigorously the City defends its ability to pursue educational diversity, it cannot adequately represent the interests of students in accessing diverse and equal educational opportunities when the City has some responsibility for the dearth of these opportunities in the first place. Proposed Intervenors' participation is needed, therefore, to "make a more vigorous presentation" of the importance of racial, as well as socioeconomic and geographic, diversity in the Specialized High Schools. *N.Y. Pub. Interest Research Grp,* 516 F.2d at 352.

Accordingly, Proposed Intervenors' presence in this action is necessary to adequately represent their interests.

## II.    In the Alternative, Permissive Intervention Is Appropriate.

In the alternative, Proposed Intervenors respectfully request the Court grant permissive intervention. Permissive intervention pursuant to Rule 24(b) "is to be liberally construed" in favor of intervention. *Olin Corp.*, 325 F.R.D. at 87 (quoting *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 407 (S.D.N.Y. 2006)); *see also McNeill v. N.Y.C. Hous. Auth.*, 719 F. Supp. 233, 250 (S.D.N.Y. 1989).

Under Rule 24(b), this Court may, in its discretion, "permit anyone to intervene" provided that the party: (1) files a "timely motion," and (2) "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). The "principal consideration" is "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978) (internal quotation marks omitted); *see also Eddystone Rail Co. v. Jamex Transfer Servs.*, 289 F. Supp. 3d 582, 595 (S.D.N.Y. 2018) (citing *U.S. Postal Serv.*, 579 F.2d at 191).

Courts may consider other factors, including "'the nature and extent of the intervenors' interests' . . . and 'whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" *U.S. Postal Serv.*, 579 F.2d at 191–92 (quoting *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977)). Courts may also consider whether their interests are "adequately represented by the other parties," *id.*, but this "is clearly a minor factor at most." *United States v. Columbia Pictures Indus., Inc.*, 88 F.R.D. 186, 189 (S.D.N.Y. 1980); *see also New York v. Pruitt*, Nos. 18-CV-1030, 18-CV-1048, 2018 WL 1684341, at *1 (S.D.N.Y. Apr. 5, 2018) (considering adequacy just one of several factors to be considered, but not required).

Permissive intervention is appropriate here. First, this motion is timely for the reasons outlined above. Second, the defenses of Proposed Intervenors and those of Defendants share questions of fact and law. Like Defendants, Proposed Intervenors will, at a minimum, defend the constitutionality of the revised eligibility criteria for the Discovery Expansion. *See Comer v. Cisneros*, 37 F.3d 775, 801–02 (2d Cir. 1994) (granting intervention to minority residents who had

27

applied for or were denied housing subsidies where the existing plaintiffs were challenging that subsidy program).

Critically, Proposed Intervenors' claims would not "unduly delay or prejudice the adjudication of the rights of the original parties." *U.S. Postal Serv.*, 579 F.2d at 191. Discovery has just begun and Proposed Intervenors are prepared to comply with the schedule set by this Court. *See supra* Section I.A. And although adequacy of representation is a far less significant consideration for permissive intervention, this Court can consider, as argued above, that the interests of Proposed Intervenors cannot be "adequately represented" by Defendants. *Id.* (internal quotation marks omitted); *see also supra* Section I.C.

Finally, Proposed Intervenors and their counsel offer specialized expertise and familiarity with the factual and legal issues that "will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *U.S. Postal Serv.*, 579 F.2d at 192 (quoting *Spangler*, 552 F.2d at 1329). Proposed Intervenors would be the only parties which include children in middle schools who will be directly harmed should Plaintiffs prevail in their challenge of the Discovery Expansion, as well as current students in the Specialized High Schools who will be harmed by the failure to increase the diversity of those schools. *See supra* pp. 8-12. This unique perspective will be critical in presenting to the court a more complete picture of the factual and legal issues in the litigation. *See Miller v. Silbermann*, 832 F. Supp. 663, 674 (S.D.N.Y. 1993) (granting intervention to individual tenants and tenant advocacy organization because the proposed intervenor-defendants, "in light of their knowledge and concern, will greatly contribute to the Court's understanding of this case."); *see Commack*, 170 F.R.D. at 106 (granting permissive intervention to religious groups, a rabbi, and individual consumers of kosher foods because "the intervenors will bring a different perspective

to the case and will contribute relevant factual variations that may assist the court in addressing the constitutional issue raised."); *see also Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 103 (D. Conn. 2007) (finding that court will benefit from intervenors' participation by "offer[ing] a unique, personal and highly relevant factual perspective to the law, its development, and its impact[,]" as well as "specialized expertise and substantial familiarity with the legal issues that are presented for review.").

The attorneys and legal organizations representing Proposed Intervenors can likewise contribute specialized expertise. Proposed Intervenors' legal representatives have a long history of experience in litigating school segregation, integration, and diversity cases throughout the country and including in New York City and state. *See, e.g., Brown v. Bd. of Educ.*, 347 U.S. 483 (1954); *see also Fisher v. Univ. of Tex. at Austin (Fisher II)*, 136 S. Ct. 2198 (2016); *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291 (2014); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988 (11th Cir. 2018); *Thomas v. Sch. Bd. St. Martin Par.*, 756 F.3d 380 (5th Cir. 2014), *on remand,* No. 6:65-cv-11314, 2016 U.S. Dist. LEXIS 8580 (W.D. La. Jan. 21, 2016); *Caulfield v. Bd. of Educ. of N.Y.*, 632 F.2d 999 (2d Cir. 1980); *ASPIRA of New York, Inc. v. Bd. of Educ. of N.Y.,* 58 F.R.D. 62 (S.D.N.Y. 1973); *Sheff v. O'Neill*, No. LND-HHD-CV-175045066-S, 2017 WL 4812624 (Conn. Super. Ct. Aug. 7, 2017).

Proposed Intervenors, as well as the attorneys and legal organizations representing them, thus bring unique knowledge, experience and expertise that will aid in the just, effective, and efficient adjudication of this case.

# CONCLUSION

For the foregoing reasons, Proposed Intervenors respectfully request that this Court grant their Motion to Intervene, pursuant to Federal Rule of Civil Procedure 24(a) or 24(b).

Respectfully submitted on May 3, 2019 by,

/s/ Rachel M. Kleinman
Janai S. Nelson
Jin Hee Lee
Rachel M. Kleinman
Liliana Zaragoza
Earl A. Kirkland III*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th floor
New York, NY 10006
Tel.: (212) 965-2200
rkleinman@naacpldf.org
lzaragoza@naacpldf.org
ekirkland@naacpldf.org


/s/ Jose Perez
Jose Perez
Francisca Fajana
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel.: (212) 219-3360
jperez@latinojustice.org
ffajana@latinojustice.org

/s/ Sarah Hinger
Sarah Hinger
Jennesa Calvo-Friedman
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 519-7882
shinger@aclu.org
jcalvo-friedman@aclu.org

/s/ Stefanie D. Coyle
Stefanie D. Coyle
Kevin E. Jason
Arthur Eisenberg
Melissa Pettit**
NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
Tel.: (212) 607-3300
scoyle@nyclu.org
kjason@nyclu.org
mpettit@nyclu.org


*Motion for Pro Hac Vice Appearance
    forthcoming

**Motion for SDNY Admission forthcoming

30