

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**GEORGIA M. PESTANA**
*Acting Corporation Counsel*

**Marilyn Richter**
Tel. 212 356-2083
mrichter@law.nyc.gov

September 23, 2019

The Honorable Edgardo Ramos
United States District Court
Southern District of New York
40 Foley Square
New York, N.Y. 10007

Re: *Christa McAuliffe Intermediate School PTO, Inc. v. Bill De Blasio*, 18cv11657 (ER)(OTW)

Dear Judge Ramos:

This letter is submitted on behalf of defendants in accordance with the parties' agreement to simultaneously submit letters setting out their respective positions concerning discovery prior to the September 25, 2019 status conference. At the June 26, 2019 conference, Your Honor asked the parties to attempt to work out their disagreements concerning discovery. As outlined below, the parties have agreed upon many issues concerning discovery but continue to disagree as to whether discovery should be bifurcated. Defendants believe bifurcation focusing first on adverse impact will be efficient and appropriate. In addition, as outlined below defendants believe that there is no longer reason to expedite this case and that any new schedule adopted by the Court need not be timed to permit the Court to rule on a motion for an injunction concerning the 2020 admission cycle. The results of the 2019 admission cycle, establish that there can be no injunction granted concerning 2020.

Agreement and Production of Data

The parties have reached agreement on many issues, including the aggregate data to be produced by defendants. In summary, defendants agreed to produce: 1) aggregate data from the admissions process for four years (the classes that entered the Specialized High Schools ("SHS") in September 2016-2019); 2) the aggregate data that DOE used to model the challenged changes; and 3) aggregate data that DOE used to develop two alternative scenarios for the September 2019 entering class (1 - if the preliminary injunction had been granted and the challenged changes had not been implemented, and 2 - if the challenged changes had been fully

implemented (20% of the seats reserved for the Discovery Program)). A full list showing the actual categories and breakdown of data that were agreed to is attached as Exhibit "1." DOE has produced the vast majority of this aggregate data and intends to produce the remainder on or before October 7, 2019.

In addition, the parties have reached agreement and DOE has produced documents concerning the Economic Need Index ("ENI"), which is related to the data. Plaintiffs had questioned a significant increase in the overall City-wide ENI and the number of schools that had an ENI of 60% or above (hereafter "high-poverty schools") in the 2017-2018 school year. Plaintiffs asserted that this change might have a significant impact on the effect of the challenged changes, and questioned the basis for this increase, and whether this increase would be applied when the challenged changes were implemented. *See, e.g.*, (Dkt # 1, Complaint, ¶ 43). DOE has provided documents showing that this increase resulted from a national initiative by the U.S. Department of Agriculture, which oversees the National School Lunch Program. The initiative is called the Direct Certification Matching Process, and requires states to implement a computerized system that matches students to recipients of food stamps and Medicaid, thereby more efficiently and effectively identifying students that are eligible for free or reduced price school lunch. As intended, this initiative significantly increased the number of students eligible for free lunch identified in New York City. This in turn increased the number of schools with an ENI of 60% or above. As the Direct Certification Matching Process remains in effect, the increase in the number of high-poverty schools will continue for calculation of admission to the Discovery Program for the class entering in 2020.

In addition, the parties have reached an agreement on the individual student data to be produced. For every student who took the exam in the past four years (for classes entering from September 2016 – September 2019), Defendants will produce: the exam score; the student's school choices in order of preference; the student's race/ethnicity; ; the middle school attended; whether the middle school was private or public; whether the middle school was a high-poverty school; whether the student received an offer based on his exam score and if so to which school; whether the student received an invitation to participate in the Discovery Program, and if so to which school; and whether the student received an offer to participate in the Discovery Program, and if so to which school. In addition, for the students who took the exam for classes entering in September 2017 – September 2019, the defendants will produce data showing whether it was known that the student met the individual criteria for disadvantage. For the class entering in September 2016, the individual criteria for disadvantage data will be provided for students who achieved a score within the range eligible for the Discovery Program. Names and other identifying information will not be produced.

The production of this individual student data required negotiation of a separate Non-Disclosure Agreement, so as to comply with the stringent privacy protections of both the Family Educational Records Privacy Act, 20 U.S.C. § 1232g and New York Education Law § 2-d. The Non-Disclosure Agreement is close to being finalized -- there are only some minor language changes that need to be made. The parties will then sign the agreement and submit it to the Court together with a proposed Second Stipulated Protective Order for Your Honor's review. In the meantime, DOE is preparing the individual student data. Once the Non-Disclosure Agreement is signed and the protective order is so-ordered, DOE will produce the data by October 7, 2019.

Remaining Disagreement on Discovery

At the June 26 conference, the parties agreed that under Second Circuit law, an equal protection violation based on a facially neutral policy must be based on a showing of both adverse impact (i.e., discriminatory effect) and intent. *Hayden v. County of Nassau*, 180 F.3d 41, 48 (2d Cir. 1999), citing *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977). It is defendants' position that plaintiffs have not and cannot show adverse impact, and accordingly, that it is unnecessary to now engage in discovery concerning the issue of intent. Indeed, the available data shows that Asian-American students had the highest passing rate of any group under the challenged changes, and that these changes had a beneficial impact on Asian-American students, increasing both the number of such students who received offers, and the percentage of the offers that were received by Asian-American students. Plaintiffs are entitled to test these results, and as outlined above, the parties have reached agreement on the production of the data that will allow plaintiffs to investigate the issue of adverse impact.

Accordingly, it is defendants' position that discovery should be bifurcated and limited at this juncture to the issue of adverse impact. *John v. Whole Foods Mkt. Grp.*, 858 F3d 732, 737 (2d Cir. 2017). A copy of plaintiffs' first set of discovery requests is attached as Exhibit "2". These requests (other than the few that seek data, and records concerning the ENI, which have been satisfied by the parties' subsequent agreements discussed above) largely seek records relating directly or tangentially to the issue of intent. These requests are enormously burdensome, seeking all records in some instances dating back to 1970, and in many instances seeking all records regardless of when they were created. Insofar as the requests seek electronic communications, a preliminary analysis produced over 81,000 emails that will have to be reviewed, a process that will cost defendants about $ 50,000 for the services of an outside vendor, as well as many hours reviewing the vendor's work. The requests for electronic communications also require production of all tweets, text messages and other forms of electronic communications. Further, the requests seek an enormous amount of material that would be covered by the deliberative process privilege, which will require the review of these records by senior officials and the preparation of declarations by them in support of the assertions of the privilege. Further, statements made by plaintiffs' counsel at the June 26 conference indicate that they will seek to discover defendants' intent in establishing the challenged changes in such remote circumstances as a statement by a person on a panel at an event that was sponsored by DOE that according to the cited news report had nothing to do with SHS admissions. Such efforts would result in additional discovery disputes.

It is respectfully submitted that this enormously burdensome production is not necessary at this juncture. Unless and until plaintiffs are able to establish that the challenged changes have an adverse impact on Asian-American students, which appears highly unlikely based on the known facts, defendants should not be required to undertake this enormously burdensome additional production.

Schedule

By letter dated July 25, 2019 (Dkt # 107), the parties informed the Court that they believed they would need to request an extension of the discovery schedule. Plaintiffs have indicated that they will have an expert analyze the data and that they also want to depose DOE

personnel concerning the data. Defendants want to depose plaintiffs' expert. Defendants have retained an expert statistician who will likely need to review plaintiffs' expert's conclusions. Presumably, plaintiffs will want to depose defendants' expert.

Although the parties have not yet worked out a proposed revised schedule, and hope this can be worked out at the conference, it is clear that a schedule encompassing these steps will extend discovery for a considerable period of time, which would make it extremely difficult to have summary judgment motion practice and a decision by late January 2020. However, as discussed below, it is defendants' position that given the data that has been provided to plaintiffs, that late January 2020 "deadline" is no longer necessary.

<u>No Basis for a Permanent Injunction Prior to the Offers for the 2020-2021 School Year</u>

Although the parties had previously indicated that they wanted the Court to issue a ruling by January 2020, the results for the September 2019 entering class - showing that the challenged changes benefited Asian-American students - has changed that. Consistent with the Declaration of Nadiya Chadha, dated January 17, 2019 (Dkt # 49), describing the timeline for making offers to the SHS for the September 2019 entering class, for the coming cycle DOE will not know who will receive an offer to an SHS based solely on exam score until the last week of January 2020. Who will receive invitations to the Discovery Program (which includes invitations to many ineligible students who cannot be excluded because it is unknown which students are eligible), will not be known until sometime in February 2020. Who will receive actual offers to the Discovery Program will not be known until sometime in late April or May 2020, after students who have received Discovery invitations have an opportunity to submit applications which must then be approved and certified, first by the student's middle school, and then be reviewed and approved by DOE's central office. . Accordingly, the data to determine whether the challenged changes will adversely affect Asian-American students taking the exam for the September 2020 entering class will not be available until late April or May 2020.[1] Therefore, the evidence that will be available in January 2020 cannot possibly lead to a certain conclusion that the challenged changes will adversely affect Asian-American students, and no injunction can issue at that time.

Plaintiffs have focused their claim primarily on the model that DOE prepared in the spring of 2018, which indicated that there would be a small decrease in the percentage of Asian-American students when the challenged changes were fully implemented. If the model was a reliable predictor, the partial implementation of the challenged changes for the class entering in September 2019 would likely have resulted in a small decrease in the number and percentage of Asian-Americans who received offers (smaller than the predicted decrease for full implementation in September 2020.) Instead, there was an increase in offers to Asian-American students.

---

[1] It should be noted that on their appeal, plaintiffs have asked the Second Circuit to issue a preliminary injunction enjoining the challenged changes for the class entering in September 2020. The Second Circuit has recently issued a notice tentatively scheduling oral argument on the appeal for the week of December 5, 2019.

4

DOE has consistently stated that the model was a rough estimate, and additional details support this statement. First, the model was developed using data from a period prior to the increase in the number of high-poverty schools. Second, as aggregate data provided to plaintiffs shows, the model assumed that 90% of the students who received Discovery Program invitations would apply and receive offers. By contrast, the actual percentage of students who received Discovery Program invitations who applied and received offers varied between 25% and 33% for the classes entering between September 2016-2018. (As other data provided to plaintiffs shows, the Discovery Program has significantly expanded in size in recent years, and DOE has been gaining experience in how to operate the admissions process for a much larger Discovery Program.)

Accordingly, the evidence that will be available as of January 2020 cannot show that the expansion of the Discovery Program by another 7% of seats in September 2020 *will* result in a significant decrease of offers to Asian-American students. Indeed, DOE has produced an analysis to plaintiffs which indicates that the number of offers to Asian-American students would probably have increased for the class entering in September 2019, if 20% rather than 13% of the seats had been set aside for the Discovery Program. While plaintiffs' counsel stated at the June 26 conference that they would likely try to show that somehow the data for the class entering in September 2019 was an outlier, and that in a different year the results might have been different, such conclusions would be wholly speculative as to what will happen in 2020.

Absent a clear showing that the challenged changes *will* have a significant adverse impact on Asian-American students for the September 2020 entering class, there is no basis for the issuance of a permanent injunction enjoining these changes. A permanent injunction cannot be based on speculation. In every case that defendants have found involving an admissions process (to a school or for employment), the group that sought and obtained a permanent injunction requiring a modified process had experienced substantial adverse impact as shown by the challenged results and was significantly underrepresented. The injunction was based on that demonstrated impact.[2] Here, Asian-American students had the highest passing rate of all groups for the September 2019 entering class and the challenged changes increased their numbers.

While permanent injunctions in employment cases generally require that the admissions process resulting in the adverse impact be modified before appointments are made, these injunctions often also mandate changes in future admissions processes. *See, e.g., United States v. City of New York*, 717 F.3d 72, 96-99 (2d Cir. 2013). In this case, it may not be possible to alter the admissions process once the results are known. Students receive offers which would be problematic to rescind. In the unlikely event that the results for the class entering in September

---

[2] *Sharif v NY State Educ. Dep't*, 709 F.Supp. 345, 365 (S.D.N.Y. 1989) presented a variation on this scenario. There, a change had been made in the method for awarding scholarships to lessen the very large adverse impact on female students. The agency then announced that for other reasons it would be reverting to the original method in the following year. Several female students sought an injunction enjoining the reversion. The court granted the injunction, and included nineteen years of past data in an appendix to its decision, which showed that the original method had always had a very large adverse impact on female students.

2020 shows significant adverse impact on Asian-American students, then plaintiffs could seek a permanent injunction concerning admissions in future years. While defendants do not concede that plaintiffs would be entitled to an injunction in that circumstance, at least then plaintiffs would be proceeding on the basis of actual facts. Accordingly, it is defendants' position that there is no need for a ruling on a permanent injunction by January 2020 and any new schedule need not attempt to accommodate that date.

Respectfully,

Marilyn Richter
Thomas B. Roberts
Assistants Corporation Counsel