UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

CHRISTA McAULIFFE INTERMEDIATE SCHOOL
PTO, INC., et al.,

                                             Plaintiffs,

           -against-

BILL DE BLASIO, et al.,

                                             Defendants.

------------------------------------------------------------------------ x

**DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

1:18-cv-11657-ER-OTW

In accordance with Federal Rule of Civil Procedure 56, and Southern District of New York Local Rule 56.1, Defendants, by their attorney, Georgia M. Pestana, Corporation Counsel of the City of New York, submit the following as their Statement of Undisputed Facts.

Background – Admission to the Specialized High Schools

1. There are nine Specialized High Schools operated by the New York City Department of Education ("DOE"). Pursuant to NY Education Law § 2590-g(12) (known as the Hecht-Calandra Act), which was enacted in 1971, all but one of these schools is required to admit students based solely on their score on an objective written admission test, the Specialized High School Admission Test ("the SHSAT"). All further references below to the Specialized High Schools ("SHS") will be to the eight SHS that admit students through the SHSAT. (Richter Declaration dated October 1, 2021 ("Richter Decl." Exh. A).

2. The eight high schools are: Bronx High School of Science; Brooklyn Technical High School; High School for Mathematics, Science and Engineering at City College; High School of American Studies at Lehman College: Queens High School for the Sciences at York College:

Staten Island Technical High School; Stuyvesant High School and the Brooklyn Latin School. (Wright Declaration dated October 1, 2021 ("Wright Decl.") Exh. D).

3. When students take the SHSAT, they are required to list which of the SHS they want to attend, in order of preference. Students may list from one to eight schools. (Wright Decl. Exh. A ¶ 4.)

4. The exam results are rank-ordered by score. The student with the highest score gets an offer to her first-choice school, then the student with the next highest score gets an offer to his first-choice school and so on. When the number of available offers to a school has been reached, no further offers are made to that school. (Wright Decl. Exh. A ¶¶ 5-6).

5. If all the seats are filled at the student's first choice school, she gets an offer to her second-choice school. If all the seats are filled at her second-choice school she gets an offer at her third-choice school and so on. (Wright Decl. Exh. A ¶ 6).

6. Hecht-Calandra also states that DOE may maintain a Discovery Program for admission to the SHS. ("Richter Decl." Exh. A).

7. The statute provides that a student may be considered for the Discovery Program if: he takes the SHSAT and scores below the cut-off score; is disadvantaged; is certified by his current school as having high potential for the special high school program; attends and then passes a summer preparatory program. (Richter Decl. Exh. A).

8. The statute does not define "disadvantaged" and does not limit the size of the Discovery Program. (Richter Decl. Exh. A).

9. Indeed, the legislative history shows that the initial bill had a cap of 14% of seats in the SHS reserved for Discovery Program participants, but that the cap was removed following

discussion among the legislators. (Roberts Declaration, dated January 17, 2019 ("Roberts Decl.") Dkt. # 48, Exh. 2, pp. 3-4).

10. The legislative history also shows that in 1970, prior to the passage of Hecht-Calandra, the three then-existing SHS, Stuyvesant High School, Brooklyn Technical High School and Bronx High School of Science, operated Discovery Programs and that overall, 18.2% of the seats in these three schools were given to students in the Discovery Programs. (Roberts Decl. Dkt. # 48, Exh. 2, p. 37). <u>Challenged Changes to the Discovery Program</u>

11. This lawsuit challenges the two changes to the Discovery Program that were announced by the Chancellor and the Mayor on June 3, 2018 to be implemented beginning with the class entering the SHHS in September 2019. (Richter Decl. Exh. B).

12. The first was an increase in the size of the Discovery Program. In the summer of 2018 there were 252 students in the Discovery Program. (Richter Decl. Exh. B; Wright Decl. Exh. A ¶ 9, n. 1.)

13. The Discovery Program would be increased to 20% of the seats at each SHS over a two-year period. (Richter Decl. Exh. B).

14. In the summer of 2019, 528 seats would be allocated for the Discovery Program, which is approximately 13% of the total seats at the eight SHS. (Wright Decl. Exh. A ¶ 9, n. 1.)

15. In the summer of 2020, approximately 800 seats would be allocated for the Discovery Program, which is approximately 20% of the total seats at the eight SHS. (Wright Decl. Exh. A ¶ 9, n. 1.)

16. The second was a modification of the definition of disadvantaged. Previously, a student was considered disadvantaged if the student's family met one of the criteria established by DOE for individual disadvantage: 1) the student's family income qualifies the student for free

lunch or reduced price lunch based on the student's meal form; 2) the student's family receives assistance from the Human Resources Administration (welfare or SNAP benefits); 3) the student is in foster care, a ward of the state, or is a Student in Temporary Housing as defined by McKinney-Vento or 4) the student is an English Language Learner or was an English Language Learner within the previous 2 school years, and enrolled in a DOE school for the first time within the last four years. (Wright Decl. Exh. A ¶ 11).

17. The individual disadvantaged requirement was maintained but it is now slightly different. Criterion 1 now states: the student's family income qualifies the student for free or reduced price lunch; and criterion 2 now states: 2) the student's family receives assistance from the New York City Human Resources Administration. Criterion 3 and 4 remain the same. (Wright Decl. Exh. ¶ 5).

18. The modification of the definition of disadvantaged that was announced on June 3, 2018, and was effective beginning with the 2019 entering class, was the inclusion of an additional criterion -- that a DOE student attends a school with an Economic Need Index of 0.6 or above, which is a high-poverty school. ((Richter Decl. Exh. B; Wright Decl. ¶ 6).

19. The Economic Need Index ("ENI") of a school is a measure created by DOE. (Ashton Declaration, dated September 30, 2021 ("Ashton Decl.") ¶ 3).

20. It has been in use in its current DOE formula since 2015. (Ashton Decl. ¶ 3).

21. DOE uses ENI to estimate the percentage of students in that school facing economic hardship (Ashton Decl. ¶ 3).

22. There are many social science research studies that support the conclusion that students attending high-poverty schools are more disadvantaged and face more academic challenges than similarly-situated students attending lower-poverty schools. See, e.g.,., *Annotated*

4

*Bibliography: The Impact of School-Based Poverty Concentration on Academic Achievement & Student Outcomes*, Poverty & Race Research Action Council.  (Ashton Decl. ¶ 4).

23. The ENI is calculated based upon the average of the Economic Need Values ("ENV") of the students attending the school.  (Ashton Decl. ¶ 5).

24. A student's ENV is 1.0 if: (a) the student lives in a household that is eligible for public assistance from the New York City Human Resources Administration; (ii) the student lived in temporary housing in the past four years; or (iii) the student is in high school, has a home language other than English and enrolled in a DOE school for the first time within the past four years.  (Ashton Decl. ¶ 6).

25. For purposes of determining a student's ENV, eligibility for public assistance from the New York City Human Resources Administration ("HRA") is defined as eligibility for any of the following programs:  the Supplemental Nutrition Assistance Program ("SNAP"), 7 U.S.C. § 2011, *et seq.*, which was formerly known as the Food Stamp Program; the Temporary Assistance for Needy Families Program ("TANF") 42 U.S.C. § 601, *et seq.*; Medicaid, 42 U.S.C. 1396, *et seq.*; and the Special Supplemental Nutrition Program for Women, Infants, And Children ("WIC"), 42 U.S.C. § 1786.   (Ashton Decl. ¶ 7).

26. If a student does not meet any of the above criteria, then the student's ENV is calculated based on the percentage of families (with school-age children) in the student's census track whose income is below the poverty income level, as estimated by the United States Census Bureau's American Community Survey Five-Year estimate (2019 ACS estimates were used in calculations for the 2020-21 ENI).  The student's ENV equals this percentage divided by 100.  For example, if 75% of the families in the student's census tract have income below the federal poverty line, then the e student will have an ENV of 0.75.  (Ashton Decl. ¶ 8)

27. If the student attends a non-DOE school, such as a charter or private school, or is home-schooled, then the criterion used for purposes of defining disadvantage is whether the student resides in a census tract where 60% or more of the families with school-age children living in the census tract have an income below the poverty line, as estimated by the U.S. Census Bureau's American Community Survey Five-Year estimate. (Wright Decl. ¶ 63.)

Asian Students Have Benefitted from the Changes to the Discovery Program

28. The representation of Asian students across all SHS as a group increased for the classes entering in 2019 and 2020 after the challenged changes were implemented. (Richter Decl., Exh. C, Report of Plaintiffs' Expert, p. 18).

29. The Asian students who took the SHSAT for the 2020 entering class obtained a higher percentage of the offers than they would have if offers had been made based on the algorithm used for admissions for the 2018 entering class, before the challenged changes were implemented. (Richter Decl., Exh. C, Report of Plaintiffs' Expert, p. 14 and Table 8).

From 2006 Through 2015 Asian Students Have Been Extremely Successful in Obtaining Offers to the SHS

30. From 2006-2015 the relevant data that is readily available is the racial/ethnic composition of the applicant pool and the racial/ethnic composition of the students who received offers based on their SHSAT score only. (Wright Decl. ¶ 9, Exh. C).

31. The Discovery Program was much smaller during that period. Only about 1-3% of the students who gained admission to the SHS did so through the Discovery Program. (Wright Decl. ¶ 8, Exh. B).

32. The racial/ethnic composition of the Discovery Program applicants and offerees for those years is not readily available. (Wright Decl. ¶ 8, Exh. B).

33. In every year from 2006 to 2015, Asian students received the largest percentage of the offers that were made based on SHSHAT score only of any racial group. (Wright Decl. ¶ 11 Exh. C)..

34. In every year from 2006 to 2015, Asian students received for more offers than they would under the predicted result model, where all groups do equally well. (Wright Decl. ¶ 11 Exh. C).

35. In every year from 2006 to 2015, Asian students had the highest passing rate (the percent of applicants in the group who received offers) of the four major racial/ethnic groups (Asian, Black, Latino and White students). (Wright Decl. ¶ 11 Exh. C).

In the Period 2016-2020 Asian Students Have Continued to Be Extremely Successful in Obtaining Offers to the SHS

36. DOE has readily available complete data for these years which shows the racial/ethnic composition of the applicants, the students who received offers based on SHSAT score only and the students who received offers to the Discovery Program. (Wright Decl. ¶ 30, Exhs. C, D).

37. .In every year from 2016 to 2020 Asian students received the largest percentage of the offers of any racial group. (Wright Decl. ¶ 31 Exhs .C, D).

38. In every year from 2016 to 2020, Asian students received for more offers than they would under the predicted result model, where all groups do equally well. (Wright Decl. ¶ 31 Exhs. C, D). .

39. In every year from 2016 to 2020, Asian students had the highest passing rate of the four major racial/ethnic groups (Wright Decl. ¶ 31 Exhs. C, D).

7

The Difference Between Discovery Invitations and Discovery Offers

40. DOE had information as to whether some but not all students who are re potentially eligible for the Discovery Program, based on their score on the SHSAT (and beginning with the entering class of 2019, their attendance at a school with an ENI of at least 0.6 or residence in a census tract with a poverty level of 60% or greater) met the individual disadvantaged criteria. Wright Decl. ¶ 65).

41. DOE sends invitation letters to all students (up to the number of students that are projected as needed to fill the available seats) who may be eligible, based on their SHSAT score and school choices. Beginning with the admission cycle for the 2019 entering class, the invitation letters are sent only to those who also meet the ENI or census tract criterion. (Wright Decl. ¶ 66).

42. There are three different invitation letters sent. For DOE students for whom DOE has records showing that the student meets the individual disadvantaged criteria the letter states that the parent or guardian should submit an application to the student's current school if the student wants to participate in the Discovery Program. (Wright Decl. ¶ 67, Exh. E).

43. For DOE students for whom DOE does not have records showing that the student meets the individual disadvantaged criteria, the invitation letter states that "Information in NYCDOE systems indicates that your child does not meet any of the four requirements listed above [the individual disadvantaged criteria]. If this is correct, do not submit an application for this program—no further action is needed." The letter then states that if the child does meet any of the four requirements the parent or guardian should submit documentation of that together with the application. (Wright Decl. ¶ 68, Exh. F).

44. For non-DOE students the invitation letter states that the child may be eligible and requests that supporting documentation showing that the child meets one of the individual disadvantaged criteria be submitted with the application.  (Wright Decl. ¶ 69, Exh. G).

45. In addition, pursuant to state law, no student is eligible to participate in the Discovery Program until their current school recommends them for the Program. This recommendation is not provided until after an application is submitted.  (Wright Decl. ¶ 70).

46. Further, for those students for whom DOE does not have records showing that the student meets one of the individual disadvantaged criteria, the documentation submitted by the parent or guardian with the application must be verified before the application can be approved and an offer made.  . (Wright Decl. ¶ 70).

47. After the application process is completed, the Discovery Program offers are made to those students who have applied and have been found eligible.  (Wright Decl. ¶ 71).

48. The invitation data shows that during the years 2016-2020, the number of invitations sent to students whose disadvantaged status was unknown the "Maybe Disadvantaged" either exceeded the number of invitations sent to students who were "Definitely Disadvantaged" based on DOE's records. or were at least 28% of the invitations.  (Wright Decl. ¶ 72, Exh. H).

49. A comparison of the invitation data to the offer data shows that most of the students who submitted an application, were found eligible and received an offer are in the category of students for whom DOE had records showing that the student met one of the individual disadvantaged criteria at the time the invitations were sent. (Wright Decl. ¶ 73, Exh. H).

50. Students in this Definitely Disadvantaged category received 83% of the offers for the 2016 entering class, received 90% of the offers for the 2017 entering class, received 95% of

the offers for the 2018 entering class, received 93% of the offers for the 2019 entering class and received 97% of the offers for the 2020 entering class.  (Wright Decl. ¶ 73, Exh. H).

51.     In the 2016-2018 entering classes the majority of students who received invitations were in the Maybe Disadvantaged category and in the 2019-2020 entering classes they were at least 29% of those who received invitations.  (Wright Decl. Exh. H).

52.     This large disparity indicates that there are students in the Maybe Disadvantaged category, for whom DOE had no records showing that they met the individual disadvantaged criteria, who did not meet these criteria and were not eligible for the Discovery Program.  (Wright Decl. ¶ 74).

53.     The ethnic/racial breakdown of the students in terms of invitations shows a lower percentage of Asian students in the Maybe Disadvantaged category than in the Definitely Disadvantaged category, and a lower percentage of Asian students in the Maybe Disadvantaged category and in the total invitations data than in the offers to the Discovery Program data.  .  (Wright Decl. ¶ 76, Exhs. D, I).

54.     For the 2016 entering class, Asian students received 58.6 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 56.9 %, and Asian students received 40.9% of all the invitations  (when the Maybe Disadvantaged students were added to the Definitely Disadvantaged students).  (Wright Decl. ¶ 77.  Exhs. D, I).

55.     For the 2017 entering class, Asian students received 65.1 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 62.9 %, and  Asian students received 41.7% of all the invitations.   (Wright Decl. ¶ 78, Exhs. D, I).

56.     For the 2018 entering class, Asian students received 61.9 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 57.9 %, and Asian students received 43% of all the invitations.   (Wright Decl. ¶ 79, Exhs. D, I).

57.     For the 2019 entering class, Asian students received 67.9% of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 59.2 %, and Asian students received 54.0% of all the invitations.  (Wright Decl. ¶ 80. Exhs. D, I).

58.     For the 2020 entering class, Asian students received 58.6 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 54.8 %, and Asian students received 49.7% of all the invitations.  (Wright Decl. ¶ 81, Exhs. D, I).

59.     Dr. Vigdor, Plaintiffs' Expert Witness, Used the Invitation Data in his Analysis. (Richter Decl. Exh. F)..

Economic Need Index and the Direct Certification Matching Process

60.     The National School Lunch Act ("the Act") requires that students whose families participate in the Supplemental Nutrition Assistance Program (commonly known as "SNAP" or the Food Stamp Program), be directly certified as eligible for free lunches. 42 U.S.C. § 1758(b)(4)(B),(C). (Ashton Decl. ¶ 7).

61.     The Act also requires that by school year 2013-14, the states directly certify 95% of the total number of school-age children in the state who are eligible for direct certification based on the family's participation in the food stamp program.  42 U.S.C. § 1758(b)(4)(F)(i)(III). (Ashton Decl. ¶ 15).

62.     The Annual Report to Congress by the United States Department of Agriculture dated October 2018 provided information about each individual state's progress towards that goal.

The Report stated that for school year 2016-2017, New York State had a direct certification rate of 84%, while the national average was 92%. (Ashton Decl. ¶ 16, Exh. A, p.3).

63. The Report contains a narrative description of how New York State planned to address this situation.  (Ashton Decl. ¶ 18, Exh. A, p. 7).

64. As noted in the Report, the Act permits the direct certification process to be performed either at the local level or the state level at the option of the state, but opined that the process is generally more efficient and accurate when performed at the State level.  (Ashton Decl, ¶ 17, Exh. A pp. 4-5).

65. The Report stated that New York State planned to perform the Direct Certification Matching Process at the state level, beginning with school year 2017-2018, whereas it had previously been done at the local level.  The New York State Education Department implemented the Direct Certification Matching Process state-wide for the school year beginning in September 2017.  (Ashton Decl. ¶¶ 18, 23, Exh. A, p. 7).

66. In addition to SNAP participation, states may choose to provide direct certification based on a family's participation in other means-tested federally funded programs. Those programs are administered by the New York City Human Resources Administration in New York City.  New York State chose to perform direct certification based on a family's participation in these additional programs.  (Ashton Decl. ¶ 22).

67. The result of the State's Direct Certification Matching Process was that more DOE students were identified as having an Economic Need Value ("ENV) of 1.0  (Ashton Decl. ¶ 23).

68.  The DOE calculates ENI annually and the ENI of a school is based on the ENV average of the students attending that school.  The data resulting from the matching process was

that the number of middle schools as well as other DOE schools with an ENI of 0.6 or more increased. (Ashton Decl. ¶¶ 5, 24, 25).

Dated:      New York, New York
            October 1, 2021

                                            GEORGIA M. PESTANA
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street
New York, N.Y. 10007
P: (917) 941-5946; (212) 356-0873
mrichter@law.nyc.gov
ssprayre@law.nyc.gov


By:     /s/ *Marilyn Richter*
        Marilyn Richter
        Sharon Sprayregen
        Assistants Corporation Counsel