18 CV 11657 (ER)(OTW)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTA McAULIFFE INTERMEDIATE SCHOOL
PTO, Inc. et al,

Plaintiffs,

-against-

BILL DE BLASIO, in his official capacity as Mayor of
New York, et al.,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**_GEORGIA M. PESTANA_**
_Corporation Counsel of the City of New York_
_Attorney for Defendants_
_100 Church Street_
_New York, N.Y.  10007_

_Of Counsel:    Marilyn Richter_
_Sharon Sprayregen_
_Tel:  (917) 941-5946; (212) 356-0873_
_Matter No. 2018-094646_

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

STANDARD OF REVIEW ........................................................................................... 3

ARGUMENT

      POINT I

            PLAINTIFFS CANNOT PREVAIL ON THEIR EQUAL PROTECTION CLAIM BECAUSE THE CHALLENGED POLICIES HAVE NOT HAD A DISCRIMINATORY EFFECT ON ASIAN STUDENTS. ............................................................................................4

            A.    A Facially Neutral Policy Does Not Violate the Equal Protection Clause of the Fourteenth Amendment Unless It Has a Discriminatory Effect ..............................................................................4

            B.    Plaintiffs' Claim Does Not Meet the Standard for Establishing Disparate Impact ....................................................6

            C.    Asian Students Have Been the Most Successful of the Four Main Racial/Ethnic Groups in the Admission Process for the SHS, Both Before and After the Challenged Changes were Implemented for the Classes Entering in 2019 and 2020.  Indeed, Asian Students Benefitted from the Changes. Compared to 2018: (1) the Percentage of the Offers Received by Asian Students *Increased* in both 2019 and 2020; (2) the Percentage of Asians who Received Offers *Increased* in 2019 and 2020; and (3) the Spread Between Asian Students' Actual Result and their Predicted Result *Increased* in both 2019 and 2020.............................................................................11

**Page**

D.     It is Undisputed that if DOE had not Implemented the Challenged Changes, Asian Students Would Have Received Fewer Offers Than They Did in 2020 When the Changes were Fully Implemented ...............................................13

POINT II

THE ANALYSIS OF PLAINTIFFS' EXPERT SHOULD BE GIVEN NO WEIGHT AS A MATTER OF FACT AND OF LAW.  THE ANALYSIS IS BASED ON AN INCORRECT POPULATION. TO THE EXTENT IT FOCUSES ON TWO SCHOOLS, IT IS CONTRARY TO THE PLAINTIFFS' CLAIM IN THE COMPLAINT. THE ASSERTION THAT ASIAN STUDENTS CHANGED THEIR BEHAVIOR IN RESPONSE TO THEIR PERCEPTIONS OF THE ANNOUNCEMENT OF THE CHALLENGED CHANGES IS PURE SPECULATION AND DOES NOT SUPPORT A CLAIM OF DISPARATE IMPACT ...............................................15

A.     The Analysis Fails to Meet the Statistical Standards Prescribed By Law Because It Analyzes an Incorrect Population ...............................................15

B.     Asian Students Received a Higher Percentage of the Offers to the Discovery Program than the Offers based on SHSAT Score Only ...............................................20

C.     Plaintiffs Cannot Show Disparate Impact by Focusing on Two Schools, and in Any Event, the Analysis, Which is Based on Invitations, is Inaccurate ...............................................21

D.     Plaintiffs Cannot Show Discriminatory Effect Necessary to State an Equal Protection Claim Based on the Alleged Behavioral Changes ...............................................23

CONCLUSION ...............................................29

# TABLE OF AUTHORITIES

**Cases**                                                                        **Pages**

*Atkins v. Westchester Cty. Dep't of Soc. Serv.*,
   31 F. App'x 52 (2d Cir. 2002) ...................................................................................4

*Boston Parent Coal. For Acad. Excellence Corp. v.*
   *Sch. Comm. Of City of Boston*,
   996 F.3d 37 (1st Cir. 2021) .......................................................................................8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................3

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio,*
   364 F. Supp. 3d 253 (S.D.N.Y. 2019),
   *aff'd,* 788 Fed. Appx. 85 ......................................................................................5, 26

*Debra P. v. Turlington*,
   644 F.2d 397 (5th Cir. 1981) ....................................................................................7

Doe *v. Lower Merion Sch. Dist.*,
   665 F.3d 524 (3d Cir. 2011)......................................................................................5

*Drew v. City of N.Y., No. 18-CV-10557 (JMF)*,
   *2020 U.S. Dist. LEXIS 120674 (S.D.N.Y. July 9, 2020)* ..........................................5

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)..................................................................................................3

*Feingold v. New York*,
   366 F.3d 138 (2d Cir. 2004)......................................................................................6

*Garza v. Cty. of Los Angeles*,
   918 F.2d 763 (9th Cir. 1990) ....................................................................................5

*Geagan v. City Univ. of N.Y.*,
   No. 09-CV-3271, 2011 U.S. Dist. LEXIS 89018, 2011 WL 3370395
   (S.D.N.Y. July 14, 2011) ........................................................................................29

*Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16-CV-4897, 2017 U.S.
   Dist. LEXIS 77710, 2017 WL 2258374
   (S.D.N.Y. May 22, 2017),
   *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 96696, 2017
   WL 2709747 (S.D.N.Y. June 22, 2017) ..................................................................28

**Cases**                                                                           **Pages**

*Guardians Asso. of NY City Police Dep't, Inc. v Civ. Serv. Com.*,
630 F2d 79 (2d Cir 1980)........................................................................................5

*Hayden v. County of Nassau*,
180 F.3d 42 (2d Cir. 1999)....................................................................................4, 9

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)........................................28

*Jaramillo v. Weyerhaeuser Co.*,
536 F.3d 140 (2d Cir. 2008)..................................................................................3

*Johnston v. Carnegie Corp. of N.Y.*,
No. 10-CV-1681, 2011 U.S. Dist. LEXIS 29862, 2011 WL 1085033
(S.D.N.Y. Feb. 24, 2011),
*report and recommendation adopted*, 2011 U.S. Dist. LEXIS 29857, 2011
WL 1118662 (S.D.N.Y. Mar. 23, 2011) .................................................................28

*Jones v. City of Boston*,
752 F.3d 38 (1st Cir. 2014)....................................................................................9

*Lewis v. Ascension Par. Sch. Bd.*,
806 F.3d 344 (5th Cir. 2015) .................................................................................5

*Malave v. Potter*,
320 F. 3d 321 (2d Cir. 2003)..................................................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..............................................................................................3

*Nunez v. Cuomo*,
No. 11-CV-3457 (DLI) (LB), 2012 U.S. Dist. LEXIS 110867
(E.D.N.Y. Aug. 7, 2012)..................................................................................... 15-16

*Patterson v. County of Oneida*,
375 F.3d 206 (2d Cir. 2004)..................................................................................6

*Pelaez v. Life Alert, Inc.*,
No. 09-CV-1668, 2011 U.S. Dist. LEXIS 34964, 2011 WL 1321999
(E.D.N.Y. Mar. 30, 2011) ......................................................................................28

*Scott v. Harris*,
550 U.S. 372 (2007)..............................................................................................3

**Cases**                                                                                                        **Pages**

*Sharif v. N.Y. State Educ. Dep't,*
    709 F. Supp. 345 (S.D.N.Y. 1989) ...............................................................................7, 21

*Smith v. Xerox Corp.,*
    196 F. 3d 358 (2d Cir. 1999)...................................................................................6, 16

*United States v City of NY,*
    637 F. Supp. 2d 77 (E.D.N.Y. 2009) ....................................................................5, 6, 7

*United States v. City of Yonkers,*
    96 F.3d 600 (2d Cir. 1996)...........................................................................................4

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,*
    429 U.S. 252 (1977)................................................................................................4, 5

*Waisome v. Port Auth. of NY & New Jersey,*
    948 F.2d 1370 (2d Cir. 1991)......................................................................................6

**Statutes**

20 U.S.C. § 1681 ...................................................................................................................7

Fed. R. Civ. P. 56 ..................................................................................................................3

Fed. R. Civ. P. 56(c) .............................................................................................................3

Hecht-Calandra Act, New York Education Law § 2590-g(12)(d)................................17

§ 1983.....................................................................................................................................7

## **PRELIMINARY STATEMENT**

Plaintiffs bring this action against Bill de Blasio, Mayor of New York, and Richard A. Carranza, former Chancellor of the New York City Department of Education ("DOE"), in their official capacities (collective, "Defendants"), alleging that the Defendants' changes to the admissions process for the eight Specialized High Schools ("SHS"), public high schools that provide rigorous instruction to academically gifted students, violate the Equal Protection Clause of the Fourteenth Amendment because they discriminate against Asian students. The changes increase the percentage of seats for students who enter through the Discovery Program, and require that a student not only be individually disadvantaged, but also attend a school with a high Economic Need Index (ENI), which is a measure of the poverty of the students at the school. There is no dispute that these changes are facially neutral. A facially neutral policy does not violate the Equal Protection Clause unless it has a discriminatory effect. The sole issue of dispute in this motion for summary judgment is whether the Plaintiffs can show a discriminatory effect. They cannot because, based on all ways of examining the data, Asian students are the highest performing ethnic group and have benefited from the changes they challenged.

The well-settled framework for analyzing whether a facially neutral policy has a discriminatory effect compares (i) the racial/ethnic composition of the passing pool (here, students who received offers) to that of the applicant pool (here, students who took the test for admissions), or (ii) the comparative passing rate of each racial/ethnic group who receive offers (i.e., compares the percentage of Asian test-takers who receive offers to the percentages of Black, Hispanic and White test-takers who receive offers). Using both of these measures Asian students are the highest performing of the four major racial groups. Using the first measure, in 2019, Asian students were

30.7% of the applicant pool and received 52.5% of the offers; in 2020, Asian students were 31.4% of the applicant pool and received 54.8 % of the offers. Using the second measure, a higher percentage of Asian test takers received offers in 2019 and 2020, than any of the other major racial/ethnic groups.  (In 2019 and 2020, 33.2% and 31.9% of Asian students received offers; the second highest performing group was White students, with 28.2% and 23.7% receiving offers in 2019 and 2020 respectively). Based solely on these numbers, the Court should grant summary judgment for Defendants because Plaintiffs cannot show a disparate impact using the proper standard.

However, even using Plaintiffs' preferred metric –a comparison of Asian students' performance before and after the Discovery Program  changes—Plaintiffs still cannot show a discriminatory effect because Asian students performed better after the changes, and the program's expansion benefited Asian students.  Compared to 2018 (i) the percentage of the offers received by Asian students *increased* in both 2019 and 2020; (ii) the percentage of Asians students who received offers also *increased* in 2019 and 2020; and (iii) the spread between Asian students' share of offers and share of test-takers *increased* in both 2019 and 2020.

Even, Plaintiffs' own expert, who compared the actual results for the class of students entering in 2020 to what the results would have been if the pre-change 2018 criteria were applied, found that Asian students fared better after the Discovery program expansion. Moreover, he analyzed an incorrect population (those who received offers were a subset of the population he analyzed) which improperly reduced (but did not eliminate) the benefit of the changes to Asian students.

Faced with the impossible task of attempting to show disparate impact in light of these facts, Plaintiffs' expert focused on Asian students' performance at two cherry-picked schools of

2

the eight SHSs, even though Plaintiffs' claim had always concerned admissions to all eight schools. He also asserted that there were purported behavioral changes by Asian students that could have been based on their alleged perceptions of the announcement of the changes, which the expert asserted was probative of disparate impact even if the perceptions were not factually correct.  The causal connection between the behavioral changes and the announcement is based purely on speculation, and, even if true—which it is not—would still fail to state a claim for discriminatory effects.

For these reasons, as discussed more fully below, Defendants' motion for summary judgment should be granted.

## STATEMENT OF FACTS

The Court is respectfully referred to Defendants' 56.1 Statement and the Declarations of Eric Ashton, dated September 30, 2021, Lianna Wright, dated October 1, 2021 Marilyn Richter, dated October 1, 2021 and the exhibits annexed thereto for a complete statement of the relevant facts.

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, no genuine issue of material fact exists. *See* Fed. R. Civ. P. 56; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). The non-movant must "make a showing sufficient to establish the existence of an element essential to that party's case . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[T]he non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of material fact for trial." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d

3

Cir. 2008) (citations omitted). The non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor may the non-moving party "rest upon the mere allegations or denials of his pleading." *Celotex*, 477 U.S. at 322 n.3. Rather, the non-moving party must "cit[e] to particular parts of the materials in the record" to show that a fact is generally disputed. Fed. R. Civ. P. 56(c). While the evidence must be viewed in the light most favorable to the non-moving party, when there is reliable objective evidence, the evidence may speak for itself. See *Scott v. Harris*, 550 U.S. 372, 378-81 (2007).

## ARGUMENT

### POINT I

### PLAINTIFFS CANNOT PREVAIL ON THEIR EQUAL PROTECTION CLAIM BECAUSE THE CHALLENGED POLICIES HAVE NOT HAD A DISCRIMINATORY EFFECT ON ASIAN STUDENTS.

**A. A Facially Neutral Policy Does Not Violate the Equal Protection Clause of the Fourteenth Amendment Unless It Has a Discriminatory Effect**

The challenged changes to the Discovery Program are facially neutral policies. It is binding precedent that discriminatory effect is a necessary component of a finding that a facially neutral statute or policy violates equal protection. The Second Circuit has held that "a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect."). *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999), citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977). Indeed, in *Hayden* the Second Circuit upheld dismissal of an equal protection claim based solely on the lack of discriminatory effect, where "appellants fail to set forth allegations which

would support a claim that they were adversely impacted by the redesign of the police officers entrance exam." In *Atkins v. Westchester Cty. Dep't of Soc. Serv.,* 31 F. App'x 52 (2d Cir. 2002), the Circuit similarly denied an equal protection claim and affirmed summary judgment for defendants because ~~the~~ plaintiffs failed to show a disparate impact, holding that "plaintiffs have not made a prima facie showing that the promotional exam has exerted a disparate impact on African-American test-takers." *Id.* at 54. *See also United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996) ("A plaintiff is required to show not only that the state action complained of had a disproportionate *or discriminatory impact* but also that the action was taken with intent to discriminate.")

Indeed, in this case, the Second Circuit affirmed this Court's denial of Plaintiffs' motion for a preliminary injunction, in which this Court stated that  "a law or policy that is facially neutral discriminates on the basis of race if it is motivated by a discriminatory purpose and its application results in a discriminatory effect." [citing *Arlington Heights*, 429 U.S. 252, 264–65]. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio,* 364 F. Supp. 3d 253, 276 (S.D.N.Y. 2019), *aff'd,* 788 Fed. Appx. 85 (2019). *See also, Drew v. City of N.Y.,* No. 18-CV-10557 (JMF), 2020 U.S. Dist. LEXIS 120674, at *9 (S.D.N.Y. July 9, 2020) (requiring facts that show "disparate impact" to state an equal protection claim).

Other circuit courts have also required a showing of discriminatory effect to establish an equal protection violation. *See, e.g.,* Doe *v. Lower Merion Sch. Dist.*, 665 F.3d 524, 549-50 (3d Cir. 2011) ("discriminatory impact must be shown to establish an equal protection violation because "plaintiffs must show that they have been injured as a result" of the governmental action to ensure that courts "can impose a meaningful remedy.") (quoting *Garza v. Cty. of Los Angeles*,

918 F.2d 763, 771 (9th Cir. 1990)); *See also, Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 358-59 (5th Cir. 2015).

### B. Plaintiffs' Claim Does Not Meet the Standard for Establishing Disparate Impact

The well-settled framework for analyzing whether a facially neutral policy has a discriminatory effect (also referred to as adverse impact, discriminatory impact and disparate impact) is applicable here. Where a claim is based on race/ethnicity, a recognized starting point is a comparison of the racial and ethnic composition of the passing pool (here, students who received offers) to that of the applicant pool (here, students who took the SHSAT). *Guardians Asso. of NY City Police Dep't, Inc. v Civ. Serv. Com*., 630 F2d 79, 86-88 (2d Cir 1980). As stated in *United States v City of NY*, 637 F. Supp. 2d 77, 96-97 (E.D.N.Y. 2009)(subsequent history omitted): "[statistical tests] assume that racial or ethnic groups will perform equally well absent discrimination. *See Smith v. Xerox Corp*., 196 F. 3d 358, 366 (2d Cir. 1999) (recognizing 'null hypothesis' of no difference between compared groups)." This is called the "predicted result." *Waisome v. Port Auth. of NY & New Jersey*, 948 F.2d 1370, 1376 (2d Cir. 1991). The predicted result is that each group's percentage of the passing pool matches the group's percentage of the applicant pool.

Another starting point for measuring whether a facially neutral policy has a discriminatory effect is a comparison of the passing rates of the different racial and ethnic groups. The passing rate of each group is the number in that racial/ethnic group who pass (here, students who received offers) divided by the number of applicants of that race who took the test. (Another way of stating this is the passing rate is the percentage of the racial/ethnic group test-takers who receive offers.) *See United States v City of NY*, 637 F. Supp. 2d 77, 96-97 (E.D.N.Y. 2009)(subsequent history

omitted) (comparing, passing rates of Black candidates to White candidates, on exams to hire firefighters). If all groups perform equally well, their passing rates are equal.

While courts developed this framework for comparing the performance of racial or ethnic groups in employment discrimination cases brought pursuant to Title VII of the Civil Rights Act of 1964 alleging disparate impact, it is also applicable to claims brought pursuant to the Equal Protection Clause of the Fourteenth Amendment and in the educational context. *See Patterson v. County of Oneida*, 375 F.3d 206, 225-27 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in violation of . . . the Equal Protection Clause . . . ."); *Feingold v. New York*, 366 F.3d 138, 159 & n.20 (2d Cir. 2004) ("Once action under color of state law is established . . . [an] equal protection claim parallels . . . [a] Title VII claim. Except, of course, that unlike a Title VII claim a Section 1983 claim can be brought against individuals.").

Thus, in *United States v. City of N.Y.*, 683 F. Supp. 2d 225, 261 (E.D.N.Y. 2010)(overruled on unrelated grounds), which was brought under both Title VII and the Equal Protection Clause, the court applied the Title VII's disparate impact standard to the plaintiffs' equal protection claim. The court reviewed the same data for both claims—the relative passing rates of White and Black candidates on the firefighter's entrance exam (*id.* at 249, 26), and found that the much lower passing rate of Black candidates satisfied -the discriminatory impact prong of the equal protection claim. *Id.* at 261. *Similarly, in Sharif v. N.Y. State Educ. Dep't*, 709 F. Supp. 345, 362 (S.D.N.Y. 1989), a case brought pursuant to the Equal Protection Clause and Title IX, 20 U.S.C. § 1681, *et seq.* the Southern District found that the female plaintiffs had met their burden of establishing a prima facie case of disparate impact in the educational context where males were 47% of the applicants but received 72% of one type of scholarship and 57% of the other type. *See also Debra*

7

*P. v. Turlington*, 644 F.2d 397, 406-07 (5th Cir. 1981) (examining differential passing rates of white and black students, as starting point for adjudicating an equal protection claim).

Plaintiffs' position, as set out in their complaint and preliminary injunction motion, is that the performance of Asian students in the admission process for the SHS for the class entering in Fall 2018, which was the admission cycle before the challenged changes were implemented, establishes the basis for comparison, and that if a smaller percentage of Asian students had received offers for the classes entering in 2019 and 2020 than they did in 2018, that this would have constituted disparate impact. *See, e.g*., ECF No. 1 (Compl.) ¶¶ 40, 48; ECF No. 11 (Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction), 10-13. In fact, as discussed below, Asian students received a greater percentage of the offers in 2019 and 2020 than they did in 2018.

However, comparing Asian students' performance in 2018 to 2019 or 2020 is not the proper comparison.  The same argument was made in a very similar recent case.  In *Boston Parent Coal. For Acad. Excellence Corp. v. Sch. Comm. Of City of Boston,* 996 F.3d 37 (1st Cir. 2021), the school district redesigned the admission criteria for three highly selective schools known for the strength of their academic programs.  The plan was adopted in light of the pandemic and the limitations it imposed.  The prior admission process was quite similar to that used for the SHS; the Boston schools utilized a standardized test and student preferences as here, but also utilized the students' grade point averages.  As here, there were many more applicants than available seats.

The plaintiff sued under the Equal Protection Clause and state law, alleging that the revised admission criteria in the plan  discriminated against White and Asian students, even though it was anticipated that White and Asian students would receive greater percentages of the offers than their percentages of the applicant pool.  Plaintiff claimed that under the plan they would receive fewer

offers than they had in prior years, and that they would receive fewer offers than they would if admissions were based solely on grade point averages and that this constituted disparate impact.

The district court entered judgment for defendant and plaintiff moved for a stay of the judgment pending resolution of the appeal.  In denying the motion, the First Circuit stated:

> Looking at the degree of disproportionate racial effect resulting from the  challenged practice is doubly problematic for plaintiff. First, as compared to a random distribution of invitations, the Plan has no adverse disparate impact on White and Asian students. Rather, plaintiff is able to generate a supposed adverse impact principally by comparing the projected admissions under the Plan to prior admissions under the predecessor plan. Alternatively, plaintiff compares projections under the Plan to projections of admissions based only on GPA. Either comparator does produce even higher percentages of White and Asian students than does the Plan. But plaintiff offers no analysis or argument for why these particular comparators, rather than a plan based on random selection, are apt for purposes of determining adverse disparate impact. *Cf. Jones v. City of Boston,* 752 F.3d 38, 47 (1st Cir. 2014) (explaining that Title VII plaintiffs seeking to prove disparate impact must show that a policy produced results "that are not randomly distributed by race").

*Id.* at 45-46.

The First Circuit ultimately denied the motion because the plaintiff failed to show intent to discriminate and stated that whether "the numerical decrease in the overrepresentation of Whites and Asians under the Plan" would constitute disparate impact did not need to be then decided but criticized this theory of impact,  calling it a "weakness" that "certainly cut[s] against finding that the degree of disproportionate effect contributes to plaintiff's likelihood of success on the merits." *Id*. at 46.

The Second Circuit's decision in *Hayden, supra*, 180 F.3d 42, employs a similar analysis. In *Hayden,* a police entrance examination was challenged, *inter alia,* under both Equal Protection and Title VII.  The plaintiffs were about seventy White, Hispanic and female applicants and the

case was brought as a class action.   Plaintiffs claimed that the exam process was intentionally designed to favor Black applicants and had a discriminatory effect on them.   The exam as administered contained numerous sections.  After the exam was graded, an advisory group looked at the results and determined which combination of sections would provide sufficient validity (job-relatedness) and minimize the adverse impact on minorities.   Based on the advisory group's assessment, the results on a number of sections were used to determine the final grades, while the results on the other sections were excluded.  *Id*. at 46-47.

The district court dismissed the complaint, holding that it failed to state a claim.  On appeal, the plaintiffs claimed that they would have done better if the results on the cognitive sections had been included in the final grades.  The Circuit held that even if true, this does not support a claim of adverse impact on plaintiffs.  The Court observed that while the redesigned exam decreased the extent of the adverse impact on Black applicants, it did not eliminate it, and that the plaintiffs acknowledged that on average they had higher scores than the Black applicants.  *Id.* at 51-53.   The Circuit affirmed the dismissal of the complaint.

Applying these established standards Plaintiffs cannot state a claim for disparate impact. First in both post-Discovery expansion years, 2019 and 2020, Asian students' share of the offers exceeded their share of the applicant pool.  In 2019,  Asian students were 30.7% of the applicant pool and received 52.5% of the offers. (Wright  Decl. ¶ 59). In 2020, Asian students were 31.4% of the applicant pool and received 54.8 % of the offers.  (*Id*.). Second, looking at the percentage of Asian test takers who receive offers, Asian students performed the best of all racial/ethnic groups: in 2019 33.2% of Asian test-takers received offers, and in 2020 31.9% of Asian test-takers received offers.  (*Id.* ¶ 61). In contrast, in 2019-2020, approximately 4-5% of Black test-takers received offers, approximately 6% of Latino test takers received offers, and 24-28% if White test-

takers received offers. (*Id.*). In sum, since Asian students were the highest performing racial/ethnic group, Plaintiffs cannot state a claim for disparate impact applying the traditional standards.

### C.  Asian Students Have Been the Most Successful of the Four Main Racial/Ethnic Groups in the Admission Process for the SHS, Both Before and After the Challenged Changes were Implemented for the Classes Entering in 2019 and 2020. Indeed, Asian Students Benefitted from the Changes. Compared to 2018: (1) the Percentage of the Offers Received by Asian Students *Increased* in both 2019 and 2020; (2) the Percentage of Asians who Received Offers *Increased* in 2019 and 2020; and (3) the Spread Between Asian Students' Actual Result and their Predicted Result *Increased* in both 2019 and 2020

The data shows that offers to Asian students, as far back as 2006, have always far exceeded the predicted result,[1] , and that Asian students always had the highest passing rate of the four major racial groups (Asian, Black Latino and White).  Beginning in 2006, the percentage of applicants who were Asian was 22% and the percentage of the offers based on SHSAT score only received by Asian students was 41%; the percentage of applicants who were Asian gradually rose to 29% in 2015 and the percentage of the SHSAT score only offers received by Asian students gradually rose to 52% by 2015.[2]  (*See* Wright Decl. ¶ 10 and Exh. C).

Beginning with the 2016 entering class, complete data as to all offers made, based on the SHSAT score only and on offers to the Discovery Program is available.  Throughout these years, Asian students continued to be the most successful of the four major groups.[3]  Their results

---

[1] As discussed, *supra*, Point I.B, the predicted result is that the percentage of the offers received by Asian students would match the percentage of applicants who were Asian.

[2] The data for the period 2006-2015 is offers based on SHSAT score only.  In this period there were only approximately 1 – 3% of the seats at the SHS reserved for Discovery Program participants, so the SHSAT score only data fairly accurately reflects the overall admission data.  (Wright Decl. ¶ 9 and Exhs. B and C),

[3] DOE also analyzes the data for students in the Native American, Multi-Racial (beginning in 2014) and Unknown categories.  The Native American and Multi-Racial groups constitute very small percentages of the applicants compared to the four major groups.  Multi-Racial students were actually the most

continued to greatly exceed the predicted result (to a larger extent than for White students, which is the other group whose actual results exceeded their predicted results). Asian students also had the highest passing rate of the four major groups in all these years. (*See* Wright Decl. ¶ 61 , Exhs. C and D).

Focusing on what Plaintiffs incorrectly claim should be the comparison basis for establishing disparate impact, the results for the 2018 entering class, the year before the changes were implemented, and comparing those results to the results for the classes entering in 2019 and 2020 after the changes were implemented, shows just how successful Asian students were in the admission process during these years, and that Asian students did even better when the changes were implemented. Thus, even under Plaintiffs' theory of what constitutes disparate impact, there was no such discriminatory effect.

In 2018, Asian students were 31.1% of the applicant pool and received 52.2% of the offers. In 2019, when the ENI criterion was implemented and the Discovery Program was expanded to approximately 13% of the seats, Asian students were 30.7% of the applicant pool and received 52.5% of the offers. In 2020, when the ENI criterion was continued and the Discovery Program was fully expanded to approximately 20% of the seats, Asian students were 31.4% of the applicant pool and received 54.8 % of the offers.   (*See* Wright Decl. ¶¶ 59, 60 and Exhs. C and D).

This data shows not only that the percentage of offers that went to Asian students increased after the changes were implemented, but also that the "spread" between the predicted result and

---

successful group in some years since 2014, with Asian students second in those years, but there were only between 112 and 362 Multi-Racial applicants, compared to between 7,946 and 8,809 Asian applicants in those years.  (*See* Wright Decl. ¶¶ 12-13, 31, n. 1, Exhs C and D).

the higher actual result for Asian students increased after the changes were implemented (21.1% in 2018; 21.8% in 2019 and 23.4% in 2020).

A comparison of the passing rate data also shows that the challenged changes benefited Asian students.[4]  The passing rate for Asian students increased after the challenged changes were implemented.  In 2018, the passing rates for Asian students was 31.7%, in 2019 it was 33.2% and in 2020 it was 31.9%.  A comparison of the Asian passing rates to those of the other three major groups shows just how successful Asian students were in the admission process, both before and after the challenged changes.  In 2018, the passing rate for Black students was 4.1%, in 2019 it was 4.4 % and in 2020 it was 5.4 %.  In 2018, the passing rate for Latino students was 5.5%, in 2019 it was 6.1% and in 2020 it was 6.4%.  In 2018, the passing rate for White students was 26.7%, in 2019 it was 28.2% and in 2020 it was 23.7%.  It should be noted that the passing rates for all four major groups were somewhat lower in 2020 than they would have been if the number of offers had not significantly decreased by 260 from the number of offers made in 2019 (from 5,342 to 5,082 offers).  (Wright Decl. ¶¶ 31, 61, 62, Exhs. C and D).

Accordingly, assuming *arguendo* that Plaintiffs use of the 2018 baseline were correct, the impact of the challenged changes was beneficial rather than adverse to Asian students and cannot possibly constitute an equal protection violation.

**D.  It is Undisputed that if DOE had not Implemented the Challenged Changes, Asian Students Would Have Received Fewer Offers Than They Did in 2020 When the Changes were Fully Implemented**

---

[4] As discussed, *supra*, Point I.B, the passing rate of each group is the number in that racial/ethnic group who pass (here, students who received offers) divided by the number of applicants of that race who took the test.

Plaintiffs' expert, Dr. Jacob Vigdor, performed an analysis of what would have been the result if offers had been made to the applicants that took the SHSAT for the entering class of 2020, in accordance with the policies that existed in 2018, prior to the challenged changes.  (Using the 2018 criteria, there would have been approximately 252 seats reserved for the Discovery Program and only the individual disadvantaged criteria in effect for eligibility for the Discovery Program.) He concluded that using the 2018 criteria,  Asian students would have received *fewer* offers to the Discovery Program in 2020 than they did with the challenged changes.  *See* Exh. C to the Richter Decl., Vigdor Report, Table 8 (p. 14) comparing column 1 (Actual Algorithm) to column 2 (2018 Algorithm).

As discussed below, it is Defendants' position that Dr. Vigdor's use of the invitation-to-the-Discovery-Program data rather than the approved-offer-to-the-Discovery-Program data is incorrect, and that had Dr. Vigdor used the approved offer data, the results would have been even more favorable to Asian students.   Accordingly, Defendants do not dispute Dr. Vigdor's conclusion that had the changes not been implemented, Asian students would have been received fewer offers for the 2020 entering class than they did receive with full implementation of the changes.

14

**Point II**

**THE ANALYSIS OF PLAINTIFFS' EXPERT SHOULD BE GIVEN NO WEIGHT AS A MATTER OF FACT AND OF LAW.   THE ANALYSIS IS BASED ON AN INCORRECT POPULATION.   TO   THE   EXTENT   IT FOCUSES   ON   TWO   SCHOOLS,   IT   IS CONTRARY TO THE PLAINTIFFS' CLAIM IN THE COMPLAINT.   THE ASSERTION THAT ASIAN STUDENTS CHANGED THEIR BEHAVIOR   IN   RESPONSE   TO   THEIR PERCEPTIONS OF THE ANNOUNCEMENT OF THE CHALLENGED CHANGES IS PURE SPECULATION AND DOES NOT SUPPORT A CLAIM OF DISPARATE IMPACT.**

The undisputed facts, discussed in Point I, *supa*, show that Asian students, already the most successful major racial group in the admission process for the SHS for many years, benefitted from the challenged changes by receiving an increased percentage of the offers to the SHS,   Faced with the impossible task of attempting to show disparate impact in light of these facts, Plaintiffs' expert analyzed an incorrect population which improperly reduced (but did not eliminate) the benefit of the changes to Asian students; focused on two of the SHS when that was never plaintiffs' claim; and asserted that there were purported behavioral changes by Asian students based on their alleged perceptions of the announcement of the changes, which the expert asserted was probative of disparate impact even if the perceptions were not factually correct.  The causal connection between the behavioral changes and the announcement was based purely on speculation.

**A.   The Analysis Fails to Meet the Statistical Standards Prescribed By Law Because It Analyzes an Incorrect Population**

It   is   axiomatic   that   "when   offering   statistics,   'plaintiffs   must   identify the *correct* population for analysis.'" *Nunez v. Cuomo*, No. 11-CV-3457 (DLI) (LB), 2012 U.S.

Dist. LEXIS 110867, at *29-30 (E.D.N.Y. Aug. 7, 2012) (citing *Smith v. Xerox Corp*., 196 F. 3d 358, 368 (2d Cir. 1999) (original emphasis) . "[I]n the context of work place promotions, we have held that the appropriate comparison is customarily between the composition of candidates seeking to be promoted and the composition of those actually promoted." *Malave v. Potter*, 320 F. 3d 321, 326 (2d Cir. 2003).

"Where the comparison includes a non-relevant population as part of the analysis, that comparison and analysis 'do not meet the statistical standards prescribed by law.' *Nunez v. Cuomo*, No. 11-CV-3457 (DLI) (LB), 2012 U.S. Dist. LEXIS 110867, at *29-30 (E.D.N.Y. Aug. 7, 2012) (citing *Chin*, 685 F. 3d at 153, 2012 U.S. App. LEXIS 14088, *39, 2012 WL 2760776, at *12.). In *Chin*, the Second Circuit held that the statistics "do not meet the statistical standard prescribed by law" (685 F. 3d at 153) because the expert "simply compared the percentage of Asian Americans in supervisory positions with the percentage of Asian American officers, rather than looking to the relevant pool [of Asian Americans who were eligible] for promotion." *Id*. at 152. *See also Nunez,* 2012 U.S. Dist. LEXIS 110867, *30 (proffered statistics likely do not "meet the standards prescribed by law" where the issue was whether certain prison closings disproportionately affected minority uniformed correction officers, but the plaintiffs' statistics examined all employees at the affected facilities).

Here, the relevant comparison is between applicants and those who received offers, either based on their SHSAT score or to the Discovery Program. Students who received offers would be the equivalent, in the labor context, to those who were "actually promoted." *Malave*, 320 F. 3d at 326.

Although the individual student level data was provided to Dr. Vigdor, he did not analyze the data for "offers" to the Discovery Program, but instead analyzed the data for "invitations" to

16

the Discovery program.  (*See* Exh. F to Richter Decl.,  Vigdor Supplemental Report, May 28, 2021, p. 1) (confirming Dr. Vigdor analyzed invitations rather than offers). [5]

Invitations are sent to parents of students inviting them *to apply* for the Discovery Program. Those students may be eligible for the Discovery Program, but when the invitations are sent The student's eligibility may be unknown.  The Hecht-Calandra Act, New York Education Law § 2590-g(12)(d) requires, *inter alia*, that students be recommended by their current school.  The school makes this recommendation on the application submitted by the student's parent.  The statute also requires that students be disadvantaged.  For many of its students, DOE has records that show that the student meets one of the individually disadvantaged criteria that DOE has established, however for many of its students DOE lacks such records.  DOE also has no records that show whether a non-DOE student (e.g., attending a private or charter school) meets the individual disadvantaged criteria. Rather than eliminate any potentially eligible students, DOE sends invitation letters to all students (up to the projected number needed to fill the available Discovery Program seats) who meet the other requirements for eligibility: their SHSAT score and SHS school choices qualify them for a Discovery seat and, since 2019, they attend a school with an ENI of at least 0.6 or live in a census tract where at least 60% of the families with school-age children have income below the federal poverty line.  (Wright Decl. ¶  63).

---

[5] In the individual student level data that Defendants provided to Plaintiffs, there are columns headed "Individual Disadvantaged Status," "Invitation to Discovery" and "Approved to Participate in Discovery."  If the student received an invitation to Discovery, the Individual Disadvantaged Status column contains either "Disadvantaged" or "Unknown."  If the Student then received an Offer, that is also  indicated in the "Approved to Participate in Discovery" column.

There are three different invitation letters to these three groups of students.  For DOE students who are known to be disadvantaged, the invitation letter asks them to fill out the application and submit it to their current school if they want to attend the Discovery Program. (Exh. E to the Wright Decl.).  For DOE students where DOE lacks records showing the student is disadvantaged, the invitation letter states:  "*Information in NYCDOE systems indicates that your child does not meet any of the four requirements listed above [the individual disadvantaged criteria].  If this is correct, do not submit an application for this program—no further action is needed.*"  (emphasis added).  The letter then states that if the child does meet any of the four requirements the parent or guardian should submit documentation of that together with the application. (Exh. F to Wright Decl.)  The letter for non-DOE students explains that the child must meet one of the four disadvantaged criteria and if the child wants to attend the Discovery Program documentation of that should be submitted  with the application. (Exh. G to Wright Decl.). [6]  Offers to the Discovery program are subsequently made to students who submit applications, whose middle school counselor or principal then certifies that the student is recommended for the Summer Discovery Program and whose required documentation, if any, of individual disadvantage is verified.

The data indicates that many invitations go to students who do not meet any of the individual disadvantaged criteria and therefore are not eligible for the Discovery Program.

---

[6] Notably, Dr. Vigdor's testimony demonstrated he did not understand that some invitations were extended to students who were in *not* eligible for the program.  Vigdor Dep. 107:20-108:1.  (Exh. G to the Richter Decl.).  Further, in his Supplemental Report, where he responds to the Supplemental Report of Michael Scuello (Exh. D to the Richter Decl.), which states that invitations are sent to students who are not eligible (pp. 1-2), Dr. Vigdor does not acknowledge or address the eligibility issue.

Between 2016 and 2020, of the students for whom there were no records showing they were disadvantaged, only between 2.9% and 13.3% received offers to the Discovery program (see Exhibit H to Wright Decl.). For the entering classes of 2018, 2019, and 2020, the most relevant years for this case, the percentage of such students who received offers was 2.9%, 13.3% and 6.0% respectively.  By contrast, of the students the DOE knows, based on its records, are disadvantaged, between 2016 and 2020, 62.2% to 78.7% received offers.  For the 2018, 2019, and 2020 entering classes, the percentage of such students who received offers was 68.5%, 78.7%, and 72.8%, respectively.  Put another way, for the 2018 entering class, students who were known to be disadvantaged received 95% of the Discovery Program offers, for the 2019 entering class they received 93% of the offers and for the 2020 entering class they received 97% of the offers.

Nor are the very low percentage of offers to students whose disadvantaged status is unknown due to few invitations sent to these students.  In the 2016-2018 entering classes the majority of invitations went to students in this unknown disadvantaged category.  In the 2019 entering classes students in this category received 30% of the invitations and in the 2020 entering class they received 28% of the invitations (Exhibit H to Wright Decl.).  Given this huge discrepancy in offers between those who <u>may</u> be disadvantaged, and those who are <u>known to be</u> disadvantaged, the reasonable inference is that many students who received invitations were simply not eligible for the Discovery program.

Using the invitation data is not only incorrect, but it also misstates and reduces the actual success rate of Asian students in the SHS admission process.  In the years 2016-2020, for which there is readily available data, Asian students received a much higher percentage of the offers than the invitations to the Discovery Program—both before and after the program's expansion. Between 2016, and 2020, Asian students received between 40.9% and 54.0% of the invitations to

the Discovery Program, but received between 58.6% and 67.9% of the offers to the Discovery Program. Moreover, Asian students consistently received a lower percentage of invitations to the Discovery program than offers based on their SHSAT score (Asians received between 51.1% and 54.0% of the offers based on their SHSAT score during these years). Thus, analyzing "invitation" data understates the actual number and percent of offers to Asian students.

In summary, offers are made to a subset of the population who receive invitations to apply for the Program; invitations are given to many students who are not eligible for the Discovery Program; and a smaller percentage of the invitations than the offers are given to Asian students. Accordingly, the invitations are not a proxy for the offers. An analysis of the data for invitations rather than offers, particularly where Dr. Vigdor had access to the offer data, does "not meet the statistical standards prescribed by law." *Chin*, 685 F. 3d at 153.

### B. Asian Students Received a Higher Percentage of the Offers to the Discovery Program than the Offers based on SHSAT Score Only

This is true in all years between 2016-2020. For the 2020 entering class Asian students received 54.0% of the offers made based on the SHSAT score and 58.9% of the offers made to the Discovery Program; similarly for the 2019 entering class, Asian students received 51.1% of the offers made based on the SHSAT score and 65.1% of the offers made to the Discovery Program. Moreover the percentage of offers Asian students received through the Discovery Program after its expansion, is similar to the percentage of offers they received pre-expansion: for the 2016, 2017, and 2018 entering classes —the three years prior to the Program's expansion—Asian students received 58.6%, 67.9% and 61.9% respectively of the offers made to the Program. Thus, when the offer data is examined, the expansion of the Discovery Program clearly benefitted Asian students.

**C.  Plaintiffs Cannot Show Disparate Impact by Focusing on Two Schools, and in Any Event, the Analysis, Which is Based on Invitations, is Inaccurate**

This action has always been about the representation of Asian students in the eight SHS. The Complaint alleges that the expansion of the Discovery program discriminates against Asian applicants to the Specialized High Schools.  Nowhere in the Cause of Action or Prayer for Relief do Plaintiffs mention any particular high school.  In the sole Cause of Action, Plaintiffs allege, "According to Defendants' own public statements, their plan to expand and reorganize the Discovery Program for admission into New York City's Specialized High Schools is intended to racially balance the schools by limiting the number of Asian Americans who are admitted." (Compl. ¶ 62).  Similarly, the requested relief concerns all Specialized High Schools.  The Complaint requests: "An entry of judgment declaring that Defendants' plan to expand and reorganize the Discovery Program for admission to New York City's Specialized High Schools violates the Equal Protection Clause," and "An entry of a preliminary and permanent injunction against Defendants prohibiting them from implementing the changes to the Discovery Program."

Plaintiffs cannot state a claim concerning the specialized high schools by focusing on an allegedly adverse impact at only two of the eight schools.  A similar argument was rejected in *Sharif v. N.Y. State Educ. Dep't*, 709 F. Supp. 345, 362 (S.D.N.Y. 1989).  There, the plaintiffs alleged that New York State discriminated against female students by relying exclusively on SAT scores to award prestigious scholarships where women consistently scored 60 points lower than men. Defendants opposed the motion for a preliminary injunction by "focus[ing] in an *ad hoc* fashion on individual schools and counties," but "failed to attack plaintiffs' evidence of statewide disparate impact." *Id.*  The court rejected this attempted defense, holding , "[i]n a case alleging statewide discrimination, such a focus [individual schools and counties] does not rebut

plaintiffs' statewide *prima facie* case. Further, as discussed in Point I, *supra,* a group that obtains more offers than the predicted result cannot show that the current policy has a disparate impact because the group would obtain still more offers under a prior policy or a different policy.

In any event, Plaintiffs' assertion that Asian students fared worse in the 2020 entering class at Stuyvesant and Bronx Science than they would have had the 2018 admissions criteria been applied is the result of using invitation data, rather than offer data to the Discovery Program. Dr Vigdor's analyses show that at six of the eight schools, Asian students received a higher percentage of the offers based on SHSAT score only and invitations to Discovery than they would have if the 2018 criteria (i.e., algorithm) had been used (Exh. C to Richter Decl., Vigdor Report, p. 17 at Table 11, p. 19 at Table 12); but a slightly lower percentage of the offers at the remaining two schools, Stuyvesant and Bronx Science. Vigdor Report, p. 15 at Table 9 (Stuyvesant); at Table 10 (Bronx Science). Specifically, according to Dr. Vigdor's analysis, Asian students received 66.9% of the offers based on SHSAT score only and invitations to Discovery for Stuyvesant in 2020, but would have received 67.6% if the 2018 algorithm were used—a difference of less than a percentage point (0.7). *See* Vigdor Report, p. 16, Table 9. Similarly, Asian students received 55.8% of the offers via SHSAT and invitations to Stuyvesant in 2020, but would have received 57.2% if the 2018 algorithm were used—a difference of 1.4%. *See* Vigdor Report, p. 16, Table 10.

Defendants' expert, Michael Scuello, in his Supplemental Report (Richter Decl. Exh. D), analyzed: (1) the percentage of all seats offered to all eight schools based on SHSAT score only *or with an invitation* to Discovery to Asian students for the 2020, 2019, and 2018 entering classes and the difference in the percentage of seats offered to Asian students between 2018 and 2020; as well as (2) similar figures, *but using "offers" instead of "invitations" to Discovery*. Consistent with Dr. Vigdor's analysis of SHSAT score and invitation data, Asian students received a slightly

lower percentage of offers based on SHSAT score only and invitations to Discovery at Bronx Science and Stuyvesant in 2020 than in 2018.  However, substituting the Discovery Program offer data for the invitation data, *at each school—including Stuyvesant and Bronx Science— a higher percentage of offers based on SHSAT score only and offers to Discovery went to Asian students in 2020 than in 2018.* (Exhibit E to Richter Decl., pp. 3, 4 ). In sum, Mr. Scuello's analyses indicate that Dr. Vigdor's results that Asians fared worse at the two schools than they would have if the 2018 criteria were used is a result of Dr. Vigdor's analysis of the invitation data, i.e., a non-relevant population[7]

### D.  Plaintiffs Cannot Show Discriminatory Effect Necessary to State an Equal Protection Claim Based on the Alleged Behavioral Changes

Finally, Dr. Vigdor attempts to salvage Plaintiffs' case by claiming that in announcing the changes to the Discovery Program, the Department of Education adopted "a stance declaring that the representation of Asian students at specialized high schools was too high."  (Exh. C  to Richter Decl., p. 25).  He cites no evidence of such a declaration.  He claims that this stance was then publicized, and provides a quote from a *New York Times* article. "Black and Hispanic students, who make up 67 percent of the public school population are grossly underrepresented at the specialized high schools, which include Stuyvesant High School and the Bronx High School of Science."  He then questions whether Asian test-takers and their families reacted to this "implicit message that their group was over-represented…" *Id.* at 21.   Dr. Vigdor surmises that the expansion of the Discovery program "could" have "discouraged" Asian students, which, in turn,

---

[7] Not only did Dr. Vigdor confirm in his subsequent Supplemental Report that he used the invitation data in his analysis (Exhibit F to Richter Decl., p. 1), but Mr. Scuello's analysis of the offer and invitation data at Bronx Science and Stuyvesant confirm that Dr. Vigdor obtained his results using data from a non-relevant population, i.e., the invitation data. (*See* Scuello Supplemental Report, p. 2)

might have triggered several behavioral changes that would adversely affected Asian students'
chances of receiving an offer.  Specifically, Dr. Vigdor claims that, relative to Asian applicants for
the entering classes in 2016-2018, Asian applicants for the entering classes of 2019 and 2020 had
a (1) reduced tendency to list Stuyvesant as a first choice; (2) a tendency to list fewer specialized
high schools overall, and (3) lower SHSAT scores.  *Id.* at pp. 21-25.  Dr. Vigdor speculates that
these three behavioral changes could have been caused by the publicization of the changes to the
Discovery Program.  Notably, Dr. Vigdor never claims outright that publicization of the changes
to the Discovery program "caused" the behavioral changes.  Rather he claims that such behavioral
changes "could logically be explained" (*id.* at  p. 24), and "can be explained," as a response to
publicization of the changes, and, at most that the evidence is "consistent with the conclusion" (*id.*
at p. 25) that the behavioral changes resulted from the publicized changes to the program.[8]

This is a completely unprecedented basis for a finding of disparate impact.  First, these
speculations do not meet the standard of causation.  To prevail on a claim for disparate impact,  a
plaintiff must "(1) identify a specific employment practice or policy (2) demonstrate that a
disparity exists [between plaintiff's group and other racial/ethnic groups]; and (3) establish a causal
relationship between the two."  *See Chin,* 685 F.3d at 151.

Dr. Vigdor did not engage in any qualitative methods research such as surveys, interviews
or focus groups.  Defendants' experts Scuello and Zhu, who have experience with both qualitative

---

[8] Much of Dr. Vigdor's analysis focuses on a discussion of ENI and changes to the ENIs of many
schools that coincided with the 2019 admissions cycle.  (Exh C to the Richter Decl., pp. 5-13).  Defendants
are submitting the Declaration of Eric Ashton, dated September 30, 2021 to explain these changes.  As a
legal matter, whether the measurement of ENI changed, why it changed, or how Asian students would have
fared had the ENIs of many schools not changed is of no consequence.  What would have occurred had ENI
been calculated differently has no bearing on how Asian students actually fared in 2020— DOE used the
revised ENI data, and Asian students garnered a greater percentage of the offers.

and quantitative methods noted that "Qualified researchers could develop instruments with objective targeted questions to determine whether the observed behavioral changes were the result of the policy change, publicity surrounding the change, or other contemporaneous events."   Nor did Dr. Vigdor perform statistical analyses sufficient to make any causal inferences. (Exh D Richter Decl.,  Scuello and Zhu at pp. 4-5).

The data for the SHS admission process, going back to 2006, shows many variations year-to-year in the number of students in a particular racial group who choose to take the SHSAT and even in the overall performance of a particular racial group on the exam.  (Wright Decl. ¶¶ 14-29, 53-56).   There are no readily apparent explanations for these variations.

It should also be noted that the Mayor and Chancellor simultaneously announced the expansion of the Discovery Program and the proposal to submit a bill to the State Legislature to phase out the SHSAT, and, in public statements discussed both reforms together.[9]   Indeed, the article Dr. Vigdor quotes in his Report discusses both reforms, and calls the proposed elimination of the SHSAT "[t]the most significant reform," and the changes to the Discovery program "a smaller change"). (*See* Richter Decl. Exh. J). As this Court noted, having watched a video of a televised interview submitted in this case, "Almost all of Chancellor Carranza's statements in the interview concerned the possible elimination of the SHSAT, which would arguably be a more significant change than the amendments to the Discovery program." *McAuliffe*, 364 F. Supp. 3d 253, at 70.  It is simply not possible, based on the statistical analyses Vigdor performed, to attribute

---

[9] *See* Richter Decl., Exh. H, Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018) ("Our first reforms will commit 20% of the seats to kids from disadvantaged communities. And we will work with Albany to eliminate a system where one broken test dictates a child's future."); Exh. B, June 3, 2018 Press Release (discussing elimination of the SHSAT and expansion of the Discovery program as a "two-part plan" to improve diversity); and Exh. I, Mayor de Blasio's op-ed in *Chalkbeat* (discussing both reforms).

any alleged behavioral changes to the publicity surrounding the Discovery Program rather than to the proposed elimination of the SHSAT or numerous other causes. (Exh. D Richter Decl.,  Scuello and Zhu Report, p. 4).

Additionally, significantly, if Asian students were discouraged, it is not attributable to Defendants and such a response would  not be based on the facts.  Neither the policy itself, nor the statements of Defendants support such discouragement. As this Court noted, there was only one public statement of either the Mayor or the Chancellor about the Discovery program that "could be construed to concern Asian-Americans specifically" but that in context, the Chancellor's statement was a rebuke of the interviewer for suggesting that minority groups must compete against each other for seats at the SHS.  *Christa McAuliiffe,* 364 F. Supp. 3d at 277-78.  Further, Defendants' press release stated that the changes to the Discovery Program would result in an increase of Black and Hispanic students in the Specialized High Schools from approximately 9% to about 16% of the enrollment.  (Exh. B to the Richter Decl.).  A perception that this rather small increase would significantly diminish Asian students' access to these schools is not factually based.

Moreover, after the results from the first year of implementation of the changes were known, Defendants filed a letter in this case in May 2019 (ECF No. 97) which stated that Asian students had received a larger percentage of the offers than they had in the prior year.  Richter Decl.)  This is particularly significant since Dr. Vigdor's analysis focuses primarily on the data for the 2020 entering class.  Those students took the SHSAT in the fall of 2019, when there was publicly available information that the changes to the Discovery Program had increased Asian students'  offers to the SHS.  If students were that concerned about the effects of the changes in the Discovery Program, they could have made inquiries about how the changes had actually

26

affected Asian students in the 2019 entering class.  There was simply no factual basis for Asian students to be discouraged about their chances of gaining admission to the SHS.   In Dr. Vigdor's opinion, it doesn't matter if the students' perceptions are accurate.  (Vigdor Report pp. 21, 25). Somehow, apparently, Defendants are still responsible for the students' perceptions and misperceptions, even if Defendants did not cause them.

Plaintiffs' theory is that, even though Asian students were the highest performing major racial group in 2018, 2019 and 2020 (approximately 31.7-33.2% of Asian students received offers in those years), and offers to Asian students exceeded their share of the applicant pool in 2018, 2019, and 2020 (comprising approximately 30.7% of the applicant pool, and receiving over 52% of the offers in those years), Asian students would have fared *even better* in 2020 (when they received 54.8% of the offers) had they not been "discouraged" by the publicization of the changes to the Discover program. If this argument were true—which it is not—Plaintiffs still would not have shown the disparate impact required for an equal protection violation.  As stated in Point I.B, *supra*, the proper analysis for determining whether Plaintiffs state a claim for discriminatory effect is a comparison of a racial/ethnic group's predicted result to its actual result or a comparison of the passing rates of different ethnic groups.  It is irrelevant to this standard whether Asian students would have performed even better.

Additionally, to state a discrimination claim based on "discouragement" or deterrence, an applicant must show that an application would be futile due to the defendant's discriminatory practices.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application."); *Pelaez v.*

*Life Alert, Inc.*, No. 09-CV-1668, 2011 U.S. Dist. LEXIS 34964, 2011 WL 1321999, at *4 (E.D.N.Y. Mar. 30, 2011) ("where a plaintiff can prove that completing an application process would have been futile based on an employer's discriminatory practices, a potential job applicant need not prove that he or she formally applied and was rejected.").

Notably, where applying is not futile, discouraging a person from applying or encouraging an applicant to withdraw is not sufficient to state a discrimination claim. *See, e.g., Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16-CV-4897, 2017 U.S. Dist. LEXIS 77710, 2017 WL 2258374, at *7 (S.D.N.Y. May 22, 2017) (dismissing failure-to-promote claim where plaintiff "allege[d] that she was discouraged from applying while less qualified men were encouraged to apply" and collecting cases), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 96696, 2017 WL 2709747 (S.D.N.Y. June 22, 2017); *Johnston v. Carnegie Corp. of N.Y.*, No. 10-CV-1681, 2011 U.S. Dist. LEXIS 29862, 2011 WL 1085033, at *11 (S.D.N.Y. Feb. 24, 2011), *report and recommendation adopted*, 2011 U.S. Dist. LEXIS 29857, 2011 WL 1118662 (S.D.N.Y. Mar. 23, 2011) ("Even if Defendants discouraged Plaintiff from applying for [a] position[], or encouraged Plaintiff to withdraw his sole application, such discouragement would not give rise to a claim for failure to promote."); *see also Geagan v. City Univ. of N.Y.*, No. 09-CV-3271, 2011 U.S. Dist. LEXIS 89018, 2011 WL 3370395, at *12 (S.D.N.Y. July 14, 2011) (plaintiff failed to meet his *prima facie* burden where "the adverse action upon which [plaintiff] seeks to rely is h[is] own decision to withdraw, not anything that the Defendants said or did").

Here, Dr. Vigdor's report claims that Asian students were "discouraged"—another word for deterred.  Since a plaintiff must show an application was futile—not merely that they were discouraged from applying—even taking Vigdor's analysis as true, Plaintiffs clearly cannot show

futility for Asian students in any aspect of the admission process for the SHS since as a group they have had, and continue to have spectacular success in gaining admission to the SHS.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that their motion for summary judgment be granted, that the Complaint be dismissed in its entirety, and that the Court grant Defendants such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            October 1, 2021

                              GEORGIA M. PESTANA
                              Corporation Counsel of the City of New York
                              Attorney for Defendants
                              100 Church Street
                              New York, N.Y. 10007
                              P: (917) 941-5946; (212) 356-0873
                              mrichter@law.nyc.gov
                              ssprayre@law.nyc.gov


                        By:   /s/ *Sharon Sprayregen*
                              Sharon Sprayregen
                              Marilyn Richter
                              Assistants Corporation Counsel