**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHRISTA McAULIFFE INTERMEDIATE
SCHOOL PTO, et al.,

       Plaintiffs,

   -against-

BILL de BLASIO, in his official capacity as
Mayor of New York City, et al.,

       Defendants.

_____

Case No. 1:18-cv-11657-ER-OTW

**PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

STANDARD OF REVIEW .................................................................................................. 3

ARGUMENT ....................................................................................................................... 3

    I.    Plaintiffs' Equal Protection Claim Cannot Be Resolved Solely
        Based on Two Years of Statistical Evidence ..................................................... 3

        A.    Citywide disparate impact is not the dispositive factor
            in an *Arlington Heights* case ................................................................ 4

        B.    Measuring disparate impact by comparison to the applicant
            pool would permit racial balancing through proxies ............................ 11

        C.    The aggregate racial effect of Defendants' plan is entirely
            dependent on the ENI ........................................................................... 15

    II.   There Is at Least a Dispute of Material Fact as to the Weight to
        Be Given to Dr. Vigdor's Analysis ................................................................. 17

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*,
No. 8:20-02540-PX, 2021 WL 4197458 (D. Md. Sept. 15, 2021) ........................7, 10, 13–15

*Boston Parent Coal. for Academic Excellence v. Sch. Comm.*,
996 F.3d 37 (1st Cir. 2021) .................................................................................13

*Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*,
11 F.4th 55 (2d Cir. 2021) ...................................................................................3

*Chin v. Port Auth.*,
685 F.3d 135 (2d Cir. 2012)................................................................................18

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y. 2019)..................................................................9

*Doe ex rel. Doe v. Lower Merion School District*,
665 F.3d 524 (3d Cir. 2011)................................................................................6

*Feingold v. New York*,
366 F.3d 138 (2d Cir. 2004)...............................................................................13

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013).............................................................................................12

*Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n*,
630 F.2d 79 (2d Cir. 1980)..................................................................................12

*Hayden v. County of Nassau*,
180 F.3d 42 (2d Cir. 1999)..........................................................................5–6, 14

*In re Employment Discrim. Litig. Against State of Ala.*,
198 F.3d 1305 (11th Cir. 1999) ...........................................................................12

*Johnson v. Killian*,
680 F.3d 234 (2d Cir. 2012)..................................................................................3

*Lewis v. Ascension Parish Sch. Bd.*,
662 F.3d 343 (5th Cir. 2011) (Jones, J., concurring) ..............................................13

*Metro. Housing Dev. Corp. v. Vill. of Arlington Heights*,
517 F.2d 409 (7th Cir. 1975) ................................................................................5

*Miller v. Johnson*,
515 U.S. 900 (1995)............................................................................................13

*N.C. State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ...................................................................10–11, 14

*Patterson v. County of Oneida*,
    375 F.3d 206 (2d Cir. 2004)............................................................................13

*Ricci v. DeStefano*,
    557 U.S. 557 (2009).....................................................................................13–14

*Sharif v. N.Y. State Educ. Dep't*,
    709 F. Supp. 345 (S.D.N.Y. 1989)................................................................21

*St. Mary's Honor Center v. Hicks*,
    509 U.S. 502 (1993).......................................................................................14

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977).....................................................................................3–5

*Washington v. Davis*,
    426 U.S. 229 (1976).....................................................................................4, 6

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988).......................................................................................14

**Statute**

42 U.S.C. § 2000e *et seq.* ...................................................................................12

**Rule**

Fed. R. Civ. P. 56(a) ...........................................................................................3

**Other Authorities**

Demographic Snapshot, *available at* https://infohub.nyced.org/docs/default-
    source/default-document-library/demographic-snapshot-2016-17-to-2020-21-
    public.xlsx (last visited Nov. 17, 2021) ........................................................9

Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan
    to Improve Diversity at Specialized High Schools* (June 3, 2018), *available at*
    https://www1.nyc.gov/office-of-the-mayor/news/281-18/mayor-de-blasio-
    chancellor-carranza-plan-improve-diversity-specialized-high/#/0 ...........................10

## PRELIMINARY STATEMENT

More than three years ago, New York City Mayor Bill de Blasio and then-Education Chancellor Richard Carranza announced a plan they said would help cure what they saw as a serious problem at the Department of Education's (DOE) eight renowned specialized high schools. Yet the group of schools, including nationally renowned Stuyvesant, Bronx Science, and Brooklyn Tech, were certainly not performing poorly. Nor were there concerns with the schools' curriculum or infrastructure. Instead, the "problem" was that these schools' student bodies did not reflect the racial composition of the City or of the applicant pool. More than half of specialized high school students were Asian-American, compared to about 16 percent in DOE schools as a whole, while Black and Hispanic students were less represented at the specialized high schools than in DOE as a whole. De Blasio and Carranza sought to correct what they saw as a racial imbalance.

Unable to change the state law requiring DOE to select students for the specialized high schools through a competitive examination, de Blasio and Carranza settled on modifying the Discovery Program. Discovery was originally designed as a way for economically disadvantaged students who just missed the exam cutoff to gain admission through completion of a summer program at a specialized high school. It was previously open to all students considered individually disadvantaged, but comprised only a small portion of specialized high school seats. The Mayor and Chancellor directed that the Discovery Program be expanded to 20 percent of seats at each school *and* that eligibility be limited to students applying from certain middle schools that were rated 0.6 or higher on the DOE-created "Economic Need Index," or ENI. That ENI floor operated to exclude many high-performing, heavily Asian-American middle schools from Discovery eligibility. DOE predicted that locking out these schools from its expanded Discovery Program

would reduce the proportion of total offers (including Discovery and regular offers) given to Asian-American students by 2.1 percentage points.

Plaintiffs—including the Parent Teacher Organization at arguably the most-harmed middle school, Christa McAuliffe IS 187—brought this lawsuit alleging that City actors instituted the Discovery changes at least in part to limit the number of Asian-Americans at the specialized schools. Yet they have not been afforded the opportunity to take full discovery on the question of discriminatory purpose. Instead, discovery was bifurcated and allowed only on the issue of disparate impact after Defendants submitted data indicating that, in the aggregate, Asian-Americans had fared better under the challenged policy in admissions to the specialized high schools as a whole. Defendants now seek summary judgment based on that very data. Yet the aggregate data is cold comfort for the students at Christa McAuliffe and other heavily Asian-American schools still excluded from 20 percent of the specialized high school seats. And it fails to account for the fact that Discovery-eligible eighth-grade schools are only about 8% Asian-American—half the percentage of Asian-American students in DOE as a whole—and that Plaintiffs' expert Dr. Jacob Vigdor found that the new Discovery criteria harmed a group of disproportionately Asian-American students who otherwise would have gained admission to the two most selective specialized high schools.

Put simply, aggregate racial effect is not the be-all and end-all of an equal protection claim. Summary judgment without inquiry into discriminatory intent is inappropriate. If it turns out that Defendants intended to discriminate against Asian-American students but failed to model correctly the aggregate racial effect of their plan, the lack of aggregate effect does not eliminate the disparate treatment the plan requires. And regardless how it is measured, racial impact is only one of the

relevant factors in determining whether a policy was enacted with discriminatory intent. For the reasons stated below, Defendants' motion should be denied.

## STATEMENT OF FACTS

Plaintiffs refer the Court to Plaintiffs' Rule 56.1 Statement and Plaintiffs' submitted evidence for a complete statement of the relevant facts.

## STANDARD OF REVIEW

"Summary judgment is warranted only upon a showing 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021) (quoting *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam), and Fed. R. Civ. P. 56(a)). At this stage, the Court "must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Id.* (quoting *Johnson*, 680 F.3d at 236).

## ARGUMENT

**I.    Plaintiffs' Equal Protection Claim Cannot Be Resolved Solely Based on Two Years of Statistical Evidence**

Defendants' primary claim is that the aggregate statistical evidence from the first two years of the 2018 Discovery changes is dispositive. There are several problems with this theory. The inquiry under *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), is designed to ferret out discriminatory intent—it is not meant to rely solely on disparate impact, and certainly not on two years of data with questionable predictive value for future cycles. Even taking the top line data at face value, a comparison of the racial demographics of the schools that remain eligible for Discovery with those that do not reveals that Asian-American students are locked out from Discovery at significantly higher rates than Black or Hispanic students. The predominantly Asian-American student body at Christa McAuliffe IS 187

is just one prominent example. Simply put, two years of admissions data—without any inquiry into the other *Arlington Heights* factors, nor any way for the Court to determine ENI going forward—does not entitle Defendants to judgment as a matter of law on Plaintiffs' equal protection claim.

Nor does the fact that Asian-American students still earn more seats than their proportion of the applicant pool. Racial balance—whether aligned with the demographics of the applicant pool or with DOE as a whole—is not the proper baseline by which to measure disparate impact. If it were, a school district could implement otherwise unconstitutional racial balancing through proxies without even triggering strict scrutiny, contrary to the weight of the Supreme Court's equal protection decisions.

### A. Citywide disparate impact is not the dispositive factor in an *Arlington Heights* case

Most fundamentally, *Arlington Heights* provides a method for "[d]etermining whether invidious discriminatory purpose was a motivating factor" in the enactment of a facially race-neutral policy. 429 U.S. at 265–66. The case was a follow-up from *Washington v. Davis*, 426 U.S. 229 (1976), which had addressed whether a facially neutral policy could violate the Equal Protection Clause based on disproportionate impact alone. *Davis* noted that while sometimes "discriminatory impact . . . may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds," in most cases, impact "is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." 426 U.S. at 242. Instead, an "invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id.*

The next year, *Arlington Heights* provided a roadmap for courts to evaluate the "totality of the relevant facts" referenced in *Davis*. Disparate impact, *Arlington Heights* said, "may provide an important starting point." 429 U.S. at 266. But except in extreme cases, "impact alone is not determinative, and the Court must look to other evidence" to assess discriminatory intent. *Id.* (footnote omitted). To be sure, the extreme cases mentioned in *Arlington Heights* were those where impact alone was sufficient to prove discriminatory intent. But nowhere did the Court say that a showing of disparate impact on a jurisdiction-wide scale is *required* to demonstrate discriminatory intent.

That is for good reason. The relevance of that statistical analysis would vary significantly depending on the facts of the case. In some cases, lack of a significant aggregate impact would complicate (or even undermine) an equal protection challenge—for example, if the rejection of the proposed affordable housing project in *Arlington Heights* did not disproportionately harm racial minorities, it is highly unlikely the case would have ever reached the Supreme Court. *See Metro. Housing Dev. Corp. v. Vill. of Arlington Heights*, 517 F.2d 409, 414–15 (7th Cir. 1975), *rev'd*, 429 U.S. 252 (1977) (plaintiffs prevailed in the Court of Appeals due in large part to the disproportionate racial impact of the Village's decision not to rezone). But looking to aggregate impact is often not all that useful in determining whether a particular government action was racially discriminatory. It may be "an important starting point," *Arlington Heights*, 429 U.S. at 266, or it may not, depending on the facts and circumstances.

Perhaps nothing illustrates this point better than Defendants' primary authority, *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999). *Hayden* involved white and Hispanic applicants who argued that a redesigned police officers' entrance exam—one particularly designed to limit the old test's disparate impact on black applicants—discriminated against them. The problem with

their argument was that the new test "was administered and scored in an identical fashion for all applicants." *Id.* at 48. Thus, the applicants who failed to pass the exam had not been subject to any differential treatment because of their race. *See also Davis*, 426 U.S. at 245–46 (noting that black test-takers "could no more successfully claim that the test denied them equal protection than could white applicants who also failed"). Indeed, the *Hayden* plaintiffs' disparate impact argument failed not because more white and Hispanic applicants passed the test in the aggregate, but because the applicants "were neither excluded from full consideration because of their race, nor were they disadvantaged because of their race." *Hayden*, 180 F.3d at 52.

*Hayden*'s citation of *Arlington Heights* for the proposition that "a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect," *id.* at 48, makes sense in this context. While establishing an equal protection claim under *Arlington Heights* does not require a showing of Citywide disparate impact, it *does* require proof of differential treatment. Without differential treatment, it is difficult to say that any particular person has been harmed at all—much less that anyone has been harmed because of his or her race. *See id.* at 52 (noting that plaintiffs who "were given the same test and were scored in the same manner" as other applicants could not show that they were harmed by the test). Defendants' reliance on *Doe ex rel. Doe v. Lower Merion School District* fails for a similar reason—the Third Circuit in that case was correct that an equal protection plaintiff must show differential treatment to establish that the action causes harm. 665 F.3d 524, 549–50 (3d Cir. 2011).

As made clear by cases like *Arlington Heights*, *Hayden*, and *Doe*, the key constitutional question is whether there is equal treatment. If the challenged policy treats all applicants equally, it is highly unlikely to violate the Equal Protection Clause. But where the government shifts to a policy that treats applicants differently based on a factor that is designed to operate as a proxy for

race, it becomes suspect. *See Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*, No. 8:20-02540-PX, 2021 WL 4197458, at *16–17 (D. Md. Sept. 15, 2021) (finding plausible that Montgomery County's facially neutral use of "local norming" and "peer grouping" in admissions to magnet middle school programs was intended to discriminate against Asian-American applicants). Here, the challenged Discovery Program eligibility criteria limit access to the program to students applying from certain middle schools with an ENI of at least 0.6 (or 60%).[1]

For students at ineligible schools, the effect of the Discovery changes is two-fold. First, otherwise eligible economically disadvantaged students cannot compete for 20 percent of the seats at each specialized high school. Defendants' Rule 56.1 Statement ¶¶ 7, 15–18 (explaining that about 20% of the seats at the specialized high schools are now set aside for Discovery students, who must meet the criteria to be individually disadvantaged *and* attend a middle school with an ENI above 0.6). Second, all students at these Discovery-ineligible schools face a more difficult bar for admission because the non-Discovery exam score cutoff is higher than it otherwise would have been due to Discovery expansion. Kieser Dec. Exhibit 4 (ChMc 4249); *see also* Plaintiffs' Rule 56.1 Statement ¶ 77. The result is that two individually disadvantaged applicants who are in all other ways similarly situated—including SHSAT score—will be treated differently in the admissions process based on the school they attend in eighth grade. Indeed, under the challenged revisions, students at eligible schools with far lower SHSAT scores can gain admission through Discovery in the place of higher scoring disadvantaged students at ineligible schools. Kieser Dec. Exhibit 4 (ChMc 4249–50). That is the sort of disparate treatment missing from cases like *Hayden* and *Doe*.

---

[1] Both the ENI metric and the 0.6 cutoff were created by, and remain entirely within the control of, the DOE. Defendants' Rule 56.1 Statement ¶¶ 18–19.

Defendants' own projections and expectations are also relevant to the equal protection inquiry. Before implementing the changes to the Discovery program, Defendants themselves expected that excluding schools with an ENI below 60% would decrease the number of Asian-American students who would be offered a seat at the specialized high schools. As DOE employee Nadiya Chadha testified in her deposition and in a previous declaration, DOE modeling based on fall 2017 admissions data indicated that applying the Discovery program changes to that year's applicants would have resulted in a 2.1 percentage point decline in offers extended to Asian-American students. Kieser Dec. Exhibits 1 & 2[2] (Chadha Dep. 31:19–32:10, 34:16–22 & Chadha Dep. Exhibit C).[3] And in various modeling shared in emails among DOE employees after the new Discovery policy was announced in June 2018, Chadha noted that DOE predicted that the students invited to participate in the revised Discovery program would be just 38% Asian-American—a sharp decline from the past. Chadha Dep. 48:1–7, 11–21, & Chadha Dep. Exhibits G & H.[4] DOE was eager to relay to the media and City Hall its prediction that Discovery would be majority Black and Hispanic after the changes. Chadha Dep. 48:1–21 & Chadha Dep. Exhibits G & H. And those predictions made sense—after all, even after the Citywide ENI jumped,[5] nearly half of the City's

---

[2] For simplicity, the remainder of this brief cites the Chadha deposition excerpts (found in Exhibit 1 of the Kieser declaration) and exhibits (found in Exhibit 2 to the Kieser declaration) without reference to the Kieser declaration.

[3] In her position as Director of Research and Policy in the Office of Student Enrollment at DOE, Ms. Chadha was "responsible for analyzing and computing offers for students each year and was responsible for the admissions process from start to finish for the specialized high schools." Chadha Dep. 8:15–9:17.

[4] While Chadha testified that comparing the columns in deposition Exhibit G would be "a little bit of an apples to oranges comparison" because "[t]he second column . . . includes kids who would ultimately choose not to participate," Chadha Dep. 44:13–45:1, 47:9–13, she presented the columns side by side in the email, giving the impression of a significant racial effect.

[5] The Demographic Snapshot shows that the average Citywide ENI jumped from 61.0% in the 2016-17 school year to 71.9% in the 2017-18 school year. Defendants have presented evidence

majority Asian-American middle schools were excluded from Discovery[6] even while nearly 5 in

6 middle schools Citywide were eligible. *See* Vigdor Dec. Exhibit 1 (Vigdor Report at 11).[7]

Moreover, the schools eligible for Discovery after the program revisions were just 7.9% Asian-

American, less than half the 16.1% citywide proportion of Asian Americans. *Id.* at 11–12 &

Table 7.[8]

It is unsurprising that DOE thought a revised policy that rendered nearly half the City's

majority Asian-American middle schools, not to mention disproportionately more Asian-

American eighth graders, ineligible for Discovery would result in a Citywide disparate impact on

Asian-American students. Available evidence indicates that this was the intended result—the ENI

floor appears to have been implemented in part to ensure that the additional Discovery students

would not have the same racial composition as students admitted solely through the SHSAT.

Chadha Dep. 28:22–29:12 & Chadha Dep. Exhibit B; Chadha Dep. 35:21–37:2, 38:21–39:21 &

---

that this dramatic shift was due to the Direct Certification Matching Process. *See* Defendants' Rule 56.1 Statement ¶¶ 65–68.

[6] As of 2020–2021, the Demographic Snapshot shows 24 schools serving eighth graders with majority Asian-American population. Eleven of them—Christa McAuliffe IS 187, JHS 216 George J. Ryan, JHS 074 Nathaniel Hawthorne, MS 158 Marie Curie, Irwin Altman Middle School 172, PS 229 Dyker, JHS 067 Louis Pasteur, IS 025 Adrien Block, New York City Lab Middle School, Queens Gateway to Health Sciences Secondary School, and IS 289—remain ineligible for Discovery under the current ENI figures.

The current Demographic Snapshot is available at https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2016-17-to-2020-21-public.xlsx (last visited Nov. 17, 2021). This Court took judicial notice of the 2017-18 Demographic Snapshot in its opinion denying Plaintiffs' motion for a preliminary injunction. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y. 2019). It may take judicial notice of the current Snapshot for the same reasons.

[7] For simplicity, the remainder of this brief cites Dr. Vigdor's initial report simply as "Vigdor Report" without reference to Dr. Vigdor's declaration.

[8] Before the ENI jump, the discrepancy would have been even greater, as eligible schools would have been just 4.9% Asian-American. *Id.*

Chadha Dep. Exhibit D. Even in public, Defendants promoted the new Discovery policy on the ground it would increase the number of Black and Hispanic students at the specialized high schools, quite obviously at the expense of Asian-Americans.[9] *Cf. Ass'n for Educ. Fairness*, 2021 WL 4197458, at *17 (finding plausible allegations that a County acted with discriminatory intent when it "set out to increase and (by necessity) decrease the representation of certain racial groups in the middle school magnet programs to align with districtwide enrollment data"). Yet because the data has yet to show the DOE's expected aggregate racial effect, Defendants now seek to avoid responsibility for their racially discriminatory policy.

Defendants' theory is that a policy change that (1) treats similarly situated applicants differently; (2) was based on a factor designed to operate as a racial proxy; and (3) was projected and modeled to have a particular racial effect, nonetheless must survive constitutional scrutiny as a matter of law because it has thus far failed to produce the overall outcome Defendants hoped it would. But *Arlington Heights* is ultimately about divining discriminatory *intent*. The 2019 and 2020 results may be data points that are relevant in determining Defendants' intent, but they are not dispositive. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016) (criticizing the district court in an election case for the "almost dispositive weight" it "gave to the fact that African American aggregate turnout increased by 1.8% in the 2014 midterm election as compared to the 2010 midterm election" and noting that "courts should not place much evidentiary weight on any one election"). That is particularly true here because, unlike in *Hayden* or *Doe*, the challenged Discovery criteria treated applicants differently based on a factor (attendance at a high-

---

[9] *See* Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools* (Jun. 3, 2018), *available at* https://www1.nyc.gov/office-of-the-mayor/news/281-18/mayor-de-blasio-chancellor-carranza-plan-improve-diversity-specialized-high/#/0 ("Based on modeling of current offer patterns, an estimated 16 percent of offers would go to black and Latino students, compared to 9 percent currently.").

ENI middle school) that was supposed to act as a proxy for race. The fact that the results were different than Defendants expected does not minimize the harm felt by those students who were excluded from Discovery but who would have been eligible if not for Defendants' policy change—including the students at Christa McAuliffe IS 187. *Cf. McCrory*, 831 F.3d at 232 ("[A]lthough aggregate African American turnout increased by 1.8% in 2014, many African American votes went uncounted. As the district court found, African Americans disproportionately cast provisional out-of-precinct ballots, which would have been counted absent [the challenged law].").

In the end, Defendants would have this Court hold that they can act with racially discriminatory intent in excluding a certain class of individuals from Discovery so long as they miscalculate the aggregate effect and some of the beneficiaries of the changed policy turn out to be other Asian-American children. None of Defendants' authority stands for the proposition that a discriminatory action is absolved if Defendants' racial predictions turn out not to be accurate. The 2019 and 2020 citywide data alone do not entitle Defendants to summary judgment.[10]

## B. Measuring disparate impact by comparison to the applicant pool would permit racial balancing through proxies

Defendants' other argument should fare even worse. Their theory is a strange one—claiming that the disparate impact of an admissions policy change must be measured against the racial composition of the applicant pool, rather than comparing how Asian-Americans fared in the admissions process before and after the challenged Discovery program changes were implemented. Were this true, Defendants could cut Asian-American enrollment at the specialized

---

[10] In Point II, Plaintiffs address why a dispute of material fact exists as to whether Defendants' changes to the Discovery criteria hurt Asian Americans' chances of gaining admission to the two most selective specialized high schools, Stuyvesant and Bronx Science. As explained below, even assuming aggregate data is the only way to demonstrate disparate impact, there is at least a genuine dispute of material fact as to aggregate racial impact at those schools, which is enough to preclude summary judgment before Plaintiffs have had the chance to probe intent.

high schools nearly in half without triggering *even an inquiry* into their intent. This theory is inconsistent with basic equal protection principles and should be rejected out of hand.

Defendants have no problem admitting that their theory is based almost entirely on an analogy to employment discrimination cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* And to be sure, in a typical Title VII disparate impact case, a pivotal inquiry is "what should the racial composition of the job force look like absent the offending employment practice?" *In re Employment Discrim. Litig. Against State of Ala.*, 198 F.3d 1305, 1312 (11th Cir. 1999). Thus, when a job qualification is challenged under Title VII's disparate impact provision, courts look to how that qualification screens out members of various racial groups. *See Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n*, 630 F.2d 79, 85–86 (2d Cir. 1980) (comparing racial makeup of those who sat for police entrance exam with those who passed). In these cases, impact *alone* is enough to establish a prima facie claim of discrimination—the employer may evade liability only if it proves that the challenged qualification is "legitimately job-related." *Id.* at 88.

But Defendants' attempt to transfer the Title VII disparate impact framework to the equal protection arena fails for two main reasons. *First*, the very nature of an equal protection claim dictates that the proper baseline cannot be the racial composition of the applicant pool (or any similar metric, such as the racial composition of DOE students as a whole). In the education context, the Supreme Court has labeled racial balancing "patently unconstitutional." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013). But that would mean little if Defendants could avoid strict scrutiny simply by adjusting the criteria for admission through use of a facially neutral racial proxy until the proportion of Asian-American students who were given offers matched the proportion who applied. Indeed, the entire point of the *Arlington Heights* inquiry is to

avoid this result. *See Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object."). Instead, the use of proxies intended "to increase and (by necessity) decrease the representation of certain racial groups in the [specialized high schools] to align with districtwide enrollment data" triggers strict scrutiny. *Ass'n for Educ. Fairness*, 2021 WL 4197458, at \*17; *see also Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 354 (5th Cir. 2011) (Jones, J., concurring) ("To allow a school district to use geography as a virtually admitted proxy for race, and then claim that strict scrutiny is inapplicable because" the policy is facially race-neutral "is inconsistent with the Supreme Court's holdings.").[11]

*Second*, Defendants are incorrect about the state of the law. They say the Second Circuit has held that the legal framework for Title VII and equal protection cases is the same, but notably, the cases they cite (*Patterson v. County of Oneida*, 375 F.3d 206, 225–27 (2d Cir. 2004), and *Feingold v. New York*, 366 F.3d 138, 159 & n.20 (2d Cir. 2004)) are not disparate impact cases. That's because *Arlington Heights* claims are actually more analogous to Title VII disparate *treatment* claims. Unlike a disparate impact plaintiff, an employee bringing a disparate treatment claim "must establish 'that the defendant had a discriminatory intent or motive' for taking a job-

---

[11] In support of their proposed analysis, Defendants cite the First Circuit's opinion in *Boston Parent Coalition for Academic Excellence v. School Committee*, 996 F.3d 37, 46 (1st Cir. 2021). But as they admit, in the interlocutory posture of that case, the court did not decide whether the percentage of white and Asian-American students admitted would "doom plaintiff's appeal on the merits." *Id.* In any event, the First Circuit's dicta is unpersuasive because racial balance is not the appropriate baseline to measure disparate impact in an equal protection case. And unlike the plaintiff in *Boston Parent Coalition*, who failed to "offer[ any] analysis or argument" for why the proper comparison is not simply "random selection," Plaintiffs here explain that (1) the effect of a policy (and particularly the intent behind it) is best measured by comparing it to what came before; and (2) setting a baseline of random selection would permit outright racial balancing, directly contrary to equal protection principles.

related action." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)). When the employer produces a non-discriminatory reason for the action, the dispositive question becomes whether that reason was simply a pretext for discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–12 (1993). The framework fits this case quite well; as here, similarly situated applicants (economically disadvantaged students with the same SHSAT score) are treated differently, and the parties dispute whether that differential treatment is due to an impermissible racial motive.

By contrast, there is no equal protection analog to a Title VII disparate *impact* claim. It makes little sense to say that an equal protection plaintiff, who must prove discriminatory intent to succeed, also must prove the same type of disparate impact necessary to prevail in a pure disparate impact case. That's why the Fourth Circuit has emphasized that plaintiffs need not show the same type of disparate impact to tilt *Arlington Heights* in their favor as they might to prevail on an intent-free theory. *See McCrory*, 831 F.3d at 231–32.

Defendants' primary Second Circuit authority actually supports this reading. *Hayden* engaged in separate analyses to reject the plaintiffs' Title VII disparate impact claim and their equal protection claim. The Title VII claim failed simply because the police officers' admissions test did not screen out more white or Hispanic applicants than Black applicants—the same analysis Defendants urge the Court to apply to this case. *See Hayden*, 180 F.3d at 52–53. But to reject the equal protection claim, the panel relied on the fact that all applicants took the same test, were scored the same way, and were subject to the same cutoff score. *Id.* at 52. In short, while Title VII disparate impact analysis might be appropriate where all applicants are subject to the same standards, it is plainly inapplicable where there is differential treatment and motive is at issue. *See Ass'n for Educ. Fairness*, 2021 WL 4197458, at *16–17 (denying motion to dismiss equal

protection challenge in part because the challenged admissions controls resulted in high achieving Asian-American students being denied admission because of where they went to elementary school). It is the disparate treatment itself—if supported by a racially discriminatory motive—that triggers strict scrutiny, just as an explicit racial classification demands strict scrutiny even if the targeted racial group remains "overrepresented" compared to the applicant pool.

Ultimately, the status quo ante *must* be the proper benchmark for an equal protection claim like Plaintiffs'. After all, Plaintiffs challenge Defendants' decision to *change* the size and eligibility criteria for the Discovery Program, a decision they allege was made with intent to reduce the number of Asian-American students admitted to the specialized high schools. If proven, Defendants' intent to reduce the number of Asian-American students would be discriminatory whether or not Asian-Americans as a group and as a proportion of the applicant pool are the "most successful" applicants to the specialized high schools. *See id.* (comparing the proportion of Asian-American students admitted to magnet programs before challenged changes to the proportion admitted after the changes, without reference to the size of the applicant pool). The aggregate effect on racial groups is simply *one factor* in determining whether the disparate treatment required by Defendants' changes to the Discovery Program bears an impermissible racial motive.

### C.     The aggregate racial effect of Defendants' plan is entirely dependent on the ENI

Another fundamental problem with Defendants' position is that the two-year lack of aggregate racial effect they claim is dispositive is mostly a function of the City-created ENI. When ENI was introduced in 2015, the Citywide average ENI was just above 60%. ECF No. 18-3.[12] It remained that way until the numbers reported in the 2017–2018 Demographic Snapshot, when it

---

[12] The Demographic Snapshot this Court initially noticed in 2019 is no longer available on the internet, but the citywide ENI figures from that Snapshot are in ECF No. 18-3.

jumped more than 10 percentage points.[13] As Dr. Vigdor explained in his report, this jump in ENI had a significant effect on the racial composition of the Discovery program—had the ENI of each middle school remained constant between 2016–2017 and 2017–2018, Defendants' Discovery changes would have produced an admitted class across the specialized high schools with almost six percentage points fewer Asian-American students. Vigdor Report at 14, Table 8. Dr. Vigdor's report also detailed how moving the ENI cutoff for Discovery eligibility up or down by ten percentage points would produce a large difference in the racial composition of disadvantaged test-takers eligible for Discovery. *Id.* at 5–6. So it is clear that the ENI figures play a large role in determining the aggregate racial effect of Defendants' redesigned Discovery criteria.

Yet available evidence indicates that the Department of Education did not consider the effect of the large ENI jump on the racial composition of the Discovery program. Ms. Chadha testified that 60% was chosen as the ENI cutoff for the revised Discovery program at least in part because it was the citywide average at the time. Chadha Dep. 82:4–83:2 & Chadha Dep. Exhibit M. Although she conducted extensive modeling to determine the racial effect of setting the ENI cutoff at various levels, the modeling used only 2017 data and the pre-increase ENI numbers; she testified that she was never asked to conduct any modeling using the increased ENI figures. Chadha Dep. 83:5–24. And although she was a part of discussions about why the racial composition of Discovery did not line up with the modeling, she could not recall any discussion about how the increased ENI might have caused that. Chadha Dep. 84:1–11.

---

[13] The citywide ENI figures for the past five years are available at the "Citywide" tab, column AO of the Demographic Snapshot.

Two important conclusions follow. First, because there is no evidence in the record that would permit the Court to predict the future of ENI (a metric entirely within DOE's control), summary judgment based on statistical aggregate impact for the past two years is particularly inappropriate. And second, DOE's apparent misunderstanding regarding how ENI would affect the composition of the Discovery Program should not be rewarded with summary judgment. Plaintiffs may still show that Defendants *intended* the adverse effect and that some students (like those at Christa McAuliffe IS 187) still bear the brunt of Defendants' effort to engineer a particular racial composition of the Discovery Program. Summary judgment is not warranted.

II.    **There Is at Least a Dispute of Material Fact as to the Weight to Be Given to Dr. Vigdor's Analysis**

Plaintiffs' expert, Dr. Vigdor, examined data related to the specialized high schools and concluded that although Asian-American students in the aggregate did not receive fewer offers to the specialized high schools as a whole, they were less likely to gain admittance to the two most selective specialized high schools—Stuyvesant and Bronx Science. Although they did not file a *Daubert* motion to exclude Dr. Vigdor's testimony and do not dispute Dr. Vigdor's overall conclusions regarding the results of the 2020 admissions process, Defendants take issue with part of Dr. Vigdor's analysis. Specifically, Defendants argue that in analyzing the impact of the challenged changes on admission to each of the eight specialized high schools, Dr. Vigdor used the "wrong" data column to determine which students would have the opportunity to participate in the Discovery Program. Defendants' rebuttal expert, Michael Scuello, asserted that had Dr. Vigdor used the information in the "offer" column of the individual student data spreadsheet Defendants produced—instead of the "invitation" column—the disparate impact Dr. Vigdor observed at the two most selective schools, Stuyvesant and Bronx Science, disappears. Defs.' Br. at 22–23. Defendants argue that because "invitations" are given to some students who ultimately

would not be eligible for the Discovery Program, Dr. Vigdor used incorrect data and that this purported flaw requires the Court to entirely disregard Dr. Vigdor's analysis. Defs.' Br. at 15–20.

To the contrary, a difference of opinion between the parties' experts is not a proper basis for a summary judgment determination. The question whether a meaningful analysis can be done using "invitations" data is at least a material dispute of fact that cannot be resolved at this stage. Moreover, is clear that Defendants' analogy to employment cases once again fails to support their argument. As Defendants note, the Second Circuit has emphasized the importance of using the correct populations for disparate impact analysis, and in a promotion case has cautioned that only those *eligible* for a promotion should be considered in the statistical analysis. *See Chin v. Port Auth.*, 685 F.3d 135, 152–53 (2d Cir. 2012). But here, Defendants' own evidence admits the problem—"it is not possible to know with precision the population of students who are eligible for the Discovery Program in any given year." Wright Dec. Exhibit A ¶ 16. Neither the "offer" nor the "invitation" data represent the true population of students typically analyzed in disparate impact cases—both are inexact approximations.

Moreover, Defendants' argument is flawed. They assert that the offer data is superior because invitations are issued to students who are not eligible for Discovery because they do not meet the criteria for individual disadvantage. And to be sure, it is likely true that some students who receive Discovery invitation letters and who DOE categorizes as "Maybe Disadvantaged" are ultimately not eligible for Discovery. *See* Defendants' Rule 56.1 Statement ¶¶ 43, 48. But it is just as certain that (1) some of these "Maybe Disadvantaged" students *were* eligible for Discovery yet did not submit applications with sufficient documentation to prove their disadvantaged status; and (2) some of the "Definitely Disadvantaged" students—those who DOE already knows are eligible for Discovery—also choose not to submit applications and were thus not given an "offer." Wright

Dec. Exhibit A ¶ 15. Indeed, Defendants' evidence indicates a large portion (between approximately 21% and 38%) of the students in that second category—those who are known to DOE to be disadvantaged and thus eligible for Discovery—do not convert their invitations into offers.[14] In the end, whether someone receives an "offer" to participate in Discovery is dependent not only on the eligibility of that particular applicant, but "whether students submit the paperwork necessary to convert their 'invitation' into an 'offer.'" Vigdor Dec. Exhibit 2 (Vigdor Supplemental Report at 2)[15]; Kieser Dec. Exhibit 3 (Scuello Dep. 126:15–127:9).

That is why Dr. Vigdor maintains in his supplemental report[16] that the "invitation" data more accurately reflects the effect of DOE's actions. DOE chooses which students will receive invitation letters—whether those letters are converted into "offers" is largely up to the students and their families. Using the "offer" data to the exclusion of the "invitation" data thus introduces a private choice component that has little to do with how DOE's policy actually selects—or excludes—students. *See* Vigdor Supplemental Report at 2. That Asian-American students convert invitations into offers at a higher rate than students identified as belonging to one of the other three major racial groups, *see id.*, might suggest that Asian-American students as a whole are more interested in the Discovery program. *See* Chadha Dep. 34:3–15 (noting that eligible students might choose not to participate in Discovery). Or it might suggest that they were, on the whole, better

---

[14] Defendants' brief recounts this evidence, noting that "of the students the DOE knows, based on its records, are disadvantaged, between 2016 and 2020, 62.2% to 78.7% received offers. For the 2018, 2019, and 2020 entering classes, the percentage of such students who received offers was 68.5%, 78.7%, and 72.8%, respectively." Defs.' Br. at 19.

[15] For simplicity, the remainder of this brief will refer simply to this report simply as "Vigdor Supplemental Report."

[16] Dr. Vigdor's supplemental report was produced in response to the supplemental report of Defendants' expert, Mr. Scuello, which argued that Dr. Vigdor had used the wrong data in his analysis. Vigdor Dec. ¶¶ 5–6.

able to navigate DOE's bureaucracy to submit a completed application. But it says little about the effect of the challenged Discovery criteria—and even less about Defendants' purpose in revising those criteria.

Further, as Defendants note, invitations sent to students in the "Maybe Disadvantaged" category declined precipitously after the challenged Discovery changes were implemented for fall 2019 admissions. *See* Defendants' Rule 56.1 Statement ¶ 51. This makes sense—because DOE excluded those students who attended schools with an ENI below the cutoff, it sent proportionally fewer invitations to students for whom it had no income information. *See id.* ¶ 41 (noting that after the challenged changes, invitation letters were sent "only to those who also meet the ENI or census tract criterion"). Since *most* students who attend Discovery-eligible schools are individually disadvantaged, it is quite likely that a higher proportion of the "Maybe Disadvantaged" students who were sent invitation letters were actually eligible for Discovery after the challenged changes were implemented. And if a higher proportion of "invited" students were eligible—and proportionally fewer ultimately ineligible students were invited—any discrepancy between "invitations" and "offers" begins to look far more like a function of private choice than DOE policy.

Put differently, analyzing "invitation" data in this context is preferable to only looking at "offer" data for much the same reason that Dr. Vigdor analyzed the racial effect on *offers* given solely based on SHSAT score rather than the racial composition of those who *accept* those offers. Looking to matriculation data fails to isolate the effect of the change in policy because it takes into account the choices of students and their parents to accept or reject the offer of admission. The same is true in the invitation-versus-offer context for Discovery—whether an invitation becomes

an offer depends on many things, most of which are out of the DOE's control.[17] Perhaps both the "invitation" and the "offer" data are inexact estimates that cannot truly capture the effect of the policy change, but Dr. Vigdor's focus on the "invitation" data does not render his analysis incorrect as a matter of law.

Defendants emphasize Dr. Vigdor's choice to analyze the invitation data in an attempt to undermine his finding that the challenged Discovery changes had a measurable disparate impact on Asian-Americans seeking admission to the two most selective specialized schools, Stuyvesant and Bronx Science. For the reasons discussed above, Defendants' disagreement with his analysis is not a proper basis for summary judgment. But even failing that, they argue that Plaintiffs cannot avoid summary judgment by pointing to a disparate impact at two of the eight schools because "[t]his action has always been about the representation of Asian students in the eight SHS." Defs.' Br. at 21. Their only authority is this Court's decades-old decision in *Sharif v. N.Y. State Educ. Dep't*, 709 F. Supp. 345 (S.D.N.Y. 1989), but that case is distinguishable. Most importantly, *Sharif* was a disparate impact case under Title IX,[18] so the statistical impact alone made up the prima facie case of discrimination. *See id.* at 360–61 (holding that Title IX claims do not require proof of discriminatory intent). Since the case alleged a statewide disparate impact, the court rejected the defendants' attempt to rebut that prima facie case with evidence focusing "on individual schools and counties." *Id.* at 362. Here, however, the claim is that Defendants implemented the challenged Discovery criteria for a discriminatory purpose. The revised criteria apply to all eight

---

[17] Defendants assert that "the reasonable inference is that many students who received invitations were simply not eligible for the Discovery program." Defs.' Br. at 19. But that is mere conjecture, and Defendants do nothing to attempt to quantify which of these students were eligible.

[18] The court also found an equal protection violation, but not due to discriminatory intent. Rather, the court held that the challenged "classification of scholarship applicants solely on the basis of SAT scores" was irrational. *Id.* at 364.

schools—and DOE expected a disparate impact on Asian-Americans at the schools combined—but the evidence of impact at the two most competitive schools is offered only to bolster Plaintiffs' claim of discriminatory intent under *Arlington Heights*. As Plaintiffs argue in Point I above, a full *Arlington Heights* analysis is necessary to determine if the challenged policy was enacted with discriminatory intent. Defendants are not entitled to summary judgment on this point alone.[19]

In short, there is at least a dispute of material fact regarding whether Dr. Vigdor's use of the "invitation" data for Discovery students is a permissible basis for his analysis. Taken in the light most favorable to Plaintiffs, the Court at this stage must assume that Dr. Vigdor's analysis was correct, and thus that the challenged Discovery changes caused the number of Asian-American students admitted to Stuyvesant and Bronx Science to decline. At this stage, Plaintiffs simply argue that evidence of adverse impact at the two most selective schools bolsters their claim for discriminatory intent and that summary judgment based *solely on the supposed lack of disparate impact* is inappropriate.

---

[19] Defendants' references to the Complaint and Prayer for Relief are misplaced for similar reasons. Any disparate impact is relevant to Plaintiffs' ultimate claim that Defendants implemented the Discovery changes with intent to discriminate against Asian-American students. If it turns out that—perhaps on account of DOE's miscalculations—aggregate impact occurred only at the top two schools, causing Asian-American students who otherwise would have been admitted to those schools to slide down to the remaining six, that impact is still relevant in determining discriminatory intent. That alone is enough to deny summary judgment.

**CONCLUSION**

Plaintiffs respectfully ask the Court to deny Defendants' motion for summary judgment and permit Plaintiffs to take discovery on Defendants' intent in altering the Discovery criteria.

DATED: November 19, 2021.

Respectfully Submitted,

_s/ Christopher M. Kieser_
CHRISTOPHER M. KIESER, Cal. Bar. No. 298486*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: CKieser@pacificlegal.org

GLENN E. ROPER, Colo. Bar No. 38723*
Pacific Legal Foundation
1745 Shea Center Drive, Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
Email: GERoper@pacificlegal.org
*Pro Hac Vice

_Counsel for Plaintiffs_