## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHRISTA McAULIFFE INTERMEDIATE
SCHOOL PTO, et al.,

                Plaintiffs,

        -against-

BILL de BLASIO, in his official capacity as
Mayor of New York City, et al.,

                Defendants.

Case No. 1:18-cv-11657-ER-OTW

**PLAINTIFFS' RULE 56.1
STATEMENT**

## I.  RESPONSES TO DEFENDANTS' STATEMENT

1.  There are nine Specialized High Schools operated by the New York City Department of Education ("DOE"). Pursuant to NY Education Law § 2590-g(12) (known as the Hecht-Calandra Act), which was enacted in 1971, all but one of these schools is required to admit students based solely on their score on an objective written admission test, the Specialized High School Admission Test ("the SHSAT"). All further references below to the Specialized High Schools ("SHS") will be to the eight SHS that admit students through the SHSAT. (Richter Declaration dated October 1, 2021 ("Richter Decl." Exh. A).

**Response:** This fact is undisputed.

2.  The eight high schools are: Bronx High School of Science; Brooklyn Technical High School; High School for Mathematics, Science and Engineering at City College; High School of American Studies at Lehman College: Queens High School for the Sciences at York College:

Staten Island Technical High School; Stuyvesant High School and the Brooklyn Latin School. (Wright Declaration dated October 1, 2021 ("Wright Decl.") Exh. D).

**Response:** This fact is undisputed.

3.      When students take the SHSAT, they are required to list which of the SHS they want to attend, in order of preference. Students may list from one to eight schools. (Wright Decl. Exh. A ¶ 4.)

**Response:** This fact is undisputed.

4.      The exam results are rank-ordered by score. The student with the highest score gets an offer to her first-choice school, then the student with the next highest score gets an offer to his first-choice school and so on. When the number of available offers to a school has been reached, no further offers are made to that school. (Wright Decl. Exh. A ¶¶ 5-6.)

**Response:** Plaintiffs clarify that this applies only to the seats not set aside for Discovery students under the challenged plan. (Wright Decl. Exh. A ¶¶ 8–16). Only students deemed eligible to participate in Discovery may compete for those seats on the basis of their SHSAT score and ranked choices. (*See id.*).

5.      If all the seats are filled at the student's first choice school, she gets an offer to her second-choice school. If all the seats are filled at her second-choice school she gets an offer at her third-choice school and so on. (Wright Decl. Exh. A ¶ 6.)

**Response:** Plaintiffs clarify that this applies only to the seats not set aside for Discovery students under the challenged plan. (Wright Decl. Exh. A ¶¶ 8–16). Only students deemed eligible to participate in Discovery may compete for those seats on the basis of their SHSAT score and ranked choices. (*See id.*).

6.     Hecht-Calandra also states that DOE may maintain a Discovery Program for admission to the SHS. ("Richter Decl." Exh. A).

**Response:** This fact is undisputed.

7.     The statute provides that a student may be considered for the Discovery Program if: he takes the SHSAT and scores below the cut-off score; is disadvantaged; is certified by his current school as having high potential for the special high school program; attends and then passes a summer preparatory program. (Richter Decl. Exh. A).

**Response:** Plaintiffs clarify that the statute requires a Discovery student to be "certified by his local school as disadvantaged." N.Y. Educ. Law § 2590-g(12)(d) (1997). Otherwise, this fact is undisputed.

8.     The statute does not define "disadvantaged" and does not limit the size of the Discovery Program. (Richter Decl. Exh. A).

**Response:** Plaintiffs agree that the statute does not define "disadvantaged" and that it does not set any numerical limit on the size of the Discovery Program. At some point, however, the size of the Discovery Program may conflict with the statutory command that the Program be administered "without in any manner interfering with the academic level" of the specialized high schools. N.Y. Educ. Law § 2590-g(12)(d) (1997). It may also eventually run afoul of the statute's requirement that admissions "shall be solely and exclusively by taking a competitive, objective and scholastic achievement examination . . . ." N.Y. Educ. Law § 2590-g(12)(b) (1997).

9.     Indeed, the legislative history shows that the initial bill had a cap of 14% of seats in the SHS reserved for Discovery Program participants, but that the cap was removed following

discussion among the legislators. (Roberts Declaration, dated January 17, 2019 ("Roberts Decl.") Dkt. # 48, Exh. 2, pp. 3-4).

**Response:** This fact is undisputed.

10.     The legislative history also shows that in 1970, prior to the passage of Hecht-Calandra, the three then-existing SHS, Stuyvesant High School, Brooklyn Technical High School and Bronx High School of Science, operated Discovery Programs and that overall, 18.2% of the seats in these three schools were given to students in the Discovery Programs. (Roberts Decl. Dkt. # 48, Exh. 2, p. 37).

**Response:** This fact is undisputed.

11.     This lawsuit challenges the two changes to the Discovery Program that were announced by the Chancellor and the Mayor on June 3, 2018 to be implemented beginning with the class entering the SHHS in September 2019. (Richter Decl. Exh. B).

**Response:** This fact is undisputed.

12.     The first was an increase in the size of the Discovery Program. In the summer of 2018 there were 252 students in the Discovery Program. (Richter Decl. Exh. B; Wright Decl. Exh. A ¶ 9, n. 1.).

**Response:** This fact is undisputed.

13.     The Discovery Program would be increased to 20% of the seats at each SHS over a two-year period. (Richter Decl. Exh. B).

**Response:** This fact is undisputed.

14.     In the summer of 2019, 528 seats would be allocated for the Discovery Program, which is approximately 13% of the total seats at the eight SHS. (Wright Decl. Exh. A ¶ 9, n. 1.).

**Response:** This fact is undisputed.

15.     In the summer of 2020, approximately 800 seats would be allocated for the Discovery Program, which is approximately 20% of the total seats at the eight SHS. (Wright Decl. Exh. A ¶ 9, n. 1.).

**Response:** This fact is undisputed.

16.     The second was a modification of the definition of disadvantaged. Previously, a student was considered disadvantaged if the student's family met one of the criteria established by DOE for individual disadvantage: 1) the student's family income qualifies the student for free lunch or reduced price lunch based on the student's meal form; 2) the student's family receives assistance from the Human Resources Administration (welfare or SNAP benefits); 3) the student is in foster care, a ward of the state, or is a Student in Temporary Housing as defined by McKinney-Vento or 4) the student is an English Language Learner or was an English Language Learner within the previous 2 school years, and enrolled in a DOE school for the first time within the last four years. (Wright Decl. Exh. A ¶ 11).

**Response:** This fact is undisputed.

17.     The individual disadvantaged requirement was maintained but it is now slightly different. Criterion 1 now states: the student's family income qualifies the student for free or reduced price lunch; and criterion 2 now states: 2) the student's family receives assistance from the New York City Human Resources Administration. Criterion 3 and 4 remain the same. (Wright Decl. Exh. ¶ 5).

**Response:** This fact is undisputed.

18.     The modification of the definition of disadvantaged that was announced on June 3, 2018, and was effective beginning with the 2019 entering class, was the inclusion of an additional

criterion—that a DOE student attends a school with an Economic Need Index of 0.6 or above, which is a high-poverty school. ((Richter Decl. Exh. B; Wright Decl. ¶ 6).

**Response:** Plaintiffs do not dispute that DOE added this additional criterion beginning with the 2019 entering class, but dispute that the Economic Need Index and especially the 0.6 cutoff accurately identify "high-poverty schools." The ENI formula does not rely entirely on individual circumstances—many students receive an Economic Need Value (which is used to calculate ENI) based upon the census tract in which they live. *See infra* ¶ 26. And many schools with an ENI below 0.6 have high poverty rates by any other measure—including Christa McAuliffe Intermediate School, which has a poverty rate of 67% according to the Demographic Snapshot.[1]

19.    The Economic Need Index ("ENI") of a school is a measure created by DOE. (Ashton Declaration, dated September 30, 2021 ("Ashton Decl.") ¶ 3).

**Response:** This fact is undisputed.

20.    It has been in use in its current DOE formula since 2015. (Ashton Decl. ¶ 3).

**Response:** Plaintiffs admit that the formula for calculating ENI has been publicly listed the same way since 2015. However, as Plaintiffs' expert Dr. Vigdor noted, a different formula was cited in a 2019 RAND Corporation paper. (Vigdor Dec. Exhibit 1 (Vigdor Report at 10)).[2]

---

[1] This information is taken from the publicly available Demographic Snapshot, which provides five years of demographic data on DOE schools. This Court has taken judicial notice of a prior version of the Snapshot. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y. 2019). The current version is available at https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2016-17-to-2020-21-public.xlsx (last visited Nov. 17, 2021). It is cited later as "Demographic Snapshot."

[2] For simplicity, the remainder of this statement cites Dr. Vigdor's initial report simply as "Vigdor Report" without reference to Dr. Vigdor's declaration.

21.     DOE uses ENI to estimate the percentage of students in that school facing economic hardship (Ashton Decl. ¶ 3).

**Response:** Plaintiffs do not dispute that DOE uses the ENI formula in an attempt to estimate the percentage of students facing economic hardship, but note that the ENI formula does not rely entirely on individual circumstances—many students receive an Economic Need Value (which is used to calculate ENI) based upon the census tract in which they live. *See infra* ¶ 26.

22.     There are many social science research studies that support the conclusion that students attending high-poverty schools are more disadvantaged and face more academic challenges than similarly-situated students attending lower-poverty schools. See, e.g., Annotated Bibliography: The Impact of School-Based Poverty Concentration on Academic Achievement & Student Outcomes, Poverty & Race Research Action Council. (Ashton Decl. ¶ 4).

**Response:** Plaintiffs do not dispute that this research exists, but dispute its relevance and application to the challenged Discovery criteria. Plaintiffs would note that many schools with an ENI below 0.6 have high poverty rates by any other measure—including Christa McAuliffe Intermediate School, which has a poverty rate of 67% according to the Demographic Snapshot.

23.     The ENI is calculated based upon the average of the Economic Need Values ("ENV") of the students attending the school. (Ashton Decl. ¶ 5).

**Response:** Plaintiffs do not dispute that this is true based on the formula listed in the Demographic Snapshot. Plaintiffs would note that as Dr. Vigdor pointed out, a different formula for calculating ENI was cited in a 2019 RAND Corporation paper. Vigdor Report at 10.

24.     A student's ENV is 1.0 if: (a) the student lives in a household that is eligible for public assistance from the New York City Human Resources Administration; (ii) the student lived in temporary housing in the past four years; or (iii) the student is in high school, has a home

language other than English and enrolled in a DOE school for the first time within the past four years. (Ashton Decl. ¶ 6).

**Response:** Plaintiffs do not dispute that this is true based on the formula listed in the Demographic Snapshot. Plaintiffs would note that as Dr. Vigdor pointed out, a different formula for calculating ENI was cited in a 2019 RAND Corporation paper. Vigdor Report at 10.

25.    For purposes of determining a student's ENV, eligibility for public assistance from the New York City Human Resources Administration ("HRA") is defined as eligibility for any of the following programs: the Supplemental Nutrition Assistance Program ("SNAP"), 7 U.S.C. § 2011, et seq., which was formerly known as the Food Stamp Program; the Temporary Assistance for Needy Families Program ("TANF") 42 U.S.C. § 601, et seq.; Medicaid, 42 U.S.C. 1396, et seq.; and the Special Supplemental Nutrition Program for Women, Infants, And Children ("WIC"), 42 U.S.C. § 1786. (Ashton Decl. ¶ 7).

**Response:** Plaintiffs have no evidence that would contradict this assertion. Plaintiffs would note, however, that as Dr. Vigdor pointed out, a different formula for calculating ENI was cited in a 2019 RAND Corporation paper. Vigdor Report at 10.

26.    If a student does not meet any of the above criteria, then the student's ENV is calculated based on the percentage of families (with school-age children) in the student's census track whose income is below the poverty income level, as estimated by the United States Census Bureau's American Community Survey Five-Year estimate (2019 ACS estimates were used in calculations for the 2020-21 ENI). The student's ENV equals this percentage divided by 100. For

example, if 75% of the families in the student's census tract have income below the federal poverty line, then the e student will have an ENV of 0.75. (Ashton Decl. ¶ 8).

**Response:** Plaintiffs do not dispute that this is true based on the formula listed in the Demographic Snapshot. Plaintiffs would note that as Dr. Vigdor pointed out, a different formula for calculating ENI was cited in a 2019 RAND Corporation paper. Vigdor Report at 10.

27.     If the student attends a non-DOE school, such as a charter or private school, or is home-schooled, then the criterion used for purposes of defining disadvantage is whether the student resides in a census tract where 60% or more of the families with school-age children living in the census tract have an income below the poverty line, as estimated by the U.S. Census Bureau's American Community Survey Five-Year estimate. (Wright Decl. ¶ 63.).

**Response:** Plaintiffs do not dispute that this is true based on the formula listed in the Demographic Snapshot. Plaintiffs would note that as Dr. Vigdor pointed out, a different formula for calculating ENI was cited in a 2019 RAND Corporation paper. Vigdor Report at 10.

28.     The representation of Asian students across all SHS as a group increased for the classes entering in 2019 and 2020 after the challenged changes were implemented. (Richter Decl., Exh. C, Report of Plaintiffs' Expert, p. 18).

**Response:** This fact is undisputed as to all the specialized schools as a group. However, as Dr. Vigdor explained, the admissions process changes *decreased* the representation of Asian-American students at the two most selective schools, Stuyvesant and Bronx Science. Vigdor Report at 15–17. Also, as Dr. Vigdor explained, the aggregate racial effect of Defendants' Discovery changes is highly dependent on the Citywide ENI values. Vigdor Report at 12–14. ENI is responsive to the poverty rate and not a fixed data point. (Kieser Dec. Exhibit 1 (Chadha Dep.

88:20–89:4)).[3] So the aggregate racial effect of the 2018 changes will not remain constant every admissions cycle. Rather, if ENI decreased Citywide, the pool of students newly ineligible for Discovery would be disproportionately Asian-American. *See* Vigdor Report at 7.

29.     The Asian students who took the SHSAT for the 2020 entering class obtained a higher percentage of the offers than they would have if offers had been made based on the algorithm used for admissions for the 2018 entering class, before the challenged changes were implemented. (Richter Decl., Exh. C, Report of Plaintiffs' Expert, p. 14 and Table 8).

**Response:** This fact is undisputed as to all the specialized schools as a group. However, as Dr. Vigdor explained, the admissions process changes *decreased* the representation of Asian students at the two most selective schools, Stuyvesant and Bronx Science. Vigdor Report at 15–17. Also, as Dr. Vigdor explained, the aggregate racial effect of Defendants' Discovery changes is highly dependent on the Citywide ENI values. Vigdor Report at 12–14. ENI is responsive to the poverty rate and not a fixed data point. (Chadha Dep. 88:20–89:4). So the aggregate racial effect of the 2018 changes will not remain constant every admissions cycle. Rather, if ENI decreased Citywide, the pool of students newly ineligible for Discovery would be disproportionately Asian-American. *See* Vigdor Report at 7.

30.     From 2006-2015 the relevant data that is readily available is the racial/ethnic composition of the applicant pool and the racial/ethnic composition of the students who received offers based on their SHSAT score only. (Wright Decl. ¶ 9, Exh. C).

---

[3] For simplicity, the remainder of this statement cites Ms. Chadha's deposition transcript simply as "Chadha Dep." without reference to Mr. Kieser's declaration.

**Response:** Plaintiffs have no evidence with which to dispute this assertion. Plaintiffs note that Defendants' racial/ethnic data is incomplete, with consistently over 5% of test takers (and before 2014, over 10% of test takers) marked as of an unknown race.

31.     The Discovery Program was much smaller during that period. Only about 1-3% of the students who gained admission to the SHS did so through the Discovery Program. (Wright Decl. ¶ 8, Exh. B).

**Response:** Plaintiffs have no evidence with which to dispute this assertion.

32.     The racial/ethnic composition of the Discovery Program applicants and offerees for those years is not readily available. (Wright Decl. ¶ 8, Exh. B).

**Response:** Plaintiffs have no evidence with which to dispute this assertion.

33.     In every year from 2006 to 2015, Asian students received the largest percentage of the offers that were made based on SHSHAT score only of any racial group. (Wright Decl. ¶ 11 Exh. C).

**Response:** This fact is undisputed.

34.     In every year from 2006 to 2015, Asian students received for more offers than they would under the predicted result model, where all groups do equally well. (Wright Decl. ¶ 11 Exh. C).

**Response:** Plaintiffs do not dispute that Asian-Americans received a higher percentage of offers during this period than the group's proportion of the testing pool. Plaintiffs dispute that Defendants' newly invented term "predicted result model"—which appears to assume that the "correct" outcome is racially balanced according to the applicant pool—carries any significance.

35.     In every year from 2006 to 2015, Asian students had the highest passing rate (the percent of applicants in the group who received offers) of the four major racial/ethnic groups (Asian, Black, Latino and White students). (Wright Decl. ¶ 11 Exh. C).

**Response:** Plaintiffs do not dispute that Asian-American students had the highest offer rate for many of these years; however, the cited data indicates that white students had a higher passing rate in 2009. Plaintiffs also note that DOE classifies a large number of students as being of "unknown" race, so it may not be possible to accurately state whether white or Asian-American students had higher passing rates in some years.

36.     DOE has readily available complete data for [2016 through 2020] which shows the racial/ethnic composition of the applicants, the students who received offers based on SHSAT score only and the students who received offers to the Discovery Program. (Wright Decl. ¶ 30, Exhs. C, D).

**Response:** Plaintiffs dispute that DOE has "complete" racial/ethnic data for 2016 through 2020, as consistently over 5% of test takers are marked as of "Unknown" race.

37.     In every year from 2016 to 2020 Asian students received the largest percentage of the offers of any racial group. (Wright Decl. ¶ 31 Exhs .C, D).

**Response:** This fact is undisputed.

38.     In every year from 2016 to 2020, Asian students received for more offers than they would under the predicted result model, where all groups do equally well. (Wright Decl. ¶ 31 Exhs. C, D).

**Response:** Plaintiffs do not dispute that Asian-Americans received a higher percentage of offers during this period than the group's proportion of the testing pool. Plaintiffs dispute that

Defendants' newly invented term "predicted result model"—which appears to assume that the "correct" outcome is racially balanced according to the applicant pool—carries any significance.

39.     In every year from 2016 to 2020, Asian students had the highest passing rate of the four major racial/ethnic groups (Wright Decl. ¶ 31 Exhs. C, D).

**Response:** This fact is undisputed, construing the term "passing rate" to mean "the percentage of applicants in the group who received offers" as in paragraph 35, above.

40.     DOE had information as to whether some but not all students who are re potentially eligible for the Discovery Program, based on their score on the SHSAT (and beginning with the entering class of 2019, their attendance at a school with an ENI of at least 0.6 or residence in a census tract with a poverty level of 60% or greater) met the individual disadvantaged criteria. Wright Decl. ¶ 65).

**Response:** This fact is undisputed.

41.     DOE sends invitation letters to all students (up to the number of students that are projected as needed to fill the available seats) who may be eligible, based on their SHSAT score and school choices. Beginning with the admission cycle for the 2019 entering class, the invitation letters are sent only to those who also meet the ENI or census tract criterion. (Wright Decl. ¶ 66).

**Response:** Plaintiffs lack evidence to dispute this assertion. Plaintiffs also clarify that this paragraph refers to "invitation letters" to participate in the Discovery Program.

42.     There are three different invitation letters sent. For DOE students for whom DOE has records showing that the student meets the individual disadvantaged criteria the letter states that the parent or guardian should submit an application to the student's current school if the student wants to participate in the Discovery Program. (Wright Decl. ¶ 67, Exh. E).

**Response:** Plaintiffs lack evidence to dispute this assertion.

43.     For DOE students for whom DOE does not have records showing that the student meets the individual disadvantaged criteria, the invitation letter states that "Information in NYCDOE systems indicates that your child does not meet any of the four requirements listed above [the individual disadvantaged criteria]. If this is correct, do not submit an application for this program—no further action is needed." The letter then states that if the child does meet any of the four requirements the parent or guardian should submit documentation of that together with the application. (Wright Decl. ¶ 68, Exh. F).

**Response:** Plaintiffs lack evidence to dispute this assertion.

44.     For non-DOE students the invitation letter states that the child may be eligible and requests that supporting documentation showing that the child meets one of the individual disadvantaged criteria be submitted with the application. (Wright Decl. ¶ 69, Exh. G).

**Response:** Plaintiffs lack evidence to support this assertion.

45.     In addition, pursuant to state law, no student is eligible to participate in the Discovery Program until their current school recommends them for the Program. This recommendation is not provided until after an application is submitted. (Wright Decl. ¶ 70).

**Response:** This fact is undisputed.

46.     Further, for those students for whom DOE does not have records showing that the student meets one of the individual disadvantaged criteria, the documentation submitted by the parent or guardian with the application must be verified before the application can be approved and an offer made. (Wright Decl. ¶ 70).

**Response:** This fact is undisputed.

47.     After the application process is completed, the Discovery Program offers are made to those students who have applied and have been found eligible. (Wright Decl. ¶ 71).

**Response:** This fact is undisputed.

48.     The invitation data shows that during the years 2016-2020, the number of invitations sent to students whose disadvantaged status was unknown the "Maybe Disadvantaged" either exceeded the number of invitations sent to students who were "Definitely Disadvantaged" based on DOE's records or were at least 28% of the invitations. (Wright Decl. ¶ 72, Exh. H).

**Response:** Plaintiffs have no evidence that would dispute the assertion that Discovery invitations to students that DOE characterized as "Maybe Disadvantaged" between 2016 and 2020 ranged from 28% of total invitations to more than 50% of total invitations. However, as Defendants state below, the proportion of invitations issued to "Maybe Disadvantaged" students declined significantly after the challenged changes were implemented. *See infra* ¶ 51. It is a reasonable inference that this decline is because since the changes were implemented, DOE has only sent invitations to students who attend eligible schools. *See supra* ¶ 41.

49.     A comparison of the invitation data to the offer data shows that most of the students who submitted an application, were found eligible and received an offer are in the category of students for whom DOE had records showing that the student met one of the individual disadvantaged criteria at the time the invitations were sent. (Wright Decl. ¶ 73, Exh. H).

**Response:** Plaintiffs have no evidence that would dispute this assertion.

50.     Students in this Definitely Disadvantaged category received 83% of the offers for the 2016 entering class, received 90% of the offers for the 2017 entering class, received 95% of the offers for the 2018 entering class, received 93% of the offers for the 2019 entering class and received 97% of the offers for the 2020 entering class. (Wright Decl. ¶ 73, Exh. H).

**Response:** Plaintiffs have no evidence that would dispute this assertion.

51.     In the 2016-2018 entering classes the majority of students who received invitations were in the Maybe Disadvantaged category and in the 2019-2020 entering classes they were at least 29% of those who received invitations. (Wright Decl. Exh. H).

**Response:** This paragraph conflicts with paragraph 48 above—according to the cited evidence, the actual percentage of invitations issued to Maybe Disadvantaged students in 2020 was 28.3%. Plaintiffs do not dispute that for the 2016–2018 entering classes, the majority of students to whom DOE issued invitations were students that DOE categorizes as "Maybe Disadvantaged."

52.     This large disparity indicates that there are students in the Maybe Disadvantaged category, for whom DOE had no records showing that they met the individual disadvantaged criteria, who did not meet these criteria and were not eligible for the Discovery Program. (Wright Decl. ¶ 74).

**Response:** Plaintiffs dispute the characterization of the invitations data as a "large disparity." Plaintiffs further dispute that the data necessarily shows that there are students that DOE characterized as "Maybe Disadvantaged" who did not meet the individual disadvantaged criteria and were not eligible for the Discovery Program. That is unsupported speculation on the part of Defendants.

53.     The ethnic/racial breakdown of the students in terms of invitations shows a lower percentage of Asian students in the Maybe Disadvantaged category than in the Definitely Disadvantaged category, and a lower percentage of Asian students in the Maybe Disadvantaged category and in the total invitations data than in the offers to the Discovery Program data. (Wright Decl. ¶ 76, Exhs. D, I).

**Response:** The cited evidence does not use the "Maybe Disadvantaged" and "Definitely Disadvantaged" terminology. Also, Exhibit I includes an unknown number of private school students—separate from the "Maybe Disadvantaged" and "Definitely Disadvantaged" categories—and it is unclear whether private school students are also included in "Maybe Disadvantaged" students in Exhibit H.

54.     For the 2016 entering class, Asian students received 58.6 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 56.9 %, and Asian students received 40.9% of all the invitations (when the Maybe Disadvantaged students were added to the Definitely Disadvantaged students). (Wright Decl. ¶ 77. Exhs. D, I).

**Response:** The cited evidence does not use the "Maybe Disadvantaged" and "Definitely Disadvantaged" terminology. Also, Exhibit I includes an unknown number of private school students—separate from the "Maybe Disadvantaged" and "Definitely Disadvantaged" categories—and it is unclear whether private school students are also included in "Maybe Disadvantaged" students in Exhibit H. Plaintiffs also note that the percentages listed in Exhibit I are rounded, while the percentages in the Wright declaration are not.

55.     For the 2017 entering class, Asian students received 65.1 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 62.9 %, and Asian students received 41.7% of all the invitations. (Wright Decl. ¶ 78, Exhs. D, I).

**Response:** The cited evidence does not use the terms "Maybe Disadvantaged" and "Definitely Disadvantaged" terminology. Also, Exhibit I includes an unknown number of private school students—separate from the "Maybe Disadvantaged" and "Definitely Disadvantaged" categories—and it is unclear whether private school students are also included in "Maybe Disadvantaged" students in Exhibit H. Plaintiffs also note that the percentages listed in Exhibit I

are rounded, while the percentages in the Wright declaration are not. As for the percentages, the offer percentage for Asian-American students should be 67.9% according to the cited data.

56.     For the 2018 entering class, Asian students received 61.9 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 57.9 %, and Asian students received 43% of all the invitations. (Wright Decl. ¶ 79, Exhs. D, I).

**Response:** The cited evidence does not use the terms "Maybe Disadvantaged" and "Definitely Disadvantaged" terminology. Also, Exhibit I includes an unknown number of private school students—separate from the "Maybe Disadvantaged" and "Definitely Disadvantaged" categories—and it is unclear whether private school students are also included in "Maybe Disadvantaged" students in Exhibit H. Plaintiffs also note that the percentages listed in Exhibit I are rounded, while the percentages in the Wright declaration are not.

57.     For the 2019 entering class, Asian students received 67.9% of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 59.2 %, and Asian students received 54.0% of all the invitations. (Wright Decl. ¶ 80. Exhs. D, I).

**Response:** The cited evidence does not use the terms "Maybe Disadvantaged" and "Definitely Disadvantaged" terminology. Also, Exhibit I includes an unknown number of private school students—separate from the "Maybe Disadvantaged" and "Definitely Disadvantaged" categories—and it is unclear whether private school students are also included in "Maybe Disadvantaged" students in Exhibit H. Plaintiffs also note that the percentages listed in Exhibit I are rounded, while the percentages in the Wright declaration are not. As for the percentages, the offer percentage for Asian-American students should be 65.1% according to the cited data.

58.    For the 2020 entering class, Asian students received 58.6 % of the offers, the percentage of the Definitely Disadvantaged students who received invitations that were Asian was 54.8 %, and Asian students received 49.7% of all the invitations. (Wright Decl. ¶ 81, Exhs. D, I).

**Response:** Plaintiffs have no evidence that would dispute this assertion.

59.    Dr. Vigdor, Plaintiffs' Expert Witness, Used the Invitation Data in his Analysis. (Richter Decl. Exh. F).

**Response:** Plaintiffs submit that there is an issue of material fact regarding the proper data to use for this analysis. As Dr. Vigdor noted in his supplemental report, the "invitation" data is entirely under the control of DOE, which selects the students to whom it will send invitation letters. As Dr. Vigdor explains, "offer" data is largely out of the DOE's control—"To simulate the outcome of the process leading to an 'offer' rather than an 'invitation' would require me to replicate not only the straightforward algorithms that [DOE] has used to determine 'invitations' but the more complicated individual family decisions that determine whether students submit the paperwork necessary to convert their 'invitation' into an 'offer.'" (Vigdor Dec. Exhibit 2 (Supplemental Vigdor Report at 2)). As the City's evidence confirms, even among those who are certainly eligible to participate (i.e., "Definitely Disadvantaged"), a "significant number of students" do not fill out an application and thus "are given no offer to participate in the Program." (Wright Decl. Exh. A ¶ 15). That the "offer" data excludes these eligible students renders it no better—and perhaps worse—than the "invitation" data in assessing the impact of the challenged Discovery changes.

60.    The National School Lunch Act ("the Act") requires that students whose families participate in the Supplemental Nutrition Assistance Program (commonly known as "SNAP" or

the Food Stamp Program), be directly certified as eligible for free lunches. 42 U.S.C. § 1758(b)(4)(B),(C). (Ashton Decl. ¶ 7).

**Response:** This fact is undisputed.

61.     The Act also requires that by school year 2013-14, the states directly certify 95% of the total number of school-age children in the state who are eligible for direct certification based on the family's participation in the food stamp program. 42 U.S.C. § 1758(b)(4)(F)(i)(III). (Ashton Decl. ¶ 15).

**Response:** This fact is undisputed.

62.     The Annual Report to Congress by the United States Department of Agriculture dated October 2018 provided information about each individual state's progress towards that goal. The Report stated that for school year 2016-2017, New York State had a direct certification rate of 84%, while the national average was 92%. (Ashton Decl. ¶ 16, Exh. A, p.3).

**Response:** This fact is undisputed.

63.     The Report contains a narrative description of how New York State planned to address this situation. (Ashton Decl. ¶ 18, Exh. A, p. 7).

**Response:** This fact is undisputed.

64.     As noted in the Report, the Act permits the direct certification process to be performed either at the local level or the state level at the option of the state, but opined that the process is generally more efficient and accurate when performed at the State level. (Ashton Decl, ¶ 17, Exh. A pp. 4-5).

**Response:** This fact is undisputed.

65.     The Report stated that New York State planned to perform the Direct Certification Matching Process at the state level, beginning with school year 2017-2018, whereas it had

previously been done at the local level. The New York State Education Department implemented the Direct Certification Matching Process state-wide for the school year beginning in September 2017. (Ashton Decl. ¶¶ 18, 23, Exh. A, p. 7).

**Response:** This fact is undisputed.

66.     In addition to SNAP participation, states may choose to provide direct certification based on a family's participation in other means-tested federally funded programs. Those programs are administered by the New York City Human Resources Administration in New York City. New York State chose to perform direct certification based on a family's participation in these additional programs. (Ashton Decl. ¶ 22).

**Response:** This fact is undisputed.

67.     The result of the State's Direct Certification Matching Process was that more DOE students were identified as having an Economic Need Value ("ENV") of 1.0 (Ashton Decl. ¶ 23).

**Response:** Plaintiffs lack evidence to dispute this assertion. Plaintiffs would note that as Dr. Vigdor pointed out, a different formula for calculating ENI was cited in a 2019 RAND Corporation paper. Vigdor Report at 10.

68.     The DOE calculates ENI annually and the ENI of a school is based on the ENV average of the students attending that school. The data resulting from the matching process was that the number of middle schools as well as other DOE schools with an ENI of 0.6 or more increased. (Ashton Decl. ¶¶ 5, 24, 25).

**Response:** Plaintiffs do not dispute that this is true based on the formula listed in the Demographic Snapshot. Plaintiffs would note that as Dr. Vigdor pointed out, a different formula for calculating ENI was cited in a 2019 RAND Corporation paper. Vigdor Report at 10.

## II.    PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

### A.    DOE's Modeling of Aggregate Racial Effect of Discovery Changes

69.    Before making revisions to the Discovery Program in 2018, DOE conducted modeling to predict the racial effect of expanding the Discovery Program and limiting eligibility to students from schools with an ENI of 60% or higher. Nadiya Chadha, who at the time was the Director of Research and Policy in the Office of Student Enrollment at DOE (Chadha Dep. 8:18–9:7), modeled the expected aggregate racial effect of the challenged changes on specialized high school offers (Chadha Dep. 31:15–18, 31:23–32:6).

70.    To develop the model, Chadha used "actual information about students who took" the SHSAT in the fall of 2016 "and regenerated who would have been invited to participate in the Discovery Program had these rules been in effect that year." (Chadha Dep. 32:14–18). She considered only students that DOE already knew met the individual disadvantaged criteria. (Chadha Dep. 32:19–23).

71.    Her model predicted that imposing the Discovery changes on the fall 2017 applicant pool would have caused the proportion of Asian-American students who received offers to attend the specialized high schools to decrease by 2.1 percentage points (and the percentage of white students who received offers to decrease by 2.5 percentage points). (Chadha Dep. Exhibit C). Defendants filed the results of this model with the Court as an attachment to Chadha's declaration opposing Plaintiffs' motion for a preliminary injunction. ECF No. 49-1 at 2.

72.    Chadha also produced models specific to the racial composition of the Discovery Program as a result of the changes. (Chadha Dep. Exhibits G–I).[4] She shared with City Hall her

---

[4] These exhibits (and others as noted in the Kieser declaration) were designated "confidential" pursuant to the protective order in effect in this case. However, Defendants do not object to them being placed on the public record, so Plaintiffs do not seek to file them under seal.

projection that Discovery invitations for the summer of 2019 would be just 38% Asian-American and 53% Black and Hispanic. (Chadha Dep. 48:1–7, 11–21). In another model (Exhibit I to the deposition), she predicted that, holding the size of Discovery constant, imposing a 0.6 ENI floor would decrease the proportion of Discovery-eligible students who were Asian-American from 47% to 38%. (Chadha Dep. 49:20–24—50:1–3 & 54:18–55:10). And in Exhibit H, she shared with DOE Press Secretary Will Mantell (Chadha Dep. 48:11–15) the modeling from Exhibit G, characterizing it as the modeled breakdown of "Discovery students" and recommending that DOE announce that it expected at least 50% of Discovery "offers" would go to Black or Hispanic students. (Exhibit H). The email chain in Exhibit H is dated June 4, 2018—one day after the changes were announced. *See supra* ¶¶ 11, 18.

### B.    Other Measures of Disparate Impact

73.    Although the aggregate impact of the Discovery changes in 2019 and 2020 was not in line with DOE's modeling, there are several other measures of disparate impact that demonstrate Asian-American students were disproportionately affected by the revisions to the Discovery Program. As Dr. Vigdor documented, schools serving eighth graders with ENIs qualifying their disadvantaged students for Discovery are, on average, just 7.9% Asian-American, "less than half the citywide percentage as reported in the Demographic Snapshot." Vigdor Report at 11–12.

74.    In the 2020 Demographic Snapshot, 515 of the 621 schools serving eighth graders had an ENI above the qualifying threshold for Discovery eligibility. Vigdor Report at 11. But the challenged plan currently excludes from Discovery eligibility 11 of the 24 schools serving eighth graders that are majority Asian-American, including Christa McAuliffe IS 187, which the current Demographic Snapshot shows is 75.6% Asian-American and has 67% of its students in poverty. As Ms. Chadha testified, many of these schools have a history of sending many students to the

specialized high schools. (Chadha Dep. 91:14–92:23). Excluded majority-Asian American schools include six of the 12 schools that received the most offers to attend the specialized high schools for the fall of 2017. (*Compare* Chadha Dep. Exhibit N *with* data from Demographic Snapshot). These schools—Christa McAuliffe IS 187, New York City Lab Middle School for Collaborative Studies, JHS 074 Nathaniel Hawthorne, JHS 067 Louis Pasteur, JHS 216 George J. Ryan, and MS 158 Marie Curie—accounted for a combined 763 offers to attend the specialized high schools in the fall of 2017. (Chadha Dep. Exhibit N).

## C.   Effect of Expanded Discovery on Cutoff Scores and Student Eligibility

75.   The effect of the Discovery expansion and change in the disadvantaged criteria is that a student who meets the individual disadvantaged criteria and scored within the range to be invited to the Discovery Program at a specialized high school will nonetheless be ineligible for Discovery if the student attends a school with an ENI below 0.6. *See supra* ¶ 18.

76.   The challenged policy sets aside 20% of all specialized high school seats for Discovery Program students. *See supra* ¶ 15. Because of the set-aside, and since there was no accompanying increase in the number of available seats at the specialized high schools, fewer offers are available for students based solely on SHSAT scores. According to a chart produced by Defendants, the 20% set-aside has a substantial effect on the cutoff score at each school—for example, while the cutoff score to gain fall 2019 admission to Brooklyn Latin (the least selective specialized high school) solely through an SHSAT score would have been 481 had Defendants not instituted the challenged changes, it rose to 486 because of the 13% set-aside implemented that

year. (Kieser Dec. Exhibit 4 (ChMc 4249)).[5] The cutoff score would have been 491 with a full

20% set-aside. *Id.* Every other specialized high school experienced a corresponding increase. *Id.*

77.     Because the increased Discovery set-aside greatly increased the cutoff score to gain

admission without Discovery *and* limited eligibility for Discovery for many applicants who qualify

as individually disadvantaged, the challenged policy makes it significantly more difficult for

individually disadvantaged students at ineligible schools to obtain a seat at the specialized high

schools. Thus, using the score cutoffs from the previous paragraph as an example, a disadvantaged

student at Christa McAuliffe IS 187 who scored a 490 could not obtain a seat at any of the

specialized high schools, through Discovery or otherwise, (*see* ChMc 4249), while a disadvantaged

student from an eligible middle school with the same score would be eligible for the Discovery

Program at Stuyvesant, the most selective school. (*See* Wright Decl. Exh. A ¶ 14 (noting that like

SHSAT offers, Discovery Program offers are made in rank-order by SHSAT score to eligible

students who apply for the Program); ChMc 4250 (noting cutoff scores for Discovery at the eight

schools)).

### D.     Discovery "Offers" versus "Invitations"

78.     Students to whom DOE sends Discovery "invitations," *see supra* ¶¶ 40–44, must

then follow through and submit an application to potentially receive an "offer" to participate in

Discovery. (Chadha Dep. 32:24–33:15; Kieser Dec. Exhibit 3 (Scuello Dep. 125:8–127:9)).[6]

Because DOE does not know the disadvantage status of every student who may be eligible for

Discovery based upon his or her SHSAT score and middle school, "it is not possible to know with

---

[5] For simplicity, the remainder of this statement cites Exhibit 4 to Mr. Kieser's declaration as "ChMc 4249" or "ChMc 4250," in reference to its Bates numbers, without reference to Mr. Kieser's declaration.

[6] For simplicity, the remainder of this statement cites Mr. Scuello's deposition transcript simply as "Scuello Dep." without reference to Mr. Kieser's declaration.

precision the population of students who are eligible for the Discovery Program in any given year."
(Wright Dec. Exh. A ¶ 16).

79.     Whether a student converts his or her "invitation" into an "offer" to attend the
Discovery Program is a process largely outside the control of DOE. Eligible students—either
Maybe or Definitely Disadvantaged—will not receive an "offer" if they do not complete the
required application, which includes income documentation for "Maybe Disadvantaged" students.
(Wright Dec. Exh. A ¶ 15). It is impossible to know whether a "Maybe Disadvantaged" invited
student was ultimately eligible for Discovery if he or she does not submit an application. There
are many reasons an invited student might choose not to submit an application, including that he
is simply not interested in participating. (Chadha Dep. 34:3–15).

E.     Stuyvesant and Bronx Science

80.     There are identifiable students who would have received offers to attend Stuyvesant
and Bronx Science absent the challenged Discovery changes. These students are
disproportionately Asian-American. (Vigdor Dec. Exhibit 2 (Vigdor Supplemental Report at 1;
(Scuello Dep. 96:15–100:11)).

DATED: November 19, 2021.

Respectfully Submitted,
s/ Christopher M. Kieser
CHRISTOPHER M. KIESER, Cal. Bar. No. 298486*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: CKieser@pacificlegal.org

GLENN E. ROPER, Colo. Bar No. 38723*
Pacific Legal Foundation
1745 Shea Center Drive, Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 419-7111
Email: GERoper@pacificlegal.org
**Pro Hac Vice*

*Counsel for Plaintiffs*