18 CV 11657 (ER) (OTW)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTA McAULIFFE INTERMEDIATE SCHOOL
PTO, Inc., et al.,

Plaintiffs,

-against-

BILL de BLASIO, in his official capacity as Mayor of
New York, et al.,

Defendants.

**DEFENDANTS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT**

*GEORGIA M. PESTANA*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Marilyn Richter*
*Sharon Sprayregen*
*Tel:  (212) 356-2083*
*Matter No. 2018-094646*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT

    POINT I

        BASED ON THE UNDISPUTED FACTS, DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ..................................................................... 1

        A. Plaintiffs' Belated Assertion that Two Years of Post-Implementation Data is Insufficient Is Meritless ............................................................. 2

        B. A Facially Neutral Policy Can Only Create an Equal Protection Violation if its Application has a Discriminatory Effect ................................ 2

        C. A Comparison of the Applicant Pool and Offer Pool Data is Not Racial Balancing and is the Widely Recognized Method to Determine Whether a Selection Process Has a Discriminatory Effect/Disparate Impact for Both Equal Protection and Title VII Claims ..................................... 4

        D. Similarly Situated Applicants Are Treated Identically, Regardless of Their Race ................................. 7

        E. On the Undisputed Facts, Invitations are Not Offers and No Disparate Impact Has Been Shown at Stuyvesant or Bronx Science High Schools ............................................................................... 9

CONCLUSION ................................................................................................ 10

## TABLE OF AUTHORITIES

**Cases**                                                                          **Pages**

*Ass'n for Educational Fairness v. Montgomery Cty. Bd. of Educ.*,
   2021 U.S. Dist. LEXIS 175450 (D. Md. Sep. 15, 2021) ..........................................6

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Boston*,
   996 F.3d 37 (1st Cir. 2021) ...................................................................... 5-6, 7, 9

*Chin v. Port Auth. of N.Y. & N.J.*,
   685 F.3d 135 (2d Cir. 2012)................................................................................8

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
   364 F. Supp. 3d 253 (S.D.N.Y.),
   *aff'd*, 788 F. App'x 85 (2d Cir. 2019)..........................................................1, 2, 5

*Debra P. v. Turlington*,
   644 F.2d 397 (5th Cir. 1981) ...............................................................................5

*Doe v. Lower Merion Sch. Dist.*,
   665 F.3d 524 (3d Cir. 2011)..................................................................................3

*Fisher v. Univ. of Texas at Austin*,
   570 U.S. 297 (2013)..........................................................................................5, 9

*N.C. State Conference of the NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ...............................................................................3

*Palmer v. Thompson*,
   403 U.S. 217 (1971)..............................................................................................3

*Paradise v. Prescott*,
   580 F. Supp. 171 (M.D. Ala. 1983),
   *aff'd United States v. Paradise,* 480 U.S. 149 (1987)..........................................5

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*,
   551 U.S. 701 (2007)..............................................................................................5

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).........................................................................................2, 3

*Washington v. Davis*,
   426 U.S. 229 (1976).................................................................................2, 3, 5, 6

**Regulation**

28 C.F.R. 50.14(3)(D)..................................................................................................5

**Rule**                                                                                        **Pages**

Rule 56.1 ...................................................................................................................................7

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt # 153) ("Pl MOL"), p. 1) opens with a sarcastic description of the Mayor's and Chancellor's publicly-stated concerns that the admissions process for the Specialized High Schools ("the SHS") results in an underrepresentation of Black and Latino students at these prestigious schools.  As the Mayor stated, concerning the 2018 entering class, "Stuyvesant High School just admitted almost a thousand students, but only ten of those students were African American and less than thirty were Latino.  In a city that is majority African American and Latino."  *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio,* 364 F. Supp. 3d 253, 269 (S.D.N.Y.), *aff'd,* 788 F. App'x 85 (2d Cir. 2019)(quoting the Mayor's Twitter feed).  Concern over these numbers is dismissively termed a "problem" by Plaintiffs (quotes in the original).  (Pl MOL, p. 1).

Plaintiffs have cited no case, and Defendants have found none, where an equal protection violation was found based on undisputed facts similar to those here.  The plaintiff group, which has been the most successful major racial group in the selection process for over a decade, challenged planned modifications to the process.  The modifications were implemented and the plaintiff group fared even better.  In addition, the plaintiff group would have received a lower percentage of the offers if the applicants in the selection process at full implementation had been selected based on the pre-implementation selection process.

**ARGUMENT**
**POINT I**

**BASED ON THE UNDISPUTED FACTS,**
**DEFENDANTS ARE ENTITLED TO**
**SUMMARY JUDGMENT**

Plaintiffs cannot establish an equal protection violation – they should lose in court because they have "won" in reality.

A. <u>Plaintiffs' Belated Assertion that Two Years of Post-Implementation Data is Insufficient Is Meritless</u>

In discovery Plaintiffs requested, and Defendants provided, detailed aggregate data and individual applicant data for the entering classes of 2016 through 2020, the three years before and the two years after the policy was implemented, partially in 2019 and fully in 2020.  Both sides' experts based their analysis on this data.  Now that it is undisputed that Asians received a greater percentage of the offers post-implementation, Plaintiffs suddenly assert that this is insufficient. They do not state how many years of data are sufficient; they simply claim that the data produced is not predictive of future cycles and does not allow the "Court to determine ENI going forward." (Pl MOL, pp. 1-2).  Plaintiffs cite no case where there was no adverse impact but the court decided that the case should remain open and undecided to see if adverse impact subsequently develops. Equal protection cases are usually decided concerning a single selection cycle.  *See, e.g., Washington v. Davis*,  426 U.S. 229 (1976).  If there is adverse impact in the future, Plaintiffs may bring a new case.

B. <u>A Facially Neutral Policy Can Only Create an Equal Protection Violation if its Application  has a Discriminatory Effect</u>

As the Court has previously found, government action "can discriminate on the basis of race" if the law or policy expressly classifies persons on the basis of race, or is facially neutral but "is enforced in a discriminatory way" or "lastly, a law or policy that is facially neutral discriminates on the basis of race if it is motivated by a discriminatory purpose and its application results in a discriminatory effect".  *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276 (S.D.N.Y.), *aff'd,* 788 F. App'x 85 (2d Cir. 2019) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)).

Plaintiffs have acknowledged that the changes to the Discovery Program are "facially race-neutral" *id.* at 268, and the Court has so found. *Id.* at 278. There are no allegations that the policy has been enforced in a discriminatory way. This leaves the third option – the challenged policy was motivated by a discriminatory purpose and its application has resulted in a discriminatory effect. That is what Plaintiffs asserted as the basis of their claim. *Id.*

Plaintiffs resort to a misreading of *Davis,* 426 U.S. 229 and *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), to argue that these cases hold that disparate impact is not required to find an equal protection violation (Pl MOL, p. 6), which is contrary to the Court's interpretation of the latter case. In both cases, the challenged policy or action was found to have a discriminatory effect on a racial group to which plaintiffs belonged. *Davis*, 426 U.S. at 233, 235, 237; *Village of Arlington Heights*, 429 U.S. at 259-60, 269. The question decided in both cases was whether that was sufficient to state an equal protection violation and the holdings were that it was not – a finding that the challenged policy or action was motivated, at least in part, by a discriminatory purpose was *also* required. *Davis*, 426 U.S. at 238-39; *Village of Arlington Heights,* 429 U.S. at 264-65. "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971), quoted in *Doe v. Lower Merion Sch. Dist.,* 665 F.3d 524, 549 (3d Cir. 2011).[1]

---

[1] Plaintiffs suggest that *N.C. State Conference of the NAACP v. McCrory,* 831 F.3d 204 (4th Cir. 2016) shows that adverse impact is not required. The case concerned a law restricting voting access that was targeted at voting methods used by Black voters in a state that had a long history of pervasive discrimination against Black voters, who still had not reached the levels of participation and registration as White voters. The first election after the law's passage was a mid-term election in which Black voter participation increased by 1.8%. The court considered these factors and found that there was adverse impact because thousands of Black voters were disenfranchised or had their votes uncounted because of the law, the voting patterns during a midterm election are different than in a general election, one election is not generally enough to

C. A Comparison of the Applicant Pool and Offer Pool Data is Not Racial Balancing and is the Widely Recognized Method to Determine Whether a Selection Process Has a Discriminatory Effect/Disparate Impact for Both Equal Protection and Title VII Claims

Plaintiffs argue that comparing the percentage of Asian students in the applicant pool to the percentage of the offers received by Asian students is unconstitutional racial balancing.  This is contrary to controlling authority.  Defendants assert that pursuant to caselaw, the proper comparison is between the applicant pool and offer pool data (either between the percentage of Asian students in the applicant pool to the percentage of Asian students who receive offers, or a comparison of the passing (or failing) rates of the different racial/ethnic groups).  Plaintiffs assert that the proper comparison is between the percentage of Asian students who have received offers under the challenged policy to the percentage of Asian students who received offers before the challenged policy was implemented.

Here, using either comparison, there is no discriminatory effect on Asian students.  Under the challenged policy, Asian students received a far higher percentage of the offers than their percentage in the applicant pool, *and* Asian students received a greater percentage of the offers under the challenged policy than they did before the challenged policy was implemented.  Second, neither comparison is racial balancing.   This term does not refer to an analysis to determine whether a selection process has a discriminatory effect on a racial group; it refers to a selection process which is structured to result in the selection of "some specified percentage of a particular group merely because of its race or ethnic origin."   *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 311 (2013) (quoting *Bakke*, 438 U.S. 265, 307 (1978)).   *See also, Parents Involved in*

be dispositive in an election case (unlike in a selection case) and because the increase represented a decrease in the rate of change prior to the law.  *Id.* at 232-22.

4

*Community Schools v. Seattle School Dist. No. 1,* 551 U.S. 701, 726-732 (2007) (finding school districts' attempts to have individual school populations reflect the overall racial demographics of the districts unconstitutional racial balancing); *McAuliffe*, 364 F. Supp. 3d at 283.

Further, in determining whether a selection process has a discriminatory effect the courts routinely compare the applicant pool and offer pool data, whether by comparing the percentage of the plaintiff group in the applicant pool to the percentage of the offers received by that group, or by comparing the passing or failing rates of the plaintiff group to other groups.  This is true for equal protection claims, including those arising in an educational context.  *See, e.g.*, *Davis,* 426 U.S. at 237 (four times as many Black applicants failed the test than did White applicants); *Paradise v. Prescott*, 580 F. Supp. 171, 172 (M.D. Ala. 1983), *aff'd  United States v. Paradise,* 480 U.S. 149, 186 (1987)(intermediate history omitted)(adverse impact in equal protection case to be measured by the "four-fifths rule" in the *Uniform Guidelines of Selection Procedure,* 28 C.F.R. 50.14(3)(D), passing rate of any group to be at least 4/5 the rate of the group with the highest passing rate);  *Debra P. v. Turlington,* 644 F.2d 397, 401, 406 (5th Cir. 1981)(comparing failure rates of Black and White students on a test required for high school graduation);  *Boston Coal. for Acad. Excellence Corp  v. Sch. Comm. of City of Boston*, 996 F.3d 37, 46 (1st Cir. 2021)(percentage of offers resulting from random selection by race an apt comparator for determining adverse impact, quoting a prior First Circuit Title VII case).  Equal Protection and Title VII disparate impact claims both require that disparate impact be established; liability on an Equal Protection claim  also requires a finding of discriminatory intent, whereas liability on a Title VII disparate impact claim requires a determination of whether the test was validated and is job-related.  *Davis*, 426 U.S. at 235-38.

Plaintiffs cite one decision, denying a motion to dismiss, that analyzed disparate impact by comparing the percentage of a group which received offers under the challenged policy to the percentage that group received pre-implementation. *Ass'n for Educational Fairness v. Montgomery Cty. Bd. of Educ.*, 2021 U.S. Dist. LEXIS 175450 at *24-25 (D. Md. Sep. 15, 2021). The case concerns admission to four magnet schools; the percentage of offers received by Asian students at all four schools significantly *decreased* after implementation, whereas the percentage of Black, Latino and White students increased at one or more schools. *Id.* at *25. The court also noted that the challenged changes in the revised admissions policy allowed the decisionmaker "flexibility" and for one change, "unfettered discretion" in making offers. *Id*. at *34.

The better comparison is that used in *Boston Coal.,* 2021 U.S. Dist. LEXIS 73633 at *41-42. The District Court rejected a comparison of the projected decrease in the percentage of offers received by White and Asian students to three competitive schools under the challenged admissions process to their pre-implementation percentages to demonstrate adverse impact. The District Court held that the "racial demographics of the Exam Schools under the old plan were a disjunctive consequence year to year….To use a variable consequence as the baseline upon which all future plans must comport is erroneous." *Id.* at *42. The data here also shows that the racial demographics of the SHS changed year to year prior to implementation. In denying a stay pending appeal, the First Circuit found that compared to a random selection there was no adverse disparate impact, questioned why that was not the apt comparator and stated that plaintiffs were "able to generate a supposed adverse impact principally by comparing the projected admissions under the Plan to prior admissions under the predecessor plan." 996 F.3d. at 46.

D. Similarly Situated Applicants Are Treated Identically, Regardless of Their Race

Plaintiffs emphasize that not all applicants are treated equally, since individually disadvantaged applicants at schools with an ENI of 0.6 or more are not eligible for the 20% of the seats available through the Discovery Program. However all individually disadvantaged students attending schools with an ENI of 0.6 or more are treated identically in terms of eligibility and all individually disadvantaged students attending schools with an ENI below 0.6 are treated identically – regardless of their race. It is undisputed that many scientific research studies show that low-income students attending high-poverty schools are more disadvantaged and face more academic challenges than similarly-situated students attending lower-poverty schools. (Pl Rule 56.1 ¶ 22). Thus, students attending high-poverty schools are not similarly situated to those attending low-poverty schools.

Plaintiffs place great emphasis on the students in the Christa McAuliffe Intermediate School, who are no longer eligible for the Discovery Program; the students of Christa McAuliffe are not a protected group for equal protection purposes. Plaintiffs presume that since the majority of the students in the school are Asian and the majority of the students are poor, the ENI requirement disproportionately affects Asian students. In the pre-implementation 2016-2017 school year, when students took the exam for the 2017 entering class, the school had 343 eighth graders.[2] There were 271 SHS offers made to Christa McAuliffe eighth graders. Thus, over 79% of the students received offers (the percentage of applicants who received offers is even higher unless every student applied). Further, the Christa McAuliffe students received over 5.1% of the 5,296 offers that were made Citywide, to both students at the City's 648 public middle schools,

---

[2] https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2016-17-to-2020-21-public.xlsx  (New York City Department of Education Demographic Snapshot).

7

and students in private schools.   The Christa McAuliffe students received over two-and-one-half times the offers made in total to students in 428, or 66% of the public schools.  (Wright Decl. ¶ 59, Chadha Decl. (Dkt # 49) ¶ 27, Exh. 2).  Clearly Christa McAuliffe students of all races are not disproportionately adversely affected in admissions to the SHS compared to the students at other schools; they are disproportionately advantaged by attending Christa McAuliffe, and this is still the case if the number of offers they receive is reduced by approximately 20%.

Plaintiffs similarly assert that disproportionate impact is shown by the fact that in one year, 11 of the 24 schools with majority Asian student bodies had an ENI below 0.6 and their students were therefore ineligible for the Discovery Program.  The relevant population is not all students, but applicants.  *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 152-53 (2d Cir. 2012)(proper population for analysis of promotional exam is those who take the exam, not all those in the lower-level position). Even if the relevant population were students and the category "majority of a student body" were relevant, there were 106 schools without a majority Asian population whose students are also ineligible for Discovery. *See* Demographic Snapshot.  Most significant, the effect of the challenged policy on Asian students was beneficial, not adverse, since the overall percentage of offers to Asian students increased, and Asian students continued to obtain a higher percentage of Discovery offers than offers based on SHSAT score.   That more Asian students receiving offers may have attended higher poverty schools than previously does not violate equal protection.

Contrary to Plaintiffs suggestion that equal protection requires that all applicants be treated identically, it is not uncommon for a selection process to provide different pathways to selection. In *Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 637-38 (5th Cir. 2014), *aff'd* 136 U.S. 2198 (2016) provided three pathways to admission to the University of Texas; in 2008 students in the top ten percent of their high school class received 81% of the seats; the remaining 19 % were

awarded based on either an individualized assessment, or high grades, class rank and exam scores. While the top ten percent pathway was not challenged, the court noted that it increased racial diversity at the University because there was de facto segregation in Texas high schools. *Id.* at 650-51.  Given variance in overall school academic performance, students at a school that is majority one race might not be in the top ten percent, but would have been in the top ten percent at a school that is a majority of a different race.  In *Boston Coal.* 2021 U.S. Dist. LEXIS 73633, at *17-18, 20% of the seats were awarded based on the students' GPA in two subjects and 80 % were awarded based on the GPA and residential zip code.  Students were rank-ordered based on GPA within their zip code, seats were allocated to each zip code based on the number of school-age children residing in the zip code and the zip codes were then ordered from lowest to highest median income.  Students were selected over ten rounds with students in the zip code with the lowest median income going first in each round.  *Id*. at *18-19.  Indeed, Hecht-Calandra authorizes the alternative admission pathway of a Discovery Program for disadvantaged students.  Plaintiffs seem to accept the validity of a Discovery Program where disadvantage is defined solely in terms of the individual student's family income and other indicia of economic hardship.  Under Plaintiffs' reasoning, Latino students could claim that this definition discriminated against them, since as Plaintiffs have noted (Complaint (Dkt # 1) ¶ 54), a significantly smaller percentage of this group is in poverty than are Black and Asian students.

E.   On the Undisputed Facts, Invitations are Not Offers and No Disparate Impact Has Been Shown at Stuyvesant or Bronx Science High Schools

Defendants refer the Court to their initial Memorandum of Law (Dkt # 149) for a discussion of why the invitation data, as well as the admissions data for two of the eight SHS, should not be considered in evaluating disparate impact.  The essential facts concerning the invitations are not

in dispute.  (Pl 56.1 Statement ¶¶ 40-50 (Dkt # 156)).  Whether it is valid to use the invitations to measure disparate impact is a question of relevance for the Court.

Even using the invitation data, as in Dr. Vigdor's analysis, a disparate impact is not shown at the eight schools overall or at Stuyvesant or Bronx Science for the Fall 2020 entering class. Significantly, the percentage of Asian students in the applicant pool for this class was 31.7%. (Wright Decl., Exh. C).  Dr. Vigdor's analysis shows Asian students received 66.9% of what he terms the "offers" to Stuyvesant based on SHSAT score offers plus Discovery invitations, but would have received 67.6% if the pre-implementation 2018 criteria were used -- a difference of 0.7% or 9 students.  The same analysis shows that Asian students received 55.8% of the "offers" to Bronx Science but would have received 57.2% if the 2018 criteria were used -- a difference of 1.4% or 13 students.  There is no showing that these minor differences are significant, and these differences are certainly within the range of the year-to-year variations in the data seen in the pre-implementation years for the entering classes in 2006-2018.  (Wright Decl. ¶¶ 14- 29, 59-60).

## CONCLUSION

For the foregoing reasons, Defendants' request that their Motion for Summary Judgment be granted, the Complaint be dismissed, and for such other and further relief as is just and proper.

Dated:          New York, New York
                December 17, 2021

                                  Georgia M. Pestana
                                  Corporation Counsel of the
                                    City of New York
                                  Attorney for Defendants
                                  100 Church Street, Room 2-180
                                  New York, New York 10007
                                  (212) 356-2083

                                  By:_____/s/_____

                                      Marilyn Richter
                                      Sharon Sprayregen
                                      Assistants Corporation Counsel